SHORT RECORD
FILED 10/17/12
APPEAL NO. 12-3388

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

CLEAN WATER ACTION )
COUNCIL of NORTHEASTERN )
WISCONSIN, INC. )
                                                  )
    and )
                                                  )
MIDWEST ENVIRONMENTAL )
DEFENSE CENTER, INC. )
                                                  )    **PETITION FOR REVIEW**
    Petitioner, )
                                                    )    Appeal No.
    v. )
                                                    )    EPA Docket No. V-2011-1
UNITED STATES ENVIRONMENTAL )
PROTECTION AGENCY, and )
                                                    )
LISA P. JACKSON, )
  Administrator, United States )
  Environmental Protection Agency, )
                                                    )
    Respondents. )

Pursuant to the Clean Air Act § 307(b)(1), 42 U.S.C. §7607(b)(1), Clean Water Action Council of Northeastern Wisconsin, Inc., and Midwest Environmental Defense Center, Inc., on behalf of their members who live, work and recreate downwind from the Georgia-Pacific Consumer Product mill in Green Bay, Wisconsin, hereby petition the Court for review of the final action taken by respondents United States Environmental Protection Agency ("EPA") and its Administrator, Lisa P. Jackson ("the Administrator"), entitled "Order Responding to Petitioners' Request That the Administrator Object to Issuance of State Operating Permit; Petition Number V-2011-1; Order Denying Petition for Objection to Permit," and dated July 23, 2012. A copy is attached hereto.

1

Notice was published in the Federal Register on August 21, 2012. 77 Fed. Reg. 50,504 (August 21, 2012). The decision negatively impacts Petitioners' members because it results in more air pollution being emitted into the air breathed by those members than allowed by law.

This Court has jurisdiction to review the Administrator's final action pursuant to 42 U.S.C. § 7607(b)(1). Less than 60 days have passed since notice of Respondents' final action appeared in the Federal Register. 77Fed. Reg. at 50,504 ("Any petition for review shall be filed within 60 days from the date this notice appears in the Federal Register, pursuant ot section 307 of the Act."). Venue is proper in this Court because this is a challenge to a final action that is locally applicable to Wisconsin. 42 U.S.C. §7607(b)(l).

DATED: October 17, 2012

Respectfully submitted,

McGILLIVRAY WESTERBERG & BENDER LLC

David C. Bender

David C. Bender
Christa O. Westerberg
Pamela R. McGillivray
James N. Saul
211 S. Paterson Street, Ste 320
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com
      Westerberg@mwbattorneys.com
      McGillivray@mwbattorneys.com
      Saul@mwbattorneys.com

Counsel for Clean Water Action Council of Northeastern Wisconsin, Inc. and Midwest Environmental Defense Center, Inc.

2

## CERTIFICATE OF SERVICE

On October 17, 2012, I caused to be served upon the following persons the foregoing Petition for Review by Certified United States Mail, Return Receipt Requested:

> Lisa P. Jackson
> United States Environmental Protection Agency
> Ariel Rios Building
> 1200 Pennsylvania Avenue, N.W.
> Washington, DC 20460

David C. Bender

auxiliary engine used to power the broom or vacuum functions on two-engine sweepers.[6]

As stated above, EPA is offering the opportunity for a public hearing, and requesting written comments on issues relevant to a full waiver analysis. Specifically, please provide comment on: (a) Whether CARB's determination that its standards, in the aggregate, are at least as protective of public health and welfare as applicable federal standards is arbitrary and capricious, (b) California needs separate standards to meet compelling and extraordinary conditions, and (c) California's standards and accompanying enforcement procedures are consistent with section 209 of the Act.

## II. Procedures for Public Participation

If a hearing is held, the Agency will make a verbatim record of the proceedings. Interested parties may arrange with the reporter at the hearing to obtain a copy of the transcript at their own expense. Regardless of whether a public hearing is held, EPA will keep the record open until October 22, 2012. Upon expiration of the comment period, the Administrator will render a decision on CARB's request based on the record of the public hearing, if any, relevant written submissions, and other information that he deems pertinent.

Persons with comments containing proprietary information must distinguish such information from other comments to the great possible extent and label it as "Confidential Business Information" (CBI). If a person making comments want EPA to base its decision in part on a submission labeled CBI, then a non-confidential version of the document that summarizes the key data or information should be submitted to the public docket. To ensure that proprietary information in not inadvertently place in the docket, submissions containing such information should be sent directly to the contact person listed above and not to the pubic docket. Information covered by a claim of confidentiality will be disclosed to EPA only to the extent allowed and by the procedures set forth in 40 CFR Part 2. If no claim of confidentiality accompanies the submission when EPA receives it, EPA will make it available to the public without further notice to the person making comments.

---

[6] The definition of yard truck is at section 2025 and two-engine sweeper is defined at 2025(d)(58).

Dated: August 9, 2012.

**Margo Tsirigotis Oge,**
*Director, Office of Transportation and Air Quality, Office of Air and Radiation.*
[FR Doc. 2012–20499 Filed 8–20–12; 8:45 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[Regional Docket Nos. V–2011–1, FRL9717–8]**

### Clean Air Act Operating Permit Program; Action on Petition for Objection to State Operating Permit for Georgia-Pacific Consumer Products

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of final Order on petition to object to Clean Air Act (Act) Title V operating permit.

**SUMMARY:** This document announces that the EPA Administrator has denied a petition from the Sierra Club, the Clean Water Action Council and the Midwest Environmental Defense Center asking EPA to object to a Title V operating permit issued by the Wisconsin Department of Natural Resources (WDNR) to Georgia-Pacific Consumer Products (Georgia-Pacific).

Sections 307(b) and 505(b)(2) of the Act provide that a petitioner may ask for judicial review of those portions of the petition which EPA denies in the United States Court of Appeals for the appropriate circuit. Any petition for review shall be filed within 60 days from the date this notice appears in the **Federal Register**, pursuant to section 307 of the Act.

**ADDRESSES:** You may review copies of the final Order, the petition, and other supporting information at the EPA Region 5 Office, 77 West Jackson Boulevard, Chicago, Illinois 60604. If you wish to examine these documents, you should make an appointment at least 24 hours before visiting day. Additionally, the final Order for the Georgia-Pacific petition is available electronically at: *http://www.epa.gov/region7/air/title5/petitiondb/petitiondb.htm.*

**FOR FURTHER INFORMATION CONTACT:** Genevieve Damico, Chief, Air Permits Section, Air Programs Branch, Air and Radiation Division, EPA, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, telephone (312) 353–4761.

**SUPPLEMENTARY INFORMATION:** The Act affords EPA a 45-day period to review and object, as appropriate, to Title V operating permits proposed by state

permitting authorities. Section 505(b)(2) of the Act authorizes any person to petition the EPA Administrator within 60 days after the expiration of the EPA review period to object to a Title V operating permit if EPA has not done so. A petition must be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the state, unless the petitioner demonstrates that it was impracticable to raise issues during the comment period, or the grounds for the issues arose after this period.

On July 23, 2011, EPA received a petition from the Sierra Club, the Clean Water Action Council and the Midwest Environmental Defense Center (Petitioners) requesting that EPA object to the Title V operating permit for Georgia-Pacific. The Petitioners alleged that the permit is not in compliance with the requirements of the Act. Specifically, the Petitioners alleged that: (1) The permit lacks applicable prevention of significant deterioration (PSD) requirements because WDNR erroneously exempted as "routine maintenance, repair, and replacement" projects that resulted in a significant net emissions increase based on the applicable "actual to potential" emissions test; (2) the permit lacks applicable PSD and new source performance standard requirements that were triggered through non-exempt fuel switching and WDNR improperly deferred addressing this issue; and, (3) the permit lacks applicable requirements ensuring protection of air quality increments which apply pursuant to the Wisconsin state implementation plan and the PSD programs.

On July 23, 2012, the Administrator issued an Order denying the petition. The Order explains the reasons behind EPA's conclusion.

Dated: July 27, 2012.

**Susan Hedman,**
*Regional Administrator, Region 5.*
[FR Doc. 2012–20519 Filed 8–20–12; 8:45 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[FRL–9719–3]**

### Good Neighbor Environmental Board Notification of Public Advisory Committee Teleconference

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notification of Public Advisory Committee Teleconference.

BEFORE·THE ADMINISTRATOR
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | ORDER RESPONDING TO |
| | ) | PETITIONERS' REQUEST |
| Georgia Pacific | ) | THAT THE ADMINISTRATOR |
| Consumer Products LP Plant | ) | OBJECT TO ISSUANCE OF |
| | ) | STATE OPERATING PERMIT |
| Permit No. 405032870-P10 | ) | |
| Issued by the Wisconsin | ) | Petition Number V-2011-1 |
| Department of Natural Resources | | |

### ORDER DENYING PETITION FOR OBJECTION TO PERMIT

On July 26, 2011, the Wisconsin Department of Natural Resources (WDNR) issued a Clean Air Act (CAA or Act) title V renewal operating permit to the Georgia Pacific Consumer Products LP Plant (Georgia Pacific) pursuant to its authority under the state of Wisconsin's implementing statute, Wis. Stat. Ann. 285.62-285.64, and regulations, Wisconsin Administrative Code (Wis. Admin. Code) NR 407, title V of the Act, 42 U.S.C. §§ 7661-7661f, and the U.S. Environmental Protection Agency's (EPA) implementing regulations at 40 C.F.R. Part 70 (Part 70). Georgia Pacific manufactures paper products in Green Bay, Wisconsin, and uses several coal-fired boilers at its plant.

On July 23, 2011, David C. Bender of McGillivray, Westerberg & Bender LLC, submitted to EPA on behalf of the Sierra Club, the Clean Water Action Council, and the Midwest Environmental Defense Center (the Petitioners) a petition requesting that EPA object to the issuance of the Georgia Pacific title V permit pursuant to section 505(b)(2) of the Act and 40 C.F.R. § 70.8(d). The Petitioners allege that the title V permit: (1) lacks applicable New Source Review (NSR), prevention of significant deterioration (PSD), and New Source Performance Standards (NSPS) requirements for the boilers because the WDNR applied an erroneous interpretation of the "routine maintenance repair and replacement" (RMRR) exemption to determine that these requirements do not apply, and because the projects in question all resulted in a significant net emissions increase based on the applicable "actual to potential" emissions test; (2) lacks applicable NSR, PSD and NSPS requirements that were triggered through non-exempt fuel switching; and (3) lacks applicable requirements ensuring protection of air quality increments, which apply pursuant to the Wisconsin state implementation plan (SIP) and the PSD programs, because the WDNR misinterprets the applicable regulations defining increment consuming emissions.

The EPA has reviewed these allegations pursuant to the standard set forth in section 505(b)(2) of the Act, which requires the Administrator to issue an objection if the Petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of the Act. *See also* 40 C.F.R. § 70.8(d); *New York Public Interest Research Group v. Whitman*, 321 F.3d 316, 333 n.11 (2d Cir. 2003) ("*NYPIRG 2003*").

1

Based on a review of the available information, including the petition, the permit record, and relevant statutory and regulatory authorities and guidance, I deny the Petitioners' request to object for the reasons set forth in this Order.

## STATUTORY AND REGULATORY FRAMEWORK

Section 502(d)(1) of the Act, 42 U.S.C. § 7661a(d)(1), requires each state to develop and submit to the EPA an operating permit program to meet the requirements of title V. The EPA granted final full approval of the Wisconsin title V operating permit program effective November 30, 2001. 66 Fed. Reg. 62946 (December 4, 2001).

All major stationary sources of air pollution and certain other sources are required to apply for title V operating permits that include emission limitations and other conditions necessary to assure compliance with applicable requirements of the Act, including the requirements of the applicable SIP. CAA sections 502(a) and 504(a), 42 U.S.C. §§ 7661a(a) and 7661c(a). The title V operating permit program generally does not impose new substantive air quality control requirements (referred to as "applicable requirements"), but does require that permits contain monitoring, recordkeeping, reporting and other requirements to assure compliance by sources with applicable emission control requirements. 57 Fed. Reg. 32250, 32251 (July 21, 1992) (EPA final action promulgating Part 70). One purpose of the title V program is to "enable the source, states, EPA, and the public to better understand the requirements to which the source is subject, and whether the source is meeting those requirements." *Id.* Thus, the title V operating permits program is a vehicle for ensuring that air quality control requirements are appropriately applied to facility emission units and that compliance with these requirements is assured.

Applicable requirements for a major stationary source or for a major modification to a major stationary source include the requirement to obtain a preconstruction permit that complies with applicable new source review requirements. Part C of the CAA establishes the PSD program, the preconstruction review program that applies to areas of the country, such as Brown County, Wisconsin, that are designated as attainment or unclassifiable for any national ambient air quality standards (NAAQS). CAA §§ 160-169,42 U.S.C. §§ 7470-7479. NSR is the term used to describe both the PSD program, as well as the nonattainment NSR program (applicable to areas that are designated as nonattainment with respect to specific NAAQS). In attainment areas, a major stationary source may not begin construction or undertake certain modifications without first obtaining a PSD permit. CAA § 165(a)(l), 42 U.S.C. § 7475(a)(l). The PSD program analysis must address two primary and fundamental elements before the permitting authority may issue a permit: (1) an evaluation of the impact of the proposed new or modified major stationary source on ambient air quality in the area, and (2) an analysis ensuring that the proposed facility is subject to Best Available Control Technology (BACT) for each pollutant subject to regulation under the Act. CAA § 165(a)(3),(4), 42 U.S.C. § 475(a)(3), (4); *see* also Wis. Admin. Code Chapter NR 405.

2

The EPA initially implemented PSD through rules on December 5, 1974. 39 Fed. Reg. 42509. The CAA amendments of 1977 set out PSD requirements within the Act. The EPA implemented the amendment's PSD requirements in two largely identical sets of regulations: one set, found at 40 C.F.R. § 52.21, contains the EPA's federal PSD program, which applies in areas without a SIP-approved PSD program; the other set of regulations, found at 40 C.F.R. § 51.166, contains the requirements that state PSD programs must meet to be approved as part of a SIP. The WDNR was delegated authority to implement the PSD regulations on February 16, 1989, through a letter from Valdas Adamkus, Regional Administrator, EPA, Region 5, to Carroll D. Besadny, Secretary, WDNR, and EPA approved Wisconsin's PSD SIP on May 27, 1999. 64 Fed. Reg. 28745.

Under section 505(a) of the Act, 42 U.S.C. § 7661d(a), and the relevant implementing regulations at 40 C.F.R. § 70.8(a), states are required to submit each proposed title V operating permit to EPA for review. Upon receipt of a proposed permit, the EPA has 45 days to object to final issuance of the permit if EPA determines the permit is not in compliance with applicable requirements or requirements under Part 70 40 C.F.R. § 70.8(c). If the EPA does not object to a permit on its own initiative, section 505(b)(2) of the Act provides that any person may petition the Administrator, within 60 days of expiration of the EPA's 45-day review period, to object to the permit. 42 U.S.C. § 7661d(b)(2); C.F.R. § 70.8(d). The petition must "be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency (unless the Petitioner demonstrates in the petition to the Administrator that it was impracticable to raise such objections within such period or unless the grounds for such objection arose after such period)." CAA section 505(b)(2); 42 U.S.C. § 7661d(b)(2).

In response to such a petition, the Administrator must issue an objection if the petitioner demonstrates that a permit is not in compliance with the requirements of the Act. *Id.*; *see also* 40 C.F.R. § 70.8(c)(1); *NYPIRG 2003*, 321 F.3d at 333 n.11. Under section 505(b)(2) of the Act, the burden is on the petitioner to make the required demonstration to EPA. *MacClarence v. EPA,* 596 F.3d 1123, 1130-33 (9th Cir. 2010); *Sierra Club v. Johnson,* 541 F.3d 1257, 1266-1267 (11th Cir. 2008); *Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 677-678 (7th Cir. 2008); *Sierra Club v. EPA*, 557 F.3d 401, 406 (6th Cir. 2009) (discussing the burden of proof in title V petitions); *see also NYPIRG 2003*, 321 F.3d at 333 n.11. In evaluating a petitioner's claims, the EPA considers, as appropriate, the adequacy of the permitting authority's rationale in the permitting record, including the response to comment. If, in responding to a petition, the EPA objects to a permit that has already been issued, the EPA or the permitting authority will modify, terminate, or revoke and reissue the permit consistent with the procedures set forth in 40 C.F.R. §§ 70.7(g)(4), (5)(i) - (ii) and 70.8(d).

**BACKGROUND**

Georgia Pacific is a major manufacturer and converter of sanitary paper products such as toilet tissue, napkins, and paper towels, located in Green Bay, Wisconsin. Emission sources at the facility include boilers, paper making equipment, feedstock pulping and bleaching, and printing operations. Boilers B23 and Boiler B24 have been shutdown. Boiler B25 is a 200 mmBTU/hr coal-fired boiler constructed in 1950, boiler B26 is a 350 mmBTU/hr boiler burning coal and

3

petroleum coke constructed in 1962, and boiler B27 is a 615 mmBTU/hr furnace boiler burning coal, petroleum coke, No. 2 fuel oil, and natural gas, constructed in 1969, and Boiler B28 is a less than 250 mmBTU/hr coal-fired boiler constructed in 1975.[1]

On November 13, 1998, WDNR issued the original title V permit for Georgia Pacific. On November 20, 2002, Georgia Pacific timely submitted to the WDNR an application to renew its title V permit. The WDNR published the public notice for the draft title V permit renewal #405032870-P10 on August 11, 2005. WDNR received comments on the draft permit from Sierra Club on September 9, 2005, and from the Wisconsin Public Interest Research Group. WDNR responded to these comments on March 16, 2010. As a result of the comments received and additional information supplied by Georgia Pacific, it was necessary for WDNR to revise the draft title V permit to the extent that WDNR published the draft permit a second time for public notice and comment. Thus, the WDNR published a second public notice for the revised draft title V permit renewal on March 26, 2010. WDNR received comments on the second draft permit from the Midwest Environmental Advocates on April 19, 2010, and from Georgia Pacific. WDNR responded to this second round of comments on May 20, 2011 (WDNR RTC). The WDNR sent the proposed title V renewal permit to the EPA on May 23, 2011. The EPA did not object to the permit, and the WDNR issued the final permit on July 26, 2011.

Under the statutory timeframe in CAA section 505(b)(2), September 5, 2011, was the deadline to file a petition requesting that the EPA object to the issuance of the final Georgia Pacific title V renewal permit. The Petitioners submitted their petition to object to the issuance of the Georgia Pacific title V permit to the EPA on July 23, 2011. Accordingly, the EPA finds that the Petitioners timely filed their petition.

## ISSUES RAISED BY THE PETITIONERS

**I.    The Permit Lacks Applicable NSR, PSD, and NSPS Requirements for the Boilers Because the WDNR Applied an Erroneous Interpretation of the RMRR Exemption to Determine that these Requirements do not Apply, and Because the Projects in Question all Resulted in a Significant Net Emissions Increase Based on the Applicable "Actual To Potential" Emissions Test**

*Petitioners' Claim*: The Petitioners state that the Georgia Pacific title V permit must include "emission limitations and other conditions as are necessary to assure compliance with applicable requirements of the Clean Air Act, including the requirements of the applicable State Implementation Plan, the Prevention of Significant Deterioration, the Nonattainment New Source Review, and the New Source Performance Standard programs." Petition at 3-4. The Petitioners briefly describe the PSD program for NAAQS attainment areas (*see* 40 C.F.R. §§ 51.166 and 52.21) and the NSR program for NAAQS nonattainment areas (*see* 40 C.F.R. § 51.165 and Appendix S; Wis. Admin. Code NR 408) and explain that under both programs, a "modified" source must obtain a PSD or NSR permit and comply with PSD or NSR applicable requirements. *Id.* The Petitioners then explain that the Georgia Pacific facility "was located in Brown County, which has been designated as attainment for all pollutants other than sulfur

---

[1] The Petitioners refer to Boilers 23 through 28 as Boilers 3 through 8. Boiler B23 was shutdown in or prior to 2002 and Boiler B24 was shutdown in or prior to 2006.

dioxide" which was briefly "designated as nonattainment for sulfur dioxide in 1981 through February, 1992." *Id.* at 5. The Petitioners claim that the permit "does not subject the plant to off-set requirements for SO2 for major modifications that occurred while the area in which the plant is located was designated as nonattainment for sulfur dioxide." *Id.* They also state that the NSPS program "requires modified sources to comply with standards established by EPA…in 40 C.F.R. Part 60." *Id.* Yet, the Petitioners assert that "[t]he Permit at issue here contains no [PSD or NSR] limits for the boilers B25, B26, or B27. Nor does the permit include NSPS standards for those boilers." *Id.*

The Petitioners assert that their public comments specifically raised "the issue of modifications to the facility's modified boilers, and that the draft permit did not ensure compliance with NSR, PSD, and NSPS requirements." *Id.* The Petitioners assert that in their public comments they "noted[] there [had] been many modifications [of the boilers]—based on public documents and sworn testimony of a former managers [sic]—that were not accounted for in [W]DNR's permit." *Id.* at 6, citing the Petitioners' comments at 1-3. The Petitioners also allege that their comments "noted that because the boilers were modified several times, in numerous ways... PSD is an applicable requirement. [W]DNR must include BACT and other PSD program requirements in the operating permit." *Id.*

The Petitioners note that the WDNR RTC on the draft permit "acknowledged the Petitioners' comments and identified a number of projects that had occurred at the facility's boilers." Petition at 6. The Petitioners also note that, in response to their public comments on the proposed title V permit, WDNR undertook an analysis to determine whether the projects at the boilers were "routine maintenance"[2] and therefore not considered a "modification" under the applicable definitions.[3] *Id.* However, the Petitioners assert that WDNR erroneously determined that five of the six projects at the boilers qualified for the routine maintenance, repair, and replacement (RMRR) exemption, meaning that the boilers were not "modified" as a result of these particular projects and did not trigger PSD, NSR and NSPS requirements. *Id.* The Petitioners also assert that WDNR "provides no apparent basis for [its] determination" that the sixth project did not result in a "modification" of the boiler because the project "'did not result in either an increase in hourly emissions, or a significant increase in annual emissions.'"[4] *Id.* at 7, quoting WDNR RTC at 3.

---

[2]The phrases "routine maintenance" and "RMRR exemption" have been used interchangeably to refer to the provisions in 40 C.F.R. §§51.166(b)(2)(iii), 52.21(b)(2)(iii)(*a*) (PSD) and 60.14(e)(1) (NSPS) that exempt certain projects from the definition of "modification" under the PSD and NSPS regulations. In other words, if a project qualifies as "routine maintenance, repair or replacement" under these provisions, then the project will not be considered a "modification" and will not trigger PSD or NSPS applicability at the facility. WDNR refers to these provisions as the "routine maintenance" provisions. We will use the phrase "RMRR exemption" when referring to these provisions.

[3]See EPA's response below to Claim 1 for the applicable definitions of "major modification" and "modification."
[4] In Section I.C. of the Petition, the Petitioners also assert that EPA should correct WDNR's "erroneous assumption" that EPA had determined that no modifications had occurred based on information EPA had previously requested from Georgia Pacific regarding these projects. Petition at 7-8. Petitioners are correct that the mere fact that EPA had previously requested information on these projects, but had not taken any further action, is not an indication that EPA has made any kind of decision regarding whether PSD, NSR or NSPS was applicable to the facility as a result of these projects. However, our basis for denial does not rely on WDNR's view regarding the meaning of EPA's enforcement activities.

RMRR Exemption. The Petitioners claim that WDNR incorrectly determined that the following projects qualified for the RMRR exemption: (1) the generating bank replacement on boiler B26 in 2002; (2) the waterwall retubing project on boiler B25 in 2001; (3) the waterwall retubing project on boiler B27 in 1996; (4) the superheater replacement project on boiler B26 in 1981; and (5) the superheater replacement project on boiler B27 in 1988. Petition at 19-35. The Petitioners first identify the four factor assessment used for determining whether the RMRR exemption applies to a particular project[5] and then provide their own RMRR exemption analysis for each of the projects and contend that WDNR did not correctly apply the four factor assessment in its RMRR exemption analysis for each of the projects. Petition at 8-35. The Petitioners further claim that WDNR inappropriately adopted a prior determination that the 2002 generating bank project at boiler B26 was RMRR without providing the analysis as part of the permitting decision. Petition at 6, 28-31.

Significant Net Emissions Increase. Referring to the projects at Boilers 25, 26, and 27, the Petitioners further assert that "the projects all resulted in a significant net emissions increase based on the applicable test." Petition at 35. The Petitioners also assert that "the 'actual to potential test' was and is the appropriate test for the modifications under consideration in this Petition." *Id.* at 36. The Petitioners provide additional statutory and regulatory context that explains why the "actual to potential" emissions test is the correct test for these projects. *Id.* at 35-44. The Petitioners also include in the petition a table for the six boiler projects that occurred from 1981 to 2002, in which they list "pre-project emissions" for each project. *Id.* at 45. The Petitioners cite as the sources of these data the facility's response to an EPA CAA section 114 request and emissions inventory data. *Id.* The table also provides each project's "potential to emit," which the Petitioners claim is from the facility's 2002 title V permit renewal application. *Id.* Based on these data, the Petitioners calculated an emissions increase for each project. *Id.*

*EPA Response*: I deny the Petitioners' request for an objection to the Permit on this claim. As an initial matter, it does not appear that these objections were raised with reasonable specificity in public comments, as required by CAA section 505(b)(2). In addition, as noted earlier, CAA section 505(b)(2) of the Act requires the Administrator to issue an objection if the Petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of the Act. EPA interprets the "demonstrat[ion]" requirement in CAA section 505(b)(2) as placing the burden on the petitioner to supply information to EPA sufficient to demonstrate the validity of each objection raised to the title V permit. The Petitioners have not demonstrated that the Georgia Pacific title V permit is not in compliance with applicable PSD, NSR and NSPS requirements under the Act for boilers B25, B26 and B27. In a petition to object, the burden is on the Petitioner to supply information sufficient to demonstrate the validity of each objection raised. CAA section 505(b)(2), 42 U.S.C. §7661 d(b)(2); *In the Matter of Cemex, Inc., Lyons Cement Plant*, Final Order at 3 (April 20, 2009) (*Cemex Order*) ("where a Petitioner's request that the Administrator object to the issuance of a title V permit is based in whole, or in part, on a

---

[5] As described by the Petitioners, the four-factor assessment for determining whether the RMRR exemption applies includes the following: (1) the nature and extent of the project; (2) the project's purpose; (3) the frequency of the project; and (4) the project's cost. Petition at 11. EPA notes that WDNR's analysis of whether the projects qualify for the RMRR exemption does not appear to comport with federal regulations and policy. *See In the Matter of Tennessee Valley Authority Paradise Fossil Fuel Plant Drakesboro, Kentucky Title V Air Quality Permit #V-07-018 R1.* Final Order at 6-11(May 2, 2011).

6

permitting authority's alleged failure to *comply* with the requirements of its approved PSD program ... the burden is on the Petitioner to demonstrate that the permitting decision was not in compliance with the requirements of the Act, including the requirements of the SIP"); *In the Matter of Carmeuse Lime and Stone,* Final Order at 5-8 (November 4, 2011) (*Carmeuse Order*); *In the Matter of Public Service Company of Colorado, dba Xcel Energy, Pawnee Station,* Final Order at 7-10 (June 30, 2011)(*Pawnee Order*). The Petitioners have not demonstrated for purposes of CAA section 505(b)(2) that PSD, NSR or NSPS should have applied to the six boiler projects at Georgia Pacific. Specifically, the Petitioners have not demonstrated that these six boiler projects resulted in a "major modification" for PSD or NSR purposes or a "modification" for NSPS purposes because the Petitioners have not provided an adequate demonstration regarding whether the projects, individually or collectively, resulted in the requisite emissions increases specified in the applicable definitions. [6]

It is important to first address what is required to trigger PSD, nonattainment NSR, and NSPS applicability. The PSD and nonattainment NSR programs apply to both the construction of new major stationary sources and major modifications of existing major stationary sources. 40 C.F.R. §§ 51.165, 51.166 and 52.21. The NSPS program applies to both new and modified affected facilities. 40 C.F.R. 60.1 and 60.14 The issue raised by the Petitioners is whether the various boiler projects that took place at Georgia Pacific constituted "major modifications" for PSD or nonattainment NSR purposes; if so, Georgia Pacific would have been required to obtain PSD or nonattainment NSR permits before commencing these projects so that the boilers would be in compliance with applicable nonattainment NSR or PSD requirements. If the projects do not constitute "major modifications," the PSD or nonattainment NSR requirements do not apply to the boilers and the Petitioners' assertions regarding the deficiencies of the Georgia Pacific title V permit would be without merit. Likewise, if the projects do not constitute modifications for NSPS purposes, NSPS requirements do not apply to the boilers and the Petitioners' assertions regarding the deficiencies of the Georgia Pacific title V permit would be without merit.

Determining whether a "major modification" or a "modification" has occurred for nonattainment NSR, PSD and NSPS purposes is a two-step process. First, there must be a physical or an operational change (or a change in the method of operation) from the project. Second, there must be the requisite type of "emissions increase" that results from that project based upon the applicable definitions. For PSD and NSR purposes, a "major modification" is defined as any physical change in or change in the method of operation of a major stationary source that would result in a "significant emissions increase" of a regulated NSR pollutant and a "significant net emissions increase" of that pollutant from the major stationary source. *See* 40 C.F.R.

---

[6] We note that Petitioners assert that WDNR "provides no apparent basis" when it concludes that the 1984 cyclone burner replacement project "did not make Boiler B27 subject to either PSD or NSPS regulations." Petition at 7; WDNR RTC at 3. That assertion appears incorrect since WDNR does provide its rationale in the RTC. After finding that this project does not qualify for the RMRR exemption, WDNR explains its analysis regarding possible emissions increases from this project: "Emissions data for individual boilers from the 1980s is not available. However, since the new burner was the same or similar in size and identical in function to the old burner, it is most likely that the replacement did not result in either an increase in hourly emissions, or a significant increase in annual emissions. In addition, according to the facility, the burner replacement occurred before the boiler had experienced any loss of capacity and was intended to maintain the boiler's then-current level of operation." WDNR RTC at 3. Thus, contrary to Petitioners' assertion in their petition, WDNR did provide its basis for its conclusion that this project did not trigger PSD or NSPS applicability for this boiler.

51.165(a)(1)(v)(A); 51.166(b)(2); 52.21(b)(2)(i). *See also* Wis. Admin. Code §§ 405.02(24), (27a), and (27m). As described above, some exemptions apply that preclude certain projects from being considered a physical or operational change, such as the RMRR exemption. *See* 40 C.F.R. §§ 51.165(a)(1)(v)(C)1), 51.166(b)(2)(a), 52.21(b)(2)(iii)(*a*). *See also* Wis. Admin. Code § 405.02(21)(b). However, if a physical change or a change in the method of operation does occur, then the second step is to determine whether the project resulted in a "significant emissions increase" and a "significant net emissions increase" as defined in the applicable regulations. 40 C.F.R. §§ 51.165(a)(1)(vi) and (x), 51.166(b)(3) and (23), and 52.21(b)(3) provide that a "net emissions increase" means "with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

> (a) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and
>
> (b) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable....[7]

Regarding whether an emissions increase would occur for purposes of determining whether the NSPS requirements would apply, the regulations at 40 C.F.R. 60.14(a) provide that:

> ...any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning of section 111 of the Act.

*See also* Wis. Admin. Code § NR 440.02(16).

As an initial matter, EPA notes that the Petitioners presented information about the emissions from these projects for the first time in their petition – this information was not presented in the public comments on the petition. The public comments asserted that the boilers were "modified" and that PSD applies. Petition at 1-4. Specifically, the Petitioners stated in their public comments on the draft permit that "DNR has not [undertaken] an investigation as to the dates when those boilers were modified, or even if they have been modified." Petition, Exhibit B at 1. The public comments next stated that "DNR inappropriately purports to extend a permit shield to the boilers for NSPS standards." *See* Draft Permit at 5. "DNR has not conducted an investigation to determine whether the boilers have been modified." *Id.* In the same paragraph, the commenters next asserted that the boilers were modified by replacing various parts of boilers 4,5,6, and 7. *Id* at 1-2. Finally, in their public comments, the Petitioners stated:

> While DNR appropriately does not extend a permit shield to the boilers for Prevention of Significant Deterioration requirements (or nonattainment new source review or NR 406 requirements), DNR should not purport to shield the boilers from NSPS because DNR has not verified that no modifications were made and, in fact, the evidence shows that

---

[7] See also Wis. Admin. Code NR405.02(24).

> modifications were made. We note that DNR has removed similar NSPS permit shield
> language from other draft permits.
>
> Furthermore, because the boilers were modified several times, in numerous ways, as set
> forth above, PSD is an applicable requirement. DNR must include BACT and other PSD
> program requirements in the operating permit.

*Id.* at 4.

The statements above are the complete record of comments provided to WDNR during the public
comment period on the applicability of NSR, PSD and NSPS for the boiler projects.[8]

Thus, it does not appear that these objections were raised with reasonable specificity in
comments, as required by CAA section 505(b)(2). More specifically, it is apparent that the
Petitioners did not provide any allegation or evidence of the requisite emissions increase from
the boiler projects that would trigger PSD, NSR or NSPS. As EPA stated in the proposal to the
original title V regulations:

> The EPA believes that Congress did not intend for petitioners to be allowed to create an
> entirely new record before the Administrator that the State has had no opportunity to
> address. Accordingly, the Agency believes that the requirement to raise issues "with
> reasonable specificity" places a burden on the petitioner, absent unusual circumstances,
> to adduce before the State the evidence that would support a finding of noncompliance
> with the Act.

56 Fed. Reg. 21712, 21750 (1991).

The Petitioners' mere assertion that the boilers were modified is not sufficient to meet the
Petitioners' burden of providing evidence or an analysis to WDNR during the public comment
period that the boilers were "modified" and that PSD, nonattainment NSR or NSPS applied to
these projects. Commenters in this instance presented no evidence or analysis during the public
comment period for WDNR to consider and respond to regarding whether the requisite emissions
increase would occur as a result of these projects. In fact, commenters did not even mention the
issue of emissions increases -- a fundamental step in the PSD, nonattainment NSR and NSPS
applicability analyses -- from these projects. In addition, the Petitioners never even explicitly
assert in their public comments that these boiler projects triggered nonattainment NSR or NSPS.
This omission is a further example of how the Petitioners failed to raise these issues with
"reasonable specificity." Moreover, the Petitioners provide no explanation in their petition that
it was impracticable to raise any of these assertions in their public comments, or that the grounds
for these assertions arose after the public comment period. Thus, EPA denies the petition on
these PSD, NSR and NSPS applicability issues on the grounds that these objections were not
raised with reasonable specificity in comments, and there is no showing that it was impracticable
to raise these objections in comments, nor any indication that the grounds for these objections
arose after the public comment period.

---

[8] No other party provided public comment on this matter and therefore the Petitioners' public comments constitute
the record of public comments on this issue before WDNR.

Alternatively, EPA denies the petition on the merits on the grounds that the Petitioners have not provided an adequate demonstration in the petition regarding the requisite emissions increases for purposes of PSD, nonattainment NSR or NSPS. The emissions information provided in the petition does not demonstrate the existence of a "significant net emissions increase" for any of the projects for purposes of nonattainment NSR and PSD applicability. The emissions table in the petition only shows a "significant emissions increase" (step 1 of the emission increase test) for each project by comparing "pre-project emissions" (which the Petitioner calculates by averaging the annual emissions from the two full calendar years prior to each change) to "potential to emit" emissions from 2002. The Petitioners do not provide a "significant net emissions increase" analysis for each project because they fail to identify "any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable" (step 2 of the emission increase test). Wis. Admin. Code NR 405.02(24)(a)(2); *also see* 40 C.F.R §§ 51.165(a)(1)(vi) and (x), 51.166(b)(3) and (23), and 52.21(b)(3)(i)(b); Pawnee Order at 7-10; Carmeuse Order at 5-8. EPA notes that the Petitioners made no attempt to address netting in the Petition as to these alleged modifications. Concerning the Petitioners' claim that the title V renewal permit failed to include a requirement to obtain $SO_2$ offsets, the requirement to obtain offsets would only apply if a demonstration that nonattainment major NSR would apply had been made. The Petitioners have not made such a demonstration.

In addition, the Petitioners also assert that the six projects in question were "modifications" that triggered NSPS requirements, but Petitioners provide no specific NSPS analysis to support this assertion. Section 111 of the Act defines a "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4); *also see* 40 C.F.R. § 60.14. Section 60.14(e) contains the exemptions from what would be considered a physical or operational change for NSPS purposes; this list includes an RMRR exemption. For the "emissions increase" portion of the analysis, a source compares the hourly emissions rate of a regulated pollutant before and after the physical or operational change at maximum capacity, considering its physical limitations. *E.g.,* 57 Fed. Reg. 32314, 32316 (July 21, 1992). The Petitioners do not provide this type of "emissions increase" analysis to demonstrate that these boiler projects triggered NSPS applicability. The emissions table in the petition only shows the annual post- "potential to emit" for each project, and only for 2002, not for the time period immediately after the specific project. However, for NSPS purposes, the "emissions increases" are based on an hourly maximum achievable analysis. The Petitioners do not provide in the table the proper pre- and post- figures for each project and thus do not present the proper NSPS "emissions increase" analysis for demonstrating NSPS applicability (i.e., they have not explained why the changes necessarily resulted in an increase in the maximum hourly rate achievable).

As noted above, EPA interprets the "demonstrat[ion]" requirement in section 505(b)(2) as placing the burden on the petitioner to supply information to EPA sufficient to demonstrate the validity of each objection raised to the title V permit. One critical reason for this is that section 505(b)(2) allows EPA only 60 days in which to respond to title V petitions, and the Administrator cannot delegate the duty to respond to such petitions. Further, as the United States Court of Appeals for the Seventh Circuit noted:

Congress deliberately gave the EPA a rather short time·period to review proposed permits, resolve questions related to those permits, and decide whether to object. Because this limited time frame may not allow the EPA to fully investigate and analyze contested allegations, it is reasonable in this context for the EPA to refrain from extensive fact-finding.

*Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 678 (7th Cir. 2008) (upholding EPA's orders regarding Midwest Generation, Illinois). Where, as here, a petition does not address a key component of applicability analyses, it is reasonable for EPA to deny the petition. This is particularly true where, as here, the Petitioners' claims involve alleged modifications from years ago, the applicability analyses are complex, there are gaps in the information, and the claims are disputed.

EPA acknowledges that PSD, nonattainment NSR and NSPS applicability determinations are complex (and are likely to be more so if they involve physical or operational changes that occurred many years ago). In particular, determining whether a significant emissions increase or a significant net emissions increase would occur in the context of PSD or nonattainment NSR, or an emissions increase would occur in the context of NSPS, can be particularly challenging. We are mindful that supplying emissions increase and significant net emissions increase information for projects such as those in this petition may be a complex exercise for petitioners, as it would be for permitting authorities or for EPA. Nevertheless, examining whether these requisite emissions increases would occur are basic elements of these applicability determinations. EPA is under no duty to object where, as is the case here, commenters had not addressed these elements before the State. Further, where petitioners do not provide an adequate demonstration with regard to these elements – as is the case here, where the Petitioners do not even address netting as to these alleged modifications for purposes of PSD and nonattainment NSR, and do even not address whether the changes necessarily resulted in an increase in the maximum hourly rate achievable for purposes of NSPS – EPA is under no duty to object.

We also note that WDNR explicitly stated that "the permit shield section will not state that Boilers B25, B26, B27 and B28 are exempt from NSPS." WDNR RTC at 3. While the permit contains a section on Permit Shield,[9] the permit does not contain provisions exempting Boilers B25, B26, and B27 from PSD, NSR or NSPS applicable requirements. Therefore, while the permit does not contain the alleged PSD, NSR and NSPS applicable requirements, it also does not provide any safe harbor from enforcement of these requirements.

Therefore, based on the above, I deny the petition to object on this claim.

## II.    The Permit Lacks Applicable NSR, PSD and NSPS Requirements That Were Triggered Through Non-Exempt Fuel Switching

*Petitioners' Claim:* The Petitioners claim that in their comments they raised the issue that the Georgia Pacific title V permit lacks applicable NSR, PSD and NSPS requirements for the boilers B23, B24, B25, B26, B27 and B28 that were triggered through non-exempt fuel switching, but that the WDNR "improperly deferred addressing this issue." Petition at 3, 46-52. The

---

[9] See Operation Permit No. 405032870-P10 at 5.

11

Petitioners state that "[a]t issue is the switch to pet coke and the switch to tires, and whether either or both constituted a change in method of operation that triggers NSR/PSD and NSPS requirements." *Id*. at 47. The Petitioners allege that Georgia Pacific "began burning petroleum coke at the boilers in December, 1978, and tires in September, 1987." *Id*. at 48. The Petitioners assert that this "fuel switching" does qualify as a "change in the method of operation" of the boilers, which means Georgia Pacific "modifies the boilers each time it burns petroleum coke and tires in the boilers." *Id*. at 46. The Petitioners further assert that this "fuel switching" does not qualify for the alternative fuels exemptions in §§ 40 C.F.R. 52.21(b)(2)(iii)(e) or 60.14(e)(4) because the boilers were not "originally designed to accommodate these fuels" and the exemptions only "apply to switches in primary fuels, not switches that involve adding a supplemental fuel." *Id*.

The Petitioners asserted that "[W]DNR responded that, because it was not the primary authority for the NSR/PSD program or for the NSPS program for most of the history of the plant, it will not make a final determination as to whether the fuel switch constituted a modification." *Id*. at 46. The Petitioners state that "[W]DNR also implies that EPA is conducting, or has conducted an investigation on this issue." *Id*. The Petitioners assert that "[W]DNR cannot avoid making a determination that NSR/PSD and NSPS are applicable requirements that must be included in the permit" and that "there is no exception for requirements that WDNR does not want to address." *Id*. at 47. The Petitioners therefore assert that "the Administrator must object" to the permit as it does not contain the applicable PSD, NSR and NSPS requirements for the use of these fuels at these boilers. *Id*.

The Petitioners acknowledge that "fuel changes can be exempt from the definition of major modification [for PSD/NSR] (or modification under NSPS)" if they qualify under the terms of the alternative fuels exemptions. Petition at 47-48. The Petitioners, however, assert that the fuel switching at these boilers "fails to meet [the] criteria" of the exemptions, arguing that the boilers were not "capable of accommodating the fuel prior to January 6, 1975." *Id*. at 48. The Petitioners cite to a letter from Timothy Mattson, a facility representative, stating that the facility did not begin burning pet coke in boilers 3, 4, 5, 6, 7 and 8 until December 1978, and did not begin burning tires in boilers 4, 5, 6 and 8 until September 1987. *Id*. at 48. In support of their claim that the facility was not designed to accommodate these fuels, the Petitioners state that "there is no indication that the boilers were designed with these non-coal fuels in mind. As EPA has previously found, pet coke was not a prevalent fuel and virtually no boilers were designed for it." *Id*. at 49, citing the *U.S. EPA Region 4 Objection, Proposed Part 70 Operating Permit, Western Kentucky Energy Corporation, Reid/Henderson Station, Sebree, Kentucky, Permit No. V-97-021,* in letter from Winston A. Smith, U.S. EPA Region 4, to John E. Hornback, Department for Environmental Protection, Frankfort, Kentucky, August 30, 1999, (Reid/Henderson Objection) at 2. The Petitioners also assert that "merely being able to accommodate a fuel is not enough. The plant must be 'designed to accommodate' the fuel.'" *Id*., citing *U.S. EPA Region 4 Objection, Proposed Part 70 Operating Permit, Florida Power Corporation, Crystal River Plant, Citrus County, Florida, Permit No. 0170004-004-AV,*under cover of letter from Winston A. Smith, U.S. EPA Region 4, to Howard L. Rhodes, Florida Department of Environmental Management, November 1, 1999. (Crystal River Objection) at 5. The Petitioners conclude that Georgia Pacific cannot use the alternative fuels exemptions for this fuel switching because it has "not demonstrated that the boilers were designed to accommodate pet coke and/or tires." *Id*. at 50.

The Petitioners next assert that the alternative fuels exemptions are not available "because the exemption[s] only apply to primary fuel changes; [they] do not exempt changes in operation that supplement primary fuels with new or additional alternative fuels." *Id. at* 51. The Petitioners claim that the use of pet coke and tires in the Georgia Pacific boilers does not qualify for the exemptions within the meaning of the PSD, NSR and NSPS regulations because those fuels are only used as supplemental fuels and not as primary fuels. The Petitioners also state: "As EPA has explained in numerous Title V objections, 40 C.F.R. 52.21(b)(2)(iii)(e)(1) does not apply to use of pet coke as a supplemental fuel." *Id.*, citing to Crystal River Objection at 6.

*EPA Response*:

I deny the Petitioners' request for an objection to the permit on this claim on the basis that the Petitioners have not demonstrated that the Georgia Pacific title V permit is not in compliance with applicable PSD, NSR and NSPS requirements under the Act for boilers burning petroleum coke and tires. The Petitioners did not demonstrate how burning pet coke and tires as fuels triggered PSD, NSR or NSPS requirements because the Petitioners did not demonstrate that the burning of pet coke or tires in these boilers caused a "significant emissions increase," "significant net emissions increase" or an "emissions increase" resulting in a "major modification" (PSD/NSR) or a "modification" (NSPS) of the boilers.[10] As explained above in response to Issue 1, the burden is on the Petitioners to supply information sufficient to demonstrate the validity of each objection raised in the petition. CAA section 505(b)(2), 42 U.S.C. §7661 d(b)(2); *CEMEX Order* at 3; *Carmeuse Order* at 5-8; *Pawnee Order* at 7-10. Here, the Petitioners do not make that demonstration because they fail to provide any discussion of the emissions increases that resulted from the fuel switching. For example, the Petitioners do not provide a "significant net emissions increase" analysis for each project because they fail to identify "any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable." Wis. Admin. Code NR 405.02(24)(a)(2); *also see* 40 C.F.R §§ 51.165(a)(1)(vi) and (x), 51.166(b)(3) and (23), 52.21(b)(3)(i)(b); Pawnee Order at 7-10; Carmeuse Order at 5-8. Moreover, the Petitioners do not provide any pre- and post-change emissions information regarding the fuel change to support their assertion that this "fuel switching" triggered NSPS requirements. In fact, the Petitioners do not provide any analysis whatsoever in their petition of the emissions increases resulting from the use of pet coke or tires in the boilers. Because the Petitioners have not submitted any emissions information to demonstrate that there was a "significant emissions increase," "significant net emissions increase" or an "emissions increase" from the use of pet coke and tires

---

[10] We note that the Petitioners state that WDNR "improperly deferred addressing this issue" when they raised this issue in their comments. Petition at 3. However, that assertion appears incorrect as WDNR seems to indicate that its decision was that these requirements did not apply as a result of the fuel switching. WDNR includes the following statement in its RTC: "Since the addition of petroleum coke as a fuel occurred over 30 years ago, there is a lack of information about resulting changes in emission rates, and it is difficult to determine the PSD and NSPS implications of this change. Therefore, at this time, no PSD or NSPS regulation has been determined by the Department to be applicable based on the comments received or the Department's review. Thus, no new conditions pertaining to PSD or NSPS are included in the final permit with respect to use of petroleum coke." WDNR RTC at 7.

that resulted in a "major modification" or a "modification" that triggered PSD, NSR or NSPS requirements, I deny the petition on this issue.[11]

### III.    The Permit Lacks Applicable Requirements Ensuring Protection of Air Quality Increments, Which Apply Pursuant to the Wisconsin State Implementation Plan (SIP) and the PSD Programs, Because the WDNR Misinterprets the Applicable Regulations Defining Increment Consuming Emissions

*Petitioners' Claim*: The Petitioners claim generally that a title V permit must assure compliance with all applicable SIP requirements, and that one such requirement in this case is protection of the air quality increments established in the PSD program.[12] Petition at 53. The Petitioners state that to determine whether a facility applying for a permit complies with this requirement, it is necessary to determine which emissions are included in the baseline concentration, and which are excluded from the baseline concentration, thus consuming increment. Petition at 57. The Petitioners assert that the Georgia Pacific title V permit lacks applicable requirements ensuring protection of air quality increments, which they assert apply to both operating and construction permits pursuant to the Wisconsin SIP and the PSD program, because the WDNR misinterprets the applicable regulations defining increment consuming emissions. Petition at 52-55.

The Petitioners claim that the WDNR failed, in Georgia Pacific's title V permit, to account for all emissions at the plant that consumed increment as a result of a 2004 modification that debottlenecked the facility's boilers. The Petitioners assert that the WDNR's inclusion in the baseline (and exclusion from increment consumption) of the boiler's maximum hourly emission rate, and the WDNR's consideration of only increases beyond what the boilers were permitted to emit on the major source baseline date, is wrong. The Petitioners claim that the WDNR's "interpretation of the applicable law cannot be squared with the statute and regulations—which require that the 'actual emissions' from a modified "major stationary source" consume increment." Petition at 55. The Petitioners assert that "there is nothing in the regulations or statute that can support [W]DNR's interpretation, whereby only increases in permitted maximum hourly emission rates consume increment." Petition at 55. The Petitioners claim that WDNR failed to account for applicable actual emission increases from the boilers as part of the PSD permitting for a 2004 project. Petition at 55.

First, the Petitioners claim that the SIP regulations at Wis. Admin. Code § NR 405.02(4)(b), which are the same as the federal regulations at 40 C.F.R. § 52.21(b)(13)(ii), (ii)(a), require that increment consumption be based on actual emissions, not hourly maximum permitted emission rates as WDNR used. Petition at 58. The Petitioners specifically cite to the definition of actual emissions in 40 C.F.R. § 52.21(b)(21)(ii) and Wis. Admin. Code § NR 405.02(1)(a) as the applicable definition. *Id.* at 58.

---

[11] EPA also notes that the emissions increase elements of the PSD, nonattainment NSR or NSPS analyses associated with fuel switching were not raised in public comments, and thus it does not appear that the objections that these requirements were triggered as a result of fuel switching were raised with reasonable specificity under CAA section 505(b)(2).

[12] The Petitioners cite to Wis. Stat. § 285.63(1)(b) (formerly at Wis. Stat. §144.393(1)(b)):

40 C.F.R. § 52.2570(c)(42)(i) (adopting Wis. Stat. § 144.393 (1979) into the Wisconsin SIP)  Petition at 53.

14

Second, the Petitioners contend that the regulations do not provide that only the "increase" resulting from a modification consumes increment but that all emissions from a modified major stationary source consume increment. Petition at 59. The Petitioners acknowledge that the EPA Environmental Appeals Board's (EAB) concluded in *In re Northern Michigan University*, 14 E.A.D. ___, PSD Appeal No. 08-02, Slip Op. at 41-46 (Feb. 18, 2009) that "the increases in emissions from a major modification consume increment, rather than all of a modified source's 'actual emissions' consuming increment." *Id.* at 60. However, the Petitioners assert that the *Northern Michigan* decision "cannot be squared with the Act or the [PSD] regulations." *Id.*

Third, the Petitioners contend that, even pursuant to the EPA's interpretation in *Northern Michigan*, "[W]DNR's basis for not including emissions from the modified facility as increment consuming appears to be based on [W]DNR's unsupported assertion that increment consumption is determined based on the modeling of allowable emission rate increases that are expressed in pounds per hour rather than tons per year'" and "[W]DNR's conclusion that where the permit is not allowing an increase in maximum permitted hourly emission rate, even a source undergoing a major modification does not consume increment." Petition at 55, quoting the WDNR's RTC at 7. The Petitioners argue that the Court of Appeals for the District of Columbia Circuit rejected WDNR's assertion that a source's allowable emissions could be used to calculate the baseline concentration, "holding that only facilities that began construction but *had not* operated prior to January 6, 1975, could include their maximum capacity to emit in the baseline; sources that had operated prior to January1975 had to use their actual emissions as 'a more realistic assessment of its impact on ambient air quality.'" Petition at 64, quoting *Alabama Power v. Costle*, 636 F.2d 323, 379 (D.C. Cir. 1979). (Emphasis in original.)

Concerning emissions increases from the boilers, the Petitioners state that the WDNR issued the facility a PSD permit in 2004 for a modification that increased the size of paper machine #9 and an electric-generating turbine, debottlenecking the boilers. Petition at 54, quoting October 7, 2004, memorandum from Don C. Faith, III, to file. The Petitioners assert that, in addition to emissions increases from the modified paper machine, the emissions increases from the debottlenecked boilers, which are attributable to the project, also consume increment. Petition at 54. The Petitioners claim that the WDNR's increment analysis for the 2004 construction permit and for the title V renewal permit that is the subject of the Petition did not consider the emissions from the boilers to be increment consuming. *Id.* The Petitioners further assert that WDNR's failure to account for these increases in the increment analysis is contrary to EPA's explicit guidance on this issue. The Petitioners cite to a February 8, 2000, letter from Robert B. Miller, Chief of the Permits and Grants Section at EPA, to Lloyd Eagan, Director of the Bureau of Air Management at WDNR, and to a memorandum from Edward E. Reich, Director, Stationary Source Compliance Division, OAQPS, to Michael M. Johnston, Chief, Air Operations Section, Region 10, regarding "PSD Applicability Pulp and Paper Mill" (July 28, 1983) as evidence that EPA considers emissions from debottlenecked boilers to consume increment. Petition at 56-57. The Petitioners also assert that "[d]espite calculating emission increases of more than 1,300 tons of particulate matter, 3,000 tons of NOx, and 19,000 tons of sulfur dioxide from increase utilization of the boilers due to the modification, [W]DNR failed to account for any of those increases in the increment analysis." Petition at 56.

15

*EPA Response*: I deny the Petitioners' request for an objection to the Permit on this claim on the basis that the Petitioners have not demonstrated that the Georgia Pacific title V permit is not in compliance with applicable requirements under the Act. The Petitioners have not demonstrated that WDNR erred in relying on the boilers' allowable emissions to determine the increment consumption associated with the 2004 modification. In particular, the Petitioners have not demonstrated that WDNR had reliable evidence that the actual emissions from the boilers on the applicable baseline date differed from the source allowable emissions as of that date.

In support of their request for EPA's review of the 2011 permit, the Petitioners cite to a provision of the Wisconsin Statutes which states that "[t]he department may approve the application for a permit required or allowed under s. 285.60 if it finds: ... (b) ... [t]he source will not cause or exacerbate a violation of any ambient air quality standard or ambient air increment under s. 285.21(1) or (2)." Petition at 53 (citing Wis. Stat. 285.63(1)(b)). Sections 285.60(1)(b) and (2)(a) of the Wisconsin Statutes prohibit the operation of an existing stationary source without timely applying for an operating permit, or a new or modified stationary source without an operating permit. In addition, section 285.63(1) of the Wisconsin Statutes, is identified as containing "[r]equirements for all sources."

WDNR does not discuss in the record of the title V renewal permit issued in 2011 how the state applies section 285.63(1)(b) of the Wisconsin Statutes in the context of a title V operating permit. The operating permit requirements in title V of the Clean Air Act and EPA's Part 70 regulations do not directly require such a showing be made to obtain a title V operating permit. However, applicable requirements include the requirements of a SIP (40 C.F.R. § 70.2), and the Petitioners argue that section 285.63(1)(b) of the Wisconsin Statutes is part of the approved Wisconsin SIP. In support, Petitioners cite EPA's approval of the 1979 version of section 144.393(1)(b) of the Wisconsin Statute before it was renumbered as section 285.63(1)(b). 40 C.F.R. § 52.2570(c)(42)(i). But the Petitioners do not address whether section 285.60 of the Wisconsin Statutes is included in the approved SIP.

In addition, the PSD permitting requirements of the CAA and EPA regulations require a showing that a source will not cause or contribute to a violation of the PSD increments. 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 51.166(k)(1). Section 285.63(1)(b) of the Wisconsin Statutes is also applicable to construction permits required under section 285.60(1)(a). The Petition also notes that the requirements of the PSD program are applicable requirements for purpose of title V permitting. Petition at 53.

Thus, EPA reads the Petition to assert two legal bases to support their claim that WDNR's demonstration of compliance with section 285.63(1)(b) was improper. One is with respect to a finding allegedly required in 2011 under the SIP to support renewal of the operating permit for this facility. The other is with respect to the showing required in 2004 under PSD permitting requirements to support issuance of a construction permit authorizing the modification of paper machine #9 and the electric-generating turbine. Neither the Petition nor WDNR's 2011 title V operating permit record discuss any change in emissions at this source since 2004 that is alleged to have consumed increment between 2004 and 2011.

EPA has previously observed that it does not generally look back and assess the adequacy of PSD permitting decisions made long before issuance of a title V permit. EPA has noted that the Agency generally does not object to the issuance of a title V permit due to concerns over BACT or related determinations made long ago during a prior preconstruction permitting process.[13] For this reason, we are not inclined to revisit the adequacy of the increment analysis conducted by WDNR to support the 2004 PSD permitting decision. However, in this case, the Petitioners asserted that the Wisconsin SIP separately required a finding in 2011 that the source would not cause or exacerbate a violation of the PSD increment to support renewal of the operating permit. Based on the latter consideration, EPA has considered the Petitioners' claims with respect to the WDNR's increment analysis below even though the adequacy of WDNR's 2004 PSD permit decision is not otherwise an issue EPA would ordinarily review in the context of a title V petition.

In response to comments on this issue, WDNR notes that "the calculus for determining PSD applicability is separate from that for increment consumption, and the two should not be confused." RTC at 7. WDNR explains that "PSD applicability … is determined based on the sum of emissions increases from a particular physical change, and any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change." In contrast, WDNR explains that "[i]ncrement consumption considers increases in emissions that have occurred after the major source baseline dates." RTC at 7. In addition, the WDNR's response to the Petitioners' comment on the 2011 title V permit renewal provides that:

> WDNR's policy has been to use allowable emission rates for increment consumption modeling, because any source may have emitted up to its allowable rate at some point in its history. Under NR 405.02(1)(b), WDNR may presume that source-specific allowable emissions for a unit are equivalent to the actual emissions of the unit.

RTC at 7.

Under the PSD program, increment is consumed if a major modification results in an increase in emissions from the baseline concentration for the relevant pollutant. The baseline concentration is generally the concentration level of a particular pollutant that existed when an applicant submitted the first PSD permit application affecting an area. 42 U.S.C. § 7479(4). However, the Clean Air Act provides that the emissions of sulfur oxides and particulate from a major source that commences construction after January 6, 1975, shall not be included in the baseline concentration and shall be counted as consuming increment. *Id.* In order to implement this exclusion from the baseline concentration and distinguish between the date when emissions changes in general (from both major and minor sources) count against the increment and the date when only emissions from construction at a major stationary source count against the increment, EPA established distinct definitions for the terms "minor source baseline date" and "major source baseline date." 40 C.F.R. 51.166(b)(14); 72 Fed. Reg. 31372, 31375 (June 6, 2007). In

---

[13] See *In the Matter of East Kentucky Power Cooperative, Inc. Hugh L. Spurlock Generating Station, Maysville Station, Petition IV-2006-04, Permit No. V-06-007,* Final Order at 19 (August 30, 2007) (*2007 Spurlock Order*). See also *In the Matter of Chevron Products Company, Richmond, California Facility, Major Facility Review Permit, Facility No. A0010,* Final Order at 9-10 (March 15, 2005).

practice, the baseline concentration is not actually established until the "minor source baseline date." Although major source emissions may consume increment prior to this date, this is not factored into the calculation until the minor source baseline date is triggered. 72 Fed. Reg. at 31376.

Thus, EPA's regulations provide that the baseline concentration is the "ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date." 40 C.F.R 51.166(b)(13)(i); 52.21(b)(13)(i); *see also* CAA section 169(4). The minor source baseline date is "the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 C.F.R 52.21 or to regulations approved pursuant to 40 C.F.R 51.166 submits a complete application under the relevant regulations." 40 C.F.R 51.166(b)(14)(ii); 52.21(b)(14)(ii). The "trigger date" for a particular pollutant is defined by federal regulation at 40 C.F.R 51.166(b)(14)(ii) and 52.21(b)(14)(ii). The major source baseline date for a particular pollutant is defined by federal regulation at 40 C.F.R 51.166(b)(14)(i) and 52.21(b)(14)(i).

Wisconsin's SIP outlines those emissions that are not included in the baseline concentration and thus consume increment as follows:

> The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):
>
> > 1. Actual emissions from any major stationary source on which construction commenced after the major source baseline date.
> > 2. Actual emissions increases and decreases at any stationary source occurring after the minor source baseline date.

Wis. Admin. Code NR 405.02(4)(a). This language is analogous to the federal regulations at 40 C.F.R 51.166(b)(13)(ii). As Georgia Pacific is a major stationary source that underwent a modification in 2004, any increases in actual emissions from the major source baseline date that resulted from the 2004 modification would be considered increment-consuming emissions under this definition. *See Northern Michigan University*, Slip Op. at p. 46 (holding it is reasonable to construe statutory, regulatory, and preamble language to mean that only emissions specifically tied back to a modification be considered increment-consuming, as opposed to all emissions from modified source).

Wisconsin's SIP further specifies in its definition of "actual emissions" that "[t]he department may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit." NR 405.02(1)(b). This is also analogous to the federal regulations defining "actual emissions" at 40 C.F.R §51.166(b)(21)(iii), which permits the reviewing authority to "presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit."

The definition of "actual emissions" that permits the reviewing authority to rely on allowable emissions was added to the federal regulations in an August 7, 1980 final rule. "Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and

Promulgation of Implementation Plans" ("1980 Final NSR Rule"), 45 Fed. Reg. 52676. In the preamble to the 1980 Final NSR Rule, the EPA "concluded that increment consumption and expansion should be based primarily on actual emissions increases and decreases which can be presumed to be allowable emissions for sources subject to source specific emissions limitations." 45 Fed. Reg. 52717. The EPA explained the basis for this reliance on allowable emissions, as follows:

> EPA believes two factors support the presumption that source-specific requirements represent actual source emissions. First, since the requirements are tailored to the design and operation of the source which are agreed on by the source and the reviewing authority, EPA believes it is generally appropriate to presume the source will operate and emit at the allowed levels. Second, the presumption maintains the integrity of the PSD and NSR systems and the SIP process. When EPA or a state devotes the resources necessary to develop source-specific emissions limitations, EPA believes it is reasonable to presume those limitations closely reflect actual source operation. EPA, states, and sources should then be able to rely on those emissions limitations when modeling increment consumption.

45 Fed. Reg. 52718. The preamble also explained that this presumption may be rebutted by a showing that actual emissions differ from allowable emissions:

> EPA, a state, or source remains free to rebut the presumption by demonstrating that the source-specific requirement is not representative of actual emissions. If this occurs, however, EPA would encourage states to revise the permits or the SIP to reflect actual source emissions. Such revisions will reduce uncertainty and complexity in the increment tracking system, since it will allow reviewing authorities and sources to rely on permits and SIP emissions limitations to model increment consumption.

45 Fed. Reg. 52718.

The authority to rely on allowable emissions as a measure of actual emissions was further confirmed in a December 31, 2002, final rule, in which the EPA confirmed that, despite changes to the definition of "actual emissions" for purposes of NSR applicability, "the new rule does not affect the way in which a source's ambient air quality impacts are evaluated." "Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NSR): Baseline Emissions Determination, Actual-to-Future-Actual Methodology, Plantwide Applicability Limitations, Clean Units, Pollution Control Projects" ("2002 NSR Reform Rule"), 67 Fed. Reg. 80186, 80202. The 2002 NSR Reform Rule discussed the continued use of allowable emissions with respect to the increment analysis, and provided that:

> If you determine that the modification of your source is a major modification, you must revert to using the existing definition of ''actual emissions'' to determine your source's actual emissions on a particular date to satisfy all other NSR permitting requirements, including any air quality analyses (for example, compliance with NAAQS, PSD increments, AQRVs) and the amount of emissions offsets required.

19

> For example, when you must determine your source's compliance with the PSD
> increments following a major modification, you must still use the allowable emissions
> from each emissions unit that is modified, or is affected by the modification.

67 Fed. Reg. 80196. Thus, the 2002 NSR Reform Rule did not change the requirements for conducting air quality impact analyses, including the manner in which increment consumption is determined. Instead, the rule reiterated EPA's longstanding interpretation of "actual emissions" as it applies to increment consumption. Thus, while the WDNR did not receive SIP approval of its NSR Reform Rule until December 17, 2008, the concepts discussed in this rule can still be applied to the 2004 project in question here.

Based on the applicable regulations, the Petitioners have not demonstrated that it was impermissible for the WDNR to presume that allowable emissions are representative of actual emissions in conducting the increment analysis. The Petitioners have not shown that it was improper for WNDR to apply the presumption under the circumstances. The Petitioners have not demonstrated that WDNR had reliable evidence that the actual emissions from this source on the major source baseline date differed from the source-specific allowable emissions as of this date. Furthermore, the Petitioners have not demonstrated that there was an increase in actual emissions at the boilers after the major source baseline date or the minor source baseline date for the relevant pollutant and baseline area. The Petitioners cite to the emissions increases identified by the PSD applicability analysis for a modification that was permitted in 2004, but this does not rebut the presumption that allowable emissions may be used to represent the actual emissions of this source as of the major source baseline date in 1975. When determining whether a significant emissions increase would occur for purposes of evaluating PSD applicability, WDNR compared the potential emissions of the plant's boilers resulting from the modification to actual emissions data from January 2001 - December 2002 preceding the project. *See* Preliminary Determination and Analysis of Construction Permit #03-DCF-327 at 50-53. On the other hand, as WDNR noted in its response to comments, an increment analysis considers increases in emissions from a different reference point. An increment analysis considers increases from all sources after the minor source baseline date and increases from construction at a major source that commences after the major source baseline date, in this case 1975 for PM10 and sulfur dioxide, and 1988 for nitrogen dioxide. 40 C.F.R 51.166(b)(14)(i),Wis. Admin. Code NR 405.02(21m). Under the regulations cited earlier, the major source baseline date for all pollutants is earlier than the period used in the PSD applicability analysis. The Petition does not identify the minor source baseline date for the relevant area.

The Petitioners also cite to a memorandum from Edward E. Reich, Director, Stationary Source Compliance Division, OAQPS, to Michael M. Johnston, Chief, Air Operations Section, Region 10, regarding "PSD Applicability Pulp and Paper Mill" (July 28, 1983), which concluded in part that emissions from a boiler at a particular modified facility consumed increment notwithstanding the fact that the boiler's permit limits did not change as a result of the modification. In the case of that facility, it was clear that after the modification, which increased digester capacity, the boiler's actual emissions would also increase beyond amounts that were able to be reached prior to the modification even without a change to the existing permit levels. In contrast, the Petitioners have not explained how the allowable emission rate in this case compares to the physical limits on the boilers' capacity to emit before or after the 2004

20

modification. Since there is no indication that the boilers could not emit up to the allowable emissions rate prior the 2004 modification, the Petitioners have not identified any similar error in WDNR's increment analysis with respect to the boilers.[14]

Finally, the language from *Alabama Power* on which the Petitioners rely is inapposite. In that case, the industry petitioners challenged EPA's interpretation of CAA section 169(4) that considered additional emissions resulting from fuel switches occurring after the major source baseline date to consume increment, even though the source was built before January 6, 1975, (the major source baseline date for $SO_X$ and particulate matter) with the capacity to accommodate the fuel switch and the fuel switch was not itself considered a modification under the Act. 636 F.2d at 377-78. The industry petitioners in that case argued that they should instead be permitted to use such a source's projected emissions in calculating the baseline concentration, and that any emissions increases resulting from the fuel switch should be "grandfathered" into the baseline concentration. *Id.* at 378. The Court upheld EPA's interpretation, finding that the use of a source's actual emissions, rather than projected emissions, was a better measure of the baseline concentration. *Id.* at 379. Importantly, in *Alabama Power*, none of the parties disputed the fact that the source's actual emissions had increased from the major source baseline date as a result of the fuel switch. On the contrary, here, the Petitioners have not demonstrated that WNDR had clear evidence that actual emissions of the boiler as of the major source or minor source baseline dates differed from allowable emissions.

The EPA disagrees with the Petitioners' assertion that the EAB's analysis in *In re Northern Michigan University* "cannot be squared with the Act or the [PSD] regulations." Petition at 59-61. The EAB decision in *Northern Michigan University* regarding the EPA's interpretation of the appropriate considerations for an increment analysis where a major source undergoes a modification was a well-reasoned decision. The Petitioners have not presented a compelling basis for EPA to reconsider this interpretation; therefore, the EPA does not plan to revisit that precedent. For the reasons discussed above, I deny your request to object on this issue.

## CONCLUSION

For the reasons set forth above and pursuant to section 505(b)(2) of the Act and 40 C.F.R. § 70.8(d), I hereby deny the petition filed by David Bender on behalf of the Sierra Club, the Clean Water Action Council and the Midwest Environmental Defense Center objecting to the title V renewal operating permit issued to Georgia Pacific.

Dated: 7/23/12

Lisa P. Jackson
Administrator

---

[14] Petitioners also cite for the same proposition a February 8, 2000, letter from Robert B. Miller, Chief of the Permits and Grants Section at EPA to Lloyd Eagan, Director of the Bureau of Air Management at WDNR. However, the only discussion of the increment analysis in that letter is a quote from the Johnston memorandum. The letter does not independently discuss the appropriate considerations for an increment analysis.