No. 12-3388

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

CLEAN WATER ACTION COUNCIL OF NORTHEASTERN WISCONSIN, INC.,
et al.,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

Respondents,

GEORGIA-PACIFIC CONSUMER PRODUCTS LP,

Intervenor.

_____

On Petition for Review of a Final Order of the Administrator of the United States
Environmental Protection Agency

_____

## (PROOF) ANSWERING BRIEF FOR RESPONDENTS
_____

IGNACIA S. MORENO
Assistant Attorney General
Of Counsel:                          Environment & Natural Resources Div.

JAMES HAVARD                         DUSTIN J. MAGHAMFAR
BRIAN DOSTER                         United States Department of Justice
SUSAN STAHLE                         Environmental Defense Section
STEPHANIE HOGAN                      P.O. Box 7611
U.S. EPA                             Washington, D.C. 20044
Office of General Counsel            (202) 514-1806

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES .................................................................. iii

GLOSSARY ............................................................................................ x

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE ................................................................ 3

STATEMENT OF FACTS ...................................................................... 6

I.     Statutory Background ................................................................... 6

     A.    *State Implementation Plans* ............................................... 6

     B.    *Prevention of Significant Deterioration* ............................ 7

     C.    *Title V* ............................................................................. 10

     D.    *EPA Review of Title V Permits* ...................................... 11

     E.    *Judicial Review* ............................................................... 13

II.    EPA's Implementation of the PSD Program ............................. 14

     A.    *Baseline Concentrations, Baseline Dates and Increment Consumption* ................................................ 14

     B.    *The 1978 Rules* ............................................................... 18

     C.    *The 1980 Rule* ................................................................ 19

     D.    *The 2002 Rule* ................................................................ 20

     E.    *The 2010 Rule* ................................................................ 21

III.   Factual and Procedural Background ........................................... 21

     A.    *Georgia Pacific's Title V Permit* ................................... 21

     B.    *EPA's Order* .................................................................... 23

STANDARD OF REVIEW .......................................................................... 25

SUMMARY OF ARGUMENT .................................................................... 29

ARGUMENT ............................................................................................... 32

I.    The Petition Is Time-Barred ........................................................... 32

      A.    *The 1978-2010 Rules Set Forth EPA's Reading of the Act,*
            *and the Arguments Made Here Could and Should Have*
            *Been Raised Then* ................................................................... 32

II.   EPA Reasonably Concluded Petitioners Did Not Demonstrate A
      Deficiency in the Title V Permit ...................................................... 39

      A.    *Congress Did Not Speak Directly to How to Calculate*
            *Consumption of Increment from a Major Stationary Source*
            *Initially Constructed Prior to January 6, 1975, the Emissions*
            *From Which Later Increase Due to a Subsequent Modification* .......... 40

      B.    *EPA Reasonably Interprets the Statute to Mean that Only*
            *Increases in Emissions from a Later Modified Major Source*
            *Consume Increment* ................................................................. 43

      C.    *The Legislative History Supports EPA's Longstanding*
            *Approach to Increment Consumption as Based on Changes*
            *in Emissions* ........................................................................... 46

      D.    *Petitioners Argue Without Merit that EPA's Interpretation*
            *of the Wisconsin SIP, and by Extension EPA's Own Regulations,*
            *Conflicts with the Plain Language of those Regulations* ...................... 49

      E.    *Petitioners' Interpretation of the Act Leads to Results*
            *Inapposite to the Purpose and Design of the PSD Program* ................. 52

CONCLUSION ............................................................................................ 57

CERTIFICATE OF SERVICE .................................................................... 58

CERTIFICATE OF COMPLIANCE ........................................................... 58

# TABLE OF AUTHORITIES

## CASES

*Ala. Power Co. v. Costle,*
   636 F.2d 323 (D.C. Cir. 1979) ............................................................ 7, 19, 35, 36, 43

*Ali v. Achim,*
   468 F.3d 462 (7th Cir. 2006) .................................................................................. 26

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
   705 F.3d 453 (D.C. Cir. 2013) ............................................................................... 38

*Auer v. Robbins,*
   519 U.S. 452 (1997) ................................................................................... 27, 28, 49

*Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.,*
   467 U.S. 837 (1984) ............................................................................. 25, 26, 41, 42

*Citizens Against Ruining the Env't v.EPA,*
   535 F.3d 670 (7th Cir. 2008) ................................................................ 12, 13, 39, 40

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 U.S. 208 (2009) ............................................................................................... 41

*Gen. Motors Corp. v. United States,*
   496 U.S. 530 (1990) ................................................................................................. 6

*Illinois EPA v. U.S. EPA,*
   947 F.2d 283 (7th Cir. 1991) .................................................................................. 26

*In re Lyon Cnty. Landfill,*
   406 F.3d 981 (8th Cir. 2005) .................................................................................. 45

*In re N. Mich. Univ. Ripley Heating Plant,* PSD Appeal No. 08-02,
   2009 WL 443976 (EAB Feb. 18, 2009) ............................... 8, 45, 46, 47, 48, 51, 52

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ............................................................................................... 25

*Long Island Care at Home, Ltd. v. Coke,*
   551 U.S. 158 (2007) ......................................................................................... 28, 49

*Marlowe v. Bottarelli,*
   938 F.2d 807 (7th Cir. 1991) .................................................................................. 27

*Medical Waste Inst. & Energy Recovery Council v. EPA*,
    645 F.3d 420 (D.C. Cir. 2011) ................................................................ 32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................ 27

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007) .............................................................................. 27

*Nat'l Cable & Telecomms. Ass'n v. Brand X Servs.*,
    545 U.S. 967 (2005) .............................................................................. 26

*Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*,
    534 U.S. 327 (2002) .............................................................................. 42

*Nat'l-Southwire Aluminum Co. v. EPA*,
    838 F.2d 835 (6th Cir. 1988) ................................................................ 54

*New York v. EPA*,
    413 F.3d 3 (D.C. Cir. 2005) .................................................................. 38

*NRDC v. EPA*,
    571 F.3d 1245 (D.C. Cir. 2009) ............................................................ 32

*Resisting Envtl. Destruction on Indigenous Lands v. EPA*,
    704 F.3d 743 (9th Cir. 2012) ................................................................ 45

*Sierra Club v. EPA*,
    557 F.3d 401 (6th Cir. 2009) ................................................................ 13

*Sierra Club v. EPA*,
    705 F.3d 458 (D.C. Cir. 2013) .............................................................. 38

*Sierra Club v. Johnson*,
    436 F.3d 1269 (11th Cir. 2006) ............................................................ 26

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................................................ 25

*Sultan Chemists, Inc. v. EPA*,
    281 F.3d 73 (3d Cir. 2002) ................................................................... 45

*Train v. Natural Res. Def. Council, Inc.*,
    421 U.S. 60 (1975) .................................................................................. 6

*Virginia v. EPA*,
    80 F.3d 869 (4th Cir. 1996) .................................................................. 11

*Wis. Elec. Power Co. v. Reilly,*
   893 F.2d 901 (7th Cir. 1990) ........................................................ 26, 27, 40, 49, 54

**STATUTES**

5 U.S.C. § 706(2) ........................................................................................ 26

5 U.S.C. § 706(2)(A) .................................................................................. 25

42 U.S.C. §§ 7401-7671q .......................................................................... 6

42 U.S.C. § 7407(d)(1)(A)(ii), (iii) ........................................................ 7

42 U.S.C. §§ 7408-09 ................................................................................. 6

42 U.S.C. § 7410(a)(1) .............................................................................. 6

42 U.S.C. § 7410(a)(2) ............................................................................ 6, 7

42 U.S.C. § 7410(a)(2)(C) ....................................................................... 7, 9

42 U.S.C. § 7410(k)(3) .............................................................................. 7

42 U.S.C. § 7411(a) ............................................................................... 42, 43

42 U.S.C. § 7411(a)(4) ........................................................................... 8, 45

42 U.S.C. § 7470-7479 .............................................................................. 7

42 U.S.C. § 7470 ......................................................................................... 7

42 U.S.C. § 7470(3) .............................................................................. 43, 52

42 U.S.C. § 7470(5) .............................................................................. 43, 52

42 U.S.C. § 7473 .................................................................................... 8, 9

42 U.S.C. § 7473(c) .............................................................................. 34, 45

42 U.S.C. § 7473(c)(1)(A), (B), (C), (D) ............................................... 34

42 U.S.C. § 7475(a) .................................................................................... 7

42 U.S.C. § 7475(a)(l) .............................................................................. 11

42 U.S.C. § 7475(a)(3) .............................................................................. 8

42 U.S.C. § 7475(e)(1), (2) ....................................................................... 9

42 U.S.C. § 7479(1) ................................................................................. 7

42 U.S.C. § 7479(2)(C) ................................................................. 8, 42, 45

42 U.S.C. § 7479(4) ..........................................1, 2, 4, 14, 18, 30, 32, 37, 39, 40, 41, 46

42 U.S.C. § 7607(b) ................................................................................. 38

42 U.S.C. § 7607(b)(1) ..................................................... 1, 13, 24, 25, 30, 32

42 U.S.C. § 7661a(a) ........................................................................... 3, 11

42 U.S.C. § 7661a(b) ............................................................................... 10

42 U.S.C. § 7661a(d) ............................................................................... 10

42 U.S.C. § 7661a(d)(1) ............................................................................ 10

42 U.S.C. § 7661a(i) ............................................................................... 10

42 U.S.C. § 7661c(a) ......................................................................... 3, 10, 11

42 U.S.C. § 7661d ............................................................................... 3, 10

42 U.S.C. § 7661d(a)(1) ............................................................................ 11

42 U.S.C. § 7661d(b)(1) ............................................................................ 12

42 U.S.C. § 7661d(b)(2) ..................................................... 1, 2, 4, 12, 23, 31, 39

42 U.S.C. §§ 7661-61f ............................................................................. 10

## STATE STATUTE

Wis. Admin. Code NR § 405.02(4) (2004) ................................................... 17

Wis. Admin. Code NR § 405.02(4)(a) ......................................................... 49

Wis. Admin. Code NR § 405.02(4)(b)(1) ..................................................... 50

Wis. Admin. Code NR § 405.02(4)(b)(2) ..................................................... 50

Wis. Admin. Code NR § 405.02(11) ........................................................... 51

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 1.25(e) ............................................................................ 22

40 C.F.R. pt. 51, App. W ............................................................... 9, 16

40 C.F.R. § 51.166 ............................................................................. 9

40 C.F.R. § 51.166(b)(8) ..................................................... 47, 51, 53

40 C.F.R. § 51.166(b)(13) ............................................................... 49

40 C.F.R. § 51.166(b)(13)(i) ............................................................ 17

40 C.F.R. § 51.166(b)(13)(i)(a) ....................................................... 17

40 C.F.R. § 51.166(b)(13)(ii) ...................................................... 49, 52

40 C.F.R. § 51.166(b)(13)(ii)(a) ........................................... 17, 18, 50

40 C.F.R. § 51.166(b)(13)(ii)(b) ............................................... 17, 50

40 C.F.R. § 51.166(b)(14)(i) ............................................................ 16

40 C.F.R. § 51.166(b)(14)(ii) ..................................................... 16, 17

40 C.F.R. § 51.166(b)(15)(i) ............................................................ 14

40 C.F.R. § 51.166(b)(21) ............................................................... 16

40 C.F.R. § 51.166(f)(1) .................................................................. 34

40 C.F.R. § 51.166(k)-(m) ................................................................. 9

40 C.F.R. § 52.21(a) ....................................................................... 10

40 C.F.R. § 52.21(b)(13)(i) .............................................................. 17

40 C.F.R. § 52.21(b)(13)(ii) ....................................................... 49, 52

40 C.F.R. § 52.21(b)(13)(ii)(a) .................................................. 17, 50

40 C.F.R. § 52.21(b)(13)(ii)(b) .................................................. 17, 50

40 C.F.R. § 52.21(b)(14)(i) .............................................................. 16

40 C.F.R. § 52.21(b)(14)(i)(a) ....................................................... 18

40 C.F.R. § 52.21(b)(14)(ii) ...................................................... 16, 17

40 C.F.R. § 52.21(b)(14)(ii)(a) ..................................................... 18

40 C.F.R. § 52.21(b)(15)(i) ......................................................... 14

40 C.F.R. § 52.21(b)(21) ............................................................ 16

40 C.F.R. § 52.21(c) ................................................................... 8

40 C.F.R. § 52.21(f)(1) .............................................................. 34

40 C.F.R. § 52.21(k)-(m) ............................................................. 9

40 C.F.R. pt. 70 ...................................................................... 10

40 C.F.R. pt. 70, App. A ............................................................ 10

40 C.F.R. § 70.2 ............................................................. 3, 10, 11

40 C.F.R. § 70.8(a)(1) ............................................................... 11

40 C.F.R. § 70.8(c) .................................................................. 12

40 C.F.R. § 70.8(d) .................................................................. 12

40 C.F.R. § 124.2 .................................................................... 22

## FEDERAL REGISTER

39 Fed. Reg. 42,510 (Dec. 5, 1974) ................................................. 15

43 Fed. Reg. 26,380 (June 19, 1978) ................................................ 18

43 Fed. Reg. 26,388 (June 19, 1978) ................................. 18, 33, 34, 35

45 Fed. Reg. 52,676 (Aug. 7, 1980) ................................. 7, 19, 20, 36, 37

53 Fed. Reg. 40,656 (Oct. 17, 1988) ............................................ 15, 19

57 Fed. Reg. 5320 (Feb. 13, 1992) .................................................. 22

64 Fed. Reg. 28,745 (May 27, 1999) ................................................. 10

66 Fed. Reg. 62,946 (Dec. 4, 2001) .............................................................. 10

67 Fed. Reg. 80,186 (Dec. 31, 2002) ......................................... 19, 20, 29, 38

72 Fed. Reg. 31,372 (June 6, 2007) ...................................................... 51, 52

72 Fed. Reg. 54,112 (Sept. 21, 2007) ............................................................ 8

75 Fed. Reg. 64,864 (Oct. 20, 2010) ....................................... 8, 9, 16, 21, 38

77 Fed. Reg. 50,504 (Aug. 21, 2012) ...................................................... 1, 24

## LEGISLATIVE HISTORY

116 Cong. Rec. 32,918 (remarks of Sen. Cooper), *reprinted in* 1 Senate Committee
on Public Works, A Legislative History of the Clean Air Act Amendments of 1970
(1974), at 260 .......................................................................................... 54

S. Rep. No. 95-127 at 97 (1977), *reprinted in* 3 A Legislative History of the Clean
Air Act Amendments of 1977, at 1471 (1978) ....................................... 46

# GLOSSARY

| | |
|---|---|
| CAA or Act | Clean Air Act, 42 U.S.C. §§ 7401-7671q |
| EAB | Environmental Appeals Board of U.S. EPA |
| EPA | United States Environmental Protection Agency, a federal agency |
| NAAQS | National Ambient Air Quality Standard |
| Order | Order Denying Petition for Objection to Permit (July 23, 2012) |
| PM | Particulate Matter |
| PSD | Prevention of Significant Deterioration, 42 U.S.C. §§ 7470-7492 |
| RTC | Response to Comments |
| SIP | State Implementation Plan |
| Title V | 42 U.S.C. §§ 7661-7661f |

## STATEMENT OF JURISDICTION

This Court lacks jurisdiction. The Statement of Jurisdiction offered by

Petitioners Clean Water Action Council of Northeastern Wisconsin, Inc. and

Midwest Environmental Defense Center, Inc. ("Petitioners") is not correct.

Petitioners nominally seek review of the "Order Denying Petition for Objection to

Permit" ("Order") issued by Respondent United States Environmental Protection

Agency ("EPA"), on July 23, 2012. Joint Appendix ("JA") __. *See* 77 Fed. Reg. 50,504

(Aug. 21, 2012) (giving notice of the Order). The Order was issued pursuant to

EPA's authority under section 505(b)(2) of the Clean Air Act ("CAA" or "the Act"), 42

U.S.C. § 7661d(b)(2). Order at 3 [JA __]. However, the sole *issue* presented for

review by Petitioners in fact challenges final action taken by EPA long ago. *See*

*infra* Argument I.A. Specifically, Petitioners claim that EPA's interpretation of

certain requirements specified in CAA section 169(4), 42 U.S.C. § 7479(4), is

unlawful. At base, this claim challenges EPA rulemakings interpreting this

statutory provision that were promulgated in 1978, 1980, 2002, and 2010. Because

Petitioners failed to challenge these actions in the proper forum (the D.C. Circuit)

within 60 days of their publication in the Federal Register, their only claim is time-

barred under CAA section 307(b)(1), 42 U.S.C. § 7607(b)(1), and this Court lacks

jurisdiction to hear it.

## STATEMENT OF THE ISSUES

1. Whether this Court has jurisdiction to hear this petition for review when the Clean Air Act provides only 60 days for review of agency rulemakings; the petition challenges nationally applicable rulemakings promulgated in 1978, 1980, 2002, and 2010; and the arguments made by Petitioners now are purely legal arguments that were equally available when those actions became final.

2. If the petition for review is not time-barred, whether EPA reasonably concluded Petitioners had not "demonstrated," within the meaning of section 505(b)(2) of the Act, 42 U.S.C. § 7661d(b)(2), that Georgia Pacific's Title V permit was inconsistent with any requirement of the Act, because Petitioners did not demonstrate any error in EPA's reasonable interpretation of the ambiguous language in section 169(4) of the Act, 42 U.S.C. § 7479(4), or in EPA and Wisconsin's reasonable interpretation of federal and state regulations implementing that section.

## STATEMENT OF THE CASE

This case involves a Clean Air Act Title V operating permit for the Georgia Pacific Consumer Products LP Plant ("Georgia Pacific"), a paper products manufacturing facility in Green Bay, Wisconsin. Title V of the CAA requires a "major [stationary] source" of air pollutants to secure an operating permit, *see* 42 U.S.C. § 7661a(a), which must contain such conditions as necessary to assure compliance with the applicable requirements of the Act. *Id.* § 7661c(a). Such applicable requirements include a major source's obligation to obtain a prevention of significant deterioration ("PSD") permit prior to starting construction of a new source or of a "major modification" at an existing source in an area that is subject to the PSD program. 40 C.F.R. § 70.2.

Among other applicable requirements, a PSD permit must ensure that emissions of pollutants from such sources do not result in violations of PSD "increments," which specify the maximum allowable increase in the concentration of an air pollutant that may occur above a defined baseline concentration. Changes in emissions in an area, such as increases in emissions because a new source is built or an existing source is modified in an area subject to PSD, "consume" increment. If the available increment is not sufficient to permit the increase in emissions, a new or modified source cannot be constructed.

In Wisconsin, Title V operating permits are issued by the Wisconsin Department of Natural Resources ("Wisconsin"), but the Act authorizes EPA to review and object to any permit. 42 U.S.C. § 7661d. If the Administrator of EPA

does not object to a proposed Title V permit, any person may petition the Administrator to object to the proposed permit, and the Administrator must issue an objection *if* the petitioner "demonstrates to the Administrator" that the permit is not in compliance with the requirements of the Act. *Id.* § 7661d(b)(2).

In 2011, the Sierra Club,[1] the Clean Water Action Council of Northeastern Wisconsin, Inc. and the Midwest Environmental Defense Center, Inc. petitioned EPA to object to the Title V permit Wisconsin issued to Georgia Pacific (the "Petition to Object"). Petition to Object at 1 [JA __]. Although Petitioners presented many arguments as bases for EPA to object to the Title V permit, only one of the issues raised before the Agency is presented in the instant petition for review. That single issue is Petitioners' allegation that EPA misinterprets section 169(4) of the Act, 42 U.S.C. § 7479(4), and the Wisconsin State Implementation Plan ("SIP") (and implicitly, EPA's longstanding regulations implementing section 169(4), on which Wisconsin's SIP is based), regarding the emissions from a modified source that should be considered to consume PSD increment. *Id.* at 59-63 [JA __].

On July 23, 2012, EPA denied the Petition to Object, finding in relevant part that Petitioners had failed to demonstrate any error in Wisconsin's interpretation of its SIP or a 2009 EPA adjudication confirming that EPA has long applied the same interpretation to substantively identical federal regulations. Order at 21 [JA __]. Petitioners subsequently filed this petition challenging EPA's denial. While Petitioners contend that this is an as-applied challenge based on EPA's failure to

---

[1] The Sierra Club is not a party to this petition for review.

correct Wisconsin's error in applying the Act, *see* Pet. Br. at 5, this petition is in fact a facial attack on long-standing, nationally applicable EPA rulemaking actions first finalized decades ago. The Act, however, requires that such challenges be brought in the D.C. Circuit within 60 days of such rules' promulgation. Accordingly, this Court lacks jurisdiction to consider the petition for review. Even if this Court did have jurisdiction, Petitioners' statutory interpretation argument is without merit, and EPA reasonably determined that Petitioners failed to demonstrate that the Title V permit issued by Wisconsin was not in compliance with the Act.

**STATEMENT OF FACTS**

## I.    Statutory Background

*A.  State Implementation Plans*

The CAA, 42 U.S.C. §§ 7401-7671q, enacted in 1970 and extensively amended in 1977 and 1990, establishes a comprehensive program for improving the nation's air quality through state and federal regulation. *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990) ("the States and the Federal Government [are] partners in the struggle against air pollution."). Under Title I of the Act, EPA is charged with identifying air pollutants that endanger the public health and welfare, and with formulating the National Ambient Air Quality Standards ("NAAQS" or "standards") that specify the maximum permissible concentrations of those pollutants in the ambient air. 42 U.S.C. §§ 7408-09. EPA has established NAAQS for six "criteria" air pollutants: sulfur dioxide, particulate matter,[2] carbon monoxide, ozone, nitrogen dioxide, and lead.

Under the Act, each State must prepare a state implementation plan, or "SIP," that provides for the implementation, maintenance and enforcement of the NAAQS in each air quality control region within the State. *Id.*; 42 U.S.C. § 7410(a)(1)-(2). The SIP must be adopted by the State after reasonable notice and a public hearing and be submitted to EPA for review and approval. *Id.* § 7410(a)(1); *see Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 66-67 (1975). EPA must

---

[2] Particulate matter is regulated via standards for two different indicators: particulate matter under ten microns in diameter ("$PM_{10}$") and under two-and-one-half microns in diameter ("$PM_{2.5}$"). Unless otherwise specified, all references to particulate matter or PM herein should be understood to mean $PM_{10}$.

approve the SIP if it meets all of the applicable requirements of the Act. 42 U.S.C. § 7410(k)(3). The Act specifies minimum elements that States must include in their SIPs. *Id.* § 7410(a)(2). One such element is a Prevention of Significant Deterioration permitting program as required in Part C of Title I of the Act. *Id.* § 7410(a)(2)(C), (J).

### B. *Prevention of Significant Deterioration*

The purpose of the PSD program is to protect the public health and welfare from adverse effects of air pollution by ensuring that increased air pollution permitted in areas attaining the NAAQS does not lead to significant deterioration of air quality in those areas, while at the same time ensuring that economic growth will occur in a manner consistent with the preservation of clean air resources. 42 U.S.C. § 7470. The PSD provisions set forth procedures and requirements for preconstruction review and permitting of new or modified sources of air pollution that plan to locate in areas that are classified as "attainment" or "unclassifiable" with respect to a particular NAAQS. *See generally id.* §§ 7470-7479.[3]  The permitting requirements apply to construction of or at "major emitting facilities," *i.e.*, sources that emit 250 tons per year (or 100 tons per year for certain source categories) of any air pollutant. *Id.* §§ 7475(a), 7479(1). The permitting requirements apply to construction of a new major source or the modification of an

---

[3] An "attainment" area is one where the air quality meets the NAAQS for a pollutant; an "unclassifiable" area is one that cannot be classified as meeting or not meeting the NAAQS for a pollutant. 42 U.S.C. § 7407(d)(1)(A)(ii), (d)(1)(A)(iii); *see Alabama Power Co. v. Costle*, 636 F.2d 323, 368 (D.C. Cir. 1979); *see also* 45 Fed. Reg. 52,676, 52,677 (Aug. 7, 1980).

existing major source. *Id.* § 7479(2)(C) (defining "construction" to include "modification"). A "modification" refers to any physical change or change in the method of operation at an existing stationary source which increases the amount of any air pollutant emitted by the source or which results in the emission of any air pollutant not previously emitted. *Id.* § 7411(a)(4).

Under CAA section 165(a)(3), to obtain a PSD permit, a proposed facility or modification subject to PSD review must demonstrate that emissions from construction or operation of such new or modified facility "will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, [or] (B) national ambient air quality standard in any air quality control region." *Id.* § 7475(a)(3). The "maximum allowable increase" of an air pollutant that may occur above a defined baseline concentration is known as the PSD "increment." 75 Fed. Reg. 64,864, 64,868 (Oct. 20, 2010) [JA __]; 72 Fed. Reg. 54,112, 54,116 (Sept. 21, 2007) [JA __]; *see* 42 U.S.C. § 7473; 40 C.F.R. § 52.21(c). Increments ensure that aggregate permitted pollution increases in attainment and unclassifiable areas do not cause significant deterioration of air quality in those areas. *See, e.g.*, 75 Fed. Reg. at 64,865 [JA __]; *see also In re N. Mich. Univ. Ripley Heating Plant*, PSD Appeal No. 08-02, slip. op. at 36-37, 2009 WL 443976 (EAB Feb. 18, 2009) (hereinafter "*In re. N. Mich.*") [JA __]. Relevant here, the Act establishes increments for sulfur dioxide and particulate matter, measured as a concentration of a pollutant in the ambient air (micrograms per cubic

meter). 42 U.S.C. § 7473. When a new source is built, emissions increase; when an existing source undergoes construction, emissions can either increase or decrease. Increases in emissions are said to "consume" increment, while conversely, decreases in emissions can "expand" available increment.

For purposes of determining whether emissions from a proposed facility will cause or contribute to an exceedance of either an increment or a NAAQS, section 165(e) requires the permitting authority or the owner or operator of the proposed facility to conduct an ambient air quality analysis. 42 U.S.C. § 7475(e)(1), (2). Accordingly, EPA regulations require a source impact analysis, which is primarily a modeling analysis designed to determine whether the allowable emissions increase from the proposed source, in conjunction with other emissions increases from existing sources, will cause or contribute to a violation of either a NAAQS or an increment. 40 C.F.R. § 51.166(k)-(m); 40 C.F.R. § 52.21(k)-(m). This analysis utilizes a combination of ambient air quality monitoring data and sophisticated air quality modeling to analyze how existing air quality would be affected by the proposed source. *See* 75 Fed. Reg. at 64,866 [JA __]; *see also* 40 C.F.R. Part 51, App. W ("Guideline on Air Quality Models").

As noted above, the Act requires the States to implement PSD permitting programs in their SIPs. *See* 42 U.S.C. § 7410(a)(2)(C), (J). One of EPA's PSD regulations specifics the minimum requirements that must be met to obtain EPA approval of state PSD permitting programs in a SIP. 40 C.F.R. § 51.166. A

separate, but nearly identical, regulation enables EPA to issue PSD permits in the absence of an approved state program. *Id.* § 52.21(a).

Wisconsin's SIP includes a PSD permitting program that has been approved by EPA as meeting the requirements of EPA's regulations and the Act. 64 Fed. Reg. 28,745 (May 27, 1999). The requirements of Wisconsin's PSD program and any terms and conditions of PSD permits issued by Wisconsin are applicable requirements for purposes of Wisconsin's Title V permits. 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.2 (subparts (1) and (2) of the definition of "applicable requirement").

### C. Title V

In 1990, Congress enacted Title V of the CAA, 42 U.S.C. §§ 7661-61f, establishing a permit program covering the operations of stationary sources of air pollution. Congress designed the Title V permit program to be administered and enforced primarily by state and local air permitting authorities pursuant to EPA-approved permit programs and subject to EPA oversight. *See* 42 U.S.C. §§ 7661a(d)(1), 7661a(i),7661d. Each State must develop and submit to EPA a permit program meeting the requirements of Title V and the applicable regulations promulgated by EPA. *Id.*; 42 U.S.C. §§ 7661a(b), (d); 40 C.F.R. Part 70, State Operating Permit Programs. EPA has granted most States, including Wisconsin, approval to administer the Title V permit program. 40 C.F.R. Part 70, App. A; 66 Fed. Reg. 62,946 (Dec. 4, 2001) (granting final, full approval of Wisconsin's Title V program).

Under the Title V program, all CAA requirements applicable to a particular source must be set forth in a comprehensive permit, often called a Title V permit or an operating permit, which serves as "a source-specific bible for Clean Air Act compliance." *Virginia v. EPA*, 80 F.3d 869, 873 (4th Cir. 1996). Sources of air pollution subject to Title V are required to apply for, and operate pursuant to, an operating permit that includes emission limitations, standards, monitoring requirements, compliance schedules, and other conditions as necessary to assure compliance with applicable requirements of the CAA, including the requirements of the applicable state implementation plan. *See* 42 U.S.C. §§ 7661a(a), 7661c(a).

For areas such as Green Bay, the applicable requirements under Title V include compliance with the requirements of the PSD program when that program applies. 42 U.S.C. §§ 7475(a)(l), 7661c(a); *see also* 40 C.F.R. § 70.2 (defining "applicable requirements" for state operating permit programs to include requirements of both implementation plans, and the terms and conditions of preconstruction permits, such as PSD permits, issued under Title I of the Act).

### D.  *EPA Review of Title V Permits*

Title V of the CAA and the applicable EPA regulations require state permitting authorities to submit all proposed Title V permits to EPA for review. 42 U.S.C. § 7661d(a)(1); 40 C.F.R. § 70.8(a)(1). Title V calls for EPA, within 45 days of receipt of a proposed Title V permit, to object to that permit on its own initiative if EPA "determine[s]" that the proposed permit "contains provisions that are . . . not in compliance" with "applicable requirements of [the Act], including the

requirements of the applicable implementation plan." 42 U.S.C. § 7661d(b)(1); *see* 40 C.F.R. § 70.8(c). If EPA does not object on its own, "any person may petition the Administrator" to do so within 60 days after the expiration of the 45-day period. 42 U.S.C. § 7661d(b)(2); *see also* 40 C.F.R. § 70.8(d). Section 505(b)(2) provides that "[t]he Administrator shall issue an objection . . . if the petitioner *demonstrates* to the Administrator that the permit is not in compliance with the requirements of [the CAA], including the requirements of the applicable implementation plan." 42 U.S.C. § 7661d(b)(2) (emphasis added); *see also* 40 C.F.R. § 70.8(d). Critically, the statute states that "[t]he Administrator shall grant or deny such petition within 60 days after the petition is filed." 42 U.S.C. § 7661d(b)(2).

EPA interprets the "demonstration" requirement in section 505(b)(2) as placing the burden on the person seeking the objection to supply information to EPA "sufficient to demonstrate the validity of each objection raised" to the Title V permit. EPA Order at 10 [JA __]. One critical reason for this is that section 505(b)(2) allows EPA *only 60 days* in which to investigate, analyze, and rule on a petition such as that submitted by Petitioners here. As this Court noted in *Citizens Against Ruining the Environment v. EPA*,

> Congress deliberately gave the EPA a rather short time period to review proposed permits, resolve questions related to those permits, and decide whether to object. Because this limited time frame may not allow the EPA to fully investigate and analyze contested allegations, it is reasonable in this context for the EPA to refrain from extensive fact-finding.

535 F.3d 670, 678 (7th Cir. 2008).

In determining whether to object, EPA considers whether the information a petitioner presents demonstrates the applicability of a CAA requirement; in this regard, a failure by petitioners to address a key component of an applicability analysis can be fatal. Order at 3, 11 [JA __]. EPA considers numerous other factors as well, such as the quality of information presented, underlying disputes, and pending enforcement actions. *See Sierra Club v. EPA*, 557 F.3d 401, 406-07 (6th Cir. 2009); *see also Citizens Against Ruining the Environment*, 535 F.3d at 679 (where "there is contested evidence of a potential violation requiring further investigation and analysis" it was reasonable for EPA to determine that a demonstration had not been made). Generally, if petitioners do not present information concerning relevant factors, then EPA may find that the petitioner has failed to satisfy the "demonstration" requirement. *See, e.g.*, Order at 11, 13-14 [JA __].

  *E.  Judicial Review*

Section 307(b)(1) permits judicial review of certain specified actions of EPA taken pursuant to the Act, as well as of "any other nationally applicable regulations promulgated, or final action taken, by the Administrator" under the Act, but only in the United States Court of Appeals for the District of Columbia. 42 U.S.C. § 7607(b)(1). Section 307(b)(1) further provides that a petition for review of a final action by EPA under the CAA that is locally applicable, such as a denial of a petition to object to a Title V permit, may be filed in the United States Court of Appeals for the appropriate circuit. *Id.*  Whether nationally or locally applicable,

petitions for review must be filed within 60 days from the date of publication in the Federal Register of notice of the final action. *Id.*

## II.    EPA's Implementation of the PSD Program

### A. Baseline Concentrations, Baseline Dates and Increment Consumption

As noted earlier, a PSD increment is a maximum allowable increase of emissions of a pollutant in an area above a specified baseline concentration for that pollutant in that area. In section 169(4) of the Act, 42 U.S.C. § 7479(4), Congress established a formula to define the term "baseline concentration." The first sentence of section 169(4) specifies that the baseline concentration for a particular pollutant is the ambient concentration level of that pollutant in a certain area, referred to as the "baseline area,"[4] that existed when the first PSD permit application addressing that pollutant was submitted by a source seeking to construct in that area. 42 U.S.C. § 7479(4); Order at 17 [JA __]. In the second sentence, Congress directed that the baseline concentration *include* projected emissions from major sources which commenced construction prior to January 6, 1975, but which had not begun operation when the baseline concentration was determined, *i.e.*, the date on which the first PSD permit application was submitted. 42 U.S.C. § 7479(4).

In the third and last sentence of section 169(4), Congress specified the exception at the heart of this petition for review:

> Emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced *after* January 6, 1975, *shall be not included* in the baseline and shall be counted against

---

[4] *See* 40 C.F.R. §§ 51.166(b)(15)(i) and 52.21(b)(15)(i) (defining "baseline area").

> the maximum allowable increases in pollutant concentrations [*i.e.*, PSD increment] established under this part.

*Id.* (emphasis added). In sum, in this third sentence Congress required that emissions of sulfur oxides and particulate matter from major sources commencing construction *after* January 6, 1975, consume increment, and excluded such emissions from baseline concentrations.[5] *Id.* The result of this exception is that all emissions from all other sources prior to submission of the first PSD permit application for an area are included in the baseline concentration.

By establishing a formula to define baseline concentration, Congress established certain parameters that govern which emissions are included in the baseline concentration and which, instead, consume increment. As EPA explained in the Order, to implement these congressionally-specified parameters and further define which specific emissions consume increment (as opposed to being included in the baseline concentration), EPA established regulatory definitions for three distinct dates: the "major source baseline date," the "trigger date," and the "minor source baseline date." Order at 17-18 [JA __]; *see* 53 Fed. Reg. 40,656, 40,658, 40,670 (Oct. 17, 1988); *see also* New Source Review Workshop Manual, Prevention

---

[5] Congress chose January 6, 1975, because that was the effective date of EPA's initial PSD regulations, which were subsequently added to the statute (with revisions) by Congress as Part C in the 1977 CAA amendments. 39 Fed. Reg. 42,510, 42,514 (Dec. 5, 1974).

of Significant Deterioration and Nonattainment Area Permitting, at C.6 (Draft Oct. 1990) (hereinafter "NSR Manual") (JA ___).[6]

The "major source baseline date" is pollutant-specific and defined by federal regulations codified at 40 C.F.R. §§ 51.166(b)(14)(i) and 52.21(b)(14)(i). For particulate matter and sulfur oxides, the major source baseline date is January 6, 1975, consistent with section 169(4). *Id.* Thus, for major sources the construction or modification of which commences *after* the major source baseline date of January 6, 1975, increases in actual emissions[7] of particulate matter and sulfur oxides consume increment.

The "trigger date" and related "minor source baseline date" are defined by federal regulations codified at 40 C.F.R. §§ 51.166(b)(14)(ii) and 52.21(b)(14)(ii). The trigger date sets the point in time after which new or modified sources have to begin performing an increment analysis for a particular pollutant as part of the PSD permitting process. *See* 75 Fed. Reg. at 64,868. "The minor source baseline date is 'the earliest date after the trigger date on which a major stationary source or a major modification'" submits a complete PSD application addressing that pollutant

---

[6] This document is referenced in the Guideline on Air Quality Models. 40 C.F.R. Part 51, App. W, Preface n.2. EPA developed the NSR Manual for use in conjunction with New Source Review workshops and training, as guidance for permitting authorities to be used in implementing the PSD requirements of the New Source Review Program. *See id.* (Preface). This draft EPA training manual, which compiled recommendations from several EPA guidance memoranda, is frequently cited in decisions of the Environmental Appeals Board. *Available at* http://www.epa.gov/nsr/ttnnsr01/gen/wkshpman.pdf (last visited Apr. 5, 2013).

[7] "Actual emissions" is defined, with multiple variations, in EPA's regulations and the Wisconsin SIP. *See* Pet. Br. at 10-11; 40 C.F.R. §§ 51.166(b)(21) and 52.21(b)(21). The specific application of this term is not relevant to this petition.

in a particular baseline area. Order at 18 [JA __], quoting 40 C.F.R. §§ 51.166(b)(14)(ii) and 52.21(b)(14)(ii).

Finally, EPA regulations define the "baseline concentration" as the "ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date." Order at 18 [JA __], quoting 40 C.F.R. §§ 51.166(b)(13)(i) and 52.21(b)(13)(i). EPA's regulations also explain which emissions are excluded from the baseline concentration: "Actual emissions…from any major stationary source on which construction commenced *after* the major source baseline date." 40 C.F.R. §§ 51.166(b)(13)(ii)(*a*) and 52.21(b)(13)(ii)(*a*) (emphasis added).[8]

To illustrate using the example of particulate matter, the major source baseline date for particulate matter is defined by Congress as January 6, 1975. The trigger date is August 7, 1977, the date of the 1977 amendments to the Act, when the original statutory increments were established. The minor source baseline date for particulate matter in the applicable baseline area is the first day after August 7, 1977, on which a complete PSD application addressing particulate matter was received by the appropriate permitting agency for that area. Generally, actual emissions of particulate matter from all sources in existence in the baseline area *on the minor source baseline date* (which is area- and pollutant-specific) are included in the baseline concentration for that area. 40 C.F.R. §§ 51.166(b)(13)(i)(*a*) and

---

[8] The regulations further excluded from the baseline concentration "[a]ctual emissions increases and decreases…at any stationary source occurring after the minor source baseline date." 40 C.F.R. §§ 51.166(b)(13)(ii)(*b*) and 52.21(b)(13)(ii)(*b*). The Wisconsin SIP includes a substantively identical definition of "baseline concentration." *See* Wis. Admin. Code NR § 405.02(4) (2004).

52.21(b)(14)(i)(*a*). However, as Congress directed in section 169(4), emissions of particulate matter from any major stationary source on which construction commenced *after* January 6, 1975, are not included in the baseline concentration but consume increment instead. 42 U.S.C. § 7479(4); 40 C.F.R. §§ 51.166(b)(13)(ii)(*a*) and 52.21(b)(14)(ii)(*a*).

Here, Georgia Pacific is a major stationary source that originally commenced construction *prior* to January 6, 1975, and its initial (pre-modification) emissions are thus included in the baseline concentration and do not consume increment. In 2004, Georgia Pacific underwent a modification, and any resulting *increase* in emissions since the major source baseline date *as a result of the modification* consumes increment. 40 C.F.R. §§ 51.166(b)(13)(ii)(*a*) and 52.21(b)(14)(ii)(*a*); Order at 17-18, 21 [JA __]; *In re N. Mich.* at 46 [JA __].

### B. *The 1978 Rules*

EPA issued two rules implementing the PSD program in 1978. While they were substantially the same, one concerned the issuance of PSD permits by EPA (43 Fed. Reg. 26,388 (June 19, 1978) [JA __]), while the other (43 Fed. Reg. 26,380 (June 19, 1978) [JA __]) addressed the requirements for PSD permitting programs in state implementation plans. Of particular relevance to this matter, EPA provided in both rulemakings that its approach to increment consumption would be driven by tracking emission *changes. See, e.g.*, 43 Fed. Reg. at 26,400-01 [JA __] ("Increases in the baseline emission of sources contributing to the baseline concentration will also

consume increment…. Conversely, reductions in the baseline emissions of sources existing in 1977 generally expand the available PSD increment(s).")

*C. The 1980 Rule*

The 1978 rules were challenged in *Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979). Largely in response to the *Alabama Power* ruling, EPA promulgated a rule in 1980 maintaining some parts and revising other parts of the PSD program, in accordance with the D.C. Circuit's decision. 45 Fed. Reg. 52,676 (Aug. 7, 1980) [JA __]. The 1980 rule first added the definition of "baseline concentration," including the description of emissions excluded from the baseline.[9] The 1980 rule consistently reaffirmed, in several contexts involving increment consumption, EPA's approach of tracking *changes* in emissions in order to calculate available increment. For example, after noting that *Alabama Power* had not directly addressed "which source emissions consume increment" and "how to calculate the amount of increment consumed by those emissions," EPA stated it was continuing with the approach it set forth in the 1978 rules. 45 Fed. Reg. at 52,717 [JA __]. EPA stated that four categories of source emissions affect increment under that approach. *Id.* The second category is of particular relevance here: "(2) emissions *changes* occurring after the baseline date at sources whose previous emissions on the baseline date are included in the baseline concentrations." *Id.* (emphasis added).

---

[9] The definition of "baseline concentration" was modified in subsequent rulemakings to account for the development of increments for additional pollutants and to include a cross-reference to the definition of "actual emissions," added in 2002. *See* 53 Fed. Reg. at 40,670; 67 Fed. Reg. 80,186, 80,261 (Dec. 31, 2002). For all other purposes, the regulation has remained unchanged since 1980.

EPA continued: "The second and fourth categories affect increment on the basis of actual emissions *changes* from the emissions included in the baseline concentration." *Id.* (emphasis added); *see also id.* ("EPA has concluded that increment consumption and expansion should be based primarily on actual emissions increases and decreases."). EPA also explained:

> Any construction commencing at a major source since January 6, 1975, may result in an increase or decrease in actual source emissions. If an actual decrease involving construction at a major stationary source occurs before the [minor source] baseline date, the reduction will expand the available increment if it is included in a federally enforceable permit or SIP provision. *An actual increase associated with construction activities at a major stationary source will consume increment.*

*Id.* at 52,720 [JA __] (emphasis added).

This implementation of the Act is further illustrated by EPA's instruction on how to calculate increment consumption, which includes analyzing "emissions *changes* that have occurred at baseline sources and emissions from *new* minor and area sources since the baseline date." *Id.* at 52,718 [JA __] (emphases added); *see also* Order at 19 [JA __], quoting 45 Fed. Reg. at 52,717 ("increment consumption and expansion should be based primarily on actual emissions increases and decreases").

### D. The 2002 Rule

EPA also revised its PSD regulations in 2002. 67 Fed. Reg. 80,186 (Dec. 31, 2002) [JA __]. EPA stated in that rule that it was not changing the way a source's ambient air quality impacts are evaluated. *Id.* at 80,202 [JA __]. Indeed, EPA stated: "[A]ny *increase* in actual emissions, based on the existing definition of

'actual emissions,' consumes PSD increment whether it occurs through normal source operation or as a result of a physical or operational change." *Id.* (emphasis added).

### E. The 2010 Rule

In 2010, EPA promulgated a rule adopting, *inter alia*, increments for $PM_{2.5}$. 75 Fed. Reg. 64,864 (Oct. 20, 2010) [JA __]. EPA reaffirmed its long-standing interpretation of the Act and its regulations, now applied to $PM_{2.5}$:

> The inventory of increment-consuming emissions includes emissions from increment-affecting sources at two separate time periods—the baseline date and the current period of time. For each source that was in existence on the relevant baseline date (major source or minor source), the inventory includes the source's actual emissions on the baseline date and its current actual emissions. *The change in emissions over these time periods represents the emissions that consume increment* (or, if emissions have gone down, expand the available increment). For sources constructed since the relevant baseline date, *all* their current actual emissions consume increment and are included in the inventory.

*Id.* at 64,869 [JA __] (emphasis added). Thus, like the 1978, 1980, and 2002 Rules before it, the 2010 Rule provided that *changes* in a baseline source's emission levels consume or expand increment (depending on whether the source's emissions increase or decrease), in contrast to new sources constructed after the relevant baseline date, the entirety of whose emissions *consume* increment.

Until now, no one has ever challenged this aspect of the 1978-2010 rules.

## III.   Factual and Procedural Background

### A. Georgia Pacific's Title V Permit

Georgia Pacific manufactures sanitary paper products. Order at 3 [JA __]. The facility utilizes several coal-fired boilers, as well as boilers that burn petroleum

coke, No. 2 fuel oil, and natural gas. *Id.* at 3-4 [JA __]. Wisconsin issued Georgia Pacific's original Title V operating permit on November 13, 1998. *Id.* at 4 [JA __]. Georgia Pacific submitted a timely Title V renewal application to Wisconsin on November 20, 2002. *Id.* In 2005, Wisconsin took public comment on the draft permit and subsequently revised the draft permit significantly, such that Wisconsin took public comment on the revised draft permit in 2010. *Id.* Certain of Petitioners here submitted comments to the State on April 19, 2010, raising multiple concerns regarding a PSD permit Wisconsin issued to Georgia Pacific for a modification to the facility. Comments at 6-7 [JA __]. As relevant to this case, the commenters alleged that Georgia Pacific underwent a major modification in 2004, and that the PSD permit issued by Wisconsin did not properly calculate the amount of increment consumed as a result of that modification. *Id.* On May 10, 2011, Wisconsin issued its response to comments ("RTC"). [JA __]. Wisconsin articulated the same interpretation of "baseline concentration" as defined in the Wisconsin SIP as EPA interprets the substantively identical definition in its regulations. RTC at 7 [JA __]. Wisconsin's response relied on the reasoning of a decision by EPA's Environmental Appeals Board ("EAB")[10] that rejected, in the context of a PSD permit issued by EPA, the same arguments made by Petitioners here. *Id.*

As required by law, Wisconsin submitted the proposed permit to EPA on May 23, 2011. EPA did not object to the proposed final permit within the Agency's 45-day

---

[10] The EAB is an administrative tribunal created on March 1, 1992. *See* 57 Fed. Reg. 5320 (Feb. 13, 1992). It is the final agency decisionmaker on administrative appeals of EPA permitting decisions under major environmental statutes that EPA administers. *See* 40 C.F.R. §§ 1.25(e), 124.2.

review period, and Wisconsin therefore issued the final permit on July 26, 2011.

Order at 4 [JA __]. On July 23, 2011, Petitioners submitted a petition to EPA

requesting that EPA object to the issuance of the permit, pursuant to section

505(b)(2) of the CAA, 42 U.S.C. § 7661d(b)(2). *Id.* Petitioners raised three principal

grounds for objecting to the permit. Among the issues raised were that Wisconsin's

interpretation of applicable regulations (which tracked EPA's longstanding

interpretation)—that only *increases* in emissions from modifications occurring after

the major source baseline date consume increment—is wrong. Order at 14-15 [JA

__]; Petition to Object at 59-60 [JA __].

    *B. EPA's Order*

    EPA considered the issues raised in the Petition to Object, and on July 23,

2012, issued an Order denying the Petition to Object. Order at 2 [JA __]. With

respect to the issue presented in this petition for review, EPA noted that the

applicable PSD regulations in the Wisconsin SIP were the same as EPA's federal

regulations, Order at 14 [JA __], and that Wisconsin had articulated the same

interpretation of its regulations as EPA has applied since 1978. *Id.* at 17 [JA __].

Further, the Order observed that the EAB had, in a "well-reasoned decision,"

recently and thoroughly considered and rejected the same arguments Petitioners

raised before the Agency. *Id.* at 21 [JA __]. EPA thus found that Petitioners had not

demonstrated error in Wisconsin's permitting decision or that EPA should revisit

EPA's longstanding interpretation of the Act and federal PSD regulations that Wisconsin referenced to support its decision. Order at 21 [JA __].[11]

Notice of EPA's Order appeared in the Federal Register on August 21, 2012. 77 Fed. Reg. 50,504. Petitioners then filed their judicial petition for review in this Court challenging the Order within the time authorized by 42 U.S.C. § 7607(b)(1), although as discussed *infra*, the Court lacks jurisdiction to consider the single issue raised by this petition for review, because that issue actually constitutes a challenge to EPA's longstanding regulations.

---

[11] The Petition to Object raised, and EPA's Order addressed and denied, other issues relating to the 2004 modification and the PSD permit issued to Georgia Pacific. Order at 14-21 [JA __]. Petitioners have not sought review of these issues.

## STANDARD OF REVIEW

The determination of jurisdiction is a "threshold issue": if subject matter jurisdiction does not exist, "the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted). Petitioner bears the burden of demonstrating subject matter jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Here, section 307(b)(1) of the Act, 42 U.S.C. § 7607(b)(1), requires that petitions for review of final EPA action be filed within 60 days of Federal Register publication of notice of their promulgation. Suits brought outside that time frame generally may not be entertained.

On the merits, because the CAA sets forth no independent standard of review applicable to this case, this Court must review the EPA's actions pursuant to the Administrative Procedure Act ("APA"), which contemplates setting aside only agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Questions of statutory interpretation are governed by the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Under "*Chevron* Step One," the Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress' intent is clear from the statutory language, the Court must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, the statue is "silent or ambiguous with respect to the specific issue," the Court proceeds

to "*Chevron* Step Two" and must decide whether the Agency's interpretation is based on a permissible construction of the statute. *Id.* at 843.

Under *Chevron* Step Two, the Court "need not conclude that the agency construction was the only one it permissibly could have adopted or even that [the Court] would have interpreted the statute the same way that the agency did." *Sierra Club v. Johnson,* 436 F.3d 1269, 1274 (11th Cir. 2006) (quoting *Chevron*, 467 U.S. at 843 n.11). *See also Ali v. Achim*, 468 F.3d 462, 468 (7th Cir. 2006); *Nat'l Cable & Telecomms. Ass'n v. Brand X Servs.,* 545 U.S. 967, 980 (2005) (courts must accept an agency's reasonable interpretation of an ambiguous statute "even if the agency's reading differs from what the court believes is the best statutory interpretation") (*citing Chevron,* 467 U.S. at 843-44 & n.11). Rather, as this Court has outlined, "Courts have generally accorded substantial deference to the EPA's interpretation of the Clean Air Act Amendments, reasoning that 'considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer…." *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 906 (7th Cir. 1990) (quoting *Chevron*, 467 U.S. at 844). *See also Illinois EPA v. U.S. EPA,* 947 F.2d 283, 289 (7th Cir. 1991). This deference "follows logically from the highly technical provisions of the Amendments ... and is consistent with the Administrative Procedure Act, which provides that agency actions are to be set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)." *Wisconsin Elec.*, 893 F.2d at 906-07 (internal citations omitted).

To prevail under this deferential standard, parties challenging final agency action under the APA must show that the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *see also id.* (the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). Even a decision of "less than ideal clarity" should be upheld so long as "the agency's path may reasonably be discerned." *National Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658 (2007) (citations and internal quotation marks omitted).

Further, EPA's interpretation of its own regulations is entitled to the highest level of deference: it is to be given "controlling" weight unless "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citation omitted).[12] This is particularly true with respect to "technical and complex" matters arising under those regulations. *Wisconsin Elec.*, 893 F.2d at 910 (considering CAA new source review requirements). As the Supreme Court has explained, "[w]here … an agency's course of action indicates that the interpretation of its own regulation reflects its considered views … we have accepted that

---

[12] Petitioners rely in error on *Marlowe v. Bottarelli*, 938 F.2d 807 (7th Cir. 1991), which preceded *Auer*, for the proposition that the Court employs a *Chevron*-style two-step deference to an agency's interpretations of its own regulations. *See* Pet. Br. at 21.

interpretation as the agency's own, even if the agency set those views forth in a legal brief." *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 171 (2007) (citing *Auer*, 519 U.S. at 462).

## SUMMARY OF THE ARGUMENT

Although couched as an as-applied challenge to Wisconsin's application of its state implementation plan to Georgia Pacific's Title V permit, this petition for review in fact presents a facial attack on various EPA rulemakings implementing the 1977 Amendments to the Clean Air Act. In those Amendments, Congress established definitions for the PSD program, including defining "construction" to include "modifications," as well as a formula for calculating a "baseline concentration" for sulfur oxides or particulate matter in any air quality area subject to the PSD program. The formula results in the *inclusion* in the baseline concentration of emissions from any major source that initially commenced construction *before* January 6, 1975—what EPA has called the "major source baseline date." Congress also specifically *excluded* from the baseline concentration emissions from major sources that commenced construction *after* the major source baseline date.

Congress left unanswered the question at issue here: what portion, if any, of the emissions from a major source *built prior to January 6, 1975, but modified later*, consume increment and what portion is reflected in the baseline concentration? By leaving this gap, Congress vested EPA with the authority to interpret and implement the statute. EPA did so via rulemakings in 1978 and 1980, specifying that *increases* in emissions from a modification of a source built prior to January 6, 1975, but modified after that date, consume increment, while the rest of that major source's emissions remain in the baseline concentration. Petitioners incorrectly

29

contend that EPA's interpretation is foreclosed by the plain meaning of section 169(4) of the Act, 42 U.S.C. § 7479(4).

This Court lacks jurisdiction to consider this issue—the sole issue raised in this case—because it is, at core, an untimely challenge to final actions taken by EPA in 1978 and 1980. EPA reaffirmed its interpretation of the Act and its regulations in rulemakings in 2002 and as recently as 2010. Section 307(b)(1), 42 U.S.C. § 7607(b)(1) provides that a petition for review of nationally applicable rulemakings such as those at issue here must be filed within 60 days of publication in the Federal Register, and only in the United States Court of Appeals for the District of Columbia Circuit. Petitioners here present purely legal arguments that could and should have been raised at the time EPA published its rulemakings in 1978, 1980, 2002, or 2010. Because the time to challenge these actions has long since passed, and because this Court is without jurisdiction to consider the validity of nationwide rules issued under the Clean Air Act in any event, the petition must be dismissed.

Even if this Court had jurisdiction, the language of section 169(4) supports EPA's interpretation, and not Petitioners'. Congress' formula defining a baseline concentration results in the inclusion in the baseline concentration for an area emissions from major sources built before January 6, 1975. Petitioners' interpretation of the statute—under which the *entirety* of every modified source's emissions (even a source built before January 6, 1975) consumes increment, and that none of those emissions remain in the baseline concentration—would

effectively read this provision out of the statute for any source that is later modified. EPA's interpretation, on the other hand, focuses on *changes* in emissions that result from later construction (including modifications), such that *changes* in emissions from post-January 6, 1975, construction (including modifications) either consume or expand increment. Accordingly, only *increases* in emissions from post-January 6, 1975, modifications consume increment, and the rest of the facility's emissions remain in the baseline concentration. EPA's interpretation is reasonable and thus entitled to deference.

EPA reasonably determined that Petitioners had not "demonstrated," within the meaning of section 505(b)(2), 42 U.S.C. § 7661d(b)(2), that Georgia Pacific's Title V permit is not in compliance with requirements of the Act, and that they had not presented a compelling basis for EPA to revisit its longstanding interpretation of the Act and EPA's implementing regulations. Accordingly, EPA reasonably denied the petition to object.

# ARGUMENT

## I.    The Petition Is Time-Barred.

The Court should not reach the merits of Petitioners' purported challenge to the Order, because the sole issue they raise is in fact a challenge to EPA's interpretation of CAA section 169(4), 42 U.S.C. § 7479(4), as set forth in four longstanding rulemakings of nationwide applicability, promulgated in 1978, 1980, 2002 and 2010. The time to challenge those actions has long passed. The Act sets a strict time limit for challenging EPA rulemakings: 60 days from the date on which notice of their promulgation is published in the Federal Register. 42 U.S.C. § 7607(b)(1). This time limit "'is jurisdictional in nature, and may not be enlarged or altered by the courts.'" *NRDC v. EPA*, 571 F.3d 1245, 1265 (D.C. Cir. 2009) (citation omitted). Thus, if the petitioners have failed to comply with it, the Court is "powerless to address their claim." *Medical Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011). Petitioners here failed to comply with this requirement with regard to their claim that EPA incorrectly interprets section 169(4) of the Act.

### A.    The 1978-2010 Rules Set Forth EPA's Reading of the Act, and the Arguments Made Here Could and Should Have Been Raised Then.

Petitioners contend that section 169(4), 42 U.S.C. § 7479(4), plainly *commands* that *all* emissions from any facility modified after January 6, 1975, consume increment, and no part of that facility's emissions can be attributable to baseline concentration, even if the facility was initially constructed *before* January 6, 1975. Pet. Br. at 22-25. Therefore, Petitioners' argue, EPA's interpretation of the

statute and the provisions of the Wisconsin SIP that are substantively identical to EPA's regulations implementing section 169(4), is foreclosed by the plain meaning of the statute. *Id.* at 22-25, 30-34. However, EPA's reading of the statute's PSD increment consumption provisions was clearly and unambiguously set forth in its 1978, 1980, 2002 and 2010 rules, and the legal arguments advanced by Petitioners here could and should have been presented at that time.

EPA's interpretation was first reflected in the 1978 rules, which consistently defined EPA's approach to increment consumption as driven by changes in emissions at a source: "The Administrator feels that increment consumption can best be tracked by tallying changes in the emission levels of sources contributing to the baseline concentration *and* increases in emissions due to new sources." 43 Fed. Reg. at 26,400 (emphasis added). EPA continued: "Thus, to implement the air quality increment approach set forth in the Act, the reviewing authority needs to verify that all *changes from baseline emission rates* (decreases or increases as appropriate) in conjunction with the increased emissions associated with approved new source construction will not violate an applicable increment of NAAQS." *Id.* (emphasis added). This is critical: EPA indicated that *changes* in emissions from sources contributing to the baseline concentration, such as those from the 2004 modification at Georgia Pacific at issue here, would consume increment, and separately, emissions from new sources would *also* consume increment. This is precisely the issue presented in the instant petition for review. *See* Pet. Br. at 22-25.

EPA also articulated its policy for using "actual emissions" to implement its approach to the baseline concentration, stating that this policy "is consistent with the intent of the Act to base increment consumption on all emission *increases* from new *and modified sources*, but to allow consumption of the increment to occur from only certain non-modification activities (e.g., some fuel-switches) of existing sources." *Id.* (emphasis added). That EPA focused on emission *increases* is further exemplified by a list added to the PSD regulations of emissions activities—all attributable to emissions increases—that could be excluded from the increment consumption calculation upon a State's request. *Id.* at 26,405; *see also* 40 C.F.R. § 51.166(f)(1) and 52.21(f)(1). Indeed, EPA's regulations simply copied section 163(c), 42 U.S.C. § 7473(c), in which Congress (repeatedly) discussed "increase[s] in emissions." 42 U.S.C. §§ 7473(c)(1)(A), (B), (C), (D).

Briefs submitted by industry petitioners challenging the 1978 rules in *Alabama Power* demonstrate that they understood that EPA would consider *increases* in emissions from pre-baseline date sources to consume increment. For example, the State of Texas expressed its understanding that "[a]llowable increments above the baseline would be consumed by increased emissions not included within the baseline." Brief for Petitioners The State of Texas in No. 78-1825 and the District of Columbia in No. 78-1752, D.C. Circuit Nos. 78-1006 (and consolidated cases) (Mar. 15, 1979) at 16 [JA __] (hereinafter "Texas Brief").

Texas was primarily concerned with the aspect of EPA's 1978 rules stating that increased emissions resulting from a source switching its source fuels (*e.g.,*

from natural gas to oil) would consume increment. *Id.* at 2 [JA __]. Specifically, the 1978 Rules exempted from increment consumption emissions increases resulting from federally-ordered fuel switching. *Id.* at 10-11, 13 [JA __]; 43 Fed. Reg. at 26,405. Texas challenged the rules for not similarly exempting from increment consumption voluntary fuel switches or those ordered by a State. Texas Brief at 10-11, 13 [JA __]. With respect to voluntary fuel switches, EPA determined that a major source constructed prior to January 6, 1975, designed to accommodate multiple fuels, would not need to obtain a PSD permit for a major modification if that source later switched fuels. *Id.* at 15 [JA __]; 43 Fed. Reg. at 26,404 [JA __].

However, as Texas wrote:

> While such fuel switches were thus deemed to be exempt from PSD permitting, EPA indicated in the preamble to its PSD regulations that *increased* emissions from fuel switches would be counted against the allowable PSD increments where the switches occurred after the baseline determination date.

Texas Brief at 15, citing 43 Fed. Reg. at 26,400 (emphasis added).

> The D.C. Circuit in *Alabama Power* described this issue as
>
> whether *increased* emissions from a major facility's voluntary switch from a relatively clean but scarce fuel to a more abundant but dirtier fuel are to consume the increments or rather are to be included within the baseline when the facility was capable of utilizing the alternate, more plentiful fuel prior to January 6, 1975.

636 F.2d at 377 (emphasis added). The D.C. Circuit noted EPA's position that such fuel switches do not constitute major modifications, but that resulting increases in emissions do consume increment. *Id.* at 377-78 & n.29 (citing 43 Fed. Reg. at 26,397). The court affirmed EPA's regulations on this issue. 636 F.2d at 381. In a later discussion, the *Alabama Power* court reiterated this point: "[A]s we have

explained in our discussion of the fuel-switches issue…only the actual emissions of a major source operating on the date of the baseline determination and on which construction commenced prior to January 6, 1975, are grandfathered; *additional emissions from such a source consume the increment.*" *Id.* at 392 n.160 (emphasis added).

Critically, in the *Alabama Power* decision and the Texas Brief, there was no suggestion that a voluntary fuel switch would result in the entirety of a facility's emissions consuming increment. That a fuel switch is not a modification triggering PSD does not distinguish this example from the instant matter: both involve pre-January 6, 1975 major stationary sources, the initial emissions from which are included in the baseline concentration. Both include increases of emissions, either from a later modification or from a fuel switch, and in both, as the court stated in *Alabama Power*, only the *increased* emissions consume increment; the remainder (*i.e.*, the source's initial actual emissions) continue to be included in the baseline concentration.[13]

The 1980 Rule reiterated EPA's interpretation of the PSD increment consumption provisions as described in detail *supra* at 19-20 (discussing 45 Fed.

---

[13] As further evidence that it was widely understood that EPA considered only increases to consume increments, the D.C. Circuit wrote: "Nor is there any quarrel over the scope or import of the last sentence of Section 169(4): emissions of sulfur dioxide and particulate matter from major facilities on which construction began after January 6, 1975, are not grandfathered into the baseline but rather count against the increments, even if such facilities are operating on the date of the first permit application." 636 F.2d at 376-77. The proposed interpretation offered by Petitioners here, that all of a modified source's emissions consume increment, would have undoubtedly been a source of significant quarrel had that been EPA's implementation of the Act.

Reg. 52,676); *see also* Order at 19 [JA __] (quoting same). Indeed, in discussing section 169(4), EPA wrote in the 1980 Rule: "The provision implies that both emissions increases and decreases should be considered for their impact on available increments." 45 Fed. Reg. at 52,720. This articulates the basic principle of EPA's interpretation of section 169(4), 42 U.S.C. § 7479(4), and explains EPA's approach to increment consumption as driven by changes in emissions, whether in the particular setting at issue here or in the analogous fuel switching scenario discussed above.

Indeed, EPA noted in the 1980 Rule that *Alabama Power* had affirmed its position on increment consumption by increased emissions from voluntary fuel switches, and stated further: "Since actual air quality on the baseline date would not reflect these increases, their exclusion from baseline concentrations is consistent with EPA's actual air quality approach to baseline concentrations." *Id.* at 52,714. Also consistent with EPA's actual air quality approach is EPA's implementation of the PSD provisions at issue here – that only *changes* in emissions from modified major stationary sources that originally commenced construction prior to January 6, 1975, consume or expand increment, and not the entire facility's emissions, as later constructed or modified. There is no question that EPA's interpretation and implementation of the PSD increment consumption provisions challenged here was set forth in the 1978 and 1980 Rules, but not challenged at that time.

While any challenge to EPA's reading of the PSD increment consumption provisions arguably should have been made when it was first set forth – *i.e.*, in 1978, or at least in 1980 – the 2002 Rule also squarely reflected EPA's (by then) longstanding reading. *See supra* at 20-21 (quoting 67 Fed. Reg. at 80,202 [JA __]). Yet again, no challenge was made to that aspect of the Rule. *See New York v. EPA*, 413 F.3d 3, 10-11 (D.C. Cir. 2005) (listing petitioners' challenges). Finally, the 2010 Rule adopting increments for PM$_{2.5}$ most recently reflected EPA's more-than-three-decades-old reading of the Act.[14] *See supra* at 21 (quoting 75 Fed. Reg. at 64,869 [JA __]). And still, as with the prior rules, no challenge was made to that aspect of the Rule. *See Sierra Club v. EPA*, 705 F.3d 458, 461 (D.C. Cir. 2013) (listing scope of decision).

Thus, the time to challenge EPA's rulemakings implementing the PSD increment consumption provisions has long passed. 42 U.S.C. § 7607(b). *See Am. Rd. & Transp. Builders Ass'n v. EPA,* 705 F.3d 453 (D.C. Cir. 2013) (dismissing petition for review as time-barred challenge to EPA regulations). At the very latest, it should have been brought by December 20, 2010, the last date on which the 2010 Rule could have been challenged.

---

[14] Indeed, in the more than thirty years since the 1977 Clean Air Act Amendments, during which period EPA has on several occasions promulgated nationally applicable regulations implementing the PSD program (*e.g.*, 1978, 1980, 1988, 1993, 2002, 2005, and 2010), EPA has not once indicated that increment consumption for sources that existed as of the major source baseline date (*i.e.*, January 6, 1975), and are subsequently constructed or modified, is calculated by anything other than *changes* in such a source's emissions. In other words, it has been clear from EPA's rulemakings over the last 30 years that EPA considers increases from modified sources that existed as of the major source baseline date to consume increment; never has EPA interpreted the Act in the manner advocated by the Petitioners here.

## II.   EPA Reasonably Concluded Petitioners Did Not Demonstrate A Deficiency in the Title V Permit.

Even if the Court determines it has jurisdiction, the petition must be denied, because EPA reasonably determined that Petitioners had not demonstrated that the Title V permit was inconsistent with any requirement of the Act, because Petitioners did not demonstrate any error in EPA's interpretation of section 169(4), 42 U.S.C. § 7479(4), or in its interpretation of implementing federal or state regulations.

Before EPA will be obligated to object to a Title V permit, a petitioner seeking such an objection must *demonstrate* to EPA that the Title V permit at issue is not in compliance with the Act. 42 U.S.C. § 7661d(b)(2); *Citizens Against Ruining the Environment*, 535 F.3d at 677-78. *See supra* at 11-13. Because the permit in this case was issued on the basis of state regulations (identical to EPA's) that the State interpreted consistent with EPA's longstanding interpretation of federal regulations governing which emissions will be counted as baseline emissions and which will consume increment, Petitioners face a daunting task in demonstrating that the permit is inconsistent with the requirements of the Act.

In their petition to the Agency and in their brief before this Court, Petitioners attempt to show error by challenging EPA's interpretation of the statute and the Wisconsin SIP (which mirrors EPA's regulations). Petition to Object at 59-63 [JA __]; Pet. Br. at 22-25, 30-34. EPA reasonably rejected this attempt, relying in part upon the recent rejection by EPA's Environmental Appeals Board of the same statutory interpretation argument advanced by Petitioners. Order at 21 [JA __]; *see*

*In re N. Mich.* at 36-46 [JA __]. Given the statutory ambiguities discussed in this brief and the reasons underlying EPA's promulgation of those longstanding regulations, *see supra* at 14-21 and *infra* at 40-42, EPA reasonably found that Petitioners had "not presented a compelling basis for EPA to reconsider [the EAB's] interpretation." Order at 21 [JA __]; *see Citizens Against Ruining the Environment*, 535 F.3d at 678 (holding EPA has discretion to determine requirements for an adequate demonstration). EPA thus reasonably concluded that Petitioners had not satisfied their burden of demonstrating error in Wisconsin's and EPA's interpretations of the Act, EPA's PSD regulations, or Wisconsin's SIP (which mirrors EPA's regulations), thus failing to demonstrate any deficiency in the permit. Order at 21 [JA __].

> A. *Congress Did Not Speak Directly to How to Calculate Consumption of Increment from a Major Stationary Source Initially Constructed Prior to January 6, 1975, the Emissions From Which Later Increase Due to a Subsequent Modification.*

As this matter presents a question of statutory interpretation, the inquiry begins with the language of the statute. *See Wisconsin Elec.*, 893 F.2d at 907 (citation omitted); *see supra* at 14-15 (text of section 169(4)). Petitioners challenge EPA's interpretation solely under *Chevron* Step One – contending that section 169(4), 42 U.S.C. § 7479(4), plainly *commands* that *all* emissions from any facility modified after January 6, 1975, consume increment, and no part of that facility's emissions can be attributable to baseline concentration, even if the facility was initially constructed *before* January 6, 1975. Since Petitioners offer only a *Chevron* Step One argument, their petition must be denied if the Court concludes that "the

statute is silent or ambiguous with respect to the specific issue." *Chevron*, 467 U.S. at 843. Indeed, if the Court determines that EPA's is a permissible interpretation of the statute, that determination itself necessarily compels rejection of Petitioners' Step One argument. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Here, an examination of the statute reveals that section 169(4), 42 U.S.C. § 7479(4), is ambiguous, and EPA reasonably interprets the ambiguous language to mean that only the *increased* emissions from such a later-modified source consume increment, while the remainder are included in the baseline concentration.

In certain respects, Congress spoke directly to how to calculate a baseline concentration for a pollutant. The first sentence of section 169(4), 42 U.S.C. § 7479(4), plainly specifies that the baseline concentration must reflect air pollutant concentrations (and hence emissions that produce such concentrations) that exist when the first PSD permit application is submitted for a specific pollutant (the "minor source baseline date"). 42 U.S.C. § 7479(4). The second and third sentences reflect a similar concept, but use a different date for *major* sources: January 6, 1975. In the second sentence, Congress specifically *added* to the baseline concentration emissions from *existing* major sources (or those that had at least commenced construction by that date). *Id.* In the third sentence, Congress *excluded* from the baseline concentration emissions from *new* major facilities not yet under construction as of January 6, 1975. *Id.*

Importantly, Congress also incorporated the concept of "modifications" into the definition of "construction," used in the third sentence, through a reference to

41

section 111(a) of the Act, 42 U.S.C. § 7411(a). 42 U.S.C. § 7479(2)(C). "Construction" thus includes both initial construction *and* the subsequent modification of an existing facility. The fact that the term "construction" includes both initial construction and subsequent modification creates real ambiguity, because it is possible for the same source to be covered by both the second and third sentences of section 169(4). That is, a source could commence its initial construction prior to January 6, 1975; thus, per the second sentence, its emissions are included in the baseline concentration. But the same source could again "commence construction" *after* January 6, 1975, by virtue of a later modification, such that its emissions are excluded from the baseline concentration pursuant to the third sentence of section 169(4).

In sum, Congress did not speak directly to how to account for emissions from major emitting facilities initially constructed prior to January 6, 1975, that again commence "construction" after that date because they undergo a subsequent modification. Rather than prescribing a specific solution for this situation, Congress instead established the basic formula for calculating a baseline concentration in section 169(4), and left EPA to implement the statutory design. This is a classic delegation of gap-filling authority warranting *Chevron* deference in a highly technical area that demands specialized expertise. *Chevron*, 467 U.S. at 843; *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 339 (2002).

### B. EPA Reasonably Interprets the Statute to Mean that Only Increases in Emissions from a Later Modified Major Source Consume Increment.

EPA, reasonably implementing its delegation of authority to fill the gaps left by the statutory definition of baseline concentration, has since the 1977 CAA Amendments stated that only *changes* in emissions from sources contributing to the baseline concentration consume or expand increment. By requiring increment analyses to focus on *changes* in emissions, EPA's approach is consistent with Congress' overall purpose in enacting the PSD provisions of the Act. Congress expected the PSD review process to assure that "economic growth will occur in a manner consistent with the preservation of existing clean air resources," 42 U.S.C. § 7470(3), and Congress expressly recognized that some increase in air emissions could be allowed as long as an adequate review is conducted by the permit authority. *Id.* § 7470(5). As the D.C. Circuit observed in *Alabama Power*, the program thus reflects a "balance" between Congress' "determination to preserve the clean air regions of the Nation" and "other vital economic and energy considerations." 636 F.2d at 387. EPA reasonably interprets the ambiguity in section 169(4) in furtherance of this congressional design.

EPA's focus on changes in emissions applies to modifications, which by definition are limited to those that result in an increase in emissions, *see* 42 U.S.C. § 7411(a). EPA's interpretation is that only the *increased emissions* consume increment, not the emissions of the entire source as modified. This interpretation of the statute is consistent with the Act because the emissions from the facility that are included in the baseline concentration per congressional direction (through the

second sentence of section 169(4)) remain in the baseline concentration no matter what the source may later do.

This makes sense: the program is designed to prevent the significant deterioration of air quality while simultaneously allowing for continued economic growth. Including existing major source emissions in the baseline concentration as Congress directed in the first two sentences of section 169(4) thus establishes a benchmark for existing air quality. Requiring that emissions from *new* major sources consume increment (per the third sentence), limits the number of new major sources that can construct in an area, thus preventing deterioration of the air quality from the benchmark. It thus follows logically from the overall purpose of the PSD program and the formula established by Congress in section 169(4) that *increased* emissions from a *modification* to a source whose emissions are included in the baseline concentration consume increment, but that the *entirety* of that source's emissions do not; the pre-modification emissions remain in the baseline concentration. Unlike Petitioners' interpretation, EPA's interpretation maintains the baseline concentration in reconciling the apparent conflict between the second and third sentences of section 169(4) as applied to facilities that are constructed before 1975 but subsequently modified – such as the Georgia Pacific facility at issue here.

EPA's interpretation is supported by section 163(c) of the Act, which repeatedly refers to "increase[s] in emissions" when delineating activities that result in increased emissions and thus consumption of increment, unless a Governor

sought an exemption for such activities. 42 U.S.C. § 7473(c); *see supra* at 34 (discussing EPA regulations implementing section 163(c)). Further, Congress defined "modification" as a change that *increases* emissions, 42 U.S.C. § 7411(a)(4), and incorporated that definition into section 169. *Id.* § 7479(2)(C). It follows from Congress' definition of modification as turning on *increases* in emissions that only the *increase* in emissions consumes increment.

The EAB examined this same question of statutory interpretation in a decision issued in 2009, relied upon by EPA in its Order. *See In re N. Mich.* at 36-46 [JA __]; Order at 21 [JA __]. The EAB examined the text of the statute, EPA's rulemakings, and legislative history in concluding that a permissible reading of the statute is that *actual emissions from the modification* consume increment, not the emissions from the entire facility. Order at 18 (citing *In re N. Mich.* at 46) [JA __]. The EAB's interpretation of section 169(4) is entitled to *Chevron* deference. *See Resisting Envtl. Destruction on Indigenous Lands v. EPA*, 704 F.3d 743, 749 (9th Cir. 2012); *see also In re Lyon Cnty. Landfill*, 406 F.3d 981, 984 (8th Cir. 2005); *Sultan Chemists, Inc. v. EPA*, 281 F.3d 73, 79 (3d Cir. 2002).

Petitioners' chief complaint—that EPA "read[s] the word 'increases' into the statute," Pet. Br. at 24-25—is thus without merit. EPA reasonably interprets the three sentences of section 169(4), read together, to mean that with respect to a source initially constructed before January 6, 1975, and later modified, only the increased emissions from the modification consume increment, and not the entire source's modifications.

### C. The Legislative History Supports EPA's Longstanding Approach to Increment Consumption as Based on Changes in Emissions.

Review of the legislative history of the 1977 CAA Amendments is not necessary to conclude that EPA has reasonably implemented the PSD program. Nonetheless, contrary to Petitioners' arguments, the available legislative history supports EPA's regulatory program.

Petitioners dispute that a report by the Senate Committee on Environment and Public Works supports the EAB's reasoning (as followed in EPA's Order). Pet Br. at 37-38. The EAB quoted the report as explaining, with respect to the exclusion from the baseline concentration of emissions from major sources commencing construction after January 6, 1975, "this of course does not include facilities built as replacements for sources in existence before January 6, 1975. Only the emissions from such replacement facilities *in excess of those* from the source replaced would be deducted from the increment." *In re N. Mich.* at 42-43 (quoting S. Rep. No. 95-127 at 97 (1977), *reprinted in* 3 A Legislative History of the Clean Air Act Amendments of 1977, at 1471 (1978) (the "Senate Report")) (emphasis original to EAB). The EAB reasonably concluded that this indicated Congress' intent that changes in emissions drive increment analyses, for both replaced and modified sources. *Id.*

Petitioners' objection is premised on its mistaken belief that "projects that do not increase emissions do not constitute 'construction' within the meaning of 42 U.S.C. § 7479(4)." Pet. Br. at 28. Petitioners' argument relies on the assumption that "construction" is limited to "modifications," which as discussed above, do

46

include an increase in emissions in their definition. But there is no basis for this position, and "construction" has a much broader meaning, not limited to modifications. *See, e.g.*, *infra* at 53 (discussing addition of pollution control equipment as an example of construction).

EPA's definition of construction for the PSD program forecloses Petitioners' argument: "*Construction* means any physical change or change in the method of operation…that would result in a *change* in emissions." 40 C.F.R. § 51.166(b)(8) (emphasis added). This is consistent with the quoted passage from the Senate Report, which is best illustrated by an example. Major stationary source A is initially constructed in 1974. Major stationary source B is initially constructed in 1984, and replaces source A. Source B emits 1,500 tons of particulate matter, while source A emitted 1,000 tons. In that situation, the Senate Report evinces Congress' intent that, on a net basis, only 500 tons of emissions would consume increment: while the increase in 1,500 tons of PM from source B consumes increment, the reduction of 1,000 tons of emissions from source A expands the available increment, so the net impact is based on 500 tons of increased emissions. This is the point made by the EAB, using replaced sources as an example: that Congress clearly contemplated *changes* (whether increases or decreases) in emissions to affect increment. *In re N. Mich.* at 43 [JA __].

While this example considers replaced sources, EPA's interpretation of the Act and its regulations is the same for the situation here, where a pre-January 6, 1975, major stationary source is later modified. *See In re N. Mich.* at 42-43 [JA __]

(applying discussion of replaced sources to modified sources by implication). EPA's implementation of section 169(4) such that only emission increases from the modification consume increment is consistent with the Senate Report, and most importantly, with the Act.

Petitioners also mischaracterize testimony by industry representatives quoted by the EAB. Pet. Br. at 26-27; *In re. N. Mich.* at 41-43 [JA __]. Petitioners are correct that the testimony expresses concern that a replacement unit at a facility will consume increment, even if it is replacing a retired unit. Pet. Br. at 26. Petitioners then distort this testimony by claiming it is actually a complaint "that by modifying a plant, all of the plant's emissions would consume the increment, instead of only the amount of any emission increase consuming increment." *Id.* This goes too far. Nothing in the industry statement, or the fact that Congress did not change the provision then at issue, *see In re N. Mich.* at 42 [JA __], suggests that Congress intended for the replacement of a single retired unit to mean the *entire* facility's emissions consume increment, instead of *that one unit's* emissions consuming increment and the retirement of the replaced unit expanding the available increment. And, as the EAB rightly pointed out, the Senate Report's (a more reliable source of legislative history) discussion of replaced sources indicates that Congress did expect that only increases in emission levels due to source replacement would consume increment. Ultimately, if this particular source of legislative history is applicable to the situation at hand, it certainly does not provide support for Petitioners' interpretation of section 169(4).

### D. Petitioners Argue Without Merit that EPA's Interpretation of the Wisconsin SIP, and by Extension EPA's Own Regulations, Conflicts with the Plain Language of those Regulations.

In drafting the 1977 CAA Amendments, Congress delegated to EPA, as the agency charged with administering the statute, the responsibility to interpret and implement the Act. As EPA explained in the Order and as discussed above, Congress established a formula for the baseline concentration, then left EPA to implement that formula. Order at 17-18 [JA __]. EPA's interpretation of the statute led to the regulatory definitions for minor source baseline date, major source baseline date, and trigger date. *Id.* EPA also promulgated the regulatory definition of baseline concentration at 40 C.F.R. §§ 51.166(b)(13) and 52.21(b)(13), and, at issue here, the exclusions from the baseline concentration at subsection (ii). *See supra* at 17.

Wisconsin adopted *substantively identical* regulations in its SIP. *Compare* Wis. Admin. Code NR § 405.02(4)(a) *with* 40 C.F.R. §§ 51.166(b)(13)(ii) and 52.21(b)(13)(ii); Order at 18 [JA __]. Petitioners contend that EPA's interpretation of the Wisconsin SIP conflicts with the plain language of those regulations. Pet. Br. at 30-34. In the Order, EPA found no error in Wisconsin's interpretation of its SIP, which relied on EPA's interpretation of substantively identical federal regulations. Order at 17 [JA __], discussing RTC at 7 [JA __]. Thus, it is EPA's interpretation of its own regulations that is truly at issue. EPA is entitled to the highest deference in the interpretation of its own regulations, *Auer*, 519 U.S. at 461, particularly in this highly technical context. *Wisconsin Elec.*, 893 F.2d at 910; *see also Long Island Care at Home*, 127 S. Ct. at 2349.

49

Petitioners essentially contend that the definition of "baseline concentration" in the Wisconsin SIP—and thus actually EPA's regulations—was meant to reflect *Petitioners'* interpretation regarding consumption of increment from modified sources. In support of this argument, Petitioners argue that because Wis. Admin. Code NR § 405.02(4)(b)(2) specifies that "[a]ctual emissions increases and decreases at any stationary source occurring after the minor source baseline date" are excluded from the baseline concentration, EPA must err in its interpretation of (b)(1), which does not specify increases and decreases in emissions in excluding from the baseline concentration emissions from major sources constructing after January 6, 1975. Pet. Br. 31-33. Again, these sections of the Wisconsin SIP are substantively identical to EPA's regulations. *See* 40 C.F.R. §§ 51.166(b)(13)(ii)(*a*), (*b*) and 52.21(b)(13)(ii)(*a*), (*b*).

Petitioners' argument fails because it does not demonstrate the terms of subparagraph (b)(1) preclude the interpretation applied by Wisconsin and EPA in the context of a modification of a major source that was initially constructed before the major source baseline date. This subparagraph covers "actual emissions . . . from any major stationary source on which construction commenced after the major source baseline date." Wis. Admin. Code NR § 405.02(4)(b)(1); *cf.* 40 C.F.R. §§ 51.166(b)(13)(ii)(*a*) and 52.21(b)(13)(ii)(*a*). Petitioners do not demonstrate that EPA cannot permissibly interpret this language to describe the actual emissions attributable to the construction (*i.e.*, the modification) that commenced after the major source baseline date. Nor do they show that this language necessarily *must*

50

encompass actual emissions from construction that commenced prior to that date, *i.e.*, emissions in the baseline concentration.

EPA's interpretation is consistent with the regulatory definition of "construction": "any physical change or change in the method of operation . . . that would result in a *change* in emissions." 40 C.F.R. § 51.166(b)(8); *see also* Wis. Admin. Code NR § 405.02(11) (substantively identical definition in Wisconsin SIP). The concept of emissions *changes* is thus incorporated in the regulations challenged by Petitioners.

Further, identifying differences in regulatory provisions does nothing to contradict the fact that over the past 35 years, EPA has on several occasions articulated *consistently* its interpretation of the challenged regulations (which differs significantly from Petitioners'). In the Order, EPA reasonably relied on the reasoning articulated by the EAB in rejecting Petitioners' arguments.[15] Order at 18, 21 [JA __]. The EAB reviewed EPA's regulations and rulemakings dating back to 1978. *In re N. Mich.* at 36-37, 43-45 [JA __]; *see Wisconsin Elec.*, 893 F.2d at 915 (giving deference to EPA's explanation of its regulations in preamble to 1974 rulemaking). The EAB considered *inter alia* the then-most recent EPA pronouncements on this issue, a proposed rulemaking in 2007. *Id.* at 37, 40, 43-45, citing 72 Fed. Reg. 31,372 (June 6, 2007). For example, EPA in that proposed rule stated:

---

[15] Although articulated by the EAB in the context of a permit issued under EPA's regulations, the analysis is equally applicable when the same language is used in the Wisconsin SIP.

> For each source that was in existence on the relevant baseline date (major source or minor source), the inventory includes the source's actual emissions on the baseline date and its current actual emissions. The change in emissions over these time periods represents the emissions that consume increment.

*Id.* at 31,377. EPA further explicitly stated that 40 C.F.R. §§ 51.166(b)(13)(ii) and 52.21(b)(13)(ii) implement this interpretation of the statute. *Id.* at 31,380. This is consistent with EPA's pronouncements in the 1978 and 1980 Rules, also quoted by the EAB. *See supra* at Argument I.A (discussing 1978 and 1980 Rules); *see also In re N. Mich.* at 43-44 [JA __].[16]

### E. Petitioners' Interpretation of the Act Leads to Results Inapposite to the Purpose and Design of the PSD Program.

As noted above, the PSD program is designed to ensure that "economic growth will occur in a manner consistent with the preservation of existing clean air resources." 42 U.S.C. § 7470(3). Congress recognized that this approach—preserving clean air while allowing for economic growth—did not foreclose an increase in emissions, so long as the decision allowing for increased emissions was subject to adequate review. *Id.* § 7470(5). Petitioners' desired interpretation of the PSD

---

[16] EPA's interpretation is also articulated in the Draft NSR Manual. In the subsection titled "Increment Consumption and Expansion," EPA wrote:

> Emissions increases that consume a portion of the applicable increment are, in general, all those *not* accounted for in the baseline concentration and specifically include: actual emissions *increases* occurring after the major source baseline date [*i.e.*, January 6, 1975], which are associated with physical changes or changes in the method of operation (*i.e.*, construction) at a major stationary source.

NSR Manual at C.10 (emphases original and added).

provisions is fundamentally at odds with the Congressional design and would lead to absurd results, as demonstrated by the following two examples.

Both examples center on a hypothetical facility: a major stationary source that initially commenced construction prior to January 6, 1975. This hypothetical facility emits 1,500 tons of particulate matter, all of which are included in the baseline concentration. The first example: Adding pollution control equipment qualifies as "construction" under EPA's regulatory definition, *see supra* at 47, because it is a physical change to the facility that results in a change in emissions. 40 C.F.R. § 51.166(b)(8). The hypothetical facility added pollution control equipment in 1995, reducing its emissions of particulate matter from 1,500 tons to 1,000 tons. Under Petitioners' interpretation, because the hypothetical facility commenced "construction" in 1995, the pollutant concentration associated with 1,000 tons of emissions *consume* increment, even though the facility actually *reduced* its emissions. Petitioners' interpretation thus hinders economic growth by perversely reducing the amount of available increment when a facility predating the major source baseline date reduces its emissions. This patently absurd result is clearly at odds with Congress' intent when it added the PSD program to the CAA.

In the second example, the hypothetical facility undergoes a major modification in 1995 that results in its emissions of particulate matter increasing by 40 tons per year, to 1,540 tons. Under EPA's interpretation, 1,500 tons of emissions would remain in the baseline concentration, and pollutant concentration attributable to 40 tons of emissions would be consumed. As discussed above, this

makes sense: the baseline concentration reflects the benchmark air quality, significant deterioration from which is to be avoided. If the increment analysis shows that the increase in emissions of 40 tons per year will not result in an increase in pollutant concentration greater than the available increment, then the modification is permissible, and air quality does not significantly deteriorate. Under Petitioners' interpretation, none of the emissions from the facility would remain in the baseline concentration, and enough of the increment in that area would have to be available to permit an increase in the pollutant concentration attributable to 1,540 tons of emissions. This heavily penalizes, and in some areas might make it impossible for older sources to make modifications that would, for example, improve their efficiency while also slightly increasing emissions. There is nothing to indicate this was Congress' intent in establishing the PSD program in the way it did.

As this Court has previously observed, pre-January 6, 1975, sources are not permanently exempted from the PSD program; to the contrary, they are subject to PSD requirements *when they are modified. Wisconsin Elec.*, 893 F.2d at 909. "The purpose of the 'modification' rule is to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction." *Id.*, quoting *National-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 843 (6th Cir. 1988) (Boggs, J. dissenting) (quoting 116 Cong. Rec. 32,918 (remarks of Sen. Cooper), *reprinted in* 1 Senate Committee on Public Works, A Legislative History of the Clean Air Act Amendments of 1970 (1974), at 260). Instead of furthering congressional design, Petitioners would instead use a modification to a

facility as an excuse to go back in time and undo Congress' determination that certain emissions from that facility would be included in the baseline concentration.

Indeed, Petitioners' approach would continuously ratchet down the baseline until it no longer contains *any* emissions from major sources initially constructed prior to January 6, 1975 (*i.e.*, when all pre-January 6, 1975, major sources have either closed or modified their facilities). At that point, *only* those major sources whose emissions are allowed by the increment could exist in a baseline area. Under EPA's approach, allowable emissions are the baseline plus the increment, thus limiting emissions to prevent significant deterioration but simultaneously allowing for economic growth. Congress could have, had it wished, directed that emissions in the baseline concentration no longer be considered part of the baseline if a facility modifies. Congress did not so direct, however, and Petitioners' approach severely curtails economic development in a manner clearly not intended by Congress.

Moreover, pre-January 6, 1975, sources and potential new sources are on equal footing with respect to competing for available increment under EPA's interpretation. If a new source wants to construct and emit 1,000 tons of particulate matter, there must be sufficient increment available in the area to allow that construction. If a pre-January 6, 1975, source wants to undertake a modification that would result in an increase in its actual emissions of 1,000 tons of particulate matter over that source's baseline levels, there again must be sufficient increment available in that area to allow that modification. There is no material difference and Petitioners' complaint of EPA causing a "barrier to new industry" (Pet. Br. at 34) is

unfounded. Indeed, Petitioners' theory would deter desirable construction and economic growth because the modified source that has to count its emissions before the modification as consuming increment might consume such a large amount of the available increment that it prevents *any* opportunity for new industry to locate in the area.

## CONCLUSION

For the foregoing reasons, the petition for review should be dismissed for lack

of jurisdiction or denied for lack of merit.

                              Respectfully submitted,


                              IGNACIA S. MORENO
                              Assistant Attorney General
                              Environment and Natural Resources Division


Dated: <u>May 3, 2013</u>          <u>s/ Dustin J. Maghamfar</u>
                              DUSTIN J. MAGHAMFAR
                              United States Department of Justice
                              Environmental Defense Section
                              P.O. Box 7611
                              Washington, D.C. 20044
                              Tel:     (202) 514-1806
                              Fax:     (202) 514-8865
                              dustin.maghamfar@usdoj.gov

                              Attorneys for Respondents

Of Counsel:

JAMES HAVARD
BRIAN DOSTER
SUSAN STAHLE
STEPHANIE HOGAN
U.S. Environmental Protection Agency
Office of General Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2013, a copy of the foregoing was served electronically through the Court's CM/ECF system on all registered counsel.

Dated:  <u>May 3, 2013</u>                    <u>s/ Dustin J. Maghamfar</u>
                                                                          Dustin J. Maghamfar

                                                                          Attorney for Respondents

**CERTIFICATE OF COMPLIANCE**

I certify that pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Seventh Circuit Rule 32, the attached brief is proportionately spaced, has a typeface of 12 points, and contains 13,957 words, exclusive of those parts of the brief exempted by Rule 32(a)(7)(B)(iii). I have relied on Microsoft Word's calculation feature.

Dated:  <u>May 3, 2013</u>                    <u>s/ Dustin J. Maghamfar</u>
                                                                          Dustin J. Maghamfar

                                                                          Attorney for Respondents

# STATUTORY AND REGULATORY ADDENDUM

\* For the convenience of the Court, we have duplicated certain key
statutes and regulations here, also appended to Petitioners' brief.

## TABLE OF CONTENTS

### STATUTES

42 U.S.C. § 7411(a) ..............................................................................ADD1

42 U.S.C. § 7470..................................................................................ADD3

42 U.S.C. § 7473..................................................................................ADD4

42 U.S.C. § 7475..................................................................................ADD6

42 U.S.C. § 7479..................................................................................ADD9

42 U.S.C. § 7607(b) ...........................................................................ADD11

42 U.S.C. § 7661d..............................................................................ADD13

### STATE STATUTE

Wis. Admin. Code NR § 405.02 (2004) ............................................ADD15

### CODE OF FEDERAL REGULATIONS

40 C.F.R. § 51.166(b)........................................................................ADD23

40 C.F.R. § 51.166(f) ........................................................................ADD31

Subsec. (a)(6). Pub. L. 95–95, § 108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, § 108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of section 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, § 108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, § 108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, § 107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, § 108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, § 107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, § 108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, § 108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 § 14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, § 108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, § 4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, § 4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Section 16 of Pub. L. 91–604 provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

FEDERAL ENERGY ADMINISTRATOR

"Federal Energy Administrator", for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of

.

the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term "existing source" means any stationary source other than a new source.

(7) The term "technological system of continuous emission reduction" means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1] of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

(b) **List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards**

(1)(A) The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

(B) Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall pub-

lish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard. Standards of performance or revisions thereof shall become effective upon promulgation. When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.

(2) The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards.

(3) The Administrator shall, from time to time, issue information on pollution control techniques for categories of new sources and air pollutants subject to the provisions of this section.

(4) The provisions of this section shall apply to any new source owned or operated by the United States.

(5) Except as otherwise authorized under subsection (h) of this section, nothing in this section shall be construed to require, or to authorize the Administrator to require, any new or modified source to install and operate any particular technological system of continuous emission reduction to comply with any new source standard of performance.

(6) The revised standards of performance required by enactment of subsection (a)(1)(A)(i) and (ii)[1] of this section shall be promulgated not later than one year after August 7, 1977. Any new or modified fossil fuel fired stationary source which commences construction prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards.

(c) **State implementation and enforcement of standards of performance**

(1) Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.

(2) Nothing in this subsection shall prohibit the Administrator from enforcing any applicable standard of performance under this section.

---

[1] See References in Text note below.

730, set forth other provisions of law that would be unaffected by this part.

Section 7459, act July 14, 1955, ch. 360, title I, §159, as added Aug. 7, 1977, Pub. L. 95–95, title I, §126, 91 Stat. 730, related to authority of States to protect the stratosphere.

SIMILAR PROVISIONS

For provisions relating to stratospheric ozone protection, see section 7671 et seq. of this title.

PART C—PREVENTION OF SIGNIFICANT DETERIORATION OF AIR QUALITY

SUBPART I—CLEAN AIR

§ 7470. Congressional declaration of purpose

The purposes of this part are as follows:

(1) to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate[1] to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air)[2], notwithstanding attainment and maintenance of all national ambient air quality standards;

(2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

(3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and

(5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process.

(July 14, 1955, ch. 360, title I, §160, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 731.)

EFFECTIVE DATE

Subpart effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

GUIDANCE DOCUMENT

Section 127(c) of Pub. L. 95–95 required Administrator, not later than 1 year after Aug. 7, 1977, to publish a guidance document to assist States in carrying out their functions under part C of title I of the Clean Air Act (this part) with respect to pollutants for which national ambient air quality standards are promulgated.

STUDY AND REPORT ON PROGRESS MADE IN PROGRAM RELATING TO SIGNIFICANT DETERIORATION OF AIR QUALITY

Section 127(d) of Pub. L. 95–95 directed Administrator, not later than 2 years after Aug. 7, 1977, to complete a

study and report to Congress on progress made in carrying out part C of title I of the Clean Air Act (this part) and the problems associated in carrying out such section.

§ 7471. Plan requirements

In accordance with the policy of section 7401(b)(1) of this title, each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region (or portion thereof) designated pursuant to section 7407 of this title as attainment or unclassifiable.

(July 14, 1955, ch. 360, title I, §161, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 731; amended Pub. L. 101–549, title I, §110(1), Nov. 15, 1990, 104 Stat. 2470.)

AMENDMENTS

1990—Pub. L. 101–549 substituted "designated pursuant to section 7407 of this title as attainment or unclassifiable" for "identified pursuant to section 7407(d)(1)(D) or (E) of this title".

§ 7472. Initial classifications

(a) Areas designated as class I

Upon the enactment of this part, all—

(1) international parks,
(2) national wilderness areas which exceed 5,000 acres in size,
(3) national memorial parks which exceed 5,000 acres in size, and
(4) national parks which exceed six thousand acres in size,

and which are in existence on August 7, 1977, shall be class I areas and may not be redesignated. All areas which were redesignated as class I under regulations promulgated before August 7, 1977, shall be class I areas which may be redesignated as provided in this part. The extent of the areas designated as Class I under this section shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990.

(b) Areas designated as class II

All areas in such State designated pursuant to section 7407(d) of this title as attainment or unclassifiable which are not established as class I under subsection (a) of this section shall be class II areas unless redesignated under section 7474 of this title.

(July 14, 1955, ch. 360, title I, §162, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 731; amended Pub. L. 95–190, §14(a)(40), Nov. 16, 1977, 91 Stat. 1401; Pub. L. 101–549, title I, §§108(m), 110(2), Nov. 15, 1990, 104 Stat. 2469, 2470.)

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §108(m), inserted at end "The extent of the areas designated as Class I under this section shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990."

Subsec. (b). Pub. L. 101–549, §110(2), substituted "designated pursuant to section 7407(d) of this title as attainment or unclassifiable" for "identified pursuant to section 7407(d)(1)(D) or (E) of this title".

[1] So in original. Probably should be "anticipated".

[2] So in original. Section was enacted without an opening parenthesis.

1977—Subsec. (a)(4). Pub. L. 95–190 inserted a comma after "size".

## § 7473. Increments and ceilings

### (a) Sulfur oxide and particulate matter; requirement that maximum allowable increases and maximum allowable concentrations not be exceeded

In the case of sulfur oxide and particulate matter, each applicable implementation plan shall contain measures assuring that maximum allowable increases over baseline concentrations of, and maximum allowable concentrations of, such pollutant shall not be exceeded. In the case of any maximum allowable increase (except an allowable increase specified under section 7475(d)(2)(C)(iv) of this title) for a pollutant based on concentrations permitted under national ambient air quality standards for any period other than an annual period, such regulations shall permit such maximum allowable increase to be exceeded during one such period per year.

### (b) Maximum allowable increases in concentrations over baseline concentrations

(1) For any class I area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
| Annual geometric mean | 5 |
| Twenty-four-hour maximum | 10 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 2 |
| Twenty-four-hour maximum | 5 |
| Three-hour maximum | 25 |

(2) For any class II area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
| Annual geometric mean | 19 |
| Twenty-four-hour maximum | 37 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| Twenty-four-hour maximum | 91 |
| Three-hour maximum | 512 |

(3) For any class III area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
| Annual geometric mean | 37 |
| Twenty-four-hour maximum | 75 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 40 |
| Twenty-four-hour maximum | 182 |
| Three-hour maximum | 700 |

(4) The maximum allowable concentration of any air pollutant in any area to which this part applies shall not exceed a concentration for such pollutant for each period of exposure equal to—

(A) the concentration permitted under the national secondary ambient air quality standard, or

(B) the concentration permitted under the national primary ambient air quality standard,

whichever concentration is lowest for such pollutant for such period of exposure.

### (c) Orders or rules for determining compliance with maximum allowable increases in ambient concentrations of air pollutants

(1) In the case of any State which has a plan approved by the Administrator for purposes of carrying out this part, the Governor of such State may, after notice and opportunity for public hearing, issue orders or promulgate rules providing that for purposes of determining compliance with the maximum allowable increases in ambient concentrations of an air pollutant, the following concentrations of such pollutant shall not be taken into account:

(A) concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, or natural gas, or both, by reason of an order which is in effect under the provisions of sections 792(a) and (b) of title 15 (or any subsequent legislation which supersedes such provisions) over the emissions from such sources before the effective date of such order.[1]

(B) the concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from using natural gas by reason of a natural gas curtailment pursuant to a natural gas curtailment plan in effect pursuant to the Federal Power Act [16 U.S.C. 791a et seq.] over the emissions from such sources before the effective date of such plan,

(C) concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission-related activities, and

(D) the increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration determined in accordance with section 7479(4) of this title.

(2) No action taken with respect to a source under paragraph (1)(A) or (1)(B) shall apply more than five years after the effective date of the order referred to in paragraph (1)(A) or the plan referred to in paragraph (1)(B), whichever is applicable. If both such order and plan are applicable, no such action shall apply more than five years after the later of such effective dates.

(3) No action under this subsection shall take effect unless the Governor submits the order or rule providing for such exclusion to the Administrator and the Administrator determines that such order or rule is in compliance with the provisions of this subsection.

(July 14, 1955, ch. 360, title I, § 163, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 732; amended Pub. L. 95–190, § 14(a)(41), Nov. 16, 1977, 91 Stat. 1401.)

---

[1] So in original. The period probably should be a comma.

REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (c)(1)(B), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

AMENDMENTS

1977—Subsec. (a). Pub. L. 95–190 inserted "section" before "7475".

## § 7474. Area redesignation

### (a) Authority of States to redesignate areas

Except as otherwise provided under subsection (c) of this section, a State may redesignate such areas as it deems appropriate as class I areas. The following areas may be redesignated only as class I or II:

(1) an area which exceeds ten thousand acres in size and is a national monument, a national primitive area, a national preserve, a national recreation area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore, and

(2) a national park or national wilderness area established after August 7, 1977, which exceeds ten thousand acres in size.

The extent of the areas referred to in paragraph[1] (1) and (2) shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990. Any area (other than an area referred to in paragraph (1) or (2) or an area established as class I under the first sentence of section 7472(a) of this title) may be redesignated by the State as class III if—

(A) such redesignation has been specifically approved by the Governor of the State, after consultation with the appropriate Committees of the legislature if it is in session or with the leadership of the legislature if it is not in session (unless State law provides that such redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area so redesignated enact legislation (including for such units of local government resolutions where appropriate) concurring in the State's redesignation;

(B) such redesignation will not cause, or contribute to, concentrations of any air pollutant which exceed any maximum allowable increase or maximum allowable concentration permitted under the classification of any other area; and

(C) such redesignation otherwise meets the requirements of this part.

Subparagraph (A) of this paragraph shall not apply to area redesignations by Indian tribes.

### (b) Notice and hearing; notice to Federal land manager; written comments and recommendations; regulations; disapproval of redesignation

(1)(A) Prior to redesignation of any area under this part, notice shall be afforded and public hearings shall be conducted in areas proposed to be redesignated and in areas which may be affected by the proposed redesignation. Prior to any such public hearing a satisfactory description and analysis of the health, environmental, economic, social, and energy effects of the proposed redesignation shall be prepared and made available for public inspection and prior to any such redesignation, the description and analysis of such effects shall be reviewed and examined by the redesignating authorities.

(B) Prior to the issuance of notice under subparagraph (A) respecting the redesignation of any area under this subsection, if such area includes any Federal lands, the State shall provide written notice to the appropriate Federal land manager and afford adequate opportunity (but not in excess of 60 days) to confer with the State respecting the intended notice of redesignation and to submit written comments and recommendations with respect to such intended notice of redesignation. In redesignating any area under this section with respect to which any Federal land manager has submitted written comments and recommendations, the State shall publish a list of any inconsistency between such redesignation and such recommendations and an explanation of such inconsistency (together with the reasons for making such redesignation against the recommendation of the Federal land manager).

(C) The Administrator shall promulgate regulations not later than six months after August 7, 1977, to assure, insofar as practicable, that prior to any public hearing on redesignation of any area, there shall be available for public inspection any specific plans for any new or modified major emitting facility which may be permitted to be constructed and operated only if the area in question is designated or redesignated as class III.

(2) The Administrator may disapprove the redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this section or is inconsistent with the requirements of section 7472(a) of this title or of subsection (a) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

### (c) Indian reservations

Lands within the exterior boundaries of reservations of federally recognized Indian tribes may be redesignated only by the appropriate Indian governing body. Such Indian governing body shall be subject in all respect to the provisions of subsection (e) of this section.

### (d) Review of national monuments, primitive areas, and national preserves

The Federal Land Manager shall review all national monuments, primitive areas, and national preserves, and shall recommend any appropriate areas for redesignation as class I where air quality related values are important attributes of the area. The Federal Land Manager shall report such recommendations, within[2] supporting analysis, to the Congress and the affected States

---

[1] So in original. Probably should be "paragraphs".

[2] So in original. Probably should be "with".

within one year after August 7, 1977. The Federal Land Manager shall consult with the appropriate States before making such recommendations.

**(e) Resolution of disputes between State and Indian tribes**

If any State affected by the redesignation of an area by an Indian tribe or any Indian tribe affected by the redesignation of an area by a State disagrees with such redesignation of any area, or if a permit is proposed to be issued for any new major emitting facility proposed for construction in any State which the Governor of an affected State or governing body of an affected Indian tribe determines will cause or contribute to a cumulative change in air quality in excess of that allowed in this part within the affected State or tribal reservation, the Governor or Indian ruling body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by any State or Indian tribe involved, the Administrator shall make a recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

(July 14, 1955, ch. 360, title I, § 164, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 733; amended Pub. L. 95–190, § 14(a)(42), (43), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title I, § 108(n), Nov. 15, 1990, 104 Stat. 2469.)

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, which directed the insertion of "The extent of the areas referred to in paragraph (1) and (2) shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990." before "Any area (other than an area referred to in paragraph (1) or (2))", was executed by making the insertion before "Any area (other than an area referred to in paragraph (1) or (2)", to reflect the probable intent of Congress.

1977—Subsec. (b)(2). Pub. L. 95–190, § 14(a)(42), inserted "or is inconsistent with the requirements of section 7472(a) of this title or of subsection (a) of this section" after "this section".

Subsec. (e). Pub. L. 95–190, § 14(a)(43), inserted "an" after "If any State affected by the redesignation of".

## § 7475. Preconstruction requirements

**(a) Major emitting facilities on which construction is commenced**

No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless—

(1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part;

(2) the proposed permit has been subject to a review in accordance with this section, the required analysis has been conducted in accordance with regulations promulgated by the Administrator, and a public hearing has been held with opportunity for interested persons including representatives of the Administrator to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;

(3) the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this chapter;

(4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility;

(5) the provisions of subsection (d) of this section with respect to protection of class I areas have been complied with for such facility;

(6) there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;

(7) the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source; and

(8) in the case of a source which proposes to construct in a class III area, emissions from which would cause or contribute to exceeding the maximum allowable increments applicable in a class II area and where no standard under section 7411 of this title has been promulgated subsequent to August 7, 1977, for such source category, the Administrator has approved the determination of best available technology as set forth in the permit.

**(b) Exception**

The demonstration pertaining to maximum allowable increases required under subsection (a)(3) of this section shall not apply to maximum allowable increases for class II areas in the case of an expansion or modification of a major emitting facility which is in existence on August 7, 1977, whose allowable emissions of air pollutants, after compliance with subsection (a)(4) of this section, will be less than fifty tons per year and for which the owner or operator of such facility demonstrates that emissions of particulate matter and sulfur oxides will not cause or contribute to ambient air quality levels

in excess of the national secondary ambient air quality standard for either of such pollutants.

**(c) Permit applications**

Any completed permit application under section 7410 of this title for a major emitting facility in any area to which this part applies shall be granted or denied not later than one year after the date of filing of such completed application.

**(d) Action taken on permit applications; notice; adverse impact on air quality related values; variance; emission limitations**

(1) Each State shall transmit to the Administrator a copy of each permit application relating to a major emitting facility received by such State and provide notice to the Administrator of every action related to the consideration of such permit.

(2)(A) The Administrator shall provide notice of the permit application to the Federal Land Manager and the Federal official charged with direct responsibility for management of any lands within a class I area which may be affected by emissions from the proposed facility.

(B) The Federal Land Manager and the Federal official charged with direct responsibility for management of such lands shall have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands within a class I area and to consider, in consultation with the Administrator, whether a proposed major emitting facility will have an adverse impact on such values.

(C)(i) In any case where the Federal official charged with direct responsibility for management of any lands within a class I area or the Federal Land Manager of such lands, or the Administrator, or the Governor of an adjacent State containing such a class I area files a notice alleging that emissions from a proposed major emitting facility may cause or contribute to a change in the air quality in such area and identifying the potential adverse impact of such change, a permit shall not be issued unless the owner or operator of such facility demonstrates that emissions of particulate matter and sulfur dioxide will not cause or contribute to concentrations which exceed the maximum allowable increases for a class I area.

(ii) In any case where the Federal Land Manager demonstrates to the satisfaction of the State that the emissions from such facility will have an adverse impact on the air quality-related values (including visibility) of such lands, notwithstanding the fact that the change in air quality resulting from emissions from such facility will not cause or contribute to concentrations which exceed the maximum allowable increases for a class I area, a permit shall not be issued.

(iii) In any case where the owner or operator of such facility demonstrates to the satisfaction of the Federal Land Manager, and the Federal Land Manager so certifies, that the emissions from such facility will have no adverse impact on the air quality-related values of such lands (including visibility), notwithstanding the fact that the change in air quality resulting from emissions from such facility will cause or contribute to concentrations which exceed the max-

imum allowable increases for class I areas, the State may issue a permit.

(iv) In the case of a permit issued pursuant to clause (iii), such facility shall comply with such emission limitations under such permit as may be necessary to assure that emissions of sulfur oxides and particulates from such facility will not cause or contribute to concentrations of such pollutant which exceed the following maximum allowable increases over the baseline concentration for such pollutants:

| | Maximum allowable increase (in micrograms per cubic meter) |
| --- | --- |
| Particulate matter: | |
| Annual geometric mean | 19 |
| Twenty-four-hour maximum | 37 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| Twenty-four-hour maximum | 91 |
| Three-hour maximum | 325 |

(D)(i) In any case where the owner or operator of a proposed major emitting facility who has been denied a certification under subparagraph (C)(iii) demonstrates to the satisfaction of the Governor, after notice and public hearing, and the Governor finds, that the facility cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for periods of twenty-four hours or less applicable to any class I area and, in the case of Federal mandatory class I areas, that a variance under this clause will not adversely affect the air quality related values of the area (including visibility), the Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may grant a variance from such maximum allowable increase. If such variance is granted, a permit may be issued to such source pursuant to the requirements of this subparagraph.

(ii) In any case in which the Governor recommends a variance under this subparagraph in which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that such variance is in the national interest. No Presidential finding shall be reviewable in any court. The variance shall take effect if the President approves the Governor's recommendations. The President shall approve or disapprove such recommendation within ninety days after his receipt of the recommendations of the Governor and the Federal Land Manager.

(iii) In the case of a permit issued pursuant to this subparagraph, such facility shall comply with such emission limitations under such permit as may be necessary to assure that emissions of sulfur oxides from such facility will not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which exceed the following maximum allowable increases for such areas over the baseline concentration for such pollutant and to assure that such emissions will not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less on more than 18 days during any annual period:

ADD7

MAXIMUM ALLOWABLE INCREASE
(In micrograms per cubic meter)

| Period of exposure | Low terrain areas | High terrain areas |
|---|---|---|
| 24-hr maximum ..................................... | 36 | 62 |
| 3-hr maximum ...................................... | 130 | 221 |

(iv) For purposes of clause (iii), the term "high terrain area" means with respect to any facility, any area having an elevation of 900 feet or more above the base of the stack of such facility, and the term "low terrain area" means any area other than a high terrain area.

(e) Analysis; continuous air quality monitoring data; regulations; model adjustments

(1) The review provided for in subsection (a) of this section shall be preceded by an analysis in accordance with regulations of the Administrator, promulgated under this subsection, which may be conducted by the State (or any general purpose unit of local government) or by the major emitting facility applying for such permit, of the ambient air quality at the proposed site and in areas which may be affected by emissions from such facility for each pollutant subject to regulation under this chapter which will be emitted from such facility.

(2) Effective one year after August 7, 1977, the analysis required by this subsection shall include continuous air quality monitoring data gathered for purposes of determining whether emissions from such facility will exceed the maximum allowable increases or the maximum allowable concentration permitted under this part. Such data shall be gathered over a period of one calendar year preceding the date of application for a permit under this part unless the State, in accordance with regulations promulgated by the Administrator, determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period. The results of such analysis shall be available at the time of the public hearing on the application for such permit.

(3) The Administrator shall within six months after August 7, 1977, promulgate regulations respecting the analysis required under this subsection which regulations—

(A) shall not require the use of any automatic or uniform buffer zone or zones,

(B) shall require an analysis of the ambient air quality, climate and meteorology, terrain, soils and vegetation, and visibility at the site of the proposed major emitting facility and in the area potentially affected by the emissions from such facility for each pollutant regulated under this chapter which will be emitted from, or which results from the construction or operation of, such facility, the size and nature of the proposed facility, the degree of continuous emission reduction which could be achieved by such facility, and such other factors as may be relevant in determining the effect of emissions from a proposed facility on any air quality control region,

(C) shall require the results of such analysis shall be available at the time of the public hearing on the application for such permit, and

(D) shall specify with reasonable particularity each air quality model or models to be

used under specified sets of conditions for purposes of this part.

Any model or models designated under such regulations may be adjusted upon a determination, after notice and opportunity for public hearing, by the Administrator that such adjustment is necessary to take into account unique terrain or meteorological characteristics of an area potentially affected by emissions from a source applying for a permit required under this part.

(July 14, 1955, ch. 360, title I, § 165, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 735; amended Pub. L. 95–190, § 14(a)(44)–(51), Nov. 16, 1977, 91 Stat. 1402.)

AMENDMENTS

1977—Subsec. (a)(1). Pub. L. 95–190, § 14(a)(44), substituted "part;" for "part;".

Subsec. (a)(3). Pub. L. 95–190, § 14(a)(45), inserted provision making applicable requirement of section 7410(j) of this title.

Subsec. (b). Pub. L. 95–190, § 14(a)(46), inserted "cause or" before "contribute" and struck out "actual" before "allowable emissions".

Subsec. (d)(2)(C). Pub. L. 95–190, § 14(a)(47)–(49), in cl. (ii) substituted "contribute" for "contrbute", in cl. (iii) substituted "quality-related" for "quality related" and "concentrations which" for "concentrations, which", and in cl. (iv) substituted "such facility" for "such sources" and "will not cause or contribute to concentrations of such pollutant which exceed" for "together with all other sources, will not exceed".

Subsec. (d)(2)(D). Pub. L. 95–190, § 14(a)(50), (51), in cl. (iii) substituted provisions relating to determinations of amounts of emissions of sulfur oxides from facilities, for provisions relating to determinations of amounts of emissions of sulfur oxides from sources operating under permits issued pursuant to this subpar., together with all other sources, and added cl. (iv).

§ 7476. Other pollutants

(a) Hydrocarbons, carbon monoxide, petrochemical oxidants, and nitrogen oxides

In the case of the pollutants hydrocarbons, carbon monoxide, photochemical oxidants, and nitrogen oxides, the Administrator shall conduct a study and not later than two years after August 7, 1977, promulgate regulations to prevent the significant deterioration of air quality which would result from the emissions of such pollutants. In the case of pollutants for which national ambient air quality standards are promulgated after August 7, 1977, he shall promulgate such regulations not more than 2 years after the date of promulgation of such standards.

(b) Effective date of regulations

Regulations referred to in subsection (a) of this section shall become effective one year after the date of promulgation. Within 21 months after such date of promulgation such plan revision shall be submitted to the Administrator who shall approve or disapprove the plan within 25 months after such date or¹ promulgation in the same manner as required under section 7410 of this title.

(c) Contents of regulations

Such regulations shall provide specific numerical measures against which permit applications

_____
¹ So in original. Probably should be "of".

may be evaluated, a framework for stimulating improved control technology, protection of air quality values, and fulfill the goals and purposes set forth in section 7401 and section 7470 of this title.

**(d) Specific measures to fulfill goals and purposes**

The regulations of the Administrator under subsection (a) of this section shall provide specific measures at least as effective as the increments established in section 7473 of this title to fulfill such goals and purposes, and may contain air quality increments, emission density requirements, or other measures.

**(e) Area classification plan not required**

With respect to any air pollutant for which a national ambient air quality standard is established other than sulfur oxides or particulate matter, an area classification plan shall not be required under this section if the implementation plan adopted by the State and submitted for the Administrator's approval or promulgated by the Administrator under section 7410(c) of this title contains other provisions which when considered as a whole, the Administrator finds will carry out the purposes in section 7470 of this title at least as effectively as an area classification plan for such pollutant. Such other provisions referred to in the preceding sentence need not require the establishment of maximum allowable increases with respect to such pollutant for any area to which this section applies.

**(f) PM-10 increments**

The Administrator is authorized to substitute, for the maximum allowable increases in particulate matter specified in section 7473(b) of this title and section 7475(d)(2)(C)(iv) of this title, maximum allowable increases in particulate matter with an aerodynamic diameter smaller than or equal to 10 micrometers. Such substituted maximum allowable increases shall be of equal stringency in effect as those specified in the provisions for which they are substituted. Until the Administrator promulgates regulations under the authority of this subsection, the current maximum allowable increases in concentrations of particulate matter shall remain in effect.

(July 14, 1955, ch. 360, title I, §166, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 739; amended Pub. L. 101–549, title I, §105(b), Nov. 15, 1990, 104 Stat. 2462.)

AMENDMENTS

1990—Subsec. (f). Pub. L. 101–549 added subsec. (f).

**§ 7477. Enforcement**

The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not subject to an implementation plan which meets the requirements of this part.

(July 14, 1955, ch. 360, title I, §167, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 101–549, title I, §110(3), title VII, §708, Nov. 15, 1990, 104 Stat. 2470, 2684.)

AMENDMENTS

1990—Pub. L. 101–549, §708, substituted "construction or modification of a major emitting facility" for "construction of a major emitting facility".

Pub. L. 101–549, §110(3), substituted "designated pursuant to section 7407(d) as attainment or unclassifiable" for "included in the list promulgated pursuant to paragraph (1)(D) or (E) of subsection (d) of section 7407 of this title".

**§ 7478. Period before plan approval**

**(a) Existing regulations to remain in effect**

Until such time as an applicable implementation plan is in effect for any area, which plan meets the requirements of this part to prevent significant deterioration of air quality with respect to any air pollutant, applicable regulations under this chapter prior to August 7, 1977, shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b) of this section.

**(b) Regulations deemed amended; construction commenced after June 1, 1975**

If any regulation in effect prior to August 7, 1977, to prevent significant deterioration of air quality would be inconsistent with the requirements of section 7472(a), section 7473(b) or section 7474(a) of this title, then such regulations shall be deemed amended so as to conform with such requirements. In the case of a facility on which construction was commenced (in accordance with the definition of "commenced" in section 7479(2) of this title) after June 1, 1975, and prior to August 7, 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to August 7, 1977.

(July 14, 1955, ch. 360, title I, §168, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 95–190, §14(a)(52), Nov. 16, 1977, 91 Stat. 1402.)

AMENDMENTS

1977—Subsec. (b). Pub. L. 95–190 substituted "(in accordance with the definition of 'commenced' in section 7479(2) of this title)" for "in accordance with this definition".

**§ 7479. Definitions**

For purposes of this part—

(1) The term "major emitting facility" means any of the following stationary sources of air pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant from the following types of stationary sources: fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging

\* more than fifty tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than two hundred and fifty million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding three hundred thousand barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities. Such term also includes any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant. This term shall not include new or modified facilities which are nonprofit health or education institutions which have been exempted by the State.

(2)(A) The term "commenced" as applied to construction of a major emitting facility means that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.

(B) The term "necessary preconstruction approvals or permits" means those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) or (ii) of subparagraph (A) of this paragraph.

(C) The term "construction" when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility.

(3) The term "best available control technology" means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990.

(4) The term "baseline concentration" means, with respect to a pollutant, the ambient concentration levels which exist at the time of the first application for a permit in an area subject to this part, based on air quality data available in the Environmental Protection Agency or a State air pollution control agency and on such monitoring data as the permit applicant is required to submit. Such ambient concentration levels shall take into account all projected emissions in, or which may affect, such area from any major emitting facility on which construction commenced prior to January 6, 1975, but which has not begun operation by the date of the baseline air quality concentration determination. Emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975, shall not be included in the baseline and shall be counted against the maximum allowable increases in pollutant concentrations established under this part.

(July 14, 1955, ch. 360, title I, § 169, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 95–190, § 14(a)(54), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title III, § 305(b), title IV, § 403(d), Nov. 15, 1990, 104 Stat. 2583, 2631.)

AMENDMENTS

1990—Par. (1). Pub. L. 101–549, § 305(b), struck out "two hundred and" after "municipal incinerators capable of charging more than".

Par. (3). Pub. L. 101–549, § 403(d), directed the insertion of ", clean fuels," after "including fuel cleaning,", which was executed by making the insertion after "including fuel cleaning" to reflect the probable intent of Congress, and inserted at end "Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990."

1977—Par. (2)(C). Pub. L. 95–190 added subpar. (C).

STUDY OF MAJOR EMITTING FACILITIES WITH
POTENTIAL OF EMITTING 250 TONS PER YEAR

Section 127(b) of Pub. L. 95–95 directed Administrator, within 1 year after Aug. 7, 1977, to report to Congress on consequences of that portion of definition of "major emitting facility" under this subpart which applies to facilities with potential to emit 250 tons per year or more.

SUBPART II—VISIBILITY PROTECTION

CODIFICATION

As originally enacted, subpart II of part C of subchapter I of this chapter was added following section 7478 of this title. Pub. L. 95–190, § 14(a)(53), Nov. 16, 1977, 91 Stat. 1402, struck out subpart II and inserted such subpart following section 7479 of this title.

§ 7491. Visibility protection for Federal class I areas

(a) Impairment of visibility; list of areas; study and report

(1) Congress hereby declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution.

SEC. 2. *Designation of Facilities.* (a) The Administrator of the Environmental Protection Agency (hereinafter referred to as "the Administrator") shall be responsible for the attainment of the purposes and objectives of this Order.

(b) In carrying out his responsibilities under this Order, the Administrator shall, in conformity with all applicable requirements of law, designate facilities which have given rise to a conviction for an offense under section 113(c)(1) of the Air Act [42 U.S.C. 7413(c)(1)] or section 309(c) of the Water Act [33 U.S.C. 1319(c)]. The Administrator shall, from time to time, publish and circulate to all Federal agencies lists of those facilities, together with the names and addresses of the persons who have been convicted of such offenses. Whenever the Administrator determines that the condition which gave rise to a conviction has been corrected, he shall promptly remove the facility and the name and address of the person concerned from the list.

SEC. 3. *Contracts, Grants, or Loans.* (a) Except as provided in section 8 of this Order, no Federal agency shall enter into any contract for the procurement of goods, materials, or services which is to be performed in whole or in part in a facility then designated by the Administrator pursuant to section 2.

(b) Except as provided in section 8 of this Order, no Federal agency authorized to extend Federal assistance by way of grant, loan, or contract shall extend such assistance in any case in which it is to be used to support any activity or program involving the use of a facility then designated by the Administrator pursuant to section 2.

SEC. 4. *Procurement, Grant, and Loan Regulations.* The Federal Procurement Regulations, the Armed Services Procurement Regulations, and to the extent necessary, any supplemental or comparable regulations issued by any agency of the Executive Branch shall, following consultation with the Administrator, be amended to require, as a condition of entering into, renewing, or extending any contract for the procurement of goods, materials, or services or extending any assistance by way of grant, loan, or contract, inclusion of a provision requiring compliance with the Air Act, the Water Act, and standards issued pursuant thereto in the facilities in which the contract is to be performed, or which are involved in the activity or program to receive assistance.

SEC. 5. *Rules and Regulations.* The Administrator shall issue such rules, regulations, and guidelines as he may deem necessary or appropriate to carry out the purposes of this Order.

SEC. 6. *Cooperation and Assistance.* The head of each Federal agency shall take such steps as may be necessary to insure that all officers and employees of this agency whose duties entail compliance or comparable functions with respect to contracts, grants, and loans are familiar with the provisions of this Order. In addition to any other appropriate action, such officers and employees shall report promptly any condition in a facility which may involve noncompliance with the Air Act or the Water Act or any rules, regulations, standards, or guidelines issued pursuant to this Order to the head of the agency, who shall transmit such reports to the Administrator.

SEC. 7. *Enforcement.* The Administrator may recommend to the Department of Justice or other appropriate agency that legal proceedings be brought or other appropriate action be taken whenever he becomes aware of a breach of any provision required, under the amendments issued pursuant to section 4 of this Order, to be included in a contract or other agreement.

SEC. 8. *Exemptions—Reports to Congress.* (a) Upon a determination that the paramount interest of the United States so requires—

(1) The head of a Federal agency may exempt any contract, grant, or loan, and, following consultation with the Administrator, any class of contracts, grants or loans from the provisions of this Order. In any such case, the head of the Federal agency granting such ex-

emption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be dis-

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.

closed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(b) Judicial review**

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title, any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[5] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title,[6] under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10 (c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[7] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

---

[4] So in original. Probably should be "subsection.".
[5] See References in Text note below.
[6] So in original.

[7] So in original. The word "to" probably should not appear.

#### (e) Temporary sources

The permitting authority may issue a single permit authorizing emissions from similar operations at multiple temporary locations. No such permit shall be issued unless it includes conditions that will assure compliance with all the requirements of this chapter at all authorized locations, including, but not limited to, ambient standards and compliance with any applicable increment or visibility requirements under part C of subchapter I of this chapter. Any such permit shall in addition require the owner or operator to notify the permitting authority in advance of each change in location. The permitting authority may require a separate permit fee for operations at each location.

#### (f) Permit shield

Compliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a of this title. Except as otherwise provided by the Administrator by rule, the permit may also provide that compliance with the permit shall be deemed compliance with other applicable provisions of this chapter that relate to the permittee if—

    (1) the permit includes the applicable requirements of such provisions, or

    (2) the permitting authority in acting on the permit application makes a determination relating to the permittee that such other provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

Nothing in the preceding sentence shall alter or affect the provisions of section 7603 of this title, including the authority of the Administrator under that section.

(July 14, 1955, ch. 360, title V, § 504, as added Pub. L. 101–549, title V, § 501, Nov. 15, 1990, 104 Stat. 2642.)

### § 7661d. Notification to Administrator and contiguous States

#### (a) Transmission and notice

    (1) Each permitting authority—

    (A) shall transmit to the Administrator a copy of each permit application (and any application for a permit modification or renewal) or such portion thereof, including any compliance plan, as the Administrator may require to effectively review the application and otherwise to carry out the Administrator's responsibilities under this chapter, and

    (B) shall provide to the Administrator a copy of each permit proposed to be issued and issued as a final permit.

    (2) The permitting authority shall notify all States—

    (A) whose air quality may be affected and that are contiguous to the State in which the emission originates, or

    (B) that are within 50 miles of the source,

of each permit application or proposed permit forwarded to the Administrator under this section, and shall provide an opportunity for such States to submit written recommendations respecting the issuance of the permit and its terms and conditions. If any part of those recommendations are not accepted by the permitting authority, such authority shall notify the State submitting the recommendations and the Administrator in writing of its failure to accept those recommendations and the reasons therefor.

#### (b) Objection by EPA

    (1) If any permit contains provisions that are determined by the Administrator as not in compliance with the applicable requirements of this chapter, including the requirements of an applicable implementation plan, the Administrator shall, in accordance with this subsection, object to its issuance. The permitting authority shall respond in writing if the Administrator (A) within 45 days after receiving a copy of the proposed permit under subsection (a)(1) of this section, or (B) within 45 days after receiving notification under subsection (a)(2) of this section, objects in writing to its issuance as not in compliance with such requirements. With the objection, the Administrator shall provide a statement of the reasons for the objection. A copy of the objection and statement shall be provided to the applicant.

    (2) If the Administrator does not object in writing to the issuance of a permit pursuant to paragraph (1), any person may petition the Administrator within 60 days after the expiration of the 45-day review period specified in paragraph (1) to take such action. A copy of such petition shall be provided to the permitting authority and the applicant by the petitioner. The petition shall be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency (unless the petitioner demonstrates in the petition to the Administrator that it was impracticable to raise such objections within such period or unless the grounds for such objection arose after such period). The petition shall identify all such objections. If the permit has been issued by the permitting agency, such petition shall not postpone the effectiveness of the permit. The Administrator shall grant or deny such petition within 60 days after the petition is filed. The Administrator shall issue an objection within such period if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of this chapter, including the requirements of the applicable implementation plan. Any denial of such petition shall be subject to judicial review under section 7607 of this title. The Administrator shall include in regulations under this subchapter provisions to implement this paragraph. The Administrator may not delegate the requirements of this paragraph.

    (3) Upon receipt of an objection by the Administrator under this subsection, the permitting authority may not issue the permit unless it is revised and issued in accordance with subsection (c) of this section. If the permitting authority has issued a permit prior to receipt of an objection by the Administrator under paragraph (2) of this subsection, the Administrator shall modify, terminate, or revoke such permit and the permitting authority may thereafter only issue a

revised permit in accordance with subsection (c) of this section.

### (c) Issuance or denial

If the permitting authority fails, within 90 days after the date of an objection under subsection (b) of this section, to submit a permit revised to meet the objection, the Administrator shall issue or deny the permit in accordance with the requirements of this subchapter. No objection shall be subject to judicial review until the Administrator takes final action to issue or deny a permit under this subsection.

### (d) Waiver of notification requirements

(1) The Administrator may waive the requirements of subsections (a) and (b) of this section at the time of approval of a permit program under this subchapter for any category (including any class, type, or size within such category) of sources covered by the program other than major sources.

(2) The Administrator may, by regulation, establish categories of sources (including any class, type, or size within such category) to which the requirements of subsections (a) and (b) of this section shall not apply. The preceding sentence shall not apply to major sources.

(3) The Administrator may exclude from any waiver under this subsection notification under subsection (a)(2) of this section. Any waiver granted under this subsection may be revoked or modified by the Administrator by rule.

### (e) Refusal of permitting authority to terminate, modify, or revoke and reissue

If the Administrator finds that cause exists to terminate, modify, or revoke and reissue a permit under this subchapter, the Administrator shall notify the permitting authority and the source of the Administrator's finding. The permitting authority shall, within 90 days after receipt of such notification, forward to the Administrator under this section a proposed determination of termination, modification, or revocation and reissuance, as appropriate. The Administrator may extend such 90 day period for an additional 90 days if the Administrator finds that a new or revised permit application is necessary, or that the permitting authority must require the permittee to submit additional information. The Administrator may review such proposed determination under the provisions of subsections (a) and (b) of this section. If the permitting authority fails to submit the required proposed determination, or if the Administrator objects and the permitting authority fails to resolve the objection within 90 days, the Administrator may, after notice and in accordance with fair and reasonable procedures, terminate, modify, or revoke and reissue the permit.

(July 14, 1955, ch. 360, title V, § 505, as added Pub. L. 101–549, title V, § 501, Nov. 15, 1990, 104 Stat. 2643.)

### § 7661e. Other authorities

#### (a) In general

Nothing in this subchapter shall prevent a State, or interstate permitting authority, from establishing additional permitting requirements not inconsistent with this chapter.

### (b) Permits implementing acid rain provisions

The provisions of this subchapter, including provisions regarding schedules for submission and approval or disapproval of permit applications, shall apply to permits implementing the requirements of subchapter IV–A of this chapter except as modified by that subchapter.

(July 14, 1955, ch. 360, title V, § 506, as added Pub. L. 101–549, title V, § 501, Nov. 15, 1990, 104 Stat. 2645.)

### § 7661f. Small business stationary source technical and environmental compliance assistance program

#### (a) Plan revisions

Consistent with sections 7410 and 7412 of this title, each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator as part of the State implementation plan for such State or as a revision to such State implementation plan under section 7410 of this title, plans for establishing a small business stationary source technical and environmental compliance assistance program. Such submission shall be made within 24 months after November 15, 1990. The Administrator shall approve such program if it includes each of the following:

(1) Adequate mechanisms for developing, collecting, and coordinating information concerning compliance methods and technologies for small business stationary sources, and programs to encourage lawful cooperation among such sources and other persons to further compliance with this chapter.

(2) Adequate mechanisms for assisting small business stationary sources with pollution prevention and accidental release detection and prevention, including providing information concerning alternative technologies, process changes, products, and methods of operation that help reduce air pollution.

(3) A designated State office within the relevant State agency to serve as ombudsman for small business stationary sources in connection with the implementation of this chapter.

(4) A compliance assistance program for small business stationary sources which assists small business stationary sources in determining applicable requirements and in receiving permits under this chapter in a timely and efficient manner.

(5) Adequate mechanisms to assure that small business stationary sources receive notice of their rights under this chapter in such manner and form as to assure reasonably adequate time for such sources to evaluate compliance methods and any relevant or applicable proposed or final regulation or standard issued under this chapter.

(6) Adequate mechanisms for informing small business stationary sources of their obligations under this chapter, including mechanisms for referring such sources to qualified auditors or, at the option of the State, for providing audits of the operations of such sources to determine compliance with this chapter.

(7) Procedures for consideration of requests from a small business stationary source for modification of—

HeinOnline -- v.26 Title 42  1148 2006

Wis. Adm. Code s NR **405**.02

Wis. Admin. Code s NR **405**. 02

WISCONSIN ADMINISTRATIVE CODE
DEPARTMENT OF NATURAL RESOURCES
CHAPTER NR 405. PREVENTION OF SIGNIFICANT DETERIORATION
Current through Reg. No. 588 (December 2004)

NR 405.02 Definitions.

The definitions contained in ch. NR 400 apply to the terms used in this chapter. In addition, the following definitions apply to the terms used in this chapter:

**(1)** "Actual emissions" means the actual rate of emissions of an air contaminant from an emissions unit, as determined in accordance with pars. (a) through (d):

(a) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the air contaminant during a 2-year period which precedes the particular date and which is representative of normal source operation. The department may allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(b) The department may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit unless reliable data are available which demonstrate that the actual emissions are different than the source-specific allowable emissions.

(c) For any emissions unit, other than an electric utility steam generating unit, which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(d) For an electric utility steam generating unit, other than a new unit or the replacement of an existing unit, actual emissions of the unit following the physical or operational change shall equal the representative actual annual emissions of the unit, provided the source owner or operator maintains and submits to the department, on an annual basis for a period of 5 years from the date the unit resumes regular operation, information demonstrating that the physical or operational change did not result in an emissions increase. A longer period, not to exceed 10 years, may be required by the department if the department determines such a period to be more representative of normal source post-change operations.

**(2)** "Allowable emissions" means the emissions rate of a stationary source calculated using the maximum rated capacity of the source, unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both, and the most stringent of the following:

(a) The applicable standards as set forth in chs. NR 440 and 445 to 449 and under sections 111 and 112 of the Act (42 USC 7411 and 7412).

(b) The applicable emissions limitations, as set forth in chs. NR 400 to 499.

(c) The emissions rate specified as a federally enforceable permit condition.

**(3)** "Baseline area" means any intrastate area, and every part thereof, designated as attainment or unclassifiable under section 107 (d) (1) (D) or (E) of the Act (42 USC 7407 (d) (1) (D) or (E)) in which the major source or major modification establishing

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the minor source baseline date would construct or would have an air quality impact equal to or greater than 1 <<mu>> g/m³ (annual average) of the air contaminant for which the minor source baseline date is established. Area redesignations under section 107 (d) (1) (D) or (E) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which either establishes a minor source baseline date or is subject to this chapter.

**(4)** (a) "Baseline concentration" means that ambient concentration level which exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each air contaminant for which a minor source baseline date is established and shall include:

1. The actual emissions representative of sources in existence on the applicable minor source baseline date, except as provided in par. (b).

2. The allowable emissions of major stationary sources which commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(b) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increases:

1. Actual emissions from any major stationary source on which construction commenced after the major source baseline date.

2. Actual emissions increases and decreases at any stationary source occurring after the minor source baseline date.

**(6)** "Begin actual construction" means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework and construction of permanent storage structures. With respect to a change in method of operation, this term refers to those on-site activities, other than preparatory activities, which mark the initiation of the change.

**(7)** "Best available control technology" or "BACT" means an emissions limitation, including a visible emissions standard, based on the maximum degree of reduction for each air contaminant subject to regulation under the Act which would be emitted from any proposed major stationary source or major modification which the department, on a case-by-case basis, taking into account energy, environmental, and economic impacts, and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including clean fuels, fuel cleaning or treatment or innovative fuel combination techniques for control of the air contaminant. In no event may application of best available control technology result in emissions of any air contaminant which would exceed the emissions allowed by any applicable standard under chs. NR 440 and 445 to 449 and under sections 111 and 112 of the Act (42 USC 7411 and 7412). Emissions from any source utilizing clean fuels or any other means to comply with this subsection may not be allowed to increase above the levels that would have been required under this subsection as it existed prior to enactment of the 1990 clean air Act amendments on November 15, 1990. If the department determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. The standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

**(8)** "Building, structure, facility or installation" or "facility, building, structure, equipment, vehicle or action" means all of the air contaminant emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Air contaminant emitting activities shall be considered as part of the same industrial grouping if they are classified under the same 2-digit major group as described in the Standard Industrial Classification Manual, 1987, incorporated by reference in s. NR 484.05.

**(8m)** "Clean coal technology" means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam, which was not in widespread use as of November 15, 1990.

**(8s)** "Clean coal technology demonstration project" means a project using funds appropriated under the heading 'Department of Energy-Clean Coal Technology', up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the U.S. environmental protection agency. The federal contribution for a qualifying project shall be at least 20% of the total cost of the demonstration project.

**(9)** "Commence" as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and has done one of the following:

(a) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time.

(b) Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

**(10)** "Complete" means, in reference to an application for a permit, that the application contains all the information necessary for processing the application. Designating an application complete for purposes of permit processing does not preclude the department from requesting or accepting any additional information.

**(11)** "Construction" means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) which would result in a change in actual emissions.

**(11m)** "Electric utility steam generating unit" means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

**(12)** "Emissions unit" means any part of a stationary source which emits or would have the potential to emit any air contaminant subject to regulation under the act.

**(13)** "Federal land manager" means, with respect to any lands in the United States, the secretary of the department with authority over such lands.

**(15)** "Fugitive emissions" means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

**(16)** "High terrain" means any area having an elevation 900 feet or more above the base of the stack of a source.

**(17)** "Indian governing body" means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self-government.

**(18)** "Indian reservation" means any federally recognized reservation established by treaty, agreement, executive order, or act of congress.

**(19)** "Innovative control technology" means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

**(20)** "Low terrain" means any area other than high terrain.

**(21)** "Major modification" means any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any air contaminant subject to regulation under the act.

(a) Any net emissions increase that is significant for volatile organic compounds shall be considered significant for ozone.

(b) A physical change or change in the method of operation does not include:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. Routine maintenance, repair, and replacement.

2. Use of an alternative fuel or raw material by reason of any order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (15 USC 791 to 798) or by reason of a natural gas curtailment plan pursuant to the Federal Power Act (16 USC 791a to 828c).

3. Use of an alternative fuel by reason of an order or rule under section 125 of the Act (42 USC 7425).

4. Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste.

5. Use of an alternative fuel or raw material by a stationary source when one of the following applies:

a. The source was capable of accommodating the alternative fuel or raw material before January 6, 1975, unless the change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to this chapter or ch. NR 406 or 408 or under an operation permit issued pursuant to ch. NR 407.

b. The source is approved to use the alternative fuel or raw material under any permit issued under this chapter or ch. NR 406, 407 or 408.

6. An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to this chapter, ch. NR 406 or 408 or 40 CFR 52.21 or under an operation permit issued pursuant to ch. NR 407.

7. Any change in ownership at a stationary source.

8. The addition, replacement or use of a pollution control project at an existing electric utility steam generating unit, unless the department determines that the addition, replacement or use renders the unit less environmentally beneficial, or except when the department determines both of the following:

a. There is reason to believe that the pollution control project would result in a significant net increase in representative actual annual emissions of any pollutant for which a national ambient air quality standard has been adopted over levels used for that source in the most recent air quality impact analysis in the area conducted for the purpose of title I of the Act (42 USC 7401 to 7515), if any.

b. The increase will cause or contribute to a violation of any national ambient air quality standard or air quality increment, or visibility limitation.

9. The installation, operation, cessation or removal of a temporary clean coal technology demonstration project, provided that the project complies with both of the following:

a. The state implementation plan.

b. Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

10. The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

11. The reactivation of a very clean coal-fired electric utility steam generating unit.

**(21m)** "Major source baseline date" means:

(a) In the case of particulate matter and sulfur dioxide, January 6, 1975.

(b) In the case of nitrogen dioxide, February 8, 1988.

**(22)** (a) "Major stationary source" means:

1. Any of the following stationary sources of air contaminants which emits, or has the potential to emit, 100 tons per year or more of any air contaminant subject to regulation under the act: Fossil fuel fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants, fossil fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants.

2. Notwithstanding the stationary source size specified in subd. 1., any stationary source which emits, or has the potential to emit, 250 tons per year or more of any air contaminant subject to regulation under the act.

3. Any physical change that would occur at a stationary source not otherwise qualifying under this subsection as a major stationary source, if the change would constitute a major stationary source by itself.

(b) A major source that is major for volatile organic compounds shall be considered major for ozone.

(c) Volatile organic compounds exclude the compounds listed under s. NR 400.02 (162) unless the compound is subject to an emission limitation under chs. NR 440 and 447 to 449 and subch. III of ch. NR 446.

(d) Mobile source emissions indirectly caused by a source which attracts mobile source activity may not be considered in determining whether the source is a major stationary source for the purposes of this chapter.

**(22m)** (a) "Minor source baseline date" means the earliest date after the trigger date on which the owner or operator of a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

1. In the case of particulate matter and sulfur dioxide, August 7, 1977.

2. In the case of nitrogen dioxide, February 8, 1988.

(b) The minor source baseline date is established for each air contaminant for which increments or other equivalent measures have been established if:

1. The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107 (d) (1) (D) or (E) of the Act (42 USC 7407(d)(1)(D) or (E)) for the air contaminant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166.

2. In the case of a major stationary source, the air contaminant would be emitted in significant amounts or, in the case of a major modification, there would be a significant net emissions increase of the air contaminant.

**(23)** "Necessary preconstruction approvals or permits" means those permits or approvals required under chs. NR 400 to 499.

**(24)** (a) "Net emissions increase" means the amount by which the sum of the following exceeds zero:

1. Any increase in actual emissions from a particular physical change or change in the method of operation at a stationary source.

2. Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

(b) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs between the following:

1. The date 5 years before construction on the particular change commences.

2. The date that the increase from the particular change occurs.

(c) An increase or decrease in actual emissions is creditable only if the reviewing authority has not relied on it in issuing a permit for the source under this chapter, which permit is in effect when the increase in actual emissions from the particular change occurs.

(d) An increase or decrease in actual emissions of sulfur dioxide, nitrogen oxides or particulate matter measured as $PM_{10}$ which occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(e) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

(f) A decrease in actual emissions is creditable only to the extent that:

1. The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions.

2. It is federally enforceable at and after the time that actual construction on the particular change begins.

3. It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

(g) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

**(24m)** "Pollution control project" means any activity or project undertaken at an existing electric utility steam generating unit for purposes of reducing emissions from the unit. Activities or projects are limited to the following:

(a) The installation of conventional or innovative pollution control technology, including but not limited to advanced flue gas desulfurization, sorbent injection for sulfur dioxide and nitrogen oxides controls and electrostatic precipitators.

(b) An activity or project to accommodate switching to a fuel which is less polluting than the fuel in use prior to the activity or project, including, but not limited to, natural gas or coal re-burning, or the co-firing of natural gas and other fuels for the purpose of controlling emissions.

(c) A permanent clean coal technology demonstration project conducted under title II, section 101 (d) of the Further Continuing Appropriations Act of 1985 (42 USC 5903 (d)), or subsequent appropriations, up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the U.S. environmental protection agency.

(d) A permanent clean coal technology demonstration project that constitutes a repowering project.

**(25)** "Potential to emit" means the maximum capacity of a stationary source to emit an air contaminant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit an air contaminant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

**(25g)** "Reactivation of a very clean coal-fired electric utility steam generating unit" means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit meets all of the following criteria:

(a) It has not been in operation for the 2-year period prior to the enactment of the clean air Act amendments of 1990 on November 15, 1990, and the emissions from the unit continue to be carried in the department's emissions inventory at the time of enactment.

(b) It was as equipped prior to shutdown with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85% and a removal efficiency for particulates of no less than 98%.

(c) It is equipped with low-NO$_x$ burners prior to the time of commencement of operations following reactivation.

(d) It is otherwise in compliance with the requirements of the act.

**(25m)** (a) "Repowering" means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the administrator, in consultation with the federal secretary of energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(b) Repowering shall also include any unit fired by oil or gas or both which has been awarded clean coal technology demon-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

stration funding as of January 1, 1991, by the federal department of energy.

(c) The department shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Act (42 USC 7651h).

**(25s)** "Representative actual annual emissions" means the average rate, in tons per year, at which the source is projected to emit a pollutant for the 2-year period after a physical change or change in the method of operation of a unit, or a different consecutive 2-year period within 10 years after that change, where the department determines that such period is more representative of normal source operations, considering the effect any such change will have on increasing or decreasing the hourly emissions rate and on projected capacity utilization. In projecting future emissions the department shall:

(a) Consider all relevant information, including but not limited to, historical operational data, the company's own representations, filings with the state or federal regulatory authorities, and compliance plans under title IV of the act.

(b) Exclude, in calculating any increase in emissions that results from the particular physical change or change in the method of operation at an electric utility steam generating unit, that portion of the unit's emissions following the change that could have been accommodated during the representative baseline period and is attributable to an increase in projected capacity utilization at the unit that is unrelated to the particular change, including any increased utilization due to the rate of electricity demand growth for the utility system as a whole.

**(26)** "Secondary emissions" means emissions which occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purposes of this chapter, secondary emissions must be specific, well defined, quantifiable, and impact the same general areas as the stationary source or modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

**(27)** (a) "Significant" means, in reference to a net emissions increase or the potential of a source to emit any of the air contaminants in Table A, a rate of emissions that would equal or exceed any of the rates in Table A.

### Table A Pollutant and Emissions Rate

1. Carbon monoxide: 100 tons per year (tpy)

2. Nitrogen oxides: 40 tpy

3. Sulfur dioxide: 40 tpy

4. Particulate matter: 25 tpy

5. $PM_{10}$: 15 tpy

6. Ozone: 40 tpy of volatile organic compounds

7. Lead: 0.60 tpy

8. Mercury: 0.10 tpy

9. Fluorides: 3.0 tpy

10. Sulfuric acid mist: 7.0 tpy

11. Hydrogen sulfide ($H_2S$): 10 tpy

12. Total reduced sulfur (including $H_2S$): 10 tpy

13. Reduced sulfur compounds (including $H_2S$): 10 tpy

14. Municipal waste combustor (MWC) acid gases (measured as total sulfur dioxide and hydrogen chloride): 40 tpy

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

15. MWC metals (measured as particulate matter): 15 tpy

16. MWC organics (measured as total tetra- through octachlorinated dibenzo-p-dioxins and dibenzofurans): $3.5 \times 10^{-6}$ tpy

17. CFCs 11, 12, 112, 114, 115: any emission rate

18. Halons 1211, 1301, 2402; any emission rate

---

(c) "Significant" means any emissions rate in reference to a net emissions increase or the potential of a source to emit an air contaminant subject to regulation under the Act other than air contaminants listed in par. (a) or under section 112 (b) of the Act (42 USC 7412 (b)).

(d) Notwithstanding par. (a), "significant" means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 <<mu>>g/m$^3$ (24-hour average).

**(28)** "Stationary source" means any building, structure, facility or installation which emits or may emit any air contaminant subject to regulation under the act.

**(29)** "Temporary clean coal technology demonstration project" means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the state implementation plans for the state in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

**History:** Cr. Register, January, 1987, No. 373, eff. 2-1-87; am. (27) (a) Register, December, 1988, No. 396, eff. 1-1-89; am. (intro.), (22) (c), (24) (d), (27) (b) and (28), cr. (22) (d), Register, May, 1992, No. 437, eff. 6-1-92; emerg. am. (7) and (27) (a) and (b), eff. 11-15-92; am. (intro.), (1) (c), (7), (8) and (27) (a), cr. (1) (d), (8m), (8s), (11m), (21) (b) 8, to 11., (24m), (25g), (25m), (25s) and (29), renum. (14) to be NR 400.02 (39m) and am., r. (27) (b), Register, May, 1993, No. 449, eff. 6-1-93; corrections in (1) (intro.) and (25g) (a) made under s. 13.93 (2m) (b) 7, and 6., Stats., Register, May, 1993, No. 449; am. (1) (b), (2) (a), (3) (intro.), (7), (21) (b) 6., (24) (d), (25m) (b), (c), Register, April, 1995, No. 472, eff. 5-1-95; am. (1) (d), (2) (intro.), (3) (intro.), (a), (4) (a) (intro.), 1. and 2., (b) 1, and 2., (7), (8), (12), (21) (intro.), (b) 3., 5. a. and b., 6. a., (22) (a) 1. and 2., (24) (d), (25g) (d), (25m) (a) and (c), (25s) (intro.) and (a), (27) (c) and (28), r. (5), cr. (21m) and (22m), Register, December, 1995, No. 480, eff. 1-1-96; am. (3) (intro.), (7), (9) (intro.), (21) (b) 2., 3., 8 and 9. (intro.) (22m) (b) 1., (24) (b) (intro.), 1., (24m) (intro.), (25g) and (25m) (a), r. (3) (a), (b), Register, December, 1996, No., 492, eff. 1-1-97; am. (21) (b) (intro.), 5, and (22) (c), Register, October, 1999, No. 526, eff. 11-1-99; **CR 01-081: am. (22) (c) Register September 2004 No. 585, eff. 10-1-04.**

WI ADC s NR **405** .02

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

establishing the magnitude of the basic design parameter(s) specified in paragraphs (h)(2)(i) and (ii) of this section.

(v) If design information is not available for a process unit, then the owner or operator shall determine the process unit's basic design parameter(s) using the maximum value achieved by the process unit in the five-year period immediately preceding the planned activity.

(vi) Efficiency of a process unit is not a basic design parameter.

(3) The replacement activity shall not cause the process unit to exceed any emission limitation, or operational limitation that has the effect of constraining emissions, that applies to the process unit and that is legally enforceable.

[51 FR 40669, Nov. 7, 1986]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §51.165, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at www.fdsys.gov.

EFFECTIVE DATE NOTE: At 76 FR 17552, Mar. 30, 2011, §51.165, paragraphs (a)(1)(v)(G) and (v)(1)(vi)(C) (3) are stayed indefinitely.

§51.166  Prevention of significant deterioration of air quality.

(a)(1) Plan requirements. In accordance with the policy of section 101(b)(1) of the Act and the purposes of section 160 of the Act, each applicable State Implementation Plan and each applicable Tribal Implementation Plan shall contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality.

(2) Plan revisions. If a State Implementation Plan revision would result in increased air quality deterioration over any baseline concentration, the plan revision shall include a demonstration that it will not cause or contribute to a violation of the applicable increment(s). If a plan revision proposing less restrictive requirements was submitted after August 7, 1977 but on or before any applicable baseline date and was pending action by the Administrator on that date, no such demonstration is necessary with respect to the area for which a baseline date would be established before final action is taken on the plan revision. Instead,

the assessment described in paragraph (a)(4) of this section, shall review the expected impact to the applicable increment(s).

(3) Required plan revision. If the State or the Administrator determines that a plan is substantially inadequate to prevent significant deterioration or that an applicable increment is being violated, the plan shall be revised to correct the inadequacy or the violation. The plan shall be revised within 60 days of such a finding by a State or within 60 days following notification by the Administrator, or by such later date as prescribed by the Administrator after consultation with the State.

(4) Plan assessment. The State shall review the adequacy of a plan on a periodic basis and within 60 days of such time as information becomes available that an applicable increment is being violated.

(5) Public participation. Any State action taken under this paragraph shall be subject to the opportunity for public hearing in accordance with procedures equivalent to those established in §51.102.

(6) Amendments. (i) Any State required to revise its implementation plan by reason of an amendment to this section, with the exception of amendments to add new maximum allowable increases or other measures pursuant to section 166(a) of the Act, shall adopt and submit such plan revision to the Administrator for approval no later than 3 years after such amendment is published in the FEDERAL REGISTER. With regard to a revision to an implementation plan by reason of an amendment to paragraph (c) of this section to add maximum allowable increases or other measures, the State shall submit such plan revision to the Administrator for approval within 21 months after such amendment is published in the FEDERAL REGISTER.

(ii) Any revision to an implementation plan that would amend the provisions for the prevention of significant air quality deterioration in the plan shall specify when and as to what sources and modifications the revision is to take effect.

(iii) Any revision to an implementation plan that an amendment to this section required shall take effect no

later than the date of its approval and may operate prospectively.

(7) *Applicability.* Each plan shall contain procedures that incorporate the requirements in paragraphs (a)(7)(i) through (vi) of this section.

(i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements.

(iv) Each plan shall use the specific provisions of paragraphs (a)(7)(iv)(*a*) through (*f*) of this section. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (a)(7)(iv)(*a*) through (*f*) of this section.

(*a*) Except as otherwise provided in paragraphs (a)(7)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases—a significant emissions increase (as defined in paragraph (b)(39) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(*b*) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (*i.e.,* the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(7)(iv)(*c*) through (*f*) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (*i.e.,* the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(*c*) *Actual-to-projected-actual applicability test for projects that only involve existing emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(40) of this section) and the baseline actual emissions (as defined in paragraphs (b)(47)(i) and (ii) of this section) for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*d*) *Actual-to-potential test for projects that only involve construction of a new emissions unit(s).* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(47)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*e*) [Reserved]

(*f*) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs

248

(a)(7)(iv)(*c*) through (*d*) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) The plan shall require that for any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with requirements under paragraph (w) of this section.

(b) *Definitions.* All State plans shall use the following definitions for the purposes of this section. Deviations from the following wording will be approved only if the State specifically demonstrates that the submitted definition is more stringent, or at least as stringent, in all respects as the corresponding definitions below:

(1)(i) *Major stationary source* means:

(*a*) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(*b*) Notwithstanding the stationary source size specified in paragraph (b)(1)(i)(*a*) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(*c*) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary source if the change would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or $NO_x$ shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(*a*) Coal cleaning plants (with thermal dryers);

(*b*) Kraft pulp mills;

(*c*) Portland cement plants;

(*d*) Primary zinc smelters;

(*e*) Iron and steel mills;

(*f*) Primary aluminum ore reduction plants;

(*g*) Primary copper smelters;

(*h*) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(*i*) Hydrofluoric, sulfuric, or nitric acid plants;

(*j*) Petroleum refineries;

(*k*) Lime plants;

(*l*) Phosphate rock processing plants;

(*m*) Coke oven batteries;

(*n*) Sulfur recovery plants;

(*o*) Carbon black plants (furnace process);

(*p*) Primary lead smelters;

(*q*) Fuel conversion plants;

(*r*) Sintering plants;

(*s*) Secondary metal production plants;

(*t*) Chemical process plants—The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(*u*) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input;

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) *Major modification* means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(39) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(49) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(39) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or NOₓ shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(a) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (y) of this section;

NOTE TO PARAGRAPH (b)(2)(iii)(a): On December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(a) is stayed indefinitely by court order. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(b) Use of an alternative fuel or raw material by reason of any order under section 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plan pursuant to the Federal Power Act;

(c) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(d) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(e) Use of an alternative fuel or raw material by a stationary source which:

(1) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or §51.166; or

(2) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(f) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or §51.166.

(g) Any change in ownership at a stationary source.

(h) [Reserved]

(i) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(1) The State implementation plan for the State in which the project is located; and

(2) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(j) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(k) The reactivation of a very clean coal-fired electric utility steam generating unit.

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (w) of this section for a PAL for that pollutant. Instead, the definition at paragraph (w)(2)(viii) of this section shall apply.

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this section.

(3)(i) *Net emissions increase* means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(a) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(7)(iv) of this section; and

(b) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (b)(3)(i)(b) shall be determined as provided in paragraph (b)(47), except that paragraphs (b)(47)(i)(c) and (b)(47)(ii)(d) of this section shall not apply.

(ii) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs within a reasonable period (to be specified by the State) before the date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if:

(a) It occurs within a reasonable period (to be specified by the reviewing authority); and

(b) The reviewing authority has not relied on it in issuing a permit for the source under regulations approved pursuant to this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(c) The increase or decrease in emissions did not occur at a Clean Unit, except as provided in paragraphs (t)(8) and (u)(10) of this section.

(d) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (b)(1)(iii) of this section or it occurs at an emission unit that is located at a major stationary source that belongs to one of the listed source categories. Fugitive emission increases or decreases are not included for those emissions units located at a facility whose primary activity is not represented by one of the source categories listed in paragraph (b)(1)(iii) of this section and that are not, by themselves, part of a listed source category.

(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxides that occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(a) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(b) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins;

(c) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(vii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(viii) Paragraph (b)(21)(ii) of this section shall not apply for determining creditable increases and decreases.

(4) *Potential to emit* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(5) *Stationary source* means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(6) *Building, structure, facility, or installation* means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same *Major Group* (*i.e.*, which have the same two-digit code) as described in the *Standard Industrial Classification Manual, 1972*, as amended by the 1977 Supplement (U.S. Government Printing Office stock numbers 4101–0066 and 003–005–00176–0, respectively).

(7) *Emissions unit* means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(30) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section.

(i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of

this section. A replacement unit, as defined in paragraph (b)(32) of this section, is an existing emissions unit.

(8) *Construction* means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions.

(9) *Commence* as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(ii) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(10) *Necessary preconstruction approvals or permits* means those permits or approvals required under Federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(11) *Begin actual construction* means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of permanent storage structures. With respect to a change in method of operation this term refers to those on-site activities, other than preparatory activities, which mark the initiation of the change.

(12) *Best available control technology* means an emissions limitation (including a visible emissions standard) based on the maximum degree of reduction for each a regulated NSR pollutant which would be emitted from any proposed major stationary source or major modification which the reviewing authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such

source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combination techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR parts 60 and 61. If the reviewing authority determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(13)(i) *Baseline concentration* means that ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a minor source baseline date is established and shall include:

(a) The actual emissions, as defined in paragraph (b)(21) of this section, representative of sources in existence on the applicable minor source baseline date, except as provided in paragraph (b)(13)(ii) of this section;

(b) The allowable emissions of major stationary sources that commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(ii) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):

(a) Actual emissions, as defined in paragraph (b)(21) of this section, from any major stationary source on which construction commenced after the major source baseline date; and

(b) Actual emissions increases and decreases, as defined in paragraph (b)(21) of this section, at any stationary source occurring after the minor source baseline date.

(14)(i) *Major source baseline date* means:

(a) In the case of $PM_{10}$ and sulfur dioxide, January 6, 1975;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2010.

(ii) *Minor source baseline date* means the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

(a) In the case of $PM_{10}$ and sulfur dioxide, August 7, 1977;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2011.

(iii) The baseline date is established for each pollutant for which increments or other equivalent measures have been established if:

(a) The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act for the pollutant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166; and

(b) In the case of a major stationary source, the pollutant would be emitted in significant amounts, or, in the case of a major modification, there would be a significant net emissions increase of the pollutant.

(iv) Any minor source baseline date established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that the reviewing authority may rescind any such minor source baseline date where it can be shown, to the satisfaction of the reviewing authority, that the emissions increase from the major stationary source, or the net emissions increase

253

from the major modification, responsible for triggering that date did not result in a significant amount of PM–10 emissions.

(15)(i) *Baseline area* means any intrastate area (and every part thereof) designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact for the pollutant for which the baseline date is established, as follows: Equal to or greater than 1 μg/m³ (annual average) for $SO_2$, $NO_2$, or $PM_{10}$; or equal or greater than 0.3 μg/m³ (annual average) for $PM_{2.5}$.

(ii) Area redesignations under section 107(d)(1)(A)(ii) or (iii) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which:

(a) Establishes a minor source baseline date; or

(b) Is subject to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166, and should be constructed in the same State as the State proposing the redesignation.

(iii) Any baseline area established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that such baseline area shall not remain in effect if the permit authority rescinds the corresponding minor source baseline date in accordance with paragraph (b)(14)(iv) of this section.

(16) *Allowable emissions* means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(i) The applicable standards as set forth in 40 CFR parts 60 and 61;

(ii) The applicable State Implementation Plan emissions limitation, including those with a future compliance date; or

(iii) The emissions rate specified as a federally enforceable permit condition.

(17) *Federally enforceable* means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(18) *Secondary emissions* means emissions which occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purposes of this section, secondary emissions must be specific, well defined, quantifiable, and impact the same general areas the stationary source modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(19) *Innovative control technology* means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

(20) Fugitive emissions means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) *Actual emissions* means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section, except that this definition shall not apply for calculating whether

254

ADD30

requirements in sections 166(c) and 166(d) of the Clean Air Act for a regulated NSR pollutant for which the Administrator has established maximum allowable increases pursuant to section 166(a) of the Act, the requirements for maximum allowable increases for that pollutant under paragraph (c)(1) of this section shall not apply upon approval of the plan by the Administrator. The following regulated NSR pollutants are eligible for such treatment:

(i) Nitrogen dioxide.

(ii) $PM_{2.5}$.

(d) *Ambient air ceilings.* The plan shall provide that no concentration of a pollutant shall exceed:

(1) The concentration permitted under the national secondary ambient air quality standard, or

(2) The concentration permitted under the national primary ambient air quality standard, whichever concentration is lowest for the pollutant for a period of exposure.

(e) *Restrictions on area classifications.* The plan shall provide that—

(1) All of the following areas which were in existence on August 7, 1977, shall be Class I areas and may not be redesignated:

(i) International parks,

(ii) National wilderness areas which exceed 5,000 acres in size,

(iii) National memorial parks which exceed 5,000 acres in size, and

(iv) National parks which exceed 6,000 acres in size.

(2) Areas which were redesignated as Class I under regulations promulgated before August 7, 1977, shall remain Class I, but may be redesignated as provided in this section.

(3) Any other area, unless otherwise specified in the legislation creating such an area, is initially designated Class II, but may be redesignated as provided in this section.

(4) The following areas may be redesignated only as Class I or II:

(i) An area which as of August 7, 1977, exceeded 10,000 acres in size and was a national monument, a national primitive area, a national preserve, a national recreational area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore; and

(ii) A national park or national wilderness area established after August 7, 1977, which exceeds 10,000 acres in size.

(f) *Exclusions from increment consumption.* (1) The plan may provide that the following concentrations shall be excluded in determining compliance with a maximum allowable increase:

(i) Concentrations attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, natural gas, or both by reason of an order in effect under section 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) over the emissions from such sources before the effective date of such an order;

(ii) Concentrations attributable to the increase in emissions from sources which have converted from using natural gas by reason of natural gas curtailment plan in effect pursuant to the Federal Power Act over the emissions from such sources before the effective date of such plan;

(iii) Concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission-related activities of new or modified sources;

(iv) The increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration; and

(v) Concentrations attributable to the temporary increase in emissions of sulfur dioxide, particulate matter, or nitrogen oxides from stationary sources which are affected by plan revisions approved by the Administrator as meeting the criteria specified in paragraph (f)(4) of this section.

(2) If the plan provides that the concentrations to which paragraph (f)(1) (i) or (ii) of this section, refers shall be excluded, it shall also provide that no exclusion of such concentrations shall apply more than five years after the effective date of the order to which paragraph (f)(1)(i) of this section, refers or the plan to which paragraph (f)(1)(ii) of this section, refers, whichever is applicable. If both such order and plan are applicable, no such exclusion shall

263

apply more than five years after the later of such effective dates.

(3) [Reserved]

(4) For purposes of excluding concentrations pursuant to paragraph (f)(1)(v) of this section, the Administrator may approve a plan revision that:

(i) Specifies the time over which the temporary emissions increase of sulfur dioxide, particulate matter, or nitrogen oxides would occur. Such time is not to exceed 2 years in duration unless a longer time is approved by the Administrator.

(ii) Specifies that the time period for excluding certain contributions in accordance with paragraph (f)(4)(i) of this section, is not renewable;

(iii) Allows no emissions increase from a stationary source which would:

(*a*) Impact a Class I area or an area where an applicable increment is known to be violated; or

(*b*) Cause or contribute to the violation of a national ambient air quality standard;

(iv) Requires limitations to be in effect the end of the time period specified in accordance with paragraph (f)(4)(i) of this section, which would ensure that the emissions levels from stationary sources affected by the plan revision would not exceed those levels occurring from such sources before the plan revision was approved.

(g) *Redesignation.* (1) The plan shall provide that all areas of the State (except as otherwise provided under paragraph (e) of this section) shall be designated either Class I, Class II, or Class III. Any designation other than Class II shall be subject to the redesignation procedures of this paragraph. Redesignation (except as otherwise precluded by paragraph (e) of this section) may be proposed by the respective States or Indian Governing Bodies, as provided below, subject to approval by the Administrator as a revision to the applicable State implementation plan.

(2) The plan may provide that the State may submit to the Administrator a proposal to redesignate areas of the State Class I or Class II: *Provided,* That:

(i) At least one public hearing has been held in accordance with procedures established in §51.102.

(ii) Other States, Indian Governing Bodies, and Federal Land Managers whose lands may be affected by the proposed redesignation were notified at least 30 days prior to the public hearing;

(iii) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social, and energy effects of the proposed redesignation, was prepared and made available for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion;

(iv) Prior to the issuance of notice respecting the redesignation of an area that includes any Federal lands, the State has provided written notice to the appropriate Federal Land Manager and afforded adequate opportunity (not in excess of 60 days) to confer with the State respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any Federal Land Manager had submitted written comments and recommendations, the State shall have published a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the Federal Land Manager); and

(v) The State has proposed the redesignation after consultation with the elected leadership of local and other substate general purpose governments in the area covered by the proposed redesignation.

(3) The plan may provide that any area other than an area to which paragraph (e) of this section refers may be redesignated as Class III if—

(i) The redesignation would meet the requirements of provisions established in accordance with paragraph (g)(2) of this section;

(ii) The redesignation, except any established by an Indian Governing Body, has been specifically approved by the Governor of the State, after consultation with the appropriate committees of the legislature, if it is in session, or with the leadership of the legislature, if it is not in session (unless State law

264