No. 12-3388

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

CLEAN WATER ACTION COUNCIL OF NORTHEASTERN WISCONSIN, INC.,
et al.,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.

Respondents

GEORGIA-PACIFIC CONSUMER PRODUCTS LP,

Intervening Respondent.

_____

On Petition for Review of a Final Order of the Administrator of the
United States Environmental Protection Agency

_____

FINAL ANSWERING BRIEF FOR INTERVENING RESPONDENT

_____

**MICHAEL BEST & FRIEDRICH LLP**
Attorneys for Intervening Respondent
Georgia-Pacific Consumer Products LP

Jordan J. Hemaidan
Todd E. Palmer
Gary A. Ahrens

Michael Best & Friedrich LLP
One South Pinckney St., Suite 700
P.O. Box 1806
Madison, WI 53701-1806
Phone: (608) 257-3501

CIRCUIT  RULE  26.1    DISCLOSURE  STATEMENT

Appellate Court No: _12-3388_____

Short Caption: _Clean Water Action Council of Northeastern Wisconsin, et al. v. EPA, et al._____

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

   [  ]    PLEASE CHECK  HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
         AND INDICATE  WHICH   INFORMATION IS NEW OR REVISED.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

      Georgia-Pacific Consumer Products LP

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

      Michael Best & Friedrich LLP

(3) If the party or amicus is a corporation:

   i) Identify all its parent corporations, if any; and

         Georgia-Pacific Consumer Products LP is an indirect, wholly-owned subsidiary of Koch Industries, Inc., a privately-held Kansas corporation with its principal place of business in Wichita, Kansas. No publicly held entity owns more than 10% of Koch Industries, Inc., or any of its subsidiaries.

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

         N/A

Attorney's Signature: _/s Jordan J. Hemaidan_____        Date: _6/19/13_____

Attorney's Printed Name: _Jordan J. Hemaidan_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes _X____       No _____

Address: _Michael Best & Friedrich LLP, One South Pinckney Street, Suite 700, Madison, WI  53703_____

Phone Number: _608-283-4431_____        Fax Number: _608-283-2275_____

E-Mail Address: _jjhemaidan@michaelbest.com_____

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT..................................................................... 1

STATEMENT OF ISSUES............................................................................... 2

STATEMENT OF THE CASE .......................................................................... 3

STATEMENT OF FACTS ................................................................................ 3

I.      Regulatory Background ........................................................................ 3

        A.      The Prevention of Significant Deterioration
                Construction Permit Program ...................................................... 3

        B.      The Title V Operation Permit Program.......................................... 5

        C.      The Wisconsin Clean Air Act PSD Construction Permit
                Program ...................................................................................... 5

        D.      Mandatory Procedures For Challenging Wisconsin
                Administrative Rules and WDNR-Issued Permits. ......................... 7

II.     Factual Background ............................................................................. 7

STANDARD OF REVIEW ............................................................................. 11

SUMMARY OF THE ARGUMENT ................................................................. 12

ARGUMENT ............................................................................................... 14

I.      The Court is Without Subject Matter Jurisdiction Because
        Petitioners' Challenge to the 2004 PSD Permit is Time Barred. ............. 14

        A.      Petitioners' Challenge to the 2004 PSD Permit is Time
                Barred Under Wisconsin Law. ................................................... 15

        B.      Federal Law Provides Additional Repose For Georgia
                Pacific's 2004 PSD Permit......................................................... 16

        C.      The Title V Permitting Process Did Not Require WDNR
                to Revisit the Increment Analysis Underlying the 2004
                PSD Permit............................................................................... 20

II.     The Petitioner's Interpretation of "Baseline Concentration" Should
        be Rejected Because it Cannot be Reconciled With the Plain
        Language of the Clean Air Act or the Framework of the PSD
        Program.................................................................................... 21

i

A.   Petitioners' Interpretation of "Baseline" is Contrary to the Plain Language of the Clean Air Act. ..................................... 22

B.   Petitioners' Interpretation of Baseline Cannot be Reconciled With the Framework of the PSD Program. ................. 25

C.   EPA's Implementation of the Increment Consumption Provisions of the PSD Program Have Been Clearly Articulated and Consistently Implemented. ............................... 28

III.   Petitioners' Interpretation of the Act Would Lead to Absurd, Devastating Results For Georgia-Pacific and All Entities Subject to PSD Permits. ....................................................................................... 30

CONCLUSION ............................................................................ 33

CERTIFICATE OF SERVICE ......................................................... 34

CERTIFICATE OF COMPLIANCE .................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Association of Career Employees v. Klauser,*
195 Wis. 2d 602, 536 N.W.2d 478 (Ct. App. 1995) .................................... 16

*Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.,*
467 U.S. 837 (1984) .................................................................................. 11

*Costanzo v. Tillinghast,*
287 U.S. 341 (1932) ............................................................................ 28, 30

*County of Sauk v. Trager,*
118 Wis. 2d 204, 346 N.W.2d 756 (1984).................................................. 16

*Crawford v. Metro. Gov't of Nashville,*
129 S.Ct. 846 (2009) ............................................................................... 22

*Davis v. Michigan Dep't of Treasury,*
489 U.S. 803 (1989) ................................................................................ 25

*In re N. Mich. Univ. Ripley Heating Plant,* PSD Appeal No. 09-02
*(*EAB Feb. 18, 2009) ....................................................................26, 27, 28

*Sierra Club v. EPA,*
499 F.3d 653 (7th Cir. 2007) ................................................................... 29

*Sierra Club v. Otter Tail Power Co.,*
615 F.3d 1008 (8th Cir. 2010) ....................................................17, 18, 19

*Steel Co. v. Citizens For A Better Env't,*
523 U.S. 83 (1998) .................................................................................. 11

*United States v. AM Gen. Corp.,*
34 F.3d 472 (7th Cir. 1994) ....................................................12, 17, 18, 19

## STATUTES

42 U.S.C. § 7470 .................................................................... 3, 12, 13

42 U.S.C. § 7470(3) ........................................................................ 25

42 U.S.C. § 7470(5) ........................................................................ 25

42 U.S.C. § 7472 .............................................................................. 5

42 U.S.C. § 7473 ........................................................................... 3, 4

42 U.S.C. § 7473(b) ........................................................................ 25

42 U.S.C. § 7479 .............................................................................. 4

42 U.S.C. § 7479(4) ............................................... 11, 13, 21, 22, 23, 24

42 U.S.C. § 7501 .............................................................................. 3

42 U.S.C. § 7604 ............................................................................ 19

42 U.S.C. § 7607(b)(1) .................................................................. 1, 2

42 U.S.C. § 7661d(b)(2) ................................................................. 1, 2

## STATE STATUTES

Wis. Admin. Code ch. NR 400-499 ................................................... 6

Wis. Admin. Code § NR 405.02(4) ............................................... 6, 24

Wis. Admin. Code § NR 405.15 ..................................................... 15

Wis. Stat. ch. 285 ............................................................................ 6

Wis. Stat. § 227.52 .................................................. 1, 7, 12, 15, 16, 20

Wis. Stat. § 227.53 ........................................................................ 16

Wis. Stat. § 227.53(1)(a)2 ......................................................... 7, 15

Wis. Stat. § 285.11(16) .................................................................... 6

Wis. Stat. § 285.11(17) .................................................................... 6

Wis. Stat. § 285.21(2) ...................................................................... 6

Wis. Stat. § 285.21(4) ................................................................ 6

Wis. Stat. § 285.61(4) .............................................................. 15

Wis. Stat. § 285.63(1)(b) .................................................... 20, 21

Wis. Stat. § 285.81 ............................................. 1, 7, 12, 15, 16, 20

Wis. Stat. § 285.81(1)(a) ........................................................... 7


**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 51.21 .................................................................. 4, 5

40 C.F.R. § 51.166(b)(13) ..................................................... 6, 24

40 C.F.R. § 51.166(b)(13)(i) ........................................................ 4

40 C.F.R. § 52.21(b)(15)(i) ......................................................... 4

40 C.F.R. § 52.21(c) ................................................................. 4

40 C.F.R. § 70.1 ...................................................................... 5


**FEDERAL REGISTER**

43 Fed. Reg. 26,388 (June 19, 1978) ....................................... 4, 26

45 Fed. Reg. 52,676 (Aug. 7, 1980) ......................................... 4, 26

57 Fed. Reg. 32,250, 32,251 (July 21, 1992) ............................. 5, 20

64 Fed. Reg. 28,745 (May 27, 1999) ............................................ 6

72 Fed. Reg. 54,112 (Sept. 21, 2007) ........................................... 4

75 Fed. Reg. 64,864 (Oct. 20, 2010) ........................................ 4, 26

## OTHER AUTHORITIES

*Objection to the Issuance of Significant Modification No.*
   *T083-23529-0003 Duke Energy Indiana Inc. Edwardsport*
   *Generating Station,* Cause No. 08-A-J-4066 (Indiana Office of
   Environmental Adjudication Order Aug. 18, 2011).........................26, 27, 28

2003-2004 Joint Legislative Audit Committee Members, Air
   Management Program, February 2004, p. 52, available online at
   http://legis.wisconsin.gov/lab/reports/04-1full.pdf.................................. 32

EPA, *New Source Review Workshop Manual* (Draft, Oct. 1990)................. 23, 30

*Memorandum: Baseline Value for PSD Increment Consumption*
   (Dec. 11, 1978) available online at
   http://www.epa.gov/region07/air/nsr/nsrmemos/m121178.pdf............. 29

*Memorandum: PSD Increment Consumption Guidance From Chief, Air*
   *Management Branch* (May 13, 1983) available online at
   http://www.epa.gov/region07/air/nsr/nsrmemos/cnsumptn.pdf............ 29

*Memorandum: Question from Otto Pearson (South Carolina State Agency)*
   (Mar. 13, 1980), available online at
   http://www.epa.gov/region07/air/nsr/nsrmemos/q_otto.pdf.................. 29

*Memorandum: Westavaco Paper Mill – PSD Applicability* (Feb. 8, 1983)
   available online at
   http://www.epa.gov/region07/air/nsr/nsrmemos/westvaco.pdf.............. 29

Merriam Webster Online Dictionary ....................................................... 22, 23

## JURISDICTIONAL STATEMENT

Petitioners Clean Water Action Council of Northeastern Wisconsin, Inc. and Midwest Environmental Defense Center, Inc. ("Petitioners") assert that they seek review of the Environmental Protection Agency's ("EPA") decision not to object to Wisconsin Department of Natural Resources' ("WDNR") 2011 issuance of an operation permit to Georgia-Pacific under Title V of the Clean Air Act. Petitioners assert this Court has jurisdiction for such a review under 42 U.S.C. §§ 7607(b)(1), 7661d(b)(2), which together allow for judicial review of EPA decisions not to object to state-issued Title V operation permits in the United States Court of Appeals.

The Petitioners' Jurisdictional Statement is incorrect. This Court lacks subject matter jurisdiction over the petition for review in this case because the petition constitutes a time-barred, collateral challenge to WDNR's issuance of Georgia-Pacific's 2004 air pollution construction permit (the "2004 PSD Permit"). Wisconsin law requires that any person objecting to issuance of an air pollution construction permit seek judicial review within 30 days of the permit's issuance. *See* Wis. Stat. §§ 285.81 & 227.52. Petitioners never brought such a challenge, and there is no authority that allows them to do so nine years after WDNR issued the 2004 PSD permit.

**STATEMENT OF ISSUES**

1. Whether this Court has subject matter jurisdiction under 42 U.S.C.

   §§ 7607(b)(1) and 7661d(b)(2) to hear a challenge to a final, non-appealable

   PSD construction permit issued in 2004.

2. Whether EPA and WDNR have reasonably interpreted and applied the term

   "baseline concentration" as set forth in § 169(4) of the Clean Air Act.

## STATEMENT OF THE CASE

Georgia-Pacific has nothing to add to EPA's Statement of the Case.

## STATEMENT OF FACTS

Georgia-Pacific offers the following additional background and facts necessary to develop and support the distinct arguments Georgia-Pacific presents in this brief.

## I.    Regulatory Background

### A.    The Prevention of Significant Deterioration Construction Permit Program

EPA's Brief generally describes the Clean Air Act's (or "Act's") Prevention of Significant Deterioration ("PSD") program and how states like Wisconsin obtain State Implementation Plan ("SIP") approval to implement the PSD permitting program.   The purpose of the PSD program is exactly as it sounds – to prevent the significant deterioration of ambient air quality. *See* 42 U.S.C. §§ 7470, 7473. To that end, the EPA uses the national ambient air quality standards ("NAAQS") established by EPA to classify geographic areas with poor air quality as "non-attainment" with NAAQS and areas with good air quality as "attainment." *Id.; see also* 42 U.S.C. §§ 7501 *et. seq.*  For non-attainment areas, the Act requires states to issue construction permits that force *reductions* in concentrations of pollutants that exceed the NAAQS. *Id.* For attainment areas, Congress established *maximum allowable increases* in pollutant concentrations so that, up to a certain point, new emission sources can be constructed in those areas.  *Id.*   In other words, for attainment areas the Act is designed to allow some deterioration of air quality to accommodate

3

economic growth, but the mandated maximum allowable increase operates to prevent "significant" deterioration of air quality. The maximum allowable increases are called *increments*. *See* 42 U.S.C. § 7473; 40 C.F.R. § 52.21(c); 72 Fed. Reg. 54,112, 54,116 (Sept. 21, 2007). The Georgia-Pacific facility at issue in this matter (the "Mill") is located in Green Bay, Wisconsin, which is an attainment area.

To allow certain increases of pollutants in attainment areas yet still prevent significant deterioration, the Act requires the establishment of a fixed baseline concentration of pollutants in the ambient air. *See* 42 U.S.C. § 7479. As prescribed by the Act and implementing regulations, the baseline concentration is established at a single point in time and applies to a certain geographic area, called the "baseline area". *See* 40 C.F.R. §§ 51.166(b)(13)(i) and 52.21(b)(15)(i) (defining "baseline area"). Once the baseline concentration is set, pollutant increases from that baseline can be permitted until the maximum allowable increase – the increment – is reached. 42 U.S.C. § 7473; 40 C.F.R. § 52.21(c). As described in the EPA Brief, prior EPA rulemakings make clear that an increase in emissions is considered to *consume increment*, and a reduction in emissions is considered to *expand increment*. *See* 43 Fed. Reg. 26,388, 26,400-01 (June 19, 1978); 45 Fed. Reg. 52,676, 52,720 (Aug. 7, 1980); 75 Fed. Reg. 64,864, 64,869 (Oct. 20, 2010). Once the increment limit is reached, no new major sources or major modifications may be permitted in that area until the ambient pollutant concentration is reduced and/or the increment is expanded.

4

Congress further delineated classifications for geographic areas based on air quality: a Class I area is considered pristine and the increment established for those areas is quite small; Class II and Class III areas are more developed and have larger increments to allow for additional development in those areas. 42 U.S.C § 7472; 40 C.F.R. § 51.21. The Georgia-Pacific facility at issue is located in Brown County, Wisconsin, which is a Class II attainment area. Petitioners' Brief at 8.

### B.    The Title V Operation Permit Program

The Title V operation permit program does not create any independent or additional substantive air emission requirements. Rather, its singular administrative purpose is to aggregate all prior relevant construction permit terms and other Clean Air Act requirements into a single permit. 40 C.F.R. § 70.1; *see also* 57 Fed. Reg. 32,250, 32,251 (July 21, 1992) (EPA notice of regulations implementing Title V) ("While Title V generally does not impose substantive new requirements, ... [t]he program will ... clarify, in a single document, which requirements apply to a source and, thus, should enhance compliance with the requirements of the Act."). As with the PSD program, states are required to develop a SIP and obtain EPA approval prior to implementing a Title V permit program.

### C.    The Wisconsin Clean Air Act PSD Construction Permit Program

In 1999 EPA first delegated to the State of Wisconsin the authority to administer and enforce the PSD permit program through an EPA-approved SIP.

5

*See* Wis. Stat. ch. 285, Wis. Admin. Code ch. NR 400 – 499, 64 Fed. Reg. 28,745 (May 27, 1999).

WDNR is required to implement and enforce the Clean Air Act, including undertaking an increment consumption analysis when issuing PSD permits, in manner that is consistent with and no more stringent than the federal program. *See* Wis. Stat. §§ 285.11(16), (17).  Most relevant to this matter, Wis. Stat. § 285.21(2) provides that "[t]he department shall promulgate by rule ambient air increments for various air contaminants in attainment areas," and directs with limited, inapplicable exception that "[t]he ambient air increments shall be consistent with and no more restrictive, either in terms of the concentration or the contaminants to which they apply, than ambient air increments under the federal clean air act ..."[1]  The Wisconsin rules for increment consumption, and in particular the definition of "baseline concentration," are practically identical to the federal regulations on increment consumption. *Compare* 40 C.F.R. § 51.166(b)(13) and Wis. Admin. Code § NR 405.02(4).  Accordingly, Wisconsin's implementation of the PSD program has always been consistent with, and no more stringent than, EPA's implementation.  Given this consistency between state and federal rules, Wisconsin relies heavily upon EPA rulemaking, guidance and policy documents to implement its state program, including implementation of increment consumption methodologies.

---

[1] The exception, found in Wis. Stat. § 285.21(4), provides that if a federal ambient air increment or ambient air quality standard in effect on April 30, 1980 is modified, WDNR shall modify state rules similarly unless the modified federal standards would not provide adequate protection for public health and welfare.

### D. Mandatory Procedures For Challenging Wisconsin Administrative Rules and WDNR-Issued Permits.

Under Wisconsin law, an interested person may challenge a WDNR-issued PSD permit by either requesting a contested case hearing before WDNR or seeking judicial review in state circuit court. *See* Wis. Stat. §§ 285.81, 227.52. A request for a contested case hearing or petition for judicial review must be filed within 30 days of issuance of a PSD permit by WDNR. Wis. Stat. §§ 285.81(1)(a), 227.53(1)(a)2.

## II. Factual Background

There are three Clean Air Act permits relevant to this case. The first is Georgia-Pacific's PSD construction permit No. 03-DCF-327 which authorized modifications to paper machine number 9 at the Mill, and was issued in 2004 (the "2004 PSD Permit"). *See* "Order Denying Petition for Objection to Permit" ("Order") at 4 (JA4). The second is Georgia-Pacific's PSD construction permit No. 05-DCF-058, which was issued in 2005. September 7, 2005, Response to Comments (JA350-60). The third is Georgia-Pacific's renewed Title V operation permit which was applied for in 2002 and issued in 2011 (the "2011 Title V Permit").[2]

On November 19, 2003, Georgia-Pacific applied for the 2004 PSD Permit, and WDNR deemed the application complete on January 9, 2004. Petition, Ex. V at 2-3 (JA64-65). WDNR's preliminary determination for the 2004 PSD Permit concluded that, "the impact of the proposed modifications to the . . . Mill will not violate PSD Class II increments or State or Federal ambient air

---

[2] Georgia-Pacific's first Title V permit was issued in 1998 and expired in 2003.

quality standards…" Petition, Ex. V at 41-42, 60 (JA103-04, 122). WDNR

issued the final 2004 PSD Permit on February 24, 2004.  Neither Petitioners

nor any other person(s) sought judicial or administrative review of the 2004

PSD Permit.

Georgia-Pacific applied for another PSD construction permit in 2005 to

undertake additional, separate modifications at the Mill (the "2005 PSD

Permit"). *See* September 7, 2005, Response to Comments (JA350-60). On the

basis of an air quality modeling and increment analysis, WDNR determined

that "the impact of the proposed modifications to the . . . Mill will not violate

PSD Class II increments or State or Federal ambient air quality standards…"

*See* March 18, 2010, Analysis and Preliminary Determination and Draft Permit

for Renewal of Operation Permit No. 405032879-P01 (JA288-343). On August

22, 2005, Georgia-Pacific submitted comments on the draft 2005 PSD Permit.

(JA344-49). EPA also submitted comments on the draft 2005 PSD Permit.  No

one else submitted public comments on the draft 2005 PSD Permit, and no one

submitted comments on the preliminary determination to issue the permit or

specifically WDNR's determination that the project would protect increment.

*See* September 7, 2005, Response to Comments (JA350-60). WDNR issued the

final 2005 PSD Permit on September 8, 2005. *See* March 18, 2010 Analysis,

Preliminary Determination and Draft Permit for Renewal (JA288-343).  Neither

Petitioners nor any other person(s) sought judicial or administrative review of

the 2005 PSD Permit.

It was not until August 11, 2005 – nearly three years after WDNR deemed Georgia-Pacific's Title V operation permit renewal application complete and 18 months after WDNR issued the 2004 PSD Permit – that the public comment period began for the first draft of Georgia-Pacific's Title V renewal permit and preliminary determination. Petition, Exhibit C (JA56). On September 9, 2005, Sierra Club and Wisconsin Public Interest Research Group ("WSPIRG") (represented by the same counsel who represents Petitioners in this case), filed comments on the proposed Title V permit renewal. September 9, 2005, Letter from David Bender (JA361-93). Neither their comments nor any others addressed any aspect of the 2004 PSD Permit, 2005 PSD Permit, or WDNR's underlying application of the term "baseline concentration" and the related increment analysis which forms the single ground for Petitioners' challenge in this case. *Id.* (JA361-93).[3] *Id.* In response to the public comments received by WDNR and additional information provided to WDNR by Georgia-Pacific during the comment period, WDNR delayed the Title V renewal process so the draft permit and associated documents could be revised as necessary. Order at 4 (JA4).

WDNR issued a response to comments on the 2005 draft Title V reissuance permit on March 16, 2010. *See* March 16, 2010 WDNR Draft Response to Comments (JA394-412). Ten days later, WDNR issued the revised draft of Georgia-Pacific's Title V renewal permit and preliminary determination for

---

[3] The public comment period for the draft 2005 PSD Permit and underlying increment analysis overlapped with the public comment period for the draft Title V renewal permit, but neither Petitioners nor Sierra Club/WPIRG filed public comments on the draft 2005 PSD Permit. September 7, 2005, Response to Comments (JA350-60).

public comment.  On April 19, 2010, Sierra Club, Clean Water Action Council of Northeastern Wisconsin and others submitted public comments on the draft permit and associated documents (Petition, Ex. B (JA38-44)), for the first time criticizing WDNR's approach to increment analysis for both the 2004 PSD Permit and the 2005 PSD Permit.  *Id.* (JA38-44).  The record does not reflect any comments by Petitioners or anyone else prior to that time concerning the 2004 PSD Permit increment analysis or WDNR's approach to increment analysis generally.  At no time have Petitioners challenged in any respect the 2005 PSD Permit, and they do not expressly challenge the 2005 PSD Permit in this case.

In May 2011, EPA and WDNR exchanged email correspondence concerning the draft Title V renewal permit, WDNR's proposed response to public comments and EPA's reaction to WDNR's proposed response. Petition, Exhibits D, E (JA57-62).  Two months later on July 23, 2011, Petitioners filed their petition requesting that EPA object to Georgia-Pacific's Title V renewal permit. Petition (JA22-37). Finally, on July 26, 2011, more than ten years after Georgia-Pacific filed its Title V renewal application, WDNR issued Georgia-Pacific's 2011 Title V Permit.  *See* July 26, 2011 Final Air Pollution Control Operation Permit Renewal (JA287). Nearly one year later on July 24, 2012, EPA issued its order denying the Petition, and on October 17, 2012, Petitioners filed their Petition for Review requesting that the Seventh Circuit review EPA's order denying their petition that EPA object to WDNR's issuance of the Title V permit. Order, Petition (JA1-21, 22-37).

**STANDARD OF REVIEW**

This court does not have subject matter jurisdiction to entertain time-barred challenges to Georgia-Pacific's 2004 PSD Permit and to Wisconsin's long-standing interpretation and application of the term "baseline concentration" in the Clean Air Act.  Every court has a special obligation to satisfy itself of its own subject matter jurisdiction. *Steel Co. v. Citizens For A Better Env't*, 523 U.S. 83, 95 (1998).   The court may not pass on jurisdictional issues and decide the case on the merits. *Id.* at 94-101. Rather, the determination of jurisdiction is a "threshold issue": if subject matter jurisdiction does not exist, "the court cannot proceed at all in any cause." *Id.* at 94-95 (citation omitted).

If this Court finds subject matter jurisdiction and reaches the merits of Petitioners' challenge to EPA's and WDNR's interpretation and application of the Act, it must apply the two-part test set forth in *Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1984).  Georgia-Pacific adopts and incorporates herein by reference EPA's articulation of how this Court should undertake the *Chevron* analysis with respect to Petitioners' challenge on the merits of WDNR's interpretation and application of the term "baseline concentration" in 42 U.S.C. § 7479(4).

## SUMMARY OF THE ARGUMENT

Congress developed the PSD program to, among other things, serve the goals of insuring economic growth while preventing significant deterioration of air quality. 42 U.S.C. § 7470. State environmental agencies that have appropriate EPA-approved SIPs administer the PSD program through permits. Wisconsin issued the 2004 PSD Permit and the 2005 PSD Permit to Georgia-Pacific pursuant to its EPA-approved SIP, and in doing so applied long-standing administrative rules and statutory interpretations that mirror EPA's. Georgia-Pacific constructed facility upgrades in reliance on that permit nine years ago. Now, for the first time, Petitioners seek to reopen the 2004 PSD Permit and the legitimacy of the rules WDNR applied when it issued the permit.

Petitioners' challenge is time barred, because Wisconsin law imposes a 30 day deadline for raising challenges to administrative agency decisions, including WDNR Clean Air Act permits. Wis. Stat. §§ 285.81 (providing a 30 day deadline for seeking a contested case hearing before WDNR) & 227.52 (providing a 30 day deadline for seeking judicial review of administrative agency decisions). There is no jurisdictional basis for review of the 2004 PSD Permit other than those afforded in Wis. Stat. §§ 285.81 and 227.52. Because Petitioners failed to initiate either of these procedures, the 2004 PSD Permit became final and unappealable after the expiration of the statutory deadlines, and Georgia-Pacific is entitled to continue its decade-long reliance on its permit. *See United States v. AM Gen. Corp.,* 34 F.3d 472, 475 (7th Cir. 1994).

Plaintiffs' challenge also fails on the merits, because in issuing the 2004 PSD Permit, WDNR properly interpreted and applied the term "baseline concentration" in 42 U.S.C. § 7479(4) when it calculated the available emissions increment.  Petitioners assert, in the absence of any reliable authority, that Congress intended the term "baseline" to be a moving target that changes with every single PSD permit that is issued.  When read in the context of the purposes underlying the PSD program and in harmony with all of its provisions, however, it becomes clear that Congress did not intend the term "baseline" as a fluid, mutable concept.  Rather, Congress intended the term "baseline" to mean a fixed, snapshot reference point against which to measure increases in pollutant concentrations over time to allow for attainment of Congress' dual goals:  economic development and prevention of significant deterioration to air quality.  42 U.S.C. § 7470.  Petitioners' interpretation of a moveable baseline would be impractical, if not impossible, to implement because agencies would constantly be calculating and recalculating the baseline concentration for every PSD permit issued.  Indeed, if Petitioners' interpretation prevails, agencies across the United States would be required to reevaluate previously issued PSD permits because every single increment consumption analysis would have been conducted using the wrong baseline, save for the first permits issued under the PSD program.  This would be an absurd result that would carry with it not only enormous administrative disruption and uncertainty, but also the threat of economic upheaval – results

that are both inconsistent with Congress' purpose for enacting the PSD
program.

## ARGUMENT

In addition to EPA's arguments in opposition to the petition for review in
this case, Georgia-Pacific contends that 1) this Court does not have subject
matter jurisdiction of the petition for review because it is a time-barred
collateral attack on Georgia-Pacific's 2004 PSD Permit; and 2) Petitioners'
interpretation of the term "baseline concentration" as an ever changing number
for purposes of calculating allowable emissions increases is contrary to the
plain language of the Act and rules, is inconsistent with the framework of EPA's
PSD program, and would, if adopted, produce absurd and devastating results
for Georgia-Pacific and all others who hold PSD permits.

## I.    The Court is Without Subject Matter Jurisdiction Because Petitioners' Challenge to the 2004 PSD Permit is Time Barred.

Although Petitioners maintain they are seeking review of EPA's decision not
to object to Wisconsin's issuance of the 2011 Title V Permit, their sole
substantive objection to the issuance of the 2011 Title V Permit is that WDNR
applied the incorrect baseline concentration in determining the available
increment for emissions increases in the 2004 PSD Permit.   Thus, Petitioners
are in fact and in substance challenging the 2004 PSD Permit, not the 2011
Title V Permit.  The time for challenging the 2004 PSD Permit expired nine
years ago.  Under the repose provided by both Wisconsin and federal law,
Georgia Pacific is entitled to rely on its 2004 PSD Permit.

**A.    Petitioners' Challenge to the 2004 PSD Permit is Time Barred Under Wisconsin Law.**

Pursuant to its delegated authority and the EPA-approved SIP for Wisconsin, WDNR issued the 2004 PSD Permit to allow Georgia-Pacific to undertake modifications to the Mill.  Using the fixed "baseline concentration" established on the minor source baseline date, WDNR determined that the increase in emissions due to the proposed Mill modifications would not exceed ambient air quality standards and would not exceed the maximum allowable emission increase – the "increment" – for the relevant geographic area. Petition Ex. V (JA63-123). Wisconsin's statutes and administrative code provide for public participation in the air permitting process and for challenging a WDNR-issued permit under the Clean Air Act.  A person who objects to a draft permit has an opportunity to submit their concerns during the public comment period. Wis. Stat. § 285.61(4); Wis. Admin. Code § NR 405.15. After the agency issues the permit, an aggrieved person may file a petition for a contested case proceeding before WDNR pursuant to Wis. Stat. § 285.81, and must do so within 30 days of the agency action.  Any person aggrieved by WDNR's decision to issue the permit also has a separate right to judicial review of that decision pursuant to the Wisconsin Administrative Procedure Act, pursuant to Wis. Stat. § 227.52 *et. seq.*  Those seeking judicial review under the Wisconsin Administrative Procedure Act must file their petition for review within 30 days of the issuance of the decision.  Wis. Stat. § 227.53(1)(a)2.

It is undisputed that Petitioners did not submit public comments on the draft 2004 PSD Permit, on WDNR's preliminary determination, or on WDNR's

increment analysis.  Nor did Petitioners file a request for administrative

contested case hearing pursuant to Wis. Stat. § 285.81 or for judicial review

pursuant to Wis. Stat. § 227.53 within the 30 days deadline after the 2004 PSD

Permit was issued.  There is no hint in the administrative record that

Petitioners made *any* mention of concerns with the 2004 PSD Permit until

2010 – *six years after the 2004 PSD Permit was issued.*   Wisconsin law

provides that where administrative action has taken place, and where a statute

sets forth a specific procedure for review of that action, the statutory remedy is

exclusive. *County of Sauk v. Trager*, 118 Wis. 2d 204, 211, 346 N.W.2d 756,

759 (1984); *Association of Career Employees v. Klauser*, 195 Wis. 2d 602, 612,

536 N.W.2d 478, 484 (Ct. App. 1995). The exclusive statutory remedies that

were available to Petitioners included the contested case hearing process under

Wis. Stat. § 285.81 and the judicial review process under Wis. Stat. § 227.52

*et. seq.*  Petitioners failed to exercise either of those remedies to challenge the

2004 PSD Permit within the statutorily provided 30 day deadlines, and their

challenge to the permit is therefore time-barred.  Accordingly, neither this

Court nor any other has subject matter jurisdiction to hear Petitioners'

challenge.

### B.     Federal Law Provides Additional Repose For Georgia Pacific's 2004 PSD Permit.

Federal law also provides repose for the 2004 PSD Permit.  This Court has

held that where a party could have raised an issue during the public comment

and administrative permitting process for a validly-issued permit, they were

required to do so and those issues cannot later be raised in subsequent

proceedings. In *United States v. AM General Corp.,* 34 F.3d 472 (7th Cir. 1994),

EPA brought an enforcement action against a company five years after the

company had received a permit from the state agency authorized to issue the

permit under the EPA-approved SIP.   EPA had submitted comments

recommending against issuance of the permit, but the state agency issued the

permit over EPA's recommendations.   Rather than appeal the permit, EPA

brought an enforcement action five years later, alleging that the permittee

failed to comply with the Act because its permit did not contain certain

emission limits required by the SIP.   This Court held there was no EPA

enforcement jurisdiction because EPA failed to appeal the permit when it had

the opportunity:

> [W]e cannot find in the text of the Clean Air Act, or elsewhere, any
> indication that Congress expressly or by implication meant to
> authorize the EPA to mount a collateral attack on a permit by
> bringing a civil penalty action as many as five years after the
> permit had been granted and the modification implemented, 28
> U.S.C. § 2462, by which time a defendant would have accrued a
> potential liability in excess of $40 million even though it had been
> operating under a permit valid on its face and never before
> challenged.  That would be a harsh remedy and we cannot be
> confident in the absence of any clues that it was one intended to
> be usable in the circumstances of this case.

*Id.* at 475.  The 8th Circuit reached a consistent result in the more recent case

of *Sierra Club v. Otter Tail Power Co.,* 615 F.3d 1008 (8th Cir. 2010).  In that

case, Sierra Club brought a citizen action under the Clean Air Act, claiming

that Otter Tail, an electric utility, was operating in violation of the Act because

the Title V permit South Dakota issued to Otter Tail seven years prior to Sierra

Club's lawsuit did not contain certain emission limits.  The court rejected

17

Sierra Club's lawsuit on grounds that Sierra Club had the opportunity, but failed, to participate in the Title V permitting process, even though the South Dakota Department of Environment and Natural Resources and EPA concluded – after notice and public comment – that the emissions limits Sierra Club now sued for were not necessary.  The court held that to allow a plaintiff to resurrect issues long after the permitting process was complete would "upset the reasonable expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies." *Otter Tail*, 615 F.3d at 1022.   Finding no clear evidence to the contrary, the court concluded that "Congress intended a more sensible and efficient regulatory scheme" than one that would allow for challenges to a Clean Air Act permit seven years after it was issued.

The rule of *AM General,* and the reasoning in both it and *Otter Tail,* apply directly to this case.   Just as EPA could have pursued an appeal of the permit in *AM General* five years before EPA brought its enforcement action, Petitioners could have pursued a challenge to Georgia-Pacific's 2004 PSD Permit and the underlying increment analysis nine years ago.  Just as there is no indication that Congress expressly or by implication meant to authorize EPA to mount collateral attacks on permits five years after their issuance by state authorities, there is no indication in the Clean Air Act that Congress meant to authorize private litigants to mount such collateral attacks. While this case is not an enforcement action, the rationally foreseeable consequences of a successful challenge to the methodology WDNR used to determine the increment for

18

Georgia-Pacific's 2004 PSD Permit would, at a minimum, include the administrative disruption and burden to both Georgia-Pacific and to WDNR of reopening and reassessing the determinations underlying the 2004 PSD Permit. If that reassessment were to yield a conclusion that Georgia-Pacific should not have been permitted to undertake the 2004 modification or that it should have been required to so with conditions not present in the 2004 PSD Permit, then Georgia-Pacific's investment will be at risk. If the Court allows a challenge now to the 2004 PSD Permit, it follows that Petitioners will seek the same relief for the 2005 PSD Permit and every other PSD permit issued to the Mill, and those investments will be put at risk.

Indeed, it is foreseeable that if successful here, Petitioners may seek forfeitures under the Clean Air Act citizen suit provision. *See* 42 U.S.C. § 7604. Although Georgia-Pacific would adamantly oppose such a claim as improper, the maximum forfeiture of up to $37,500 per day for Clean Air Act violations amounts to a potential claim for tens of millions of dollars in forfeitures against Georgia-Pacific. Such an outcome creates an absurd and intolerable risk for a permittee whose only failure was to comply with its permit. These are exactly the kinds of harsh consequences that the rule of *AM General* is directed against. Just as in *AM General* and *Otter Tail,* there is no evidence in the Clean Air Act that Congress, expressly or by implication, intended for Petitioners or anyone else to potentially generate such consequences by attacking a permit nine years after it was issued.

19

**C.    The Title V Permitting Process Did Not Require WDNR to Revisit the Increment Analysis Underlying the 2004 PSD Permit.**

Petitioners are incorrect that Wis. Stat. § 285.63(1)(b) provides an independent or alternative basis for revisiting the 2004 PSD Permit or increment analysis underlying it.  That statute allows WDNR to approve a Title V permit application if, among other things, it finds that "[t]he source will not cause or exacerbate a violation of any . . . ambient air increment . . .."  Nothing in Wis. Stat. § 285.63(1)(b) requires, or even implies, that WDNR must reopen and reassess the increment analysis underlying a final PSD permit that was never appealed or otherwise challenged.  Nor does the statute contain any hint of legislative intent to displace the exclusive methods for obtaining administrative and judicial review of PSD permits under Wis. Stat. §§ 285.81 and 227.52.

Furthermore, the 2011 Title V Permit did not authorize an increase in emissions from the Mill that would consume increment, which is the necessary prerequisite for triggering an increment analysis.  As discussed above, increment protection, along with the associated increment analyses, is associated with PSD permits that authorize emissions increases within an attainment area. Generally, a Title V permit cannot authorize an increase in emissions therefore can never trigger a need for an increment analysis. See 57 Fed. Reg. 32,250, 32,251.   Specifically in this case, EPA concluded that there were no emissions increases associated with the 2011 Title V Permit.  Rather, the last emission increases authorized for the Mill were addressed in the

20

previously issued PSD permits.  See Order at 16 ("[n]either the Petition nor

WDNR's 2011 Title V operating permit record discuss any change in emissions

at this source since 2004 that is alleged to have consumed increment between

2004 and 2011.")

Because there was no new emission increase associated with the 2011 Title

V Permit that WDNR had not already addressed in previously issued PSD

permits, WDNR had no need or duty to evaluate ambient air increment, and

certainly no requirement to revisit those evaluations underlying the 2004 PSD

Permit.  Because there was no obligation for WDNR under Wis. Stat. §

285.63(1)(b) to reassess the increment analysis underlying previously issued

PSD permits, that statute cannot serve to rescue Petitioners time barred and

inequitable challenge to the 2004 PSD Permit.

## II.    The Petitioner's Interpretation of "Baseline Concentration" Should be Rejected Because it Cannot be Reconciled With the Plain Language of the Clean Air Act or the Framework of the PSD Program.

For purposes of this case, Georgia-Pacific adopts and incorporates by

reference all of the arguments in the EPA Brief in support of granting *Chevron*

deference to EPA's (and by extension, WDNR's) interpretation of the term

"baseline concentration" as used in 42 U.S.C. § 7479(4).  There are at least two

additional reasons which support rejection of Petitioners' interpretation of the

term "baseline concentration." First, Petitioners' interpretation of the term

"baseline" in 42 U.S.C. § 7479(4) as a continuously diminishing number rather

than a fixed snapshot is not supported by the plain language of the Clean Air

Act or the rules promulgated under it.  To the extent there is ambiguity in the

statute or rules by which EPA or WDNR have implement this and other parts of

the PSD program, canons of construction require resolution of the ambiguity in

favor of the EPA and WDNR interpretation, because Petitioners' plain language

argument fails to take into account, and cannot be reconciled with, the

framework of the PSD program as a whole.

**A.    Petitioners' Interpretation of "Baseline" is Contrary to the Plain Language of the Clean Air Act.**

The Petitioners argue that the "baseline concentration" used to calculate

allowable emissions increases changes with every PSD permit issued, and that

it that it must be recalculated each time emissions increase or decrease.  EPA

and WDNR interpret the term "baseline concentration" as a number that is

established once, and from which allowable emissions increment are

calculated.

The Act defines "baseline concentration" as "the ambient concentration

levels *which exist at the time of the first application for a permit in an area*

*subject to this part...*" 42 U.S.C. § 7479(4) (emphasis added). On its face, this

language establishes a single date on which the baseline concentration must be

set, because as a practical matter, there can be only one *first application for a*

*permit* in a single geographic area.  If this were not plain enough to establish

that Congress meant for "baseline" to mean a fixed number, resort can be

made to a dictionary.   *See Crawford v. Metro. Gov't of Nashville,* 129 S.Ct. 846,

850 (2009).  The Merriam Webster Online Dictionary defines the term

"baseline" as an initial set of critical observations or data used for comparison

or a control, a line serving as a basis. *See* Merriam Webster,

http://www.merriam-webster.com/dictionary/baseline. A baseline, no matter what the context, is a static reference point from which subsequent changes are measured.  In the context of increment consumption, the single baseline concentration, established pursuant to the Act, is used as "the reference point for determining air quality in an area" and from which to measure emissions increases "against the maximum allowable increases in pollutant concentrations established under this part." *See* EPA, *New Source Review Workshop Manual* at C.6 (Draft, Oct. 1990) ("NSR Manual"); 42 U.S.C. § 7479(4).

The term "baseline concentration" has been defined in greater detail in EPA rules and incorporated into the Wisconsin SIP as follows:

> (a) "Baseline concentration" means that ambient concentration level *which exists in the baseline area at the time of the applicable minor source baseline date.* A baseline concentration is determined for each air contaminant for which a minor source baseline date is established *and shall include*:
>
> 1. The actual emissions representative of sources in existence on the applicable minor source baseline date, except as provided in par. (b).
> 2. The allowable emissions of major stationary sources which commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.
>
> (b) The following *will not be included* in the baseline concentration and will affect the applicable maximum allowable increases:
>
> 1. Actual emissions from any major stationary source on which construction commenced after the major source baseline date.
> 2. Actual emissions increases and decreases at any stationary source occurring after the minor source baseline date.

Wis. Admin. Code § NR 405.02(4) (emphasis added); see also 40 C.F.R.

§ 51.166 (b)(13) (which for purposes of this case, is substantively identical to

the Wis. Admin. Code § NR 405.02(4)).  Just as Congress expressly grounded

the concept of "baseline" to a single, fixed point in time in 42 U.S.C. § 7479(4),

so too did Wisconsin in Wis. Admin. Code § NR 405.02(4).  Under the plain

language of the rule, on the minor source baseline date, WDNR was required to

calculate the baseline concentration for Brown County, Wisconsin.  The

baseline concentration established on that date would exclude the actual

emissions of any major stationary source then-existing in Brown County at

which construction had commenced after the major source baseline date.

Petitioners argue that the plain language of sub (b)(1) requires *all* emissions

from every modified facility to count against the increment, even if the facility's

original emissions had previously been included in the baseline.  Under that

interpretation, the facility's original emissions are either counted twice (once in

the baseline and again against the increment), or the original emissions are

removed from the baseline concentration, thus changing the baseline

concentration (thereby creating a moving baseline).  In either circumstance,

Petitioners' interpretation is untenable.  On the one hand, it would be improper

to double-count emissions within an air permitting framework. On the other

hand, any interpretation that would create a moving baseline would ignore the

plain language of the rule that the baseline concentration is that which exists

"at the time of the applicable minor source baseline date."  A baseline

concentration cannot be *both* a snapshot of the ambient concentration at the

24

time of the minor source baseline date *and* get smaller with every permitted facility modification.  Because Petitioners' interpretation either results in double counting of emissions or an understanding of "baseline" that is directly contrary to the plain meaning of the word and its use in the Clean Air Act and rules promulgated under it, it cannot displace EPA's interpretation.

### B. Petitioners' Interpretation of Baseline Cannot be Reconciled With the Framework of the PSD Program.

Petitioners' argument that the baseline concentration is an ever-changing number fails to account for the Act's overall purpose and its regulatory framework.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citing *United States v. Morton*, 467 U.S. 822, 828 (1984)).  The relevant context is that Congress created the PSD program "to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;" and "to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision making process."  42 U.S.C. § 7470(3) & (5).  Moreover, Congress specifically set "maximum allowable *increases of concentrations over baseline* concentrations" for particulate matter and sulfur dioxide.  42 U.S.C. § 7473(b) (emphasis added).  Moreover, the rules developed under the Clean Air Act specifically allow for available increment to be reduced based on emissions

increases and for available increment to be expanded based on emissions reductions. *See* 43 Fed. Reg. 26,388, 26,400-01 (June 19, 1978); 45 Fed. Reg. 52,676, 52,720 (Aug. 7, 1980); 75 Fed. Reg. 64,864, 64,869 (Oct. 20, 2010). Under Petitioners' interpretation, available increment is reduced not only by emissions *increases* at a source as provided in EPA's rules, but by *all* of the source's actual emissions, including emissions that were included in the baseline calculation. To count all of a facility's actual emissions against available increment (as opposed to just counting emissions increases from a facility) would result in rapid if not instantaneous disappearance of available increment, effectively cutting off further economic growth. Such a result is not only in direct contravention with the very framework of EPA's rules implementing the PSD program, it plainly frustrates Congress' stated intent to balance economic growth with the preservation of clean air resources. *See In re N. Mich. Univ. Ripley Heating Plant,* PSD Appeal No. 09-02 *(*EAB Feb. 18, 2009) ("*Northern Michigan*"); *Objection to the Issuance of Significant Modification No. T083-23529-0003 Duke Energy Indiana Inc. Edwardsport Generating Station*, Cause No. 08-A-J-4066 (Indiana Office of Environmental Adjudication Order Aug. 18, 2011) ("*Duke Energy*").

Although neither *Northern Michigan* nor *Duke Energy* bind this Court, the reasoning contained in them is useful.[4] In *Northern Michigan*, the Environmental Appeals Board ("EAB") reasoned that Congress' intent, as

---

[4] Petitioners' counsel advanced the interpretation at issue in this case in both *Northern Michigan* and *Duke Energy*.

evidenced by the legislative history of the Act, support EPA's longstanding

interpretation of the increment consumption provisions of the Act.  The EAB

observed that to accept the interpretive stretches advocated by Sierra Club in

that case could actually work against Sierra Club, and would allow for

interpretations of the term "baseline" and its related increment provisions that

would cut directly against the interpretation Sierra Club was advancing:

> [O]ne could reasonably construe the statutory, regulatory and
> preamble language to mean that *all actual emissions from the
> modifications to a source* consume increment, not that *all actual
> emissions from the modifications to the source* plus *actual emissions
> from the portions of the source that were not modified* consumer
> increment. In this way, the emissions in question could be
> specifically tied back to the modifications, and only those
> emissions would be considered increment-consuming.

*Northern Michigan,* PSD Appeal No. 09-02, at 46 (emphasis in original). The

EAB then reasoned that Sierra Club's invitation to disturb the long-standing

EPA interpretation would produce results "that confound the very sense and

policy undergirding a workable increment scheme." *Id.*  It concluded that

Sierra Club's reading would result in "double counting" of emissions in the

baseline and emissions against increment and concluded that if adopted, the

Petitioners' interpretation would "seem a manifest unfairness and does violence

to what we must assume to be a prudently conceived and administered

system." *Id.*

Just two years after the EAB issued its *Northern Michigan* decision, Sierra

Club asserted its interpretation of the term "baseline" as a moving target before

the Indiana Office of Environmental Adjudication ("Indiana") in the *Duke*

*Energy* case. Like the EAB, Indiana interpreted the increment-related provisions in harmony with the framework of the Act, and agreed with EPA's longstanding interpretation of '"baseline" as a fixed concept. Indiana concluded that "[a] long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts." *Duke Energy,* Cause No. 08-A-J-4066, at 4 (Order Aug. 18, 2011). Petitioners have provided no basis for not applying *Northern Michigan* and *Duke Energy* with equal force in this case. Indeed, Petitioners have failed to address the crux of that reasoning at all. Accordingly, the Court should reject Petitioners interpretation for the same reasons Indiana and the EAB rejected it.

### C.  EPA's Implementation of the Increment Consumption Provisions of the PSD Program Have Been Clearly Articulated and Consistently Implemented.

For more than seven decades the Supreme Court has held that longstanding administrative construction of a statute, coupled with the failure of Congress to act to change that construction "creates a presumption in favor of the administrative interpretation, to which we should give great weight, even if we doubted the correctness of the ruling." *Costanzo v. Tillinghast*, 287 U.S. 341, 345 (1932). In addition to the numerous rule makings undertaken by EPA and described in EPA's brief, the agency has also issued numerous guidance documents consistently making clear that increment is consumed only by emission *increases* that occur after the baseline date. *See for example*

*Memorandum: Baseline Value for PSD Increment Consumption* (Dec. 11, 1978)

available online at

http://www.epa.gov/region07/air/nsr/nsrmemos/m121178.pdf;

*Memorandum: Question from Otto Pearson (South Carolina State Agency)*

(Mar. 13, 1980), available online at

http://www.epa.gov/region07/air/nsr/nsrmemos/q_otto.pdf; *Memorandum:*

*Westavaco Paper Mill – PSD Applicability* (Feb. 8, 1983) available online at

http://www.epa.gov/region07/air/nsr/nsrmemos/westvaco.pdf; *Memorandum:*

*PSD Increment Consumption Guidance From Chief, Air Management Branch*

(May 13, 1983) available online at

http://www.epa.gov/region07/air/nsr/nsrmemos/cnsumptn.pdf.

   EPA's most substantial guidance on the calculation of increment

consumption is found in its NSR Manual, which EPA issued coincident with

the 1990 Clean Air Act amendments.  The NSR Manual consists of several

hundred pages of step by step instruction for implementation of the PSD

program. State agencies have used the NSR manual extensively in their

implementation of the PSD program, and this Court has used it to understand

and explain EPA's intent.  *Sierra Club v. EPA*, 499 F.3d 653, 654-655 (7th Cir.

2007) (citing the NSR Manual to describe EPA's position that Best Available

Control Technology does not contemplate redesigning a proposed project).  In

the NSR manual, EPA dedicates no less than 33 pages to describing how to

undertake an ambient air quality analysis, and repeatedly explains that

increment is consumed by *increases* in emissions from a fixed baseline

concentration.  For example, the NSR Manual provides, "The amount of PSD
increment that has been consumed in a PSD area is determined from the
emissions increases and decreases which have occurred from sources since the
applicable baseline date... Emissions increases that consume a portion of the
applicable increment are, in general, all those <u>not</u> accounted for in the baseline
concentration..." NSR Manual at C.10 (emphasis in original).  Under the rule of
*Costanzo*, EPA's longstanding and consistent guidance, coupled with the
numerous rulemakings undertaken by EPA that are discussed in rigorous
detail in EPA's Brief, entitles EPA's interpretation to a presumption of validity.
Petitioners have not provided any basis in law for displacing that presumption.

## III.  Petitioners' Interpretation of the Act Would Lead to Absurd, Devastating Results For Georgia-Pacific and All Entities Subject to PSD Permits.

In its brief, EPA correctly argued that adoption of Petitioners' interpretation
would cause considerable regulatory disruption.  EPA Brief, pp. 52 – 56.
Georgia-Pacific agrees and goes further to ask that the Court consider the
particular impact that adoption of Petitioners' interpretation would have on
Georgia-Pacific and other entities regulated by the Clean Air Act's PSD
program.  As discussed above, if Petitioners' interpretation is accepted by this
Court, WDNR will presumably be required to re-open and revise the increment
consumption analysis for Georgia-Pacific's 2004 PSD Permit according to that
interpretation.  Thus recalculated, all of the Mill's emissions (historic emissions
and increased emissions from the 2004 modification) would be counted as

consumed increment, and WDNR would then have to establish a project-specific baseline concentration.

Moreover, if the Title V permitting program is used as a means to revisit previously issued PSD permits, Petitioners and others so inclined will have an opportunity on the occasion of each Title V permit renewal to challenge a PSD permit they failed to timely and properly challenge under state law. To allow such challenges would not only be disruptive for the permittee toward whom the challenge is directed, it would threaten to unwind all previously issued PSD permits within the attainment area. This is because each PSD increment consumption analysis contributes to the next. Each proposed increase in emissions is considered against the increment currently available to ensure compliance with ambient air quality standards and the increment. In this sense, PSD permit analyses are cumulative in nature. If prior PSD permits are reopened and the amount of increment available during the prior permitting revised, the revision would impact all other PSD permits subsequently issued.

It cannot have been Congress's intent that long standing methodologies for measuring compliance would change after decades of implementation, and that such changes would be applied retroactively, with the impact of putting Georgia-Pacific's significant capital investments at risk. Just as disturbing is the specter of subjecting Georgia-Pacific to enforcement actions claiming tens of millions of dollars in what is likely to be allegations of failure to comply with the Clean Air Act for many years – all despite the facts that Georgia-Pacific constructed its capital improvements and operated its facility in accordance

31

with a permit from WDNR that was never challenged within statutorily mandated deadlines. A revised increment analysis and a new baseline concentration for the 2004 PSD Permit would most certainly result in demands for similar revisions for Georgia Pacific's 2005 PSD Permit, with the same absurd and potentially devastating results.

The disruption that would result from adoption of Petitioners' interpretation, including re-opening permits and redoing the increment analysis underlying them would, no doubt, be followed by demands from Petitioners and others that this exercise be repeated for nearly every PSD permit issued for industrial facilities not only in Wisconsin, but throughout the United States. In Wisconsin alone, WDNR issued 148 major source construction permits and 1713 minor source construction permits between 1994 and 2003. *See* 2003-2004 Joint Legislative Audit Committee Members, Air Management Program, February 2004, p. 52, available online at

http://legis.wisconsin.gov/lab/reports/04-1full.pdf.

Adoption and implementation of the sliding "baseline concentration" interpretation would result in a deluge of regulatory uncertainty for every single facility regulated by the PSD program in Wisconsin and elsewhere. Such an outcome is unthinkable not only for Georgia-Pacific, but for the thousands of regulated entities that have constructed new sources in compliance with duly-issued PSD permits and thereafter operated in compliance with Title V permits that incorporate those PSD limits. Such regulatory uncertainty and the attendant threat of economic devastation is not the result Congress intended

when it created the PSD program.  Because Petitioners' assertion that baseline is a continuously decreasing number is so diametrically at odds with Congress' intent, this Court should reject it.

## CONCLUSION

For the foregoing reasons and those briefed by EPA, the Court should dismiss the Petition for Review for lack of subject matter jurisdiction. Alternatively, if the Court finds that there is jurisdiction, the Court should dismiss the Petition for Review on the merits.

Dated:  June 19, 2013                    Respectfully submitted,

                                                      MICHAEL BEST & FRIEDRICH LLP


                                          By:    s/ Jordan J. Hemaidan
                                                      Jordan J. Hemaidan
                                                      Todd E. Palmer
                                                      Gary A. Ahrens
                                                      Michael Best & Friedrich LLP
                                                      One South Pinckney St., Suite 700
                                                      P.O. Box 1806
                                                      Madison, WI 53701-1806
                                                      Phone: (608) 257-3501

                                                      Attorneys for Intervening Respondent
                                                      Georgia-Pacific Consumer Products LP

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2013, a copy of the foregoing was served

electronically through the Court's CM/ECF system on all registered counsel.


Dated: June 19, 2013                    s/ Jordan J. Hemaidan
                                        Jordan J. Hemaidan
                                        Attorney for Intervening Respondent
                                        Georgia-Pacific Consumer Products LP


**CERTIFICATE OF COMPLIANCE**

I certify that pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure and Seventh Circuit Rule 32, the attached brief is proportionately

spaced, has a typeface of 12 points, and contains 7,971 words, exclusive of

those parts of the brief exempted by Rule 32(a)(7)(B)(iii). I have relied on

Microsoft Word's calculation feature.


Dated: June 19, 2013                    s/ Jordan J. Hemaidan
                                        Jordan J. Hemaidan
                                        Attorney for Intervening Respondent
                                        Georgia-Pacific Consumer Products LP

# INDEX TO ADDENDUM

**Item**                                                        **Addendum Page**

42 U.S.C. § 7470 ................................................................................................... 1

42 U.S.C. § 7473 ................................................................................................... 2

42 U.S.C. § 7479 ................................................................................................... 4

42 U.S.C. § 7607(b)(1) ........................................................................................ 6

42 U.S.C. § 7661d(b)(2) ...................................................................................... 8


40 C.F.R. § 51.166(b) ......................................................................................... 10

40 C.F.R. § 51.166(b)(13)(i) ............................................................................. 11

40 C.F.R. § 52.21(c) ........................................................................................... 12


Wis. Stat. § 227.52 .............................................................................................. 14

Wis. Stat. § 227.53 .............................................................................................. 16

Wis. Stat. § 285.81 .............................................................................................. 18


Wis. Admin. Code § NR 405.02 ...................................................................... 21

Wis. Admin. Code § NR 405.15 ...................................................................... 28


*Objection to the Issuance of Significant Modification No.*
*T083-23529-0003 Duke Energy Indiana Inc.*
*Edwardsport Generating Station*, Cause No. 08-A-J-4066
(Indiana Office of Environmental Adjudication Order Aug. 18, 2011) ............. 30

Pub. L. 101–549, which is set out as a note under section 6921 of this title.

The Solid Waste Disposal Act, referred to in subsec. (g)(6), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, § 2, Oct. 21, 1976, 90 Stat. 2795, which is classified generally to chapter 82 (§ 6901 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

### REVIEW OF ACID GAS SCRUBBING REQUIREMENTS

Section 305(c) of Pub. L. 101–549 provided that: ''Prior to the promulgation of any performance standard for solid waste incineration units combusting municipal waste under section 111 or section 129 of the Clean Air Act [42 U.S.C. 7411, 7429], the Administrator shall review the availability of acid gas scrubbers as a pollution control technology for small new units and for existing units (as defined in 54 Federal Register 52190 (December 20, 1989)[)], taking into account the provisions of subsection (a)(2) of section 129 of the Clean Air Act.''

## § 7430. Emission factors

Within 6 months after November 15, 1990, and at least every 3 years thereafter, the Administrator shall review and, if necessary, revise, the methods (''emission factors'') used for purposes of this chapter to estimate the quantity of emissions of carbon monoxide, volatile organic compounds, and oxides of nitrogen from sources of such air pollutants (including area sources and mobile sources). In addition, the Administrator shall establish emission factors for sources for which no such methods have previously been established by the Administrator. The Administrator shall permit any person to demonstrate improved emissions estimating techniques, and following approval of such techniques, the Administrator shall authorize the use of such techniques. Any such technique may be approved only after appropriate public participation. Until the Administrator has completed the revision required by this section, nothing in this section shall be construed to affect the validity of emission factors established by the Administrator before November 15, 1990.

(July 14, 1955, ch. 360, title I, § 130, as added Pub. L. 101–549, title VIII, § 804, Nov. 15, 1990, 104 Stat. 2689.)

## § 7431. Land use authority

Nothing in this chapter constitutes an infringement on the existing authority of counties and cities to plan or control land use, and nothing in this chapter provides or transfers authority over such land use.

(July 14, 1955, ch. 360, title I, § 131, as added Pub. L. 101–549, title VIII, § 805, Nov. 15, 1990, 104 Stat. 2689.)

### PART B—OZONE PROTECTION

## §§ 7450 to 7459. Repealed. Pub. L. 101–549, title VI, § 601, Nov. 15, 1990, 104 Stat. 2648

Section 7450, act July 14, 1955, ch. 360, title I, § 150, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 725, set forth Congressional declaration of purpose.

Section 7451, act July 14, 1955, ch. 360, title I, § 151, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 726, set forth Congressional findings.

Section 7452, act July 14, 1955, ch. 360, title I, § 152, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 726, set forth definitions applicable to this part.

Section 7453, act July 14, 1955, ch. 360, title I, § 153, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 726, related to studies by Environmental Protection Agency.

Section 7454, act July 14, 1955, ch. 360, title I, § 154, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 728; amended Pub. L. 96–88, title V, § 509(b), Oct. 17, 1979, 93 Stat. 695, related to research and monitoring activities by Federal agencies.

Section 7455, act July 14, 1955, ch. 360, title I, § 155, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 729, related to reports on progress of regulation.

Section 7456, act July 14, 1955, ch. 360, title I, § 156, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 729, authorized President to enter into international agreements to foster cooperative research.

Section 7457, act July 14, 1955, ch. 360, title I, § 157, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 729, related to promulgation of regulations.

Section 7458, act July 14, 1955, ch. 360, title I, § 158, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 730, set forth other provisions of law that would be unaffected by this part.

Section 7459, act July 14, 1955, ch. 360, title I, § 159, as added Aug. 7, 1977, Pub. L. 95–95, title I, § 126, 91 Stat. 730, related to authority of States to protect the stratosphere.

### SIMILAR PROVISIONS

For provisions relating to stratospheric ozone protection, see section 7671 et seq. of this title.

### PART C—PREVENTION OF SIGNIFICANT DETERIORATION OF AIR QUALITY

#### SUBPART I—CLEAN AIR

## § 7470. Congressional declaration of purpose

The purposes of this part are as follows:

(1) to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate[1] to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air)[2], notwithstanding attainment and maintenance of all national ambient air quality standards;

(2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

(3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and

(5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process.

(July 14, 1955, ch. 360, title I, § 160, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 731.)

---

[1] So in original. Probably should be ''anticipated''.
[2] So in original. Section was enacted without an opening parenthesis.

EFFECTIVE DATE

Subpart effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

GUIDANCE DOCUMENT

Section 127(c) of Pub. L. 95–95 required Administrator, not later than 1 year after Aug. 7, 1977, to publish a guidance document to assist States in carrying out their functions under part C of title I of the Clean Air Act (this part) with respect to pollutants for which national ambient air quality standards are promulgated.

STUDY AND REPORT ON PROGRESS MADE IN PROGRAM RELATING TO SIGNIFICANT DETERIORATION OF AIR QUALITY

Section 127(d) of Pub. L. 95–95 directed Administrator, not later than 2 years after Aug. 7, 1977, to complete a study and report to Congress on progress made in carrying out part C of title I of the Clean Air Act (this part) and the problems associated in carrying out such section.

## § 7471. Plan requirements

In accordance with the policy of section 7401(b)(1) of this title, each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region (or portion thereof) designated pursuant to section 7407 of this title as attainment or unclassifiable.

(July 14, 1955, ch. 360, title I, §161, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 731; amended Pub. L. 101–549, title I, §110(1), Nov. 15, 1990, 104 Stat. 2470.)

AMENDMENTS

1990—Pub. L. 101–549 substituted "designated pursuant to section 7407 of this title as attainment or unclassifiable" for "identified pursuant to section 7407(d)(1)(D) or (E) of this title".

## § 7472. Initial classifications

### (a) Areas designated as class I

Upon the enactment of this part, all—

(1) international parks,

(2) national wilderness areas which exceed 5,000 acres in size,

(3) national memorial parks which exceed 5,000 acres in size, and

(4) national parks which exceed six thousand acres in size,

and which are in existence on August 7, 1977, shall be class I areas and may not be redesignated. All areas which were redesignated as class I under regulations promulgated before August 7, 1977, shall be class I areas which may be redesignated as provided in this part. The extent of the areas designated as Class I under this section shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990.

### (b) Areas designated as class II

All areas in such State designated pursuant to section 7407(d) of this title as attainment or unclassifiable which are not established as class I

under subsection (a) of this section shall be class II areas unless redesignated under section 7474 of this title.

(July 14, 1955, ch. 360, title I, §162, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 731; amended Pub. L. 95–190, §14(a)(40), Nov. 16, 1977, 91 Stat. 1401; Pub. L. 101–549, title I, §§108(m), 110(2), Nov. 15, 1990, 104 Stat. 2469, 2470.)

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §108(m), inserted at end "The extent of the areas designated as Class I under this section shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990."

Subsec. (b). Pub. L. 101–549, §110(2), substituted "designated pursuant to section 7407(d) of this title as attainment or unclassifiable" for "identified pursuant to section 7407(d)(1)(D) or (E) of this title".

1977—Subsec. (a)(4). Pub. L. 95–190 inserted a comma after "size".

## § 7473. Increments and ceilings

### (a) Sulfur oxide and particulate matter; requirement that maximum allowable increases and maximum allowable concentrations not be exceeded

In the case of sulfur oxide and particulate matter, each applicable implementation plan shall contain measures assuring that maximum allowable increases over baseline concentrations of, and maximum allowable concentrations of, such pollutant shall not be exceeded. In the case of any maximum allowable increase (except an allowable increase specified under section 7475(d)(2)(C)(iv) of this title) for a pollutant based on concentrations permitted under national ambient air quality standards for any period other than an annual period, such regulations shall permit such maximum allowable increase to be exceeded during one such period per year.

### (b) Maximum allowable increases in concentrations over baseline concentrations

(1) For any class I area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
|     Annual geometric mean | 5 |
|     Twenty-four-hour maximum | 10 |
| Sulfur dioxide: | |
|     Annual arithmetic mean | 2 |
|     Twenty-four-hour maximum | 5 |
|     Three-hour maximum | 25 |

(2) For any class II area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
|     Annual geometric mean | 19 |
|     Twenty-four-hour maximum | 37 |
| Sulfur dioxide: | |
|     Annual arithmetic mean | 20 |

| | |
|---|---|
| Twenty-four-hour maximum ........................... | 91 |
| Three-hour maximum ..................................... | 512 |

(3) For any class III area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| Pollutant | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
| Annual geometric mean.................................. | 37 |
| Twenty-four-hour maximum .......................... | 75 |
| Sulfur dioxide: | |
| Annual arithmetic mean............................... | 40 |
| Twenty-four-hour maximum .......................... | 182 |
| Three-hour maximum ..................................... | 700 |

(4) The maximum allowable concentration of any air pollutant in any area to which this part applies shall not exceed a concentration for such pollutant for each period of exposure equal to—

(A) the concentration permitted under the national secondary ambient air quality standard, or

(B) the concentration permitted under the national primary ambient air quality standard,

whichever concentration is lowest for such pollutant for such period of exposure.

**(c) Orders or rules for determining compliance with maximum allowable increases in ambient concentrations of air pollutants**

(1) In the case of any State which has a plan approved by the Administrator for purposes of carrying out this part, the Governor of such State may, after notice and opportunity for public hearing, issue orders or promulgate rules providing that for purposes of determining compliance with the maximum allowable increases in ambient concentrations of an air pollutant, the following concentrations of such pollutant shall not be taken into account:

(A) concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, or natural gas, or both, by reason of an order which is in effect under the provisions of sections 792(a) and (b) of title 15 (or any subsequent legislation which supersedes such provisions) over the emissions from such sources before the effective date of such order.[1]

(B) the concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from using natural gas by reason of a natural gas curtailment plan in effect pursuant to the Federal Power Act [16 U.S.C. 791a et seq.] over the emissions from such sources before the effective date of such plan,

(C) concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission-related activities, and

(D) the increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration determined in accordance with section 7479(4) of this title.

(2) No action taken with respect to a source under paragraph (1)(A) or (1)(B) shall apply more than five years after the effective date of the order referred to in paragraph (1)(A) or the plan referred to in paragraph (1)(B), whichever is applicable. If both such order and plan are applicable, no such action shall apply more than five years after the later of such effective dates.

(3) No action under this subsection shall take effect unless the Governor submits the order or rule providing for such exclusion to the Administrator and the Administrator determines that such order or rule is in compliance with the provisions of this subsection.

(July 14, 1955, ch. 360, title I, §163, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 732; amended Pub. L. 95–190, §14(a)(41), Nov. 16, 1977, 91 Stat. 1401.)

REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (c)(1)(B), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

AMENDMENTS

1977—Subsec. (a). Pub. L. 95–190 inserted ''section'' before ''7475''.

## § 7474. Area redesignation

**(a) Authority of States to redesignate areas**

Except as otherwise provided under subsection (c) of this section, a State may redesignate such areas as it deems appropriate as class I areas. The following areas may be redesignated only as class I or II:

(1) an area which exceeds ten thousand acres in size and is a national monument, a national primitive area, a national preserve, a national recreation area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore, and

(2) a national park or national wilderness area established after August 7, 1977, which exceeds ten thousand acres in size.

The extent of the areas referred to in paragraph[1] (1) and (2) shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990. Any area (other than an area referred to in paragraph (1) or (2) or an area established as class I under the first sentence of section 7472(a) of this title) may be redesignated by the State as class III if—

(A) such redesignation has been specifically approved by the Governor of the State, after consultation with the appropriate Committees of the legislature if it is in session or with the leadership of the legislature if it is not in session (unless State law provides that such redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of

---
[1] So in original. The period probably should be a comma.

[1] So in original. Probably should be ''paragraphs''.

**ADDENDUM 3**

centrations of particulate matter shall remain in effect.

(July 14, 1955, ch. 360, title I, §166, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 739; amended Pub. L. 101–549, title I, §105(b), Nov. 15, 1990, 104 Stat. 2462.)

AMENDMENTS

1990—Subsec. (f). Pub. L. 101–549 added subsec. (f).

## § 7477. Enforcement

The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not subject to an implementation plan which meets the requirements of this part.

(July 14, 1955, ch. 360, title I, §167, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 101–549, title I, §110(3), title VII, §708, Nov. 15, 1990, 104 Stat. 2470, 2684.)

AMENDMENTS

1990—Pub. L. 101–549, §708, substituted "construction or modification of a major emitting facility" for "construction of a major emitting facility".

Pub. L. 101–549, §110(3), substituted "designated pursuant to section 7407(d) as attainment or unclassifiable" for "included in the list promulgated pursuant to paragraph (1)(D) or (E) of subsection (d) of section 7407 of this title".

## § 7478. Period before plan approval

### (a) Existing regulations to remain in effect

Until such time as an applicable implementation plan is in effect for any area, which plan meets the requirements of this part to prevent significant deterioration of air quality with respect to any air pollutant, applicable regulations under this chapter prior to August 7, 1977, shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b) of this section.

### (b) Regulations deemed amended; construction commenced after June 1, 1975

If any regulation in effect prior to August 7, 1977, to prevent significant deterioration of air quality would be inconsistent with the requirements of section 7472(a), section 7473(b) or section 7474(a) of this title, then such regulations shall be deemed amended so as to conform with such requirements. In the case of a facility on which construction was commenced (in accordance with the definition of "commenced" in section 7479(2) of this title) after June 1, 1975, and prior to August 7, 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to August 7, 1977.

(July 14, 1955, ch. 360, title I, §168, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 95–190, §14(a)(52), Nov. 16, 1977, 91 Stat. 1402.)

AMENDMENTS

1977—Subsec. (b). Pub. L. 95–190 substituted "(in accordance with the definition of 'commenced' in section 7479(2) of this title)" for "in accordance with this definition".

## § 7479. Definitions

For purposes of this part—

(1) The term "major emitting facility" means any of the following stationary sources of air pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant from the following types of stationary sources: fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than fifty tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than two hundred and fifty million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding three hundred thousand barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities. Such term also includes any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant. This term shall not include new or modified facilities which are nonprofit health or education institutions which have been exempted by the State.

(2)(A) The term "commenced" as applied to construction of a major emitting facility means that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.

(B) The term "necessary preconstruction approvals or permits" means those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) or (ii) of subparagraph (A) of this paragraph.

(C) The term "construction" when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility.

(3) The term "best available control technology" means an emission limitation based on the maximum degree of reduction of each

pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990.

(4) The term "baseline concentration" means, with respect to a pollutant, the ambient concentration levels which exist at the time of the first application for a permit in an area subject to this part, based on air quality data available in the Environmental Protection Agency or a State air pollution control agency and on such monitoring data as the permit applicant is required to submit. Such ambient concentration levels shall take into account all projected emissions in, or which may affect, such area from any major emitting facility on which construction commenced prior to January 6, 1975, but which has not begun operation by the date of the baseline air quality concentration determination. Emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975, shall not be included in the baseline and shall be counted against the maximum allowable increases in pollutant concentrations established under this part.

(July 14, 1955, ch. 360, title I, § 169, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 95–190, § 14(a)(54), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title III, § 305(b), title IV, § 403(d), Nov. 15, 1990, 104 Stat. 2583, 2631.)

AMENDMENTS

1990—Par. (1). Pub. L. 101–549, § 305(b), struck out "two hundred and" after "municipal incinerators capable of charging more than".

Par. (3). Pub. L. 101–549, § 403(d), directed the insertion of ", clean fuels," after "including fuel cleaning,", which was executed by making the insertion after "including fuel cleaning" to reflect the probable intent of Congress, and inserted at end "Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990."

1977—Par. (2)(C). Pub. L. 95–190 added subpar. (C).

STUDY OF MAJOR EMITTING FACILITIES WITH POTENTIAL OF EMITTING 250 TONS PER YEAR

Section 127(b) of Pub. L. 95–95 directed Administrator, within 1 year after Aug. 7, 1977, to report to Congress on consequences of that portion of definition of "major emitting facility" under this subpart which applies to facilities with potential to emit 250 tons per year or more.

SUBPART II—VISIBILITY PROTECTION

CODIFICATION

As originally enacted, subpart II of part C of subchapter I of this chapter was added following section 7478 of this title. Pub. L. 95–190, § 14(a)(53), Nov. 16, 1977, 91 Stat. 1402, struck out subpart II and inserted such subpart following section 7479 of this title.

§ 7491. Visibility protection for Federal class I areas

(a) Impairment of visibility; list of areas; study and report

(1) Congress hereby declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution.

(2) Not later than six months after August 7, 1977, the Secretary of the Interior in consultation with other Federal land managers shall review all mandatory class I Federal areas and identify those where visibility is an important value of the area. From time to time the Secretary of the Interior may revise such identifications. Not later than one year after August 7, 1977, the Administrator shall, after consultation with the Secretary of the Interior, promulgate a list of mandatory class I Federal areas in which he determines visibility is an important value.

(3) Not later than eighteen months after August 7, 1977, the Administrator shall complete a study and report to Congress on available methods for implementing the national goal set forth in paragraph (1). Such report shall include recommendations for—

(A) methods for identifying, characterizing, determining, quantifying, and measuring visibility impairment in Federal areas referred to in paragraph (1), and

(B) modeling techniques (or other methods) for determining the extent to which manmade air pollution may reasonably be anticipated to cause or contribute to such impairment, and

(C) methods for preventing and remedying such manmade air pollution and resulting visibility impairment.

Such report shall also identify the classes or categories of sources and the types of air pollutants which, alone or in conjunction with other sources or pollutants, may reasonably be anticipated to cause or contribute significantly to impairment of visibility.

(4) Not later than twenty-four months after August 7, 1977, and after notice and public hearing, the Administrator shall promulgate regulations to assure (A) reasonable progress toward meeting the national goal specified in paragraph (1), and (B) compliance with the requirements of this section.

(b) Regulations

Regulations under subsection (a)(4) of this section shall—

(1) provide guidelines to the States, taking into account the recommendations under sub-

SEC. 2. *Designation of Facilities.* (a) The Administrator of the Environmental Protection Agency (hereinafter referred to as "the Administrator") shall be responsible for the attainment of the purposes and objectives of this Order.

(b) In carrying out his responsibilities under this Order, the Administrator shall, in conformity with all applicable requirements of law, designate facilities which have given rise to a conviction for an offense under section 113(c)(1) of the Air Act [42 U.S.C. 7413(c)(1)] or section 309(c) of the Water Act [33 U.S.C. 1319(c)]. The Administrator shall, from time to time, publish and circulate to all Federal agencies lists of those facilities, together with the names and addresses of the persons who have been convicted of such offenses. Whenever the Administrator determines that the condition which gave rise to a conviction has been corrected, he shall promptly remove the facility and the name and address of the person concerned from the list.

SEC. 3. *Contracts, Grants, or Loans.* (a) Except as provided in section 8 of this Order, no Federal agency shall enter into any contract for the procurement of goods, materials, or services which is to be performed in whole or in part in a facility then designated by the Administrator pursuant to section 2.

(b) Except as provided in section 8 of this Order, no Federal agency authorized to extend Federal assistance by way of grant, loan, or contract shall extend such assistance in any case in which it is to be used to support any activity or program involving the use of a facility then designated by the Administrator pursuant to section 2.

SEC. 4. *Procurement, Grant, and Loan Regulations.* The Federal Procurement Regulations, the Armed Services Procurement Regulations, and to the extent necessary, any supplemental or comparable regulations issued by any agency of the Executive Branch shall, following consultation with the Administrator, be amended to require, as a condition of entering into, renewing, or extending any contract for the procurement of goods, materials, or services or extending any assistance by way of grant, loan, or contract, inclusion of a provision requiring compliance with the Air Act, the Water Act, and standards issued pursuant thereto in the facilities in which the contract is to be performed, or which are involved in the activity or program to receive assistance.

SEC. 5. *Rules and Regulations.* The Administrator shall issue such rules, regulations, standards, and guidelines as he may deem necessary or appropriate to carry out the purposes of this Order.

SEC. 6. *Cooperation and Assistance.* The head of each Federal agency shall take such steps as may be necessary to insure that all officers and employees of this agency whose duties entail compliance or comparable functions with respect to contracts, grants, and loans are familiar with the provisions of this Order. In addition to any other appropriate action, such officers and employees shall report promptly any condition in a facility which may involve noncompliance with the Air Act or the Water Act or any rules, regulations, standards, or guidelines issued pursuant to this Order to the head of the agency, who shall transmit such reports to the Administrator.

SEC. 7. *Enforcement.* The Administrator may recommend to the Department of Justice or other appropriate agency that legal proceedings be brought or other appropriate action be taken whenever he becomes aware of a breach of any provision required, under the amendments issued pursuant to section 4 of this Order, to be included in a contract or other agreement.

SEC. 8. *Exemptions—Reports to Congress.* (a) Upon a determination that the paramount interest of the United States so requires—

(1) The head of a Federal agency may exempt any contract, grant, or loan, and, following consultation with the Administrator, any class of contracts, grants or loans from the provisions of this Order. In any such case, the head of the Federal agency granting such exemption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be dis-

---

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.

closed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(b) Judicial review**

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

[4] So in original. Probably should be "subsection,".

[5] So in original. The word "to" probably should not appear.

Case: 12-3388    Document: 31    Filed: 06/19/2013    Pages: 81

**(e) Temporary sources**

The permitting authority may issue a single permit authorizing emissions from similar operations at multiple temporary locations. No such permit shall be issued unless it includes conditions that will assure compliance with all the requirements of this chapter at all authorized locations, including, but not limited to, ambient standards and compliance with any applicable increment or visibility requirements under part C of subchapter I of this chapter. Any such permit shall in addition require the owner or operator to notify the permitting authority in advance of each change in location. The permitting authority may require a separate permit fee for operations at each location.

**(f) Permit shield**

Compliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a of this title. Except as otherwise provided by the Administrator by rule, the permit may also provide that compliance with the permit shall be deemed compliance with other applicable provisions of this chapter that relate to the permittee if—

(1) the permit includes the applicable requirements of such provisions, or

(2) the permitting authority in acting on the permit application makes a determination relating to the permittee that such other provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

Nothing in the preceding sentence shall alter or affect the provisions of section 7603 of this title, including the authority of the Administrator under that section.

(July 14, 1955, ch. 360, title V, § 504, as added Pub. L. 101–549, title V, § 501, Nov. 15, 1990, 104 Stat. 2642.)

**§ 7661d. Notification to Administrator and contiguous States**

**(a) Transmission and notice**

(1) Each permitting authority—

(A) shall transmit to the Administrator a copy of each permit application (and any application for a permit modification or renewal) or such portion thereof, including any compliance plan, as the Administrator may require to effectively review the application and otherwise to carry out the Administrator's responsibilities under this chapter, and

(B) shall provide to the Administrator a copy of each permit proposed to be issued and issued as a final permit.

(2) The permitting authority shall notify all States—

(A) whose air quality may be affected and that are contiguous to the State in which the emission originates, or

(B) that are within 50 miles of the source,

of each permit application or proposed permit forwarded to the Administrator under this section, and shall provide an opportunity for such States to submit written recommendations respecting the issuance of the permit and its terms and conditions. If any part of those recommendations are not accepted by the permitting authority, such authority shall notify the State submitting the recommendations and the Administrator in writing of its failure to accept those recommendations and the reasons therefor.

**(b) Objection by EPA**

(1) If any permit contains provisions that are determined by the Administrator as not in compliance with the applicable requirements of this chapter, including the requirements of an applicable implementation plan, the Administrator shall, in accordance with this subsection, object to its issuance. The permitting authority shall respond in writing if the Administrator (A) within 45 days after receiving a copy of the proposed permit under subsection (a)(1) of this section, or (B) within 45 days after receiving notification under subsection (a)(2) of this section, objects in writing to its issuance as not in compliance with such requirements. With the objection, the Administrator shall provide a statement of the reasons for the objection. A copy of the objection and statement shall be provided to the applicant.

(2) If the Administrator does not object in writing to the issuance of a permit pursuant to paragraph (1), any person may petition the Administrator within 60 days after the expiration of the 45-day review period specified in paragraph (1) to take such action. A copy of such petition shall be provided to the permitting authority and the applicant by the petitioner. The petition shall be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency (unless the petitioner demonstrates in the petition to the Administrator that it was impracticable to raise such objections within such period or unless the grounds for such objection arose after such period). The petition shall identify all such objections. If the permit has been issued by the permitting agency, such petition shall not postpone the effectiveness of the permit. The Administrator shall grant or deny such petition within 60 days after the petition is filed. The Administrator shall issue an objection within such period if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of this chapter, including the requirements of the applicable implementation plan. Any denial of such petition shall be subject to judicial review under section 7607 of this title. The Administrator shall include in regulations under this subchapter provisions to implement this paragraph. The Administrator may not delegate the requirements of this paragraph.

(3) Upon receipt of an objection by the Administrator under this subsection, the permitting authority may not issue the permit unless it is revised and issued in accordance with subsection (c) of this section. If the permitting authority has issued a permit prior to receipt of an objection by the Administrator under paragraph (2) of this subsection, the Administrator shall modify, terminate, or revoke such permit and the permitting authority may thereafter only issue a

Case: 12-3388    Document: 31    Filed: 06/19/2013    Pages: 81

revised permit in accordance with subsection (c) of this section.

**(c) Issuance or denial**

If the permitting authority fails, within 90 days after the date of an objection under subsection (b) of this section, to submit a permit revised to meet the objection, the Administrator shall issue or deny the permit in accordance with the requirements of this subchapter. No objection shall be subject to judicial review until the Administrator takes final action to issue or deny a permit under this subsection.

**(d) Waiver of notification requirements**

(1) The Administrator may waive the requirements of subsections (a) and (b) of this section at the time of approval of a permit program under this subchapter for any category (including any class, type, or size within such category) of sources covered by the program other than major sources.

(2) The Administrator may, by regulation, establish categories of sources (including any class, type, or size within such category) to which the requirements of subsections (a) and (b) of this section shall not apply. The preceding sentence shall not apply to major sources.

(3) The Administrator may exclude from any waiver under this subsection notification under subsection (a)(2) of this section. Any waiver granted under this subsection may be revoked or modified by the Administrator by rule.

**(e) Refusal of permitting authority to terminate, modify, or revoke and reissue**

If the Administrator finds that cause exists to terminate, modify, or revoke and reissue a permit under this subchapter, the Administrator shall notify the permitting authority and the source of the Administrator's finding. The permitting authority shall, within 90 days after receipt of such notification, forward to the Administrator under this section a proposed determination of termination, modification, or revocation and reissuance, as appropriate. The Administrator may extend such 90 day period for an additional 90 days if the Administrator finds that a new or revised permit application is necessary, or that the permitting authority must require the permittee to submit additional information. The Administrator may review such proposed determination under the provisions of subsections (a) and (b) of this section. If the permitting authority fails to submit the required proposed determination, or if the Administrator objects and the permitting authority fails to resolve the objection within 90 days, the Administrator may, after notice and in accordance with fair and reasonable procedures, terminate, modify, or revoke and reissue the permit.

(July 14, 1955, ch. 360, title V, §505, as added Pub. L. 101–549, title V, §501, Nov. 15, 1990, 104 Stat. 2643.)

**§ 7661e. Other authorities**

**(a) In general**

Nothing in this subchapter shall prevent a State, or interstate permitting authority, from establishing additional permitting requirements not inconsistent with this chapter.

**(b) Permits implementing acid rain provisions**

The provisions of this subchapter, including provisions regarding schedules for submission and approval or disapproval of permit applications, shall apply to permits implementing the requirements of subchapter IV–A of this chapter except as modified by that subchapter.

(July 14, 1955, ch. 360, title V, §506, as added Pub. L. 101–549, title V, §501, Nov. 15, 1990, 104 Stat. 2645.)

**§ 7661f. Small business stationary source technical and environmental compliance assistance program**

**(a) Plan revisions**

Consistent with sections 7410 and 7412 of this title, each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator as part of the State implementation plan for such State or as a revision to such State implementation plan under section 7410 of this title, plans for establishing a small business stationary source technical and environmental compliance assistance program. Such submission shall be made within 24 months after November 15, 1990. The Administrator shall approve such program if it includes each of the following:

(1) Adequate mechanisms for developing, collecting, and coordinating information concerning compliance methods and technologies for small business stationary sources, and programs to encourage lawful cooperation among such sources and other persons to further compliance with this chapter.

(2) Adequate mechanisms for assisting small business stationary sources with pollution prevention and accidental release detection and prevention, including providing information concerning alternative technologies, process changes, products, and methods of operation that help reduce air pollution.

(3) A designated State office within the relevant State agency to serve as ombudsman for small business stationary sources in connection with the implementation of this chapter.

(4) A compliance assistance program for small business stationary sources which assists small business stationary sources in determining applicable requirements and in receiving permits under this chapter in a timely and efficient manner.

(5) Adequate mechanisms to assure that small business stationary sources receive notice of their rights under this chapter in such manner and form as to assure reasonably adequate time for such sources to evaluate compliance methods and any relevant or applicable proposed or final regulation or standard issued under this chapter.

(6) Adequate mechanisms for informing small business stationary sources of their obligations under this chapter, including mechanisms for referring such sources to qualified auditors or, at the option of the State, for providing audits of the operations of such sources to determine compliance with this chapter.

(7) Procedures for consideration of requests from a small business stationary source for modification of—

establishing the magnitude of the basic design parameter(s) specified in paragraphs (h)(2)(i) and (ii) of this section.

(v) If design information is not available for a process unit, then the owner or operator shall determine the process unit's basic design parameter(s) using the maximum value achieved by the process unit in the five-year period immediately preceding the planned activity.

(vi) Efficiency of a process unit is not a basic design parameter.

(3) The replacement activity shall not cause the process unit to exceed any emission limitation, or operational limitation that has the effect of constraining emissions, that applies to the process unit and that is legally enforceable.

[51 FR 40669, Nov. 7, 1986]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §51.165, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.fdsys.gov*.

EFFECTIVE DATE NOTE: At 76 FR 17552, Mar. 30, 2011, §51.165, paragraphs (a)(1)(v)(G) and (v)(1)(vi)(C) *(3)* are stayed indefinitely.

## § 51.166 Prevention of significant deterioration of air quality.

(a)(1) *Plan requirements.* In accordance with the policy of section 101(b)(1) of the Act and the purposes of section 160 of the Act, each applicable State Implementation Plan and each applicable Tribal Implementation Plan shall contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality.

(2) *Plan revisions.* If a State Implementation Plan revision would result in increased air quality deterioration over any baseline concentration, the plan revision shall include a demonstration that it will not cause or contribute to a violation of the applicable increment(s). If a plan revision proposing less restrictive requirements was submitted after August 7, 1977 but on or before any applicable baseline date and was pending action by the Administrator on that date, no such demonstration is necessary with respect to the area for which a baseline date would be established before final action is taken on the plan revision. Instead,

the assessment described in paragraph (a)(4) of this section, shall review the expected impact to the applicable increment(s).

(3) *Required plan revision.* If the State or the Administrator determines that a plan is substantially inadequate to prevent significant deterioration or that an applicable increment is being violated, the plan shall be revised to correct the inadequacy or the violation. The plan shall be revised within 60 days of such a finding by a State or within 60 days following notification by the Administrator, or by such later date as prescribed by the Administrator after consultation with the State.

(4) *Plan assessment.* The State shall review the adequacy of a plan on a periodic basis and within 60 days of such time as information becomes available that an applicable increment is being violated.

(5) *Public participation.* Any State action taken under this paragraph shall be subject to the opportunity for public hearing in accordance with procedures equivalent to those established in §51.102.

(6) *Amendments.* (i) Any State required to revise its implementation plan by reason of an amendment to this section, with the exception of amendments to add new maximum allowable increases or other measures pursuant to section 166(a) of the Act, shall adopt and submit such plan revision to the Administrator for approval no later than 3 years after such amendment is published in the FEDERAL REGISTER. With regard to a revision to an implementation plan by reason of an amendment to paragraph (c) of this section to add maximum allowable increases or other measures, the State shall submit such plan revision to the Administrator for approval within 21 months after such amendment is published in the FEDERAL REGISTER.

(ii) Any revision to an implementation plan that would amend the provisions for the prevention of significant air quality deterioration in the plan shall specify when and as to what sources and modifications the revision is to take effect.

(iii) Any revision to an implementation plan that an amendment to this section required shall take effect no

247

source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combination techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR parts 60 and 61. If the reviewing authority determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(13)(i) *Baseline concentration* means that ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a minor source baseline date is established and shall include:

(a) The actual emissions, as defined in paragraph (b)(21) of this section, representative of sources in existence on the applicable minor source baseline date, except as provided in paragraph (b)(13)(ii) of this section;

(b) The allowable emissions of major stationary sources that commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(ii) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):

(a) Actual emissions, as defined in paragraph (b)(21) of this section, from any major stationary source on which construction commenced after the major source baseline date; and

(b) Actual emissions increases and decreases, as defined in paragraph (b)(21) of this section, at any stationary source occurring after the minor source baseline date.

(14)(i) *Major source baseline date* means:

(a) In the case of $PM_{10}$ and sulfur dioxide, January 6, 1975;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2010.

(ii) *Minor source baseline date* means the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

(a) In the case of $PM_{10}$ and sulfur dioxide, August 7, 1977;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2011.

(iii) The baseline date is established for each pollutant for which increments or other equivalent measures have been established if:

(a) The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act for the pollutant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166; and

(b) In the case of a major stationary source, the pollutant would be emitted in significant amounts, or, in the case of a major modification, there would be a significant net emissions increase of the pollutant.

(iv) Any minor source baseline date established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that the reviewing authority may rescind any such minor source baseline date where it can be shown, to the satisfaction of the reviewing authority, that the emissions increase from the major stationary source, or the net emissions increase

253

## § 52.18  Abbreviations.

Abbreviations used in this part shall be those set forth in part 60 of this chapter.

[38 FR 12698, May 14, 1973]

## § 52.20  Attainment dates for national standards.

Each subpart contains a section which specifies the latest dates by which national standards are to be attained in each region in the State. An attainment date which only refers to a month and a year (such as July 1975) shall be construed to mean the last day of the month in question. However, the specification of attainment dates for national standards does not relieve any State from the provisions of subpart N of this chapter which require all sources and categories of sources to comply with applicable requirements of the plan—

(a) As expeditiously as practicable where the requirement is part of a control strategy designed to attain a primary standard, and

(b) Within a reasonable time where the requirement is part of a control strategy designed to attain a secondary standard.

[37 FR 19808, Sept. 22, 1972, as amended at 39 FR 34535, Sept. 26, 1974; 51 FR 40676, Nov. 7, 1986]

## § 52.21  Prevention of significant deterioration of air quality.

(a)(1) *Plan disapproval.* The provisions of this section are applicable to any State implementation plan which has been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards. Specific disapprovals are listed where applicable, in subparts B through DDD of this part. The provisions of this section have been incorporated by reference into the applicable implementation plans for various States, as provided in subparts B through DDD of this part. Where this section is so incorporated, the provisions shall also be applicable to all lands owned by the Federal Government and Indian Reservations located in such State. No disapproval with re-

spect to a State's failure to prevent significant deterioration of air quality shall invalidate or otherwise affect the obligations of States, emission sources, or other persons with respect to all portions of plans approved or promulgated under this part.

(2) *Applicability procedures.* (i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements. The Administrator has authority to issue any such permit.

(iv) The requirements of the program will be applied in accordance with the principles set out in paragraphs (a)(2)(iv)(*a*) through (*f*) of this section.

(*a*) Except as otherwise provided in paragraphs (a)(2)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases—a significant emissions increase (as defined in paragraph (b)(40) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(*b*) The procedure for calculating (before beginning actual construction)

14

NOTE TO PARAGRAPH (b)(55): By a court order on December 24, 2003, this paragraph (b)(55) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(56) *Functionally equivalent component* means a component that serves the same purpose as the replaced component.

NOTE TO PARAGRAPH (b)(56): By a court order on December 24, 2003, this paragraph (b)(56) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(57) *Fixed capital cost* means the capital needed to provide all the depreciable components. ''Depreciable components'' refers to all components of fixed capital cost and is calculated by subtracting land and working capital from the total capital investment, as defined in paragraph (b)(58) of this section.

NOTE TO PARAGRAPH (b)(57): By a court order on December 24, 2003, this paragraph (b)(57) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(58) *Total capital investment* means the sum of the following: all costs required to purchase needed process equipment (purchased equipment costs); the costs of labor and materials for installing that equipment (direct installation costs); the costs of site preparation and buildings; other costs such as engineering, construction and field expenses, fees to contractors, startup and performance tests, and contingencies (indirect installation costs); land for the process equipment; and working capital for the process equipment.

NOTE TO PARAGRAPH (b)(58): By a court order on December 24, 2003, this paragraph (b)(58) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the FEDERAL REGISTER advising the public of the termination of the stay.

(c) *Ambient air increments.* In areas designated as Class I, II or III, increases in pollutant concentration over the baseline concentration shall be limited to the following:

| Pollutant | Maximum allowable increase (micrograms per cubic meter) |
|---|---|
| **Class I Area** | |
| $PM_{2.5}$: | |
| Annual arithmetic mean | 1 |
| 24-hr maximum | 2 |
| $PM_{10}$: | |
| Annual arithmetic mean | 4 |
| 24-hr maximum | 8 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 2 |
| 24-hr maximum | 5 |
| 3-hr maximum | 25 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 2.5 |
| **Class II Area** | |
| $PM_{2.5}$: | |
| Annual arithmetic mean | 4 |
| 24-hr maximum | 9 |
| $PM_{10}$: | |
| Annual arithmetic mean | 17 |
| 24-hr maximum | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| 24-hr maximum | 91 |
| 3-hr maximum | 512 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 25 |
| **Class III Area** | |
| $PM_{2.5}$: | |
| Annual arithmetic mean | 8 |
| 24-hr maximum | 18 |
| $PM_{10}$: | |
| Annual arithmetic mean | 34 |
| 24-hr maximum | 60 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 40 |
| 24-hr maximum | 182 |
| 3-hr maximum | 700 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 50 |

For any period other than an annual period, the applicable maximum allowable increase may be exceeded during one such period per year at any one location.

(d) *Ambient air ceilings.* No concentration of a pollutant shall exceed:

(1) The concentration permitted under the national secondary ambient air quality standard, or

(2) The concentration permitted under the national primary ambient air quality standard, whichever concentration is lowest for the pollutant for a period of exposure.

# CHAPTER 227

# ADMINISTRATIVE PROCEDURE AND REVIEW

SUBCHAPTER I
GENERAL PROVISIONS
227.01    Definitions.
227.02    Compliance with other statutes.
227.03    Application of this chapter.
227.04    Considerations for small business.
SUBCHAPTER II
ADMINISTRATIVE RULES
227.10    Statements of policy and interpretations of law; discrimination prohibited.
227.11    Extent to which chapter confers rule−making authority.
227.113    Incorporation of local, comprehensive planning goals.
227.114    Rule making; considerations for small business.
227.115    Review of rules affecting housing.
227.116    Rules to include time period.
227.117    Review of rules impacting energy availability.
227.12    Petition for rules.
227.13    Advisory committees and informal consultations.
227.135    Statements of scope of proposed rules.
227.137    Economic impact analyses of proposed rules.
227.14    Preparation of proposed rules.
227.15    Legislative council staff.
227.16    When hearings required.
227.17    Notice of hearing.
227.18    Conduct of hearings.
227.185    Approval by governor.
227.19    Legislative review prior to promulgation.
227.20    Filing of rules.
227.21    Publication of rules; incorporation by reference.
227.22    Effective date of rules.
227.23    Forms.
227.24    Emergency rules; exemptions.
227.25    Legislative reference bureau.
227.26    Legislative review after promulgation; joint committee for review of administrative rules.
227.27    Construction of administrative rules.
227.30    Review of administrative rules or guidelines.
SUBCHAPTER III
ADMINISTRATIVE ACTIONS AND JUDICIAL REVIEW
227.40    Declaratory judgment proceedings.
227.41    Declaratory rulings.
227.42    Right to hearing.
227.43    Division of hearings and appeals.
227.44    Contested cases; notice; parties; hearing; records.
227.45    Evidence and official notice.
227.46    Hearing examiners; examination of evidence by agency.
227.47    Decisions.
227.48    Service of decision.
227.483    Costs upon frivolous claims.
227.485    Costs to certain prevailing parties.
227.49    Petitions for rehearing in contested cases.
227.50    Ex parte communications in contested cases.
227.51    Licenses.
227.52    Judicial review; decisions reviewable.
227.53    Parties and proceedings for review.
227.54    Stay of proceedings.
227.55    Record on review.
227.56    Additional evidence; trial; motion to dismiss; amending petition.
227.57    Scope of review.
227.58    Appeals.
227.59    Certification of certain cases from the circuit court of Dane County to other circuits.
227.60    Jurisdiction of state courts to determine validity of laws when attacked in federal court and to stay enforcement.

## SUBCHAPTER I

## GENERAL PROVISIONS

**227.01  Definitions.**  In this chapter:

**(1)**  "Agency" means a board, commission, committee, department or officer in the state government, except the governor, a district attorney or a military or judicial officer.

**(2)**  "Code", when used without further modification, means the Wisconsin administrative code under s. 35.93.

**(3)**  "Contested case" means an agency proceeding in which the assertion by one party of any substantial interest is denied or controverted by another party and in which, after a hearing required by law, a substantial interest of a party is determined or adversely affected by a decision or order.  There are 3 classes of contested cases as follows:

(a)  A "class 1 proceeding" is a proceeding in which an agency acts under standards conferring substantial discretionary authority upon it.  "Class 1 proceedings" include rate making, price setting, the granting of a certificate of convenience and necessity, the making, review or equalization of tax assessments and the granting or denial of a license.

(b)  A "class 2 proceeding" is a proceeding in which an agency determines whether to impose a sanction or penalty against a party.  "Class 2 proceedings" include the suspension or revocation of or refusal to renew a license because of an alleged violation of law.  Any proceeding which could be construed to be both a class 1 and a class 2 proceeding shall be treated as a class 2 proceeding.

(c)  A "class 3 proceeding" is any contested case not included in class 1 or class 2.

**(4)**  "Hearing examiner" means a person designated under s. 227.43 or 227.46 (1) to preside over a contested case.

**(5)**  "License" includes all or any part of an agency permit, certificate, approval, registration, charter or similar form of permis-

sion required by law, except a motor vehicle operator's license issued under ch. 343, a vehicle registration certificate issued under ch. 341, a license required primarily for revenue purposes, a hunting or fishing approval or a similar license where issuance is merely a ministerial act.

**(6)**  "Licensing" means an agency process relating to the granting, denial, renewal, revocation, suspension, annulment, withdrawal or amendment of a license.

**(7)**  "Official of the agency" means a secretary, commissioner or member of a board of an agency.

**(8)**  "Party" means a person or agency named or admitted as a party in a contested case.

**(9)**  "Person aggrieved" means a person or agency whose substantial interests are adversely affected by a determination of an agency.

**(10)**  "Proposed rule" means all or any part of an agency's proposal to promulgate a rule.

**(11)**  "Register" means the Wisconsin administrative register under s. 35.93.

**(13)**  "Rule" means a regulation, standard, statement of policy or general order of general application which has the effect of law and which is issued by an agency to implement, interpret or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency.  "Rule" does not include, and s. 227.10 does not apply to, any action or inaction of an agency, whether it would otherwise meet the definition under this subsection, which:

(a)  Concerns the internal management of an agency and does not affect private rights or interests.

(b)  Is a decision or order in a contested case.

(c)  Is an order directed to a specifically named person or to a group of specifically named persons that does not constitute a general class, and which is served on the person or persons to whom it is directed by the appropriate means applicable to the order.  The

Case: 12-3388    Document: 31    Filed: 06/19/2013    Pages: 81
Electronic reproduction of 2011–12 Wis. Stats. database, updated to May 1, 2013.

227.485    ADMINISTRATIVE PROCEDURE                    Updated 11–12 Wis. Stats. Database    24

**(b)** The party or the party's attorney knew, or should have known, that the motion was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

**History:** 1985 a. 52; Stats. 1985 s. 227.115; 1985 a. 182 ss. 33s, 57; 1985 a. 332 s. 253; Stats. 1985 s. 227.485; 1987 a. 186; 1997 a. 27, 79; 2003 a. 145.

That the state loses a case does not justify the automatic imposition of fees and costs. An award depends upon whether the state's position had arguable merit. Behnke v. DHSS, 146 Wis. 2d 178, 430 N.W.2d 600 (Ct. App. 1988).

Sub. (4) requires a party who prevails in an agency's proposed decision to seek costs within 30 days of the proposed decision, thereby permitting the hearing examiner to make appropriate findings on entitlement to, and amount of, costs to be awarded. Any disputes regarding that decision can then be resolved, along with the merits of the underlying matter, in one final decision. Gordon v. State Medical Examining Board, 225 Wis. 2d 552, 593 N.W.2d 481 (Ct. App. 1999), 98–2144.

**227.49 Petitions for rehearing in contested cases. (1)** A petition for rehearing shall not be a prerequisite for appeal or review. Any person aggrieved by a final order may, within 20 days after service of the order, file a written petition for rehearing which shall specify in detail the grounds for the relief sought and supporting authorities. An agency may order a rehearing on its own motion within 20 days after service of a final order. This subsection does not apply to s. 17.025 (3) (e). No agency is required to conduct more than one rehearing based on a petition for rehearing filed under this subsection in any contested case.

**(2)** The filing of a petition for rehearing shall not suspend or delay the effective date of the order, and the order shall take effect on the date fixed by the agency and shall continue in effect unless the petition is granted or until the order is superseded, modified, or set aside as provided by law.

**(3)** Rehearing will be granted only on the basis of:

(a) Some material error of law.

(b) Some material error of fact.

(c) The discovery of new evidence sufficiently strong to reverse or modify the order, and which could not have been previously discovered by due diligence.

**(4)** Copies of petitions for rehearing shall be served on all parties of record. Parties may file replies to the petition.

**(5)** The agency may order a rehearing or enter an order with reference to the petition without a hearing, and shall dispose of the petition within 30 days after it is filed. If the agency does not enter an order disposing of the petition within the 30–day period, the petition shall be deemed to have been denied as of the expiration of the 30–day period.

**(6)** Upon granting a rehearing, the agency shall set the matter for further proceedings as soon as practicable. Proceedings upon rehearing shall conform as nearly may be to the proceedings in an original hearing except as the agency may otherwise direct. If in the agency's judgment, after such rehearing it appears that the original decision, order or determination is in any respect unlawful or unreasonable, the agency may reverse, change, modify or suspend the same accordingly. Any decision, order or determination made after such rehearing reversing, changing, modifying or suspending the original determination shall have the same force and effect as an original decision, order or determination.

**History:** 1975 c. 94 s. 3; 1975 c. 414; 1977 c. 139; 1979 c. 208; 1985 a. 182 s. 33t; Stats. 1985 s. 227.49.

This section does not require service of a petition for rehearing within 20 days of service of the order, only filing. DOR v. Hogan, 198 Wis. 2d 792, 542 N.W.2d 148 (Ct. App. 1995), 95–0438.

Filing of a petition for rehearing under sub. (1) is not accomplished upon its mailing. A petition is filed when it is physically delivered to and received by the relevant authority. Currier v. Wisconsin Department of Revenue, 2006 WI App 12, 288 Wis. 2d 693, 709 N.W.2d 520, 05–0292.

**227.50 Ex parte communications in contested cases. (1)** (a) In a contested case, no ex parte communication relative to the merits or a threat or offer of reward shall be made, before a decision is rendered, to the hearing examiner or any other official or employee of the agency who is involved in the decision–making process, by:

1. An official of the agency or any other public employee or official engaged in prosecution or advocacy in connection with the matter under consideration or a factually related matter; or

2. A party to the proceeding, or any person who directly or indirectly would have a substantial interest in the proposed agency action or an authorized representative or counsel.

(b) Paragraph (a) 1. does not apply to an advisory staff which does not participate in the proceeding.

(c) This subsection does not apply to an ex parte communication which is authorized or required by statute.

(d) This subsection does not apply to an ex parte communication by an official or employee of an agency which is conducting a class 1 proceeding.

(e) This subsection does not apply to any communication made to an agency in response to a request by the agency for information required in the ordinary course of its regulatory functions by rule of the agency.

**(2)** A hearing examiner or other agency official or employee involved in the decision–making process who receives an ex parte communication in violation of sub. (1) shall place on the record of the pending matter the communication, if written, a memorandum stating the substance of the communication, if oral, all written responses to the communication and a memorandum stating the substance of all oral responses made, and also shall advise all parties that the material has been placed on the record; however, any writing or memorandum which would not be admissible into the record if presented at the hearing shall not be placed in the record, but notice of the substance or nature of the communication shall be given to all parties. Any party desiring to rebut the communication shall be allowed to do so, if the party requests the opportunity for rebuttal within 10 days after notice of the communication. The hearing examiner or agency official or employee may, if deeming it necessary to eliminate the effect of an ex parte communication received, withdraw from the proceeding, in which case a successor shall be assigned.

**History:** 1975 c. 94 s. 3; 1975 c. 414; 1977 c. 418; 1985 a. 182 s. 33t; Stats. 1985 s. 227.50.

The failure to notify the parties of the receipt of an ex parte communication was harmless error. Seebach v. PSC, 97 Wis. 2d 712, 295 N.W.2d 753 (Ct. App. 1980).

**227.51 Licenses. (1)** When the grant, denial or renewal of a license is required to be preceded by notice and opportunity for hearing, the provisions of this chapter concerning contested cases apply.

**(2)** When a licensee has made timely and sufficient application for the renewal of a license or a new license with reference to any activity of a continuing nature, the existing license does not expire until the application has been finally acted upon by the agency, and, if the application is denied or the terms of the new license are limited, until the last day for seeking review of the agency decision or a later date fixed by order of the reviewing court.

**(3)** Except as otherwise specifically provided by law, no revocation, suspension, annulment or withdrawal of any license is lawful unless the agency gives notice by mail to the licensee of facts or conduct which warrant the intended action and the licensee is given an opportunity to show compliance with all lawful requirements for the retention of the license. If an agency finds that public health, safety or welfare imperatively requires emergency action and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. Such proceedings shall be promptly instituted and determined.

**History:** 1975 c. 414; 1985 a. 182 s. 33t; Stats. 1985 s. 227.51.
**Cross–reference:** See also chs. SPS 1 and 2, Wis. adm. code.
Summary suspension of occupational licenses is discussed. 76 Atty. Gen. 110.

**227.52 Judicial review; decisions reviewable.** Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, are subject to review as provided in this chapter, except as otherwise provided by law and except for the following:

**(1)** Decisions of the department of revenue other than decisions relating to alcohol beverage permits issued under ch. 125.

**ADDENDUM 15**

Case: 12-3388     Document: 31     Filed: 06/19/2013     Pages: 81
Electronic reproduction of 2011–12 Wis. Stats. database, updated to May 1, 2013.

25     Updated 11–12 Wis. Stats. Database          ADMINISTRATIVE PROCEDURE          227.53

**(2)** Decisions of the department of employee trust funds.

**(3)** Those decisions of the division of banking that are subject to review, prior to any judicial review by, the banking review board, and decisions of the division of banking relating to savings banks or savings and loan associations, but no other institutions subject to the jurisdiction of the division of banking.

**(4)** Decisions of the office of credit unions.

**(6)** Decisions of the chairperson of the government accountability board or the chairperson's designee.

**(7)** Those decisions of the department of workforce development which are subject to review, prior to any judicial review, by the labor and industry review commission.

**History:** 1975 c. 414; 1977 c. 187, 418; 1981 c. 79, 96, 391; 1983 a. 27, 122, 183, 538; 1985 a. 182 s. 35; Stats. 1985 s. 227.52; 1995 a. 27 ss. 6233, 9130 (4); 1997 a. 3, 27; 1999 a. 9, 182; 2003 a. 33; 2007 a. 1.

**Cross–reference:** See s. 50.03 (11) for review under subchapter I of chapter 50.

**Legislative Council Note, 1981:** The amendment to s. 227.15 applies court review under ch. 227 to revocations, suspensions and nonrenewals by the department of permits issued by it. [Bill 300–A]

An order of the tax appeals commission refusing to dismiss proceedings for lack of jurisdiction was not appealable because the merits of the case were still pending. Pasch v. DOR, 58 Wis. 2d 346, 206 N.W.2d 157 (1973).

The requirements of ss. 227.15 and 227.16 (1) [now ss. 227.52 and 227.53 (1)] for standing to seek review of an administrative decision do not create separate and independent criteria, but both sections essentially require that to be a person aggrieved for standing purposes, one must have an interest recognized by law in the subject matter that is injuriously affected by the decision. Wisconsin's Environmental Decade, Inc. v. PSC, 69 Wis. 2d 1, 230 N.W.2d 243 (1975).

An order of the employment relations commission directing an election and determining the bargaining unit under 111.70 (4) (d) is not reviewable. West Allis v. WERC, 72 Wis. 2d 268, 240 N.W.2d 416 (1976).

An unconditional interim order by the public service commission fixing utility rates pending final determination was reviewable when no provision was made for the refund of excess interim rates. Friends of the Earth v. PSC, 78 Wis. 2d 388, 254 N.W.2d 299 (1977).

The decision of the PSC not to investigate under ss. 196.28 and 196.29 was a nonreviewable, discretionary determination. Reviewable decisions are defined. Wisconsin's Environmental Decade, Inc. v. PSC, 93 Wis. 2d 650, 287 N.W.2d 737 (1980).

A court order setting aside an administrative order and remanding the case to the administrative agency was appealable as of right. Bearns v. DILHR, 102 Wis. 2d 70, 306 N.W.2d 22 (1981).

Because an appointment to office was an administrative decision, a challenge of appointment could only be made under this chapter. State ex rel. Frederick v. Cox, 111 Wis. 2d 264, 330 N.W.2d 603 (Ct. App. 1982).

A declaratory judgment action was improper when the plaintiff did not pursue any available remedies under ch. 227. Turkow v. DNR, 216 Wis. 2d 273, 576 N.W.2d 288 (Ct. App. 1998), 97–1149.

The division of hearings and appeals is not a line agency charged with the administration and enforcement of the statutes involved and does not have experience administering the underlying program. Unless the line agency has adopted DHA's interpretation as its own, de novo review of a DHA decision is appropriate. Buettner v. DHFS, 2003 WI App 90, 264 Wis. 2d 700, 663 N.W.2d 282, 01–0981.

Unlike factual questions, or questions with legal issues intertwined with factual determinations, neither party bears any burden when the issue before the court is whether an administrative agency exceeded the scope of its powers in promulgating a rule. The court examines the enabling statute de novo to ascertain whether the statute grants express or implied authorization for the rule. Any reasonable doubt pertaining to an agency's implied powers are resolved against the agency. Wisconsin Citizens Concerned for Cranes and Doves v. DNR, 2004 WI 40, 270 Wis. 2d 318, 677 N.W.2d 612, 02–1166.

Although this section does not require that an administrative decision be final to be subject to judicial review, case law has established that the legislative intent was to limit judicial review to final orders of an agency. A final order for purposes of judicial review directly affects the legal rights, duties, or privileges of a person. One aspect of this standard is whether the person would have another opportunity for judicial review, whereas an interlocutory order is one under which the substantial rights of the parties remain undetermined and the cause is retained for further action. Sierra Club v. DNR, 2007 WI App 181, 304 Wis. 2d 614, 736 N.W.2d 918, 06–2653.

Administrative decisions eligible for judicial review in Wisconsin. Klitzke, 61 MLR 405.

**227.53 Parties and proceedings for review.** **(1)** Except as otherwise specifically provided by law, any person aggrieved by a decision specified in s. 227.52 shall be entitled to judicial review of the decision as provided in this chapter and subject to all of the following procedural requirements:

(a) 1. Proceedings for review shall be instituted by serving a petition therefor personally or by certified mail upon the agency or one of its officials, and filing the petition in the office of the clerk of circuit court for the county where the judicial review proceedings are to be held. If the agency whose decision is sought to be reviewed is the tax appeals commission, the banking review board, the credit union review board, or the savings institutions review board, the petition shall be served upon both the agency

whose decision is sought to be reviewed and the corresponding named respondent, as specified in par. (b) 1. to 4.

2. Unless a rehearing is requested under s. 227.49, petitions for review of contested cases shall be served and filed within 30 days after the service of the decision of the agency upon all parties under s. 227.48. If a rehearing is requested under s. 227.49, any party desiring judicial review under this subdivision shall serve and file a petition for review within 30 days after service of the order finally disposing of the application for rehearing, or within 30 days after the final disposition by operation of law of any such application for rehearing. The 30–day period for serving and filing a petition under this subdivision commences on the day after personal service or mailing of the decision by the agency.

2m. Petitions for review other than contested cases shall be served and filed within 30 days after personal service or mailing of the decision by the agency.

3. If the petitioner is a resident, the proceedings shall be held in the circuit court for the county where the petitioner resides, except that if the petitioner is an agency, the proceedings shall be in the circuit court for the county where the respondent resides and except as provided in ss. 73.0301 (2) (b) 2., 77.59 (6) (b), 182.70 (6), and 182.71 (5) (g). If the petitioner is a nonresident, the proceedings shall be held in the county where the property affected by the decision is located or, if no property is affected, in the county where the dispute arose. If all parties stipulate and the court to which the parties desire to transfer the proceedings agrees, the proceedings may be held in the county designated by the parties. If 2 or more petitions for review of the same decision are filed in different counties, the circuit judge for the county in which a petition for review of the decision was first filed shall determine the venue for judicial review of the decision, and shall order transfer or consolidation where appropriate.

(b) The petition shall state the nature of the petitioner's interest, the facts showing that petitioner is a person aggrieved by the decision, and the grounds specified in s. 227.57 upon which petitioner contends that the decision should be reversed or modified. The petition may be amended, by leave of court, though the time for serving the same has expired. The petition shall be entitled in the name of the person serving it as petitioner and the name of the agency whose decision is sought to be reviewed as respondent, except that in petitions for review of decisions of the following agencies, the latter agency specified shall be the named respondent:

1. The tax appeals commission, the department of revenue.

2. The banking review board, the division of banking.

3. The credit union review board, the office of credit unions.

4. The savings institutions review board, the division of banking, except if the petitioner is the division of banking, the prevailing parties before the savings institutions review board shall be the named respondents.

(c) A copy of the petition shall be served personally or by certified mail or, where service is timely admitted in writing, by first class mail, not later than 30 days after the institution of the proceeding, upon each party who appeared before the agency in the proceeding in which the decision sought to be reviewed was made or upon the party's attorney of record. A court may not dismiss the proceeding for review solely because of a failure to serve a copy of the petition upon a party or the party's attorney of record unless the petitioner fails to serve a person listed as a party for purposes of review in the agency's decision under s. 227.47 or the person's attorney of record.

(d) Except in the case of the tax appeals commission, the banking review board, the credit union review board, and the savings institutions review board, the agency and all parties to the proceeding before it shall have the right to participate in the proceedings for review. The court may permit other interested persons to intervene. Any person petitioning the court to intervene shall serve a copy of the petition on each party who appeared before the

ADDENDUM 16

Case: 12-3388   Document: 31   Filed: 06/19/2013   Pages: 81
Electronic reproduction of 2011–12 Wis. Stats. database, updated to May 1, 2013.

227.53   **ADMINISTRATIVE PROCEDURE**   **Updated 11–12 Wis. Stats. Database**   26

agency and any additional parties to the judicial review at least 5 days prior to the date set for hearing on the petition.

**(2)** Every person served with the petition for review as provided in this section and who desires to participate in the proceedings for review thereby instituted shall serve upon the petitioner, within 20 days after service of the petition upon such person, a notice of appearance clearly stating the person's position with reference to each material allegation in the petition and to the affirmance, vacation or modification of the order or decision under review. Such notice, other than by the named respondent, shall also be served on the named respondent and the attorney general, and shall be filed, together with proof of required service thereof, with the clerk of the reviewing court within 10 days after such service. Service of all subsequent papers or notices in such proceeding need be made only upon the petitioner and such other persons as have served and filed the notice as provided in this subsection or have been permitted to intervene in said proceeding, as parties thereto, by order of the reviewing court.

**History:** 1971 c. 243; 1975 c. 94 s. 3; 1975 c. 414; 1977 c. 26 s. 75; 1977 c. 187; 1979 c. 90, 208, 355; 1985 a. 149 s. 10; 1985 a. 182 ss. 37, 57; Stats. 1985 s. 227.53; 1987 a. 27, 313, 399; 1991 a. 221; 1995 a. 27; 1997 a. 27; 1999 a. 9, 85; 2001 a. 38; 2003 a. 33, 118; 2005 a. 253; 2009 a. 324.

The circuit court had no jurisdiction of an appeal from the tax appeals commission when the petition for review was served only on the department of revenue and not on the commission within the allowed 30 days. Brachtl v. DOR, 48 Wis. 2d 184, 179 N.W.2d 921 (1970).

Service on the department of a notice of appeal by ordinary mail, when received in time and not promptly objected to was good service. Service on a staff member of the department was sufficient when in the past that individual had represented himself as an agent and as an attorney for the department. Hamilton v. DILHR, 56 Wis. 2d 673, 203 N.W.2d 7 (1973).

An appeal will not lie from an order denying a petition to reopen an earlier PSC order when no appeal was taken from the order or the order denying rehearing within 30 days. Town of Caledonia v. PSC, 56 Wis. 2d 720, 202 N.W.2d 912 (1973).

A failure to strictly comply with the caption requirements of sub. (1) does not divest a court of jurisdiction if all other jurisdictional requirements are met. Evans v. DLAD, 62 Wis. 2d 622, 215 N.W.2d 408 (1974).

When the taxpayer failed to serve a copy of his petition for review of a decision and order of the tax appeals commission upon the department of revenue within 30 days, the circuit court had no jurisdiction. Cudahy v. DOR, 66 Wis. 2d 253, 224 N.W.2d 570 (1974).

The implied authority of the PSC under various provisions of ch. 196 to insure that future supplies of natural gas will remain as reasonably adequate and sufficient as practicable indicates a legally recognized interest of the environmental group members living in the area affected by the commission order in the future adequacy of their service that is sufficient to provide standing if the facts alleged in the petition are true to challenge the commission's failure to consider conservation alternatives to the proposed priority system. Wisconsin's Environmental Decade, Inc. v. PSC, 69 Wis. 2d 1, 230 N.W.2d 243 (1975).

A county had standing to challenge the validity of a rule not adopted in conformity with ss. 227.02 through 227.025, 1983 stats. Dane County v. DHSS, 79 Wis. 2d 323, 255 N.W.2d 539 (1977).

"Parties" under sub. (1) (c), 1975 stats., are those persons affirmatively demonstrating active interest in the proceedings; the PSC must identify parties. Wisconsin's Environmental Decade, Inc. v. PSC, 84 Wis. 2d 504, 267 N.W.2d 609 (1978).

Chapter 801 is inapplicable to judicial review proceedings. Omernick v. DNR, 94 Wis. 2d 309, 287 N.W.2d 841 (Ct. App. 1979).

Service on a department rather than on a specific division within the department was sufficient notice under this section. Sunnyview Village v. DOA, 104 Wis. 2d 396, 311 N.W.2d 632 (1981).

When the petitioners lacked standing to seek review and the intervenors filed after the time limit in sub. (1), the intervenors could not continue to press their claim. Fox v. DHSS, 112 Wis. 2d 514, 334 N.W.2d 532 (1983).

The test for determining whether a party has standing is: 1) whether the agency decision directly causes injury to the interest of the petitioner; and 2) whether the asserted interest is recognized by law. Waste Management of Wisconsin v. DNR, 144 Wis. 2d 499, 424 N.W.2d 685 (1988).

Although it may not be able to sue the state, a county has standing to bring a petition for review because the petition initiates a special proceeding rather than an action. Richland County v. DHSS, 146 Wis. 2d 271, 430 N.W.2d 374 (Ct. App. 1988).

Delivery of a petition to an agency attorney did not meet the requirements for service under sub. (1) (a) 1. Weisensel v. DHSS, 179 Wis. 2d 637, 508 N.W.2d 33 (Ct. App. 1993).

The time provisions under sub. (2) are mandatory. Wagner v. State Medical Examining Board, 181 Wis. 2d 633, 511 N.W.2d 874 (1994).

In the case of a ch. 227 petition for review, the petition commences the action rather than continuing it. As an attorney is not authorized to accept the service of process commencing an action, service on the attorney general rather than the agency is insufficient to commence an action for review. Gimenez v. State Medical Examining Board, 229 Wis. 2d 312, 600 N.W.2d 28 (Ct. App. 1999), 98–1367.

Section 227.48 applies only to contested cases. By virtue of the reference to s. 227.48, the 30–day deadline in sub. (1) (a) 2. is inapplicable to noncontested cases. Because there is no statutory limit for noncontested cases, a 6–month default limitation applies. Hedrich v. Board of Regents of the University of Wisconsin System, 2001 WI App 228, 248 Wis. 2d 204, 635 N.W.2d 650, 00–2002.

Because parties to an agency proceeding have the right to participate in judicial review proceedings under the first sentence in sub. (1) (d), those parties are not part of the group referred to as "other interested persons" in the second sentence and therefore are not entitled to petition for permissive intervention. Under sub. (1) (d) the petition to intervene must be served on all parties to the judicial review at least 5 days before the hearing on the intervention petition. Citizens' Utility Board v. PSC, 2003 WI App 206, 267 Wis. 2d 414, 671 N.W.2d 11, 02–1834.

As a general matter, sub. (1) (a) 2. affords a petitioner 20 days from the date of service of the original adverse agency decision to file a petition for judicial review. The extended deadline for filing a petition for judicial review applies only when rehearing is requested under s. 227.49. Section 227.19 (1) specifies that the petition for rehearing must be filed, meaning physically delivered to and received by the agency, within 20 days of the initial decision. If a petition for rehearing is not filed within the 20–day time limit, a rehearing is not properly requested under s. 227.49 and the petitioner does not acquire the benefit of the extended deadline for petitioning for judicial review. Currier v. Wisconsin Department of Revenue, 2006 WI App 12, 288 Wis. 2d 693, 709 N.W.2d 520, 05–0292.

Although sub. (1) did not clearly prescribe which governmental entity must be named and served as respondent in this case, DHA's notice gave clear instructions and clarified any ambiguity in sub. (1), making the petitioner's failure to follow the notice unreasonable and dismissal of the petition for judicial review proper. All Star Rent A Car, Inc. v. Department of Transportation, 2006 WI 85, 292 Wis. 2d 615, 716 N.W.2d 506, 03–2668.

Sub. (1) (b)does not authorize a circuit court to dismiss a petition for judicial review because it does not show the nature of the petitioner's interest or state a ground for relief under s. 227.57 unless the petitioner has notice of the possibility of dismissal and a reasonable opportunity to request leave to amend the petition. The claimed deficiency must be raised by motion of the respondent and may not be raised by the court sua sponte. Jackson v. LIRC, 2006 WI App 97, 293 Wis. 2d 332, 715 N.W.2d 654, 05–2123.

The 30–day limitation period under sub. (1) (a) 2. is triggered only by s. 227.48 service of the decision upon the parties, which occurs on the date the decision is mailed to the parties, not the various dates of receipt. Once the time limitation is triggered, strict compliance is required. Wisconsin Power & Light Co. v. PSC, 2006 WI App 221, 296 Wis. 2d 705, 725 N.W. 2d 423, 05–3092.

**227.54  Stay of proceedings.** The institution of the proceeding for review shall not stay enforcement of the agency decision. The reviewing court may order a stay upon such terms as it deems proper, except as otherwise provided in ss. 196.43, 253.06, and 448.02 (9).

**History:** 1983 a. 27; 1985 a. 182 s. 39; Stats. 1985 s. 227.54; 1987 a. 5; 1997 a. 27, 311; 2007 a. 20, 196; 2009 a. 28.

**227.55  Record on review.** Within 30 days after service of the petition for review upon the agency, or within such further time as the court may allow, the agency shall transmit to the reviewing court the original or a certified copy of the entire record of the proceedings in which the decision under review was made, including all pleadings, notices, testimony, exhibits, findings, decisions, orders and exceptions, therein; but by stipulation of all parties to the review proceedings the record may be shortened by eliminating any portion thereof. Any party, other than the agency, refusing to stipulate to limit the record may be taxed by the court for the additional costs. The record may be typewritten or printed. The exhibits may be typewritten, photostated or otherwise reproduced, or, upon motion of any party, or by order of the court, the original exhibits shall accompany the record. The court may require or permit subsequent corrections or additions to the record when deemed desirable.

**History:** 1985 a. 182 s. 41; Stats. 1985 s. 227.55.

Time provisions under this section are mandatory. Wagner v. State Medical Examining Board, 181 Wis. 2d 633, 511 N.W.2d 874 (1994).

**227.56  Additional evidence; trial; motion to dismiss; amending petition. (1)** If before the date set for trial, application is made to the circuit court for leave to present additional evidence on the issues in the case, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceedings before the agency, the court may order that the additional evidence be taken before the agency upon such terms as the court may deem proper. The agency may modify its findings and decision by reason of the additional evidence and shall file with the reviewing court the additional evidence together with any modified or new findings or decision.

**(2)** Proceedings for review of administrative agency decisions as provided in this chapter may be brought on for trial or hearing at any time upon not less than 10 days' notice given after the expi-

**2011–12 Wis. Stats. database updated though 2013 Wis. Act 10 and all Supreme Court Orders enacted before May 1, 2013. Statutory changes effective on or prior to May 1, 2013 are published as currently in effect. Changes effective after May 1, 2013 are designated by NOTES. See Are the Statutes on this Website Official? (5–1–13)**

ADDENDUM 17

Case: 12-3388    Document: 31    Filed: 06/19/2013    Pages: 81
Electronic reproduction of 2011–12 Wis. Stats. database, updated to May 1, 2013.

1    Updated 11–12 Wis. Stats. Database    **AIR POLLUTION**    285.01

# CHAPTER 285

# AIR POLLUTION

<table>
<tr><td colspan="2">SUBCHAPTER I<br>DEFINITIONS</td><td colspan="2">SUBCHAPTER VI<br>WASTE INCINERATORS; OZONE DEPLETING<br>SUBSTANCES; EMISSION LIMITS<br>AND OTHER REQUIREMENTS</td></tr>
</table>

| | | | |
|---|---|---|---|
| 285.01 | Definitions. | | |
| | **SUBCHAPTER II** | 285.51 | Solid waste incinerator operator certification. |
| | **GENERAL POWERS AND DUTIES** | 285.53 | Testing emissions from medical waste incinerators. |
| 285.11 | Air pollution control; department duties. | 285.54 | Medical waste incinerator fees. |
| 285.13 | Air pollution control; department powers. | 285.57 | Emission of ozone–depleting substances. |
| 285.14 | State implementation plans. | 285.59 | Recovery of ozone–depleting refrigerants. |
| 285.15 | Interstate agreement. | | **SUBCHAPTER VII** |
| 285.17 | Classification, reporting and monitoring. | | **PERMITS AND FEES** |
| 285.19 | Inspections. | 285.60 | Air pollution control permits. |
| | **SUBCHAPTER III** | 285.61 | Construction permit application and review. |
| | **AIR QUALITY STANDARDS, PERFORMANCE** | 285.62 | Operation permit; application, review and effect. |
| | **STANDARDS; EMISSION LIMITS AND** | 285.63 | Criteria for permit approval. |
| | **NONATTAINMENT AREAS** | 285.64 | Criteria for operation permits for stationary sources. |
| 285.21 | Ambient air quality standards and increments. | 285.65 | Permit conditions. |
| 285.23 | Identification of nonattainment areas. | 285.66 | Permit duration and renewal. |
| 285.25 | Air resource allocation. | 285.67 | Permit revision, suspension and revocation. |
| 285.27 | Performance and emission standards. | 285.68 | Failure to adopt rule or issue permit or exemption. |
| 285.28 | Agricultural waste; hazardous air contaminants. | 285.69 | Fees. |
| 285.29 | Best available retrofit technology. | | **SUBCHAPTER VIII** |
| | **SUBCHAPTER IV** | | **MISCELLANEOUS** |
| | **VOLATILE ORGANIC COMPOUNDS AND MOBILE SOURCES; EMISSION** | 285.70 | Confidentiality of records. |
| | **LIMITS AND STANDARDS** | 285.71 | Federal aid. |
| 285.30 | Motor vehicle emissions limitations; inspections. | 285.73 | Local air pollution control programs. |
| 285.31 | Gasoline vapor recovery. | 285.75 | County program. |
| 285.33 | Employee trip reduction program. | 285.76 | Notice concerning proposed area redesignations. |
| 285.35 | Clean fuel fleet program. | 285.77 | Machinery use. |
| 285.37 | Reformulated gasoline. | 285.78 | Registration of early emission reductions. |
| 285.39 | Volatile organic compounds growth accommodation and replenishment. | 285.79 | Small business stationary source technical and environmental compliance assistance program. |
| | **SUBCHAPTER V** | 285.795 | Small business environmental council. |
| | **SULFUR DIOXIDE AND NITROGEN OXIDE** | | **SUBCHAPTER IX** |
| | **EMISSION RATES AND GOALS** | | **ENFORCEMENT; PENALTIES** |
| 285.41 | Sulfur dioxide emission rates after 1992; major utilities. | 285.81 | Hearings on certain air pollution actions. |
| 285.43 | Sulfur dioxide emission rates; state–owned facilities. | 285.83 | Violations; enforcement. |
| 285.45 | Sulfur dioxide emission goals after 1992; major utilities and other large air contaminant sources. | 285.85 | Emergency procedure. |
| 285.47 | Nitrogen oxide emission goal; major utilities. | 285.86 | Asbestos citations. |
| 285.48 | Nitrogen oxide emissions reductions. | 285.87 | Penalties for violations relating to air pollution. |
| 285.49 | Trading program for nitrogen oxide emissions credits. | | |

## SUBCHAPTER I

## DEFINITIONS

**285.01 Definitions.** In this chapter, unless the context requires otherwise:

**(1)** "Air contaminant" means dust, fumes, mist, liquid, smoke, other particulate matter, vapor, gas, odorous substances or any combination thereof but shall not include uncombined water vapor.

**(2)** "Air contaminant source", or "source" if not otherwise modified, means any facility, building, structure, installation, equipment, vehicle or action that emits or may emit an air contaminant directly, indirectly or in combination with another facility, building, structure, installation, equipment, vehicle or action.

**(3)** "Air pollution" means the presence in the atmosphere of one or more air contaminants in such quantities and of such duration as is or tends to be injurious to human health or welfare, animal or plant life, or property, or would unreasonably interfere with the enjoyment of life or property.

**(4)** "Air pollution control permit" means any permit required or allowed under s. 285.60.

**(5)** "Allocation of the available air resource" means either:

(a) The apportionment among air contaminant sources of the difference between an ambient air quality standard and the concentration in the atmosphere of the corresponding air contaminant in existence at the time the rule promulgated under s. 285.25 becomes effective; or

(b) The apportionment among air contaminant sources of the difference between an ambient air increment and the baseline concentration if a baseline concentration is established.

**(7)** "Allowable emission" means the emission rate calculated using the maximum rated capacity of the origin of, or the equipment emitting an air contaminant based on the most stringent applicable emission limitation and accounting for any enforceable permit conditions which limit operating rate, or hours of operation, or both.

**(8)** "Ambient air increment" means the maximum allowable concentration of an air contaminant above the base line concentration.

**(9)** "Ambient air quality standard" means a level of air quality which will protect public health with an adequate margin of safety or may be necessary to protect public welfare from anticipated adverse effects.

**(9m)** "Architectural coating" means a coating applied to a stationary structure, including a parking lot, and its appurtenances or to a mobile home.

**(10)** "Attainment area" means an area which is not a nonattainment area.

**(11)** "Base line concentration" means concentration in the atmosphere of an air contaminant which exists in an area at the time of the first application to the U.S. environmental protection agency for a prevention of significant deterioration permit under 42 USC 7475 or the first application for an air pollution control permit under s. 285.60 for a major source located in an attainment

*2011–12 Wis. Stats. database updated though 2013 Wis. Act 10 and all Supreme Court Orders enacted before May 1, 2013.*
*Statutory changes effective on or prior to May 1, 2013 are published as currently in effect. Changes effective after May 1,*
*2013 are designated by NOTES. See Are the Statutes on this Website Official? (5–1–13)*

ADDENDUM 18

Electronic reproduction of 2011–12 Wis. Stats. database, updated to May 1, 2013.

sources. Under the system, the department may not register a reduction in emissions of greenhouse gases if the reduction was made before January 1, 1991.

(b) The department may establish and operate systems under which the department registers reductions in emissions of fine particulate matter, mercury or other air contaminants identified by the department if the reductions are made before the reductions are required by law.

(c) The department may verify and quantify, or require the verification and quantification of, emission reductions that a person seeks to register under par. (a) or (b).

(d) Registration of emission reductions under this section is voluntary.

**(3)** (a) The department shall promulgate rules for the system under sub. (2) (a). In promulgating the rules, the department shall make the system as consistent as possible with other state, federal and international programs designed to reduce emissions of greenhouse gases.

(b) The department shall promulgate rules for any system that the department establishes under sub. (2) (b). In promulgating the rules, the department shall make the system as consistent as possible with other state, federal and international programs designed to reduce emissions of the substances covered by the system.

**History:** 1999 a. 195.

### 285.79 Small business stationary source technical and environmental compliance assistance program.
**(1)** Definition. In this section, "small business stationary source" means a stationary source designated under sub. (2) (a) or, except as provided in sub. (2) (b), a stationary source that satisfies all of the following criteria:

(a) Is owned or operated by a person that employs 100 or fewer individuals.

(b) Is a small business concern, as determined under 15 USC 632 (a).

(c) Is not a major stationary source, as defined in rules promulgated by the department.

(d) Does not emit 50 tons or more per year of any regulated pollutant.

(e) Emits a total of less than 75 tons per year of all regulated pollutants.

**(2)** Designations and exclusions. (a) In response to a petition by a stationary source, the department may, by rule, designate as a small business stationary source any stationary source that does not meet the criteria of sub. (1) (c), (d) or (e) but that does not emit a total of more than 100 tons per year of all regulated pollutants.

(b) The department may, by rule, after consultation with the administrators of the federal environmental protection agency and the federal small business administration, exclude from the definition of small business stationary source any category or subcategory of stationary source that the department determines to have sufficient technical and financial capabilities to meet the requirements of the federal clean air act without the assistance provided under this section.

**(3)** Assistance program. The department shall develop and administer a small business stationary source technical and environmental compliance assistance program. The program shall include all of the following:

(a) Mechanisms to develop, collect and coordinate information concerning methods and technologies that small business stationary sources can use to comply with the federal clean air act and programs to encourage lawful cooperation among small business stationary sources or other persons to further compliance with the federal clean air act.

(b) Mechanisms for providing small business stationary sources with information concerning alternative technologies, process changes, products and methods of operation that help

reduce air pollution and with other assistance in pollution prevention and accidental release detection and prevention.

(c) A compliance assistance program that assists small business stationary sources in determining applicable requirements under this chapter and s. 299.15 and in receiving air pollution control permits in a timely and efficient manner.

(d) Mechanisms to ensure that small business stationary sources receive notice of their rights under the federal clean air act and state laws implementing the federal clean air act in a manner and form that assures reasonably adequate time for small business stationary sources to evaluate compliance methods and any relevant or applicable proposed or final regulation or standard issued under the federal clean air act.

(e) Mechanisms for referring small business stationary sources to qualified auditors to determine compliance with the federal clean air act and state laws implementing the federal clean air act and other mechanisms for informing small business stationary sources of their obligations under the federal clean air act and state laws.

(f) Procedures for consideration of a request from a small business stationary source for alteration of any required work practice or technological method of compliance with this chapter or of the schedule of measures that must be taken to implement a required work practice or method of compliance before an applicable compliance date, based on the technological and financial capability of the small business stationary source.

**(4)** Granting alterations. The department may not grant an alteration under sub. (3) (f) unless the alteration complies with the requirements of the federal clean air act and any applicable plan under s. 285.11 (6). If those applicable requirements are set forth in federal regulations, the department may only grant alterations authorized in those regulations.

**History:** 1991 a. 302; 1995 a. 227 s. 462; Stats. 1995 s. 285.79; 2011 a. 32.
**Cross-reference:** See also ch. NR 437, Wis. adm. code.

### 285.795 Small business environmental council.
**(1)** The small business environmental council shall do all of the following:

(a) Advise the department concerning the effectiveness of the small business stationary source technical and environmental compliance assistance program under s. 285.79, difficulties encountered by small business stationary sources, as defined in s. 285.79 (1), in complying with s. 299.15 and ch. 285 and the degree and severity of enforcement of s. 299.15 and ch. 285 against small business stationary sources.

(c) Review information to be provided to small business stationary sources in connection with s. 299.15 and ch. 285 to ensure that the information can be understood by persons without technical training.

(d) Provide other advice, as directed by the secretary, related to assisting small businesses in complying with federal and state air pollution laws.

**(2)** The employees of the department who staff the small business stationary source technical and environmental compliance assistance program under s. 285.79 shall provide the small business environmental council with the assistance necessary to comply with sub. (1).

**History:** 1991 a. 302; 1995 a. 227; 2007 a. 125; 2011 a. 32 s. 3334b; Stats. 2011 s. 285.795.

### SUBCHAPTER IX

### ENFORCEMENT; PENALTIES

### 285.81 Hearings on certain air pollution actions.
**(1)** Permit holder; permit applicant; order recipient. Any permit, part of a permit, condition or requirement in a permit, order, decision or determination by the department under ss. 285.39, 285.60 to 285.69 or 285.75 shall become effective unless

**ADDENDUM 19**

Case: 12-3388   Document: 31   Filed: 06/19/2013   Pages: 81
Electronic reproduction of 2011–12 Wis. Stats. database, updated to May 1, 2013.

**285.81**   **AIR POLLUTION**                            **Updated 11–12 Wis. Stats. Database**   **26**

the permit holder or applicant or the order recipient seeks a hearing challenging the action in the following manner:

(a) *Petition.* The person seeking a hearing shall file a petition with the department within 30 days after the date of the action sought to be reviewed. The petition shall set forth specifically the issue sought to be reviewed, the interest of the petitioner, the reasons why a hearing is warranted and the relief desired. Upon receipt of the petition, the department shall hold a hearing after at least 10 days' notice.

(b) *Hearing.* The hearing shall be a contested case under ch. 227. At the beginning of the hearing the petitioner shall present evidence in support of the allegations made in the petition. Following the hearing the department's action may be affirmed, modified or withdrawn.

**(1m)** EFFECT OF A CHALLENGE. (a) Subject to par. (b), if a permit holder or applicant seeks a hearing challenging part of a permit or a condition or requirement in a permit under sub. (1), the remainder of the permit shall become effective and the permit holder or applicant may, at its discretion, begin the activity for which the application was submitted or for which the permit was issued.

(b) An emission limitation contained in a construction permit becomes effective despite a challenge under par. (a), unless the permit holder or applicant challenging the emission limitation obtains a stay of the emission limitation from the hearing examiner or court considering the challenge.

**(2)** OTHER PERSONS. Any person who is not entitled to seek a hearing under sub. (1) (intro.) and who meets the requirements of s. 227.42 (1) or who submitted comments in the public comment process under s. 285.62 (4) or (5) may seek review under sub. (1) of any permit, part of a permit, order, decision or determination by the department under ss. 285.39, 285.60 to 285.69 or 285.75.

**(3)** MINING HEARING. Subsections (1) and (2) do not apply if a hearing on the matter is conducted as a part of a hearing under s. 293.43.

**(4)** REVIEW OF DEPARTMENT DETERMINATIONS. An air pollution control permit, part of an air pollution control permit or determination by the department under ss. 285.39, 285.60 to 285.69 or 285.75 is not subject to review in any civil or criminal enforcement action for a violation of this chapter. This subsection does not restrict the ability of a person to challenge an administrative rule as provided in s. 227.40 (2).

**History:** 1979 c. 34, 221; 1985 a. 182 s. 57; 1991 a. 302; 1995 a. 227 s. 502; Stats. 1995 s. 285.81; 2003 a. 118; 2005 a. 28.

This section permits the persons identified in subs. (1) and (2) to challenge only a part of a permit, or only certain conditions or requirements. It does not address when a decision issued by an administrative law judge after the administrative hearing is final. Sierra Club v. Department of Natural Resources, 2007 WI App 181, 304 Wis. 2d 614, 736 N.W.2d 918, 06−2653.

Sub. (4) provides in unequivocal terms that enumerated permits and determinations are not subject to review. U.S. v. Murphy Oil USA, Inc. 143 F. Supp. 2d 1054 (2001).

**285.83**   **Violations: enforcement. (1)** (a) If the department has reason to believe that a violation of this chapter or s. 299.15 or any rule promulgated or special order, plan approval or permit issued under this chapter or s. 299.15 has occurred, it may:

1. Cause written notice to be served upon the alleged violator. The notice shall specify the alleged violation, and contain the findings of fact on which the charge of violation is based. The notice may include an order that necessary corrective action be taken within a reasonable time. This order shall become effective unless, no later than 30 days after the date the notice and order are served, the person named in the notice and order requests in writing a hearing before the department. Upon such request, the department shall after due notice hold a hearing. Instead of an order, the department may require that the alleged violator appear before the department for a hearing at a time and place specified in the notice and answer the charges complained of; or

2. Initiate action under s. 285.59 (8) or 285.87.

(b) If after such hearing the department finds that a violation has occurred, it shall affirm or modify its order previously issued,

or issue an appropriate order for the prevention, abatement or control of the problems involved or for the taking of such other corrective action as may be appropriate. If the department finds that no violation has occurred, it shall rescind its order. Any order issued as part of a notice or after hearing may prescribe one or more dates by which necessary action shall be taken in preventing, abating or controlling the violation.

**(2)** The notice under sub. (1) (a) 1. for an alleged violation of rules promulgated under s. 285.31 (3) may include a tag or other notice placed on the dispensing equipment that is alleged to be in violation of rules promulgated under s. 285.31 (3).

**History:** 1971 c. 125 s. 522 (2); 1977 c. 377; 1979 c. 34 s. 980h; 1979 c. 221 s. 2202 (39); Stats. 1979 s. 144.423; 1989 a. 284; 1991 a. 39; 1995 a. 227 s. 510; Stats. 1995 s. 285.83.

**Cross−reference:** See also chs. NR 493 and 494, Wis. adm. code.

**285.85**   **Emergency procedure. (1)** If the secretary finds that a generalized condition of air pollution exists and that it creates an emergency requiring immediate action to protect human health or safety, he or she shall order persons causing or contributing to the air pollution to reduce or discontinue immediately the emission of air contaminants, and such order shall fix a place and time, not later than 24 hours thereafter, for a hearing to be held before the department. Not more than 24 hours after the commencement of such hearing, and without adjournment thereof, the natural resources board shall affirm, modify or set aside the order of the secretary.

**(2)** In the absence of a generalized condition of air pollution of the type referred to in sub. (1), if the secretary finds that emissions from the operation of one or more air contaminant sources is causing imminent danger to human health or safety, he or she may order the persons responsible for the operations in question to reduce or discontinue emissions immediately, without regard to s. 285.83. In such event, the requirements for hearing and affirmance, modification or setting aside of orders set forth in sub. (1) shall apply.

**History:** 1979 c. 34 ss. 983m, 2102 (39) (g); 1979 c. 176; Stats. 1979 s. 144.424; 1995 a. 227 s. 511; Stats. 1995 s. 285.85.

**Cross−reference:** See also ch. NR 493, Wis. adm. code.

**285.86**   **Asbestos citations. (1)** The department may follow the procedures for the issuance of a citation under ss. 23.50 to 23.99 to collect a forfeiture from a person who commits a violation specified under sub. (2).

**(2)** The department shall promulgate rules that specify violations of rules relating to asbestos abatement and management that are promulgated under ss. 285.11, 285.13, 285.17 and 285.27 to which sub. (1) applies. In a rule promulgated under this subsection, the department may limit the applicability of sub. (1) based on the frequency of violation and on health and environmental risks caused by the violation.

**(3)** The department shall submit any proposed rules under sub. (2) to the department of justice. The department may not promulgate a rule under sub. (2) unless the rule is approved by the department of justice.

**History:** 1999 a. 9.

**Cross−reference:** See also ch. NR 447, Wis. adm. code.

**285.87**   **Penalties for violations relating to air pollution. (1)** Except as provided in s. 285.57 (5) or 285.59 (8), any person who violates this chapter or any rule promulgated, any permit issued or any special order issued under this chapter shall forfeit not less than $10 or more than $25,000 for each violation. Each day of continued violation is a separate offense.

**(2)** (a) Except as provided in par. (b), any person who intentionally commits an act that violates, or fails to perform an act required by this chapter, except s. 285.59, or any rule promulgated, any permit issued or any special order issued under this chapter, except s. 285.59, shall be fined not more than $25,000 per day of violation or imprisoned for not more than 6 months or both.

(b) If the conviction under par. (a) is for a violation committed after another conviction under par. (a), the person is guilty of a Class I felony, except that, notwithstanding the maximum fine

*2011–12 Wis. Stats. database updated though 2013 Wis. Act 10 and all Supreme Court Orders enacted before May 1, 2013. Statutory changes effective on or prior to May 1, 2013 are published as currently in effect. Changes effective after May 1, 2013 are designated by NOTES. See* Are the Statutes on this Website Official? *(5–1–13)*

**ADDENDUM 20**

# Chapter NR 405

## PREVENTION OF SIGNIFICANT DETERIORATION

NR 405.01    Applicability; purpose.
NR 405.02    Definitions.
NR 405.025   Methods for calculation of increases in actual emissions.
NR 405.03    Restrictions on area classifications.
NR 405.04    Exclusions from increment consumption.
NR 405.05    Redesignation.
NR 405.06    Stack heights.
NR 405.07    Review of major stationary sources and major modifications —
             source applicability and exemptions.
NR 405.08    Control technology review.
NR 405.09    Source impact analysis.

NR 405.10    Air quality models.
NR 405.11    Air quality analysis.
NR 405.12    Source information.
NR 405.13    Additional impact analyses.
NR 405.14    Sources impacting federal Class I areas — additional requirements.
NR 405.15    Public participation.
NR 405.16    Source obligation.
NR 405.17    Innovative control technology.
NR 405.18    Plant–wide applicability limitations (PALs).
NR 405.19    Forest County Potawatomi Class I area.

**NR 405.01 Applicability; purpose. (1)** APPLICABILITY. The provisions of this chapter apply to the construction of any new major stationary source or any project at an existing major stationary source located in an area designated as attainment or unclassifiable.

**(2)** PURPOSE. The purpose of this chapter is to establish, pursuant to s. 285.60, Stats., the requirements and procedures for reviewing and issuing air pollution control construction permits to any new major stationary source and any project at an existing major stationary source located in an area designated as attainment or unclassifiable.

Note: Throughout the proposed rule, changes have been made which result in the provisions of this PSD rule differing from 40 CFR 51.166, the federal regulation on which it is based. In this rule, the term "air contaminant" is substituted for the term "pollutant" in the federal regulation and "department" for "the State", "the Governor" and "reviewing authority". The federal definition for "building, structure, facility or installation" is applied to the phrase "facility, building, structure, equipment, vehicle or action" – a similar term which appears in Wisconsin's statutory provisions on air pollution. In addition, cross references in the federal regulation have been changed in the rule to comparable provisions in Wisconsin's rule (e.g., "40 CFR Parts 60 and 61" has been changed to "chs. NR 440 and 447 to 449 and subch. IV of ch. NR 446"). Eliminated from the rule are provisions of the federal regulations which do not apply to the state's PSD program (i.e., provisions governing EPA approval of plan revisions).

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; correction in (2) made under s. 13.93 (2m) (b) 7., Stats., Register, December, 1996, No. 492; CR 03–118: am. (1) and (2), Register June 2007 No. 618, eff. 7–1–07.

**NR 405.02 Definitions.** The definitions contained in ch. NR 400 apply to the terms used in this chapter. In addition, the following definitions apply to the terms used in this chapter:

**(1)** "Actual emissions" means the actual rate of emissions of a regulated NSR air contaminant from an emissions unit, as determined in accordance with pars. (a) to (c), except that this definition does not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under s. NR 405.18. Instead, subs. (2m) and (25f) shall apply for those purposes.

(a) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the air contaminant during a consecutive 24–month period which precedes the particular date and which is representative of normal source operation. The department shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(b) The department may presume that source–specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(c) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

**(2)** "Allowable emissions" means the emissions rate of a stationary source calculated using the maximum rated capacity of the source, unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both, and the most stringent of the following:

(a) The applicable standards as set forth in chs. NR 440 and 445 to 449 and under sections 111 and 112 of the Act (42 USC 7411 and 7412).

(b) The applicable emissions limitations, as set forth in chs. NR 400 to 499.

(c) The emissions rate specified as a federally enforceable permit condition.

**(2m)** "Baseline actual emissions" means the rate of emissions, in tons per year, of a regulated NSR air contaminant, as determined in accordance with pars. (a) to (d).

(a) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the air contaminant during any consecutive 24–year period selected by the owner or operator within the 5–year period immediately preceding when the owner or operator begins actual construction of the project. The department shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

1. The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns and malfunctions.

2. The average rate shall be adjusted downward to exclude any emissions in excess of an emission limitation that was legally enforceable during the consecutive 24–month period.

3. For a regulated NSR air contaminant, when a project involves multiple emissions units, only one consecutive 24–month period may be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period may be used for each regulated NSR air contaminant.

4. The average rate may not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, or for adjusting this amount if required by subd. 2.

(b) For an existing emissions unit, other than an electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the air contaminant during any consecutive 24–month period selected by the owner or operator within the 10–year period immediately preceding either the date the owner or operator begins actual construction of the project, or, the date a complete

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also Are the Codes on this Website Official?*

Register May 2012 No. 677

## ADDENDUM 21

permit application is received by the department for a permit required under ch. NR 406 or for a permit revision under ch. NR 407, whichever is earlier, except that the 10–year period may not include any period earlier than November 15, 1990.

1. The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns and malfunctions.

2. The average rate shall be adjusted downward to exclude any emissions in excess of an emission limitation that was legally enforceable during the consecutive 24–month period.

3. The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had the major stationary source been required to comply with the limitation during the consecutive 24–month period. However, if an emission limitation is part of a maximum achievable control technology standard that the administrator proposed or promulgated under 40 CFR part 63, the baseline actual emissions need only be adjusted if the state has taken credit for the emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of s. NR 408.06 (9).

4. For a regulated NSR air contaminant, when a project involves multiple emissions units, only one consecutive 24–month period may be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period may be used for each regulated NSR air contaminant.

5. The average rate may not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, or for adjusting this amount if required by subds. 2. and 3.

(c) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of the unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(d) For a PAL for a stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in par. (a), for other existing emissions units in accordance with the procedures contained in par. (b), and for a new emissions unit, in accordance with the procedures contained in par. (c).

**(3)** "Baseline area" means any intrastate area, and every part thereof, designated as attainment or unclassifiable under section 107 (d) (1) (D) or (E) of the Act (42 USC 7407 (d) (1) (D) or (E)) in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact equal to or greater than 1 $\mu g/m^3$ (annual average) of the air contaminant for which the minor source baseline date is established. Area redesignations under section 107 (d) (1) (D) or (E) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which either establishes a minor source baseline date or is subject to this chapter.

**(4)** (a) "Baseline concentration" means that ambient concentration level which exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each air contaminant for which a minor source baseline date is established and shall include:

1. The actual emissions representative of sources in existence on the applicable minor source baseline date, except as provided in par. (b).

2. The allowable emissions of major stationary sources which commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(b) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increases:

1. Actual emissions from any major stationary source on which construction commenced after the major source baseline date.

2. Actual emissions increases and decreases at any stationary source occurring after the minor source baseline date.

**(6)** "Begin actual construction" means, in general, initiation of physical on–site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework and construction of permanent storage structures. With respect to a change in method of operation, this term refers to those on–site activities, other than preparatory activities, which mark the initiation of the change.

**(7)** "Best available control technology" or "BACT" means an emissions limitation, including a visible emissions standard, based on the maximum degree of reduction for each air contaminant subject to regulation under the Act which would be emitted from any proposed major stationary source or major modification which the department, on a case–by–case basis, taking into account energy, environmental, and economic impacts, and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including clean fuels, fuel cleaning or treatment or innovative fuel combination techniques for control of the air contaminant. In no event may application of best available control technology result in emissions of any air contaminant which would exceed the emissions allowed by any applicable standard under chs. NR 440 and 445 to 449 and under sections 111 and 112 of the Act (42 USC 7411 and 7412). Emissions from any source utilizing clean fuels or any other means to comply with this subsection may not be allowed to increase above the levels that would have been required under this subsection as it existed prior to enactment of the 1990 clean air Act amendments on November 15, 1990. If the department determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. The standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

**(8)** "Building, structure, facility or installation" or "facility, building, structure, equipment, vehicle or action" means all of the activities which emit or may emit a regulated NSR air contaminant, belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person, or persons under common control, except the activities of any vessel. Regulated NSR air contaminant emitting activities shall be considered as part of the same industrial grouping if they are classified under the same 2–digit major group as described in the Standard Industrial Classification Manual, 1987, incorporated by reference in s. NR 484.05.

**(8m)** "Clean coal technology" means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam, which was not in widespread use as of November 15, 1990.

**(8s)** "Clean coal technology demonstration project" means a project using funds appropriated under the heading 'Department

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also Are the Codes on this Website Official?*

Register May 2012 No. 677

**ADDENDUM 22**

of Energy–Clean Coal Technology', up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the U.S. environmental protection agency. The federal contribution for a qualifying project shall be at least 20% of the total cost of the demonstration project.

**(9)** "Commence" as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and has done one of the following:

(a) Begun, or caused to begin, a continuous program of actual on–site construction of the source, to be completed within a reasonable time.

(b) Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

**(10)** "Complete" means, in reference to an application for a permit, that the application contains all the information necessary for processing the application. Designating an application complete for purposes of permit processing does not preclude the department from requesting or accepting any additional information.

**(11)** "Construction" means any physical change or change in the method of operation, including fabrication, erection, installation, demolition, or modification of an emissions unit, which would result in a change in emissions.

**(11c)** "Continuous emissions monitoring system" or "CEMS" means all of the equipment that may be required to meet the data acquisition and availability requirements of this chapter, to sample, condition if applicable, analyze and provide a record of emissions on a continuous basis.

**(11e)** "Continuous emissions rate monitoring system" or "CERMS" means the total equipment required for the determination and recording of the air contaminant mass emissions rate in terms of mass per unit of time.

**(11j)** "Continuous parameter monitoring system" or "CPMS" means all of the equipment necessary to meet the data acquisition and data availability requirements of this chapter to monitor process and control device operational parameters, and to record average operational parameter values on a continuous basis.

**Note:** Process and control device operational parameters include secondary voltages and electric currents, and other information, such as gas flow rate, $O_2$ or $CO_2$ concentrations.

**(11m)** "Electric utility steam generating unit" means any steam electric generating unit that is constructed for the purpose of supplying more than one–third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam–electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

**(12)** "Emissions unit" means any part of a stationary source which emits or would have the potential to emit any regulated NSR air contaminant and includes an electric utility steam generating unit. For purposes of this chapter, there are 2 types of emissions units described as follows:

(a) A new emissions unit is any emissions unit which is or will be newly constructed and which has existed for less than 2 years from the date the emissions unit first operated.

(b) An existing emissions unit is any emissions unit that does not meet the requirements in par. (a). Notwithstanding par. (a), a replacement unit, as defined in sub. (25k), is an existing emissions unit.

**(13)** "Federal land manager" means, with respect to any lands in the United States, the secretary of the department with authority over such lands.

**(15)** "Fugitive emissions" means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

**(16)** "High terrain" means any area having an elevation 900 feet or more above the base of the stack of a source.

**(17)** "Indian governing body" means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self–government.

**(18)** "Indian reservation" means any federally recognized reservation established by treaty, agreement, executive order, or act of congress.

**(19)** "Innovative control technology" means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

**(20)** "Low terrain" means any area other than high terrain.

**(20m)** "Lowest achievable emission rate" or "LAER" has the meaning given in s. NR 408.02 (19).

**(21)** "Major modification" means any physical change in or change in the method of operation of a major stationary source that would result in a significant emissions increase of a regulated NSR air contaminant and a significant net emissions increase of that air contaminant from the major stationary source.

(a) Any significant emissions increase from any emissions units or net emissions increase at a major stationary source that is significant for volatile organic compounds shall be considered significant for ozone.

(b) A physical change or change in the method of operation does not include any of the following:

1. Routine maintenance, repair and replacement.

2. Use of an alternative fuel or raw material by reason of any order under sections 2 (a) and (b) of the Federal Energy Supply and Environmental Coordination Act of 1974 (15 USC 791 to 798) or by reason of a natural gas curtailment plan pursuant to the Federal Power Act (16 USC 791a to 828c).

3. Use of an alternative fuel by reason of an order or rule under section 125 of the Act (42 USC 7425).

4. Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste.

5. Use of an alternative fuel or raw material by a stationary source when one of the following applies:

a. The source was capable of accommodating the alternative fuel or raw material before January 6, 1975, unless the change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to this chapter or ch. NR 406 or 408 or under an operation permit issued pursuant to ch. NR 407.

b. The source is approved to use the alternative fuel or raw material under any permit issued under this chapter or ch. NR 406, 407 or 408.

6. An increase in the hours of operation or in the production rate, unless the change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to this chapter, ch. NR 406 or 408 or 40 CFR 52.21 or under an operation permit issued pursuant to ch. NR 407.

7. Any change in ownership at a stationary source.

8. The installation, operation, cessation of operation or removal of a temporary clean coal technology demonstration

**The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also Are the Codes on this Website Official?**

Register May 2012 No. 677

project, provided that the project complies with both of the following:

a. The state implementation plan.

b. Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

9. The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated air contaminant emitted by the unit. This exemption shall apply on a pollutant–by–pollutant basis.

10. The reactivation of a very clean coal–fired electric utility steam generating unit.

(c) This definition does not apply with respect to a particular regulated NSR air contaminant when the major stationary source is complying with the requirements under s. NR 405.18 for a PAL for that air contaminant. Instead, the definition at s. NR 405.18 (2) (e) shall apply.

**(21m)** "Major source baseline date" means:

(a) In the case of particulate matter and sulfur dioxide, January 6, 1975.

(b) In the case of nitrogen dioxide, February 8, 1988.

**(22)** (a) "Major stationary source" means:

1. Any of the following stationary sources of air contaminants which emits, or has the potential to emit, 100 tons per year or more of any air contaminant subject to regulation under the Act: Fossil fuel fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation, as described by the 6–digit code of 312140 or 325193 in the North American Industry Classification System United States, 2007, incorporated by reference in s. NR 484.05 (17)), fossil fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants.

2. Notwithstanding the stationary source size specified in subd. 1., any stationary source which emits, or has the potential to emit, 250 tons per year or more of any air contaminant subject to regulation under the act.

3. Any physical change that would occur at a stationary source not otherwise qualifying under this subsection as a major stationary source, if the change would constitute a major stationary source by itself.

(b) A major source that is major for volatile organic compounds shall be considered major for ozone.

(c) Volatile organic compounds exclude the compounds listed under s. NR 400.02 (162) unless the compound is subject to an emission limitation under chs. NR 440 and 447 to 449 and subch. IV of ch. NR 446.

(d) Mobile source emissions indirectly caused by a source which attracts mobile source activity may not be considered in determining whether the source is a major stationary source for the purposes of this chapter.

**(22m)** (a) "Minor source baseline date" means the earliest date after the trigger date on which the owner or operator of a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

1. In the case of particulate matter and sulfur dioxide, August 7, 1977.

2. In the case of nitrogen dioxide, February 8, 1988.

(b) The minor source baseline date is established for each air contaminant for which increments or other equivalent measures have been established if:

1. The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107 (d) (1) (D) or (E) of the Act (42 USC 7407(d)(1)(D) or (E)) for the air contaminant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166.

2. In the case of a major stationary source, the air contaminant would be emitted in significant amounts or, in the case of a major modification, there would be a significant net emissions increase of the air contaminant.

**(23)** "Necessary preconstruction approvals or permits" means those permits or approvals required under chs. NR 400 to 499.

**(24)** (a) "Net emissions increase" means, with respect to any regulated NSR air contaminant emitted by a major stationary source, the amount by which the difference between the sum of emission increases and the sum of emission decreases of the following exceeds zero:

1. The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to the methods contained in s. NR 405.025.

2. Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this subdivision shall be determined as provided in sub. (2m), except that sub. (2m) (a) 3. and 4. do not apply.

(b) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs between the following:

1. The date 5 years before construction on the particular change commences.

2. The date that the increase from the particular change occurs.

(c) An increase or decrease in actual emissions is creditable only if all of the following are satisfied:

1. It is contemporaneous with the particular change.

2. The department has not relied on it in issuing a permit for the source under this chapter and the permit is in effect when the increase in actual emissions from the particular change occurs.

(d) An increase or decrease in actual emissions of sulfur dioxide, nitrogen oxides or particulate matter measured as $PM_{10}$ which occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(e) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(f) A decrease in actual emissions is creditable only to the extent that all of the following are satisfied:

1. The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions.

2. It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

3. It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

(g) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit an air contaminant. Any

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also* *Are the Codes*
*on this Website Official?*

Register May 2012 No. 677

**ADDENDUM 24**

replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(h) Section NR 405.02 (1) (a) does not apply for determining creditable increases and decreases.

**(24j)** "Plant–wide applicability limitation" or "PAL" means an emission limitation expressed in tons per year, for a regulated NSR air contaminant at a major stationary source, that is enforceable as a practical matter and established source–wide in accordance with s. NR 405.18.

**(25)** "Potential to emit" means the maximum capacity of a stationary source to emit an air contaminant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit an air contaminant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

**(25b)** "Predictive emissions monitoring system" or "PEMS" means all of the equipment necessary to monitor process and control device operational parameters and to calculate and record the mass emissions rate on a continuous basis.

**Note:** Process and control device operational parameters include secondary voltages and electric currents, and other information, such as gas flow rate, $O_2$ or $CO_2$ concentrations.

**(25d)** "Prevention of significant deterioration program" or "PSD program" means a major source preconstruction permit program that has been approved by the administrator and incorporated into the state implementation plan to implement the requirements of 40 CFR 51.166. Any permit issued under a PSD program is a major NSR permit.

**(25e)** "Project" means a physical change in, or change in method of operation of, an existing major stationary source.

**(25f)** (a) "Projected actual emissions" means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR air contaminant in any one of the 5 years following the date the unit resumes regular operation after the project. If the project involves increasing the emissions unit's design capacity or the emissions unit's potential to emit the regulated NSR air contaminant, and full utilization of the emissions unit's capacity or potential would result in a significant net emissions increase, "projected actual emissions" means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR air contaminant in any one of the 10 years following the date the unit resumes regular operation after the project.

(b) 1. In determining the projected actual emissions before beginning actual construction, the owner or operator of the major stationary source shall do all of the following:

a. Consider all relevant information, including historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the state or federal regulatory authorities and compliance plans under the approved state implementation plan.

b. Include fugitive emissions to the extent quantifiable and emissions associated with startups, shutdowns and malfunctions.

2. In determining the projected actual emissions before beginning actual construction, the owner or operator shall exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24–month period used to establish the baseline actual emissions under sub. (2m) and that are also unrelated to the particular project, including any increased utilization due to product demand growth.

(c) In lieu of using the method in par. (b), the owner or operator may elect to use the emissions unit's potential to emit, in tons per year, as defined under sub. (25).

**(25g)** "Reactivation of a very clean coal–fired electric utility steam generating unit" means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal–fired utility unit after a period of discontinued operation where the unit meets all of the following criteria:

(a) It has not been in operation for the 2–year period prior to the enactment of the clean air Act amendments of 1990 on November 15, 1990, and the emissions from the unit continue to be carried in the department's emissions inventory at the time of enactment.

(b) It was as equipped prior to shutdown with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85% and a removal efficiency for particulates of no less than 98%.

(c) It is equipped with low–$NO_x$ burners prior to the time of commencement of operations following reactivation.

(d) It is otherwise in compliance with the requirements of the act.

**(25i)** "Regulated NSR air contaminant" means all of the following:

(a) Any air contaminant for which a national ambient air quality standard has been promulgated and any constituents or precursors for the air contaminants identified by the administrator, e.g., volatile organic compounds are precursors for ozone.

**Note:** Nitrogen oxides have been identified by the administrator as precursors for ozone.

(b) Any air contaminant that is subject to any standard promulgated under section 111 of the Act (42 USC 7411).

(c) Any Class I or II substance subject to a standard promulgated under or established by title VI of the Act (42 USC 7671 to 7671q).

(d) Any air contaminant that otherwise is subject to regulation under the Act; except that any or all hazardous air pollutants either listed in section 112 of the Act (42 USC 7412) or added to the list pursuant to section 112(b)(2) of the Act (42 USC 7412(b)(2)), which have not been delisted pursuant to section 112(b)(3) of the Act (42 USC 7412 (b)(3)), are not regulated NSR air contaminants unless the listed hazardous air pollutant is also regulated as a constituent or precursor of a general air contaminant listed under section 108 of the Act (42 USC 7408).

**(25k)** "Replacement unit" means an emissions unit for which all the criteria listed in pars. (a) to (d) are met. No creditable emission reductions may be generated from shutting down the existing emissions unit that is replaced.

(a) The emissions unit is a reconstructed unit within the meaning of s. NR 400.02 (130), or the emissions unit completely takes the place of an existing emissions unit.

(b) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(c) The replacement does not change any of the basic design parameters of the process line.

(d) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

**(25m)** (a) "Repowering" means replacement of an existing coal–fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal–fired turbines, integrated gasification fuel cells, or as determined by the administrator, in consultation with

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also Are the Codes on this Website Official?*

Register May 2012 No. 677

the federal secretary of energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(b) Repowering shall also include any unit fired by oil or gas or both which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the federal department of energy.

(c) The department shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Act (42 USC 7651h).

**(25s)** "Representative actual annual emissions" means the average rate, in tons per year, at which the source is projected to emit a pollutant for the 2–year period after a physical change or change in the method of operation of a unit, or a different consecutive 2–year period within 10 years after that change, where the department determines that such period is more representative of normal source operations, considering the effect any such change will have on increasing or decreasing the hourly emissions rate and on projected capacity utilization. In projecting future emissions the department shall:

(a) Consider all relevant information, including but not limited to, historical operational data, the company's own representations, filings with the state or federal regulatory authorities, and compliance plans under title IV of the Act.

(b) Exclude, in calculating any increase in emissions that results from the particular physical change or change in the method of operation at an electric utility steam generating unit, that portion of the unit's emissions following the change that could have been accommodated during the representative baseline period and is attributable to an increase in projected capacity utilization at the unit that is unrelated to the particular change, including any increased utilization due to the rate of electricity demand growth for the utility system as a whole.

**(26)** "Secondary emissions" means emissions which occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purposes of this chapter, secondary emissions shall be specific, well defined, quantifiable, and impact the same general areas as the stationary source or modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

**(27)** (a) "Significant" means, in reference to a net emissions increase or the potential of a source to emit any of the air contaminants in Table A, a rate of emissions that would equal or exceed any of the rates in Table A.

**Table A**
**Pollutant and Emissions Rate**

1. Carbon monoxide: 100 tons per year (tpy)
2. Nitrogen oxides: 40 tpy
3. Sulfur dioxide: 40 tpy
4. Particulate matter: 25 tpy
5. $PM_{10}$: 15 tpy
5m. $PM_{2.5}$: 10 tpy, also 40 tpy of nitrogen oxides or 40 tpy of sulfur dioxide
6. Ozone: 40 tpy of volatile organic compounds
7. Lead: 0.60 tpy

8. Municipal solid waste landfill emissions (measured as non-methane organic compounds): 50 tpy
9. Fluorides: 3.0 tpy
10. Sulfuric acid mist: 7.0 tpy
11. Hydrogen sulfide ($H_2S$): 10 tpy
12. Total reduced sulfur (including $H_2S$): 10 tpy
13. Reduced sulfur compounds (including $H_2S$): 10 tpy
14. Municipal waste combustor (MWC) acid gases (measured as sulfur dioxide and hydrogen chloride): 40 tpy
15. MWC metals (measured as particulate matter): 15 tpy
16. MWC organics (measured as total tetra– through octa– chlorinated dibenzo–p–dioxins and dibenzofurans): $3.5\times10^{-6}$ tpy

(c) "Significant" means any emissions rate in reference to a net emissions increase or the potential of a source to emit an air contaminant subject to regulation under the Act other than the air contaminants listed in par. (a) or under section 112 (b) of the Act (42 USC 7412 (b)).

(d) Notwithstanding par. (a), "significant" means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 $\mu g/m^3$ (24–hour average).

**(27m)** "Significant emissions increase" means, for a regulated NSR air contaminant, an increase in emissions that is equal to or greater than the value for that air contaminant listed in s. NR 405.02 (27).

**(28)** "Stationary source" means any building, structure, facility or installation which emits or may emit any air contaminant subject to regulation under the act.

**(28m)** "Subject to regulation under the Act" means, for any air contaminant, that the contaminant is subject to either a provision of the Act, or a nationally applicable regulation codified by the administrator in title 40, chapter I, subchapter C of the CFR, that requires actual control of the quantity of air emissions of the contaminant, and that the control requirement has taken effect and is operative to control, limit, or restrict the quantity of emissions of the contaminant released from the regulated activity.

**(29)** "Temporary clean coal technology demonstration project" means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the state implementation plans for the state in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (27) (a) Register, December, 1988, No. 396, eff. 1–1–89; am. (intro.), (22) (c), (24) (d), (27) (b) and (28), cr. (22) (d), Register, May, 1992, No. 437, eff. 6–1–92; emerg. am. (7) and (27) (a) and (b), eff. 11–15–92; am. (intro.), (1) (c), (7), (8) and (27) (a), cr. (1) (d), (8m), (8s), (11m), (21) (b) 8. to 11., (24m), (25g), (25m), (25s) and (29), renum. (14) to be NR 400.02 (39m) and am., r. (27) (b), Register, May, 1993, No. 449, eff. 6–1–93; corrections in (1) (intro.) and (25g) (a) made under s. 13.93 (2m) (b) 7. and 6., Stats., Register, May, 1993, No. 449; am. (1) (b), (2) (a), (3) (intro.), (7), (21) (b) 6., (24) (d), (25m) (b), (c), Register, April, 1995, No. 472, eff. 5–1–95; am. (1) (d), (2) (intro.), (3) (intro.), (a), (4) (a) (intro.), 4., (b) 1. and 2., (7), (8), (12), (21) (intro.), (b) 3., 5. a. and b., 6., 8. a., (22) (a) 1. and 2., (24) (d), (25g) (d), (25m) (a) and (c), (25s) (intro.) and (a), (27) (c) and (28), r. (5), cr. (21m) and (22m), Register, December, 1995, No. 480, eff. 1–1–96; am. (3) (intro.), (7), (9) (intro.), (21) (b) 2., 3., 8 and 9. (intro.) (22m) (b) 1., (24) (b) (intro.), 1., (24m) (intro.), (25g) and (25m) (a), r. (3) (a), (b), Register, December, 1996, No., 492, eff. 1–1–97; am. (21) (b) (intro.), 5. and (22) (c), Register, October, 1999, No. 526, eff. 11–1–99; CR 01–081: am. (22) (c) Register September 2004 No. 585, eff. 10–1–04; CR 03–118: am. (1) (intro.), (a) to (c), (8), (11) and (12), r. (1) (d), (24m), (27) (a) 8., 17. and 18., cr. (2m), (11c), (11e), (11j), (20m), (24j), (25b), (25d), (25e), (25f), (25i) and (27m), r. and recr. (21) and (24), Register June 2007 No. 618, eff. 7–1–07; CR 06–109: cr. (27) (a) 8. Register May 2008 No. 629, eff. 6–1–08; CR 07–104: am. (12) (b) and (22) (a) 1., cr. (25k) Register July 2008 No. 631, eff. 8–1–08; CR 07–036: am. (22) (c) Register November 2008 No. 635, eff. 12–1–08; CR 10–050: am. (25k) (intro.), cr. (27) (a) 5m. Register November 2010 No. 659, eff. 12–1–10; EmR1046: emerg. cr. (28m), eff. 12–15–10; CR 10–144: cr. (28m) Register August 2011 No. 668, eff. 9–1–11.

**NR 405.025  Methods for calculation of increases in actual emissions. (1)** For projects that only involve existing emissions units, any increase in actual emissions from a physical

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also Are the Codes on this Website Official?*

Register May 2012 No. 677

**ADDENDUM 26**

change or change in the method of operation at a stationary source shall equal the sum of the difference between the projected actual emissions and the baseline actual emissions for each existing emissions unit involved in the project.

**(2)** For projects that only involve construction of a new emissions unit or units, any increase in actual emissions from a physical change or change in the method of operation at a stationary source shall equal the sum of the differences between the potential to emit from each new emissions unit following completion of the project and the baseline actual emissions for each unit before the project.

**(3)** For projects that involve existing and new emissions units, any increase in actual emissions from a physical change or change in the method of operation at a stationary source shall equal the sum of the emissions increases for each emissions unit involved in the project, using the method specified in sub. (1) for existing emissions units and the method in sub. (2) for new emissions units.

**History:** CR 03–118: cr. Register June 2007 No. 618, eff. 7–1–07.

### NR 405.03 Restrictions on area classifications.
**(1)** All of the following areas which were in existence on August 7, 1977, shall be Class I areas and may not be redesignated by the department:

(a) International parks.

(b) National wilderness areas which exceed 5,000 acres in size.

(c) National memorial parks which exceed 5,000 acres in size.

(d) National parks which exceed 6,000 acres in size.

**(2)** Any other area, unless otherwise specified in the legislation creating such an area, is initially designated Class II, but may be redesignated as provided in this chapter.

**(3)** The following areas may be redesignated only as Class I or II:

(a) An area which as of August 7, 1977, exceeded 10,000 acres in size and was a national monument, a national primitive area, a national preserve, a national recreational area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore.

(b) A national park or national wilderness area established after August 7, 1977, which exceeds 10,000 acres in size.

**(4)** The extent of the areas referred to in subs. (1) and (3) shall conform to any changes in the boundaries which have occurred subsequent to August 7, 1977.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; emerg. cr. (4), eff. 11–15–92; cr. (4), Register, May, 1993, No. 449, eff. 6–1–93.

### NR 405.04 Exclusions from increment consumption.
**(1)** All of the following concentrations shall be excluded in determining compliance with a maximum allowable increase:

(a) Concentrations attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, natural gas, or both by reason of an order in effect under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (15 USC 791 to 798) over the emissions from such sources before the effective date of such an order.

(b) Concentrations attributable to the increase in emissions from sources which have converted from using natural gas by reason of a natural gas curtailment plan in effect pursuant to the Federal Power Act (16 USC 791a to 828c) over the emissions from such sources before the effective date of the plan.

(c) Concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission–related activities of new or modified sources.

(d) The increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration.

(e) Concentrations attributable to the temporary increase in emissions of sulfur dioxide, nitrogen dioxide or particulate matter from stationary sources which are affected by plan revisions approved by the administrator as meeting the criteria specified in sub. (4).

**(2)** No sources which have concentrations which are excluded from increment consumption under sub. (1) (a) and (b) may any longer have those concentrations excluded 5 years after the effective date of the order to which sub. (1) (a) refers or the plan to which sub. (1) (b) refers, whichever is applicable. If both such order and plan are applicable, no such exclusion may apply more than 5 years after the later of such effective dates.

**(4)** For purposes of excluding concentrations pursuant to sub. (1) (e), the administrator may approve a plan revision that:

(a) Specifies the time over which the temporary emissions increase of sulfur dioxide, nitrogen dioxide or particulate matter would occur. Such time is not to exceed 2 years in duration unless a longer time is approved by the administrator.

(b) Specifies that the time period for excluding certain contributions in accordance with par. (a) is not renewable.

(c) Allows no emissions increase from a stationary source which would do either of the following:

1. Impact a Class I area or an area where an applicable increment is known to be violated.

2. Cause or contribute to the violation of a national ambient air quality standard.

(d) Requires limitations to be in effect at the end of the time period specified in accordance with par. (a) which would insure that the emissions levels from stationary sources affected by the plan revision would not exceed those levels occurring from such sources before the plan revision was approved.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (1) (e), (2), (3) and (4) (a), Register, May, 1992, No. 437, eff. 6–1–92; am. (1) (a) and (e), (4) (intro.) and (a), r. (3), Register, December, 1995, No. 480, eff. 1–1–96; am. (1) (intro.), (a), (b), (4) (c) (intro.), Register, December, 1996, No. 492, eff. 1–1–97.

### NR 405.05 Redesignation.
**(1)** All areas of the state, except as otherwise provided under s. NR 405.03, shall be designated either Class I, Class II, or Class III. Any designation other than Class II shall be subject to the redesignation procedures of this section. Any redesignation must be approved by the administrator as a revision to the applicable state implementation plan.

**(2)** The department may redesignate areas of the state Class I or Class III if the following criteria are met:

(a) At least one public hearing has been held in the area affected.

(b) Other states, Indian governing bodies, and federal land managers whose lands may be affected by the proposed redesignation are notified at least 30 days prior to the public hearing.

(c) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social and energy effects of the proposed redesignation, is prepared and made available for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion.

(d) Prior to the issuance of notice respecting the redesignation of an area that includes any federal lands, the department shall provide written notice to the appropriate federal land manager and the federal land manager shall be allowed 30 days to confer with the department respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any federal land manager submits written comments and recommendations, the department shall publish a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the federal land manager).

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also Are the Codes on this Website Official?*

## ADDENDUM 27

source or major modification. The owner or operator need not provide an analysis of the impact on vegetation having no significant commercial or recreational value.

**(2)** The owner or operator shall provide an analysis of the air quality impact projected for the area as a result of general, commercial, residential, industrial and other growth associated with the major source or major modification.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87.

**NR 405.14 Sources impacting federal Class I areas — additional requirements. (1)** NOTICE TO EPA. The department shall transmit to the administrator a copy of each permit application relating to a major stationary source or major modification and provide notice to the administrator of every action related to the consideration of such permit.

**(2)** FEDERAL LAND MANAGER. The federal land manager and the federal official charged with direct responsibility for management of Class I lands have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands and to consider, in consultation with the administrator, whether a proposed source or modification would have an adverse impact on such values.

**(3)** DENIAL — IMPACT ON AIR QUALITY RELATED VALUES. The department shall allow the federal land manager of any Class I lands the opportunity to present to the department after the department's preliminary determination required under procedures developed in accordance with s. NR 405.16, a demonstration that the emissions from the proposed major source or major modification would have an adverse impact on the air quality related values (including visibility) of any federal mandatory Class I lands, notwithstanding that the change in air quality resulting from emissions from such source or modification would not cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the department concurs with such demonstration, the permit may not be issued.

**(4)** CLASS I VARIANCES. The owner or operator of a proposed major source or major modification may demonstrate to the federal land manager that the emissions from the source would have no adverse impact on the air quality–related values, including visibility, of these lands, notwithstanding that the change in air quality resulting from emissions from the source or modification would cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the federal land manager concurs with this demonstration and so certifies to the department, the department may, provided that applicable requirements of this chapter are otherwise met, issue the permit with such emission limitations as may be necessary to assure that emissions of particulate matter measured as $PM_{10}$, sulfur dioxide and nitrogen dioxide would not exceed the following maximum allowable increases over minor source baseline concentration for these air contaminants.

| Pollutant | Maximum allowable increase ($\mu g/m^3$) |
|---|---|
| $PM_{10}$ | |
|    Annual arithmetic mean | 17 |
|    24–hour maximum | 30 |
| Sulfur dioxide | |
|    Annual arithmetic mean | 20 |
|    24–hour maximum | 91 |
|    3–hour maximum | 325 |
| Nitrogen dioxide | |
|    Annual arithmetic mean | 25 |

**(5)** SULFUR DIOXIDE VARIANCE BY DEPARTMENT WITH FEDERAL LAND MANAGER'S CONCURRENCE. (a) The owner or operator of a proposed major source or major modification which cannot be approved under procedures developed pursuant to sub. (4) may demonstrate to the department that the source or modification can-

not be constructed by reason of any maximum allowable increase for sulfur dioxide for periods of 24–hours or less applicable to any Class I area and, in the case of federal mandatory Class I areas, that a variance under this subsection would not adversely affect the air quality related values of the area (including visibility).

(b) The department, after consideration of the federal land manager's recommendation (if any) and subject to his or her concurrence, may grant, after notice and an opportunity for a public hearing, a variance from such maximum allowable increase.

(c) If such variance is granted, the department shall issue a permit to such major source or major modification in accordance with provisions developed pursuant to sub. (7), provided that the applicable requirements of this chapter are otherwise met.

**(6)** VARIANCE BY THE DEPARTMENT WITH THE CONCURRENCE OF THE PRESIDENT OF THE UNITED STATES. (a) The recommendations of the department and the federal land manager shall be transferred to the president in any case where the department recommends a variance in which the federal land manager does not concur.

(b) The president may approve the department's recommendation if he or she finds that such variance is in the national interest.

(c) If such a variance is approved, the department shall issue a permit in accordance with provisions developed pursuant to the requirements of sub. (7), provided that the applicable requirements of this chapter are otherwise met.

**(7)** EMISSION LIMITATIONS FOR PRESIDENTIAL DENIAL OR DEPARTMENTAL VARIANCE. In the case of a permit issued under procedures developed pursuant to sub. (5) or (6), the major source or major modification shall comply with emission limitations as may be necessary to assure that emissions of sulfur dioxide from the major source or major modification would not, during any day on which the otherwise applicable maximum allowable increases are exceeded, cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increase for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period.

**Maximum Allowable SO₂ Increase ($\mu g/m^3$)**

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24–hour maximum | 36 | 62 |
| 3–hour maximum | 130 | 221 |

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (4) and (7), Register, May, 1992, No. 437, eff. 6–1–92; am. (4), Register, April, 1995, No. 472, eff. 5–1–95; am. (1), (2) and (4), Register, December, 1995, No. 480, eff. 1–1–96; am. (7), Register, December, 1996, No. 492, eff. 1–1–97.

**NR 405.15 Public participation. (1)** The department shall notify all applicants within 20 days as to the completeness of the application or any deficiency in the application or information submitted. In the event of such a deficiency, the date of receipt of the application shall be the date on which the department received all required information.

**(2)** Within 205 business days after receipt of a complete application, the department shall:

(a) Make a preliminary determination whether construction should be approved, approved with conditions, or disapproved.

(b) Make available in at least one location in each region in which the proposed source would be constructed a copy of all materials the applicant submitted, a copy of the preliminary determination, and a copy or summary of other materials, if any, considered in making the preliminary determination.

(c) Notify the public, by advertisement in a newspaper of general circulation in each region in which the proposed source would be constructed, of the application, the preliminary determination,

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also* **Are the Codes on this Website Official?**

Register May 2012 No. 677

the degree of increment consumption that is expected from the source or modification, and of the opportunity for comment at a public hearing, as well as written public comment.

(d) Send a copy of the notice of public comment to the applicant, the administrator and to officials and agencies having cognizance over the location where the proposed construction would occur as follows: any other state or local air pollution control agencies; the chief executives of the city and county where the source would be located; any comprehensive regional land use planning agency; and any state, federal land manager, or Indian governing body whose lands may be affected by emissions from the major source or major modification.

(e) Provide opportunity for a public hearing for interested persons to appear and submit written or oral comments on the air quality impact of the source, alternatives to it, the control technology required, and other appropriate considerations.

(f) Consider all comments submitted within a time specified in the notice of public comment and all comments received at any public hearing in making a final decision on the approvability of the application. The department shall make all comments available for public inspection in the same locations where the department made available pre–construction information relating to the proposed major source or major modification.

(g) Make a final determination whether construction should be approved, approved with conditions, or disapproved.

(h) Notify the applicant in writing of the final determination and make such notification available for public inspection at the same location where the department made available pre–construction information and public comments relating to the source.

**Note:** The requirement that a final permit determination be accomplished within one year of receipt of a permit application in the federal regulations has been changed to within 205 business days of receipt of application in this subsection.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (2) (d), Register, December, 1995, No. 480, eff. 1–1–96; am. (2) (intro), Register, August, 2000, No. 536, eff. 9–1–00.

**NR 405.16   Source obligation. (1)** Approval to construct does not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the chs. NR 400 to 499 and any other requirements under local, state or federal law.

**(2)** At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit an air contaminant such as a restriction on hours of operation, then the requirements of ss. NR 405.08 to 405.17 shall apply to the source or modification as though construction had not yet commenced on the major source or major modification.

**(3)** For a project involving existing emissions units at a major stationary source which does not have a PAL, in circumstances where the calculated difference between projected actual emissions using the method specified in s. NR 405.02 (25f) (b) 1. to 2., and baseline actual emissions does not exceed the level that is considered significant for the air contaminant, the owner or operator shall do the following as applicable:

(a) Before beginning actual construction of the project, document and maintain a record of all of the following:

1. A description of the project.

2. Identification of the emissions unit or units whose emissions of a regulated NSR air contaminant could be affected by the project.

3. The calculation of the net emissions increase under s. NR 405.02 (24) (a) that was used to determine that the project is not a major modification for any regulated NSR air contaminant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under s. NR 405.02 (25f)

(b) 2. and an explanation why the amount was excluded, and any netting calculations, if applicable.

(b) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, provide a copy of the information in par. (a) to the department. Nothing in this paragraph shall be construed to require the owner or operator of the unit to obtain any determination from the department before beginning actual construction.

(c) If the owner or operator excludes emissions from the calculation of projected actual emissions under s. NR 405.02 (25f) (b) 2. and the difference between projected actual emissions and baseline actual emissions exceeds the level that is considered to be significant for the air contaminant prior to the exclusion of emissions from the calculation of projected actual emissions under s. NR 405.02 (25f) (b) 2., before beginning actual construction, provide a copy of the information in par. (a) to the department. Nothing in this paragraph shall be construed to require the owner or operator of the unit to obtain any determination from the department before beginning actual construction.

(d) Monitor the emissions of any regulated NSR air contaminant that could increase as a result of the project and that is emitted by any emissions unit identified in par. (a) 2. and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated NSR air contaminant at the emissions unit.

(e) If the unit is an existing electric utility steam generating unit, submit a report to the department within 60 days after the end of each year during which records must be generated under par. (d) setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(f) If the unit is an existing unit other than an electric utility steam generating unit, submit a report to the department if the annual emissions, in tons per year, from the project identified in par. (a), exceed the baseline actual emissions, as documented and maintained pursuant to par. (d) by a significant amount, as defined in s. NR 405.02 (27), for that regulated NSR air contaminant, and if the emissions differ from the preconstruction projection that was provided to the department pursuant to par. (c). The report shall be submitted to the department within 60 days after the end of the year. The report shall contain all of the following:

1. The name, address and telephone number of the major stationary source.

2. The annual emissions as calculated pursuant to par. (a) 3.

3. Any other information that the owner or operator wishes to include in the report, e.g., an explanation as to why the emissions differ from the preconstruction projection.

**(4)** The owner or operator of the source shall make the information required to be documented and maintained pursuant to sub. (3) available for inspection, upon request by the department or the general public.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; CR 03–118: cr. (3) and (4), Register June 2007 No. 618, eff. 7–1–07.

**NR 405.17   Innovative control technology. (1)** An owner or operator of a proposed major stationary source or major modification may request the department to approve a system of innovative control technology.

**(2)** The department may, with the consent of the governor of any other affected state, determine that the major source or major modification may employ a system of innovative control technology if all of the following conditions are met:

(a) The proposed control system would not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function.

*The Wisconsin Administrative Code on this web site is updated on the 1st day of each month, current as of that date. See also Are the Codes on this Website Official?*

Register May 2012 No. 677



# INDIANA OFFICE OF ENVIRONMENTAL ADJUDICATION

AUG 18 2011

*Mary Davidsen*
Chief Environmental Law Judge

INDIANA GOVERNMENT CENTER NORTH
100 NORTH SENATE AVENUE
SUITE N501
INDIANAPOLIS, IN 46204-2211
(317) 232-8591
(317) 233-9372 FAX

| | | |
|---|---|---|
| STATE OF INDIANA | ) | BEFORE THE INDIANA OFFICE OF |
| | ) | ENVIRONMENTAL ADJUDICATION |
| COUNTY OF MARION | ) | |

IN THE MATTER OF: )
)
OBJECTION TO THE ISSUANCE OF )
OF SIGNIFICANT SOURCE MODIFICATION )     CAUSE NO. 08-A-J-4066
NO. T083-23529-00003 )
DUKE ENERGY INDIANA INC. )
EDWARDSPORT GENERATING STATION )
EDWARDSPORT, KNOX COUNTY, INDIANA )
)
Sierra Club *et al.* )
   Petitioners )
Duke Energy Indiana Inc. )
   Permittee/Respondent )
Indiana Department of Environmental Management )
   Respondent )

## FINDINGS OF FACT, CONCLUSIONS
## OF LAW AND ORDER

This matter came before the Office of Environmental Adjudication (the Court or OEA) on Duke Energy Indiana, Inc.'s Second Motion for Partial Summary Judgment; and the Court, being duly advised and having read the motion, brief, response, reply and evidence submitted in support and in opposition, which pleadings are parts of the Court's record, now enters the following findings of fact, conclusions of law and order.

### Summary of Decision

On September 24, 2008, Duke Energy Indiana, Inc. filed its Second Motion for Summary Judgment. Duke seeks summary judgment on the Petitioners' second issue. The issue is how much of the emissions from alleged modifications to EGS (1) should count towards the baseline concentration or (2) consumes available increment. The ELJ concludes that only the increase in actual emissions from the alleged modifications made after the major source baseline date[1] consume increment. The actual emissions from the Plant on the major source baseline date should be included in the baseline concentration. However, neither party has been able to establish whether there has been an increase or decrease in emissions, and, if there has been an

---

[1] The major source baseline dates are January 6, 1975 for $PM_{10}$ and $SO_2$; February 8, 1988 for $NO_2$.

increase or decrease, the amount of increased or decreased emissions. Therefore, there are
genuine issues of material fact and summary judgment is not appropriate and should be denied.

### Statement of the Case

1. On January 25, 2008, the Indiana Department of Environmental Management (IDEM)
   issued Significant Source Modification No. T083-23529-00003 (the "Permit") to Duke
   Energy Indiana Inc. (hereafter referred to as "Duke") for its Edwardsport Generating
   Station (EGS).

2. Sierra Club, Valley Watch, Inc., Save the Valley, Inc. and Citizen Action Coalition of
   Indiana, Inc. (collectively the "Petitioners") filed a Verified Petition for Review and for
   Stay of Effectiveness on February 12, 2008.

3. Duke filed its Second Motion for Summary Judgment on September 24, 2008. The
   Petitioners filed their Response in Opposition to Duke Energy Indiana, Inc.'s Second
   Motion for Summary Judgment on February 20, 2009. Duke filed its Reply Brief in
   Support of Its Second Motion for Summary Judgment on April 3, 2009. The Indiana
   Department of Environmental Management (IDEM) filed its Reply to Petitioners'
   Response to Duke Energy Indiana, Inc.'s Second Motion for Summary Judgment on
   April 3, 2009. Oral argument was held on May 20, 2009.

4. The Court granted Duke's Motion to Dismiss on November 24, 2010. The Court
   determined that the Petitioners had not stated a claim upon which the Court could grant
   relief on the allegations of error relating to $N_2O$ and $CO_2$.

5. The Court denied Duke's First Motion for Partial Summary Judgment on January 28,
   2011. The Court determined that the allegations contained in the Petitioners' Issues 1
   and 2 did not constitute an impermissible collateral attack nor did these issues constitute
   an impermissible enforcement action. Duke's Motion for Reconsideration of Order
   Denying First Motion for Partial Summary Judgment was denied on April 26, 2011.

### Findings of Fact

1. The Permit allowed the modification of the EGS by the construction of an integrated
   gasification combined cycle (IGCC) electric generating facility with the retirement of
   existing generating units and their associated equipment.

2. IDEM determined[2] that PSD requirements were not applicable to emissions of nitrogen
   oxides ($NO_x$) and sulfur dioxide ($SO_2$) from the proposed IGCC Plant. Consequently,
   IDEM did not require air quality impact analysis for these pollutants.

---

[2] For clarity's sake, the ELJ makes no finding as to the correctness of the determinations made by the IDEM in
Findings of Fact 2, 3 and 5; rather, the ELJ merely finds that the IDEM made the determinations.

2

3. IDEM determined that emissions of particulate matter of less than 10 microns diameter ($PM_{10}$) from the proposed IGCC Plant would not cause or contribute to violations of $NAAQS^3$ or allowable PSD increments for $PM_{10}$ in the impact area for the project.

4. The existing generating units at EGS include four steam boilers and three steam turbine generators. Boiler Unit 6-1 was originally installed in 1943 as a coal-fired boiler. It was subsequently converted to an oil-fired operation in 1974 and, after this fuel conversion, had a nominal heat input capacity of 510 mmBtu/hr. Coal-fired boilers 7-1 and 7-2 were installed in 1948 and each boiler has a nominal heat input capacity of 510 mmBtu/hr. Coal-fired boiler 8-1 was installed in 1951 and has a nominal heat input capacity of 510 mmBtu/hr.

5. In determining whether PSD requirements applied to emissions from the proposed IGCC plant, IDEM assumed that emissions from the units to be shut down were in (or contributed to) the baseline concentration for $PM_{10.}$ IDEM's PSD increment analysis for $PM_{10}$ assumed that retiring the existing EGS units were have the effect of expanding the available increment for the new plant.

6. In its modeling analysis for $PM_{10}$ increment compliance, Duke modeled[4] the entire emission rates from the existing EGS boilers were negative numbers, thereby partially offsetting the impacts from the emissions from the new emission sources at the plant.

<h3 align="center">Applicable Law</h3>

This Court must apply a *de novo* standard of review to this proceeding when determining the facts at issue. *Indiana Dept. of Natural Resources v. United Refuse Co., Inc.,* 615 N.E.2d 100 (Ind. 1993). Findings of fact must be based exclusively on the evidence presented to the ELJ, and deference to the agency's initial factual determination is not allowed. *Id.;* I.C. § 4-21.5-3-27(d). "*De novo* review" means that: "all issues are to be determined anew, based solely upon the evidence adduced at that hearing and independent of any previous findings." *Grisell v. Consol. City of Indianapolis,* 425 N.E.2d 247 (Ind.Ct.App. 1981).

The OEA may enter judgment for a party if it finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits and testimony, if any, show that a genuine issue as to any material fact does not exist and that the moving party is entitled to judgment as a matter of law." I.C. § 4-21.5-3-23. The moving party bears the burden of establishing that summary judgment is appropriate. All facts and inferences must be construed in favor of the non-movant. *Gibson v. Evansville Vanderburgh Building Commission, et al.,* 725 N.E.2d 949 (Ind.Ct.App. 2000).

"In statutory construction, our primary goal is to ascertain and give effect to the intent of the legislature. *Gray v. D & G, Inc.,* 938 N.E.2d 256, 259 (Ind. Ct. App. 2010). The language of the statute itself is the best evidence of legislative intent, and we must

---

[3] National Ambient Air Quality Standards

[4] The ELJ finds that the Duke performed this action, but makes no finding as to whether this action was correct.

give all words their plain and ordinary meaning unless otherwise indicated by statute. Id. Furthermore, we presume that the legislature intended statutory language to be applied in a logical manner consistent with the statute's underlying policies and goals. Id. However, we will not interpret a statute which is clear and unambiguous on its face; rather, we will give such a statute its apparent and obvious meaning. *Ind. State Bd. of Health v. Journal-Gazette Co*, 608 N.E.2d 989, 992 (Ind. Ct. App. 1993), adopted, 619 N.E.2d 273 (Ind. 1993)" *United States Steel Corp., et al v. Northern Indiana Public Service Corp.*, 949 N.E.2d 891, 904 (Ind. Ct. App.).

Statutory provisions cannot be read standing alone; instead, they must be construed in light of the entire act of which they are a part. *Deaton v. City of Greenwood*, 582 N.E.2d 882, 885 (Ind. Ct. App. 1991); *Bourbon Mini-Mart v. IDEM*, 806 N.E.2d 14, 20; 2004 Ind. App. LEXIS 586 (Ind. Ct. App. 2004).

Further, if a court determines that the statute or rule is ambiguous, it may look to the agency's interpretation for evidence of the legislative intent. The Indiana Supreme Court, in *Shell Oil v. Meyer*, 705 N.E.2d 962, 976 (Ind. 1998) held, "However, administrative interpretation may provide a guide to legislative intent. "A long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts." *Board of Sch. Trustees v. Marion Teachers Ass'n*, 530 N.E.2d 309, 311 (Ind. Ct. App. 1988); accord *Baker v. Compton*, 247 Ind. 39, 42, 211 N.E.2d 162, 164 (1965)."

326 IAC 2-2-5(a) states: (a) The owner or operator of the proposed major stationary source or major modification shall demonstrate that allowable emissions increases in conjunction with all other applicable emissions increases or reductions (including secondary emissions) will not cause or contribute to air pollution in violation of any:
(1) ambient air quality standard, as designated in 326 IAC 1-3, in any air quality control region; or
(2) applicable maximum allowable increase over the baseline concentration in any area as described in section 6 of this rule.

326 IAC 2-2-6(a) states: (a) Any demonstration under section 5 of this rule shall demonstrate that increased emissions caused by the proposed major stationary source or major modification will not exceed eighty percent (80%) of the available maximum allowable increases (MAI) over the baseline concentrations for sulfur dioxide, particulate matter, and nitrogen dioxide indicated in subsection (b)(1). Available maximum allowable increases are determined by adjusting the MAI to include impacts from actual emissions:
(1) from any major stationary source or major modification on which construction commenced after the major source baseline date; and
(2) increases and decreases at any source occurring after the minor source baseline date.
On a case-by-case basis, a source may petition the commissioner to use in excess of this eighty percent (80%). The commissioner may authorize such use provided the source adequately demonstrates the need for the same.

4

326 IAC 2-2-1(g) states:  (g) "Baseline concentration" means that ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a minor source baseline date is established and shall include the following:

> (1) The actual emissions, as defined in subsection (b), representative of sources in existence on the applicable minor source baseline date except as provided in subdivision (3).
> (2) The allowable emissions of major stationary sources that commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.
> (3) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase or increases:
>> (A) Actual emissions, as defined in subsection (b), from any major stationary source on which construction commenced after the major source baseline date.
>> (B) Increases and decreases of actual emissions, as defined in subsection (b), at any stationary source occurring after the minor source baseline date.

326 IAC 2-2-1(b)(1) defines "actual emissions" as "the actual rate of emissions of a regulated new source review (NSR) pollutant from an emissions unit as determined in accordance with the following:

> (1) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive twenty-four (24) month period preceding the particular date and representative of normal source operation. The department shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.
> (2) The department may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.
> (3) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.
> (4) The term shall not apply for calculating a significant emissions increase under section 2(d) of this rule or for establishing a PAL under 326 IAC 2-2.4. Instead, subsections (e) and (pp) shall apply for those purposes."

326 IAC 2-2-1(p) defines "construction" as any physical change or change in the method of operation, including:

> (1) fabrication;
> (2) erection;
> (3) installation;
> (4) demolition; or
> (5) modification;
> of an emissions unit, that would result in a change in emissions.

The Environmental Appeals Board decided this issue in *In Re: Northern Michigan University, Ripley Heating Plant, PDS Appeal No. 08-02* (EAB Feb. 18, 2009) (hereafter

5

**ADDENDUM 34**

"NMU". In this case, Sierra Club made the same arguments that it makes in this cause. However, the Board remanded the matter to U.S. EPA, but determined:

> In so doing, the Board rejects Sierra Club's argument that the "plain language" of the statute and regulations require that *all* the emissions from a source that undergoes a major modification after an applicable "baseline" date must be treated as increment consuming. Rather, the Board holds that, under the statute, regulations, and long-standing Agency interpretation, pre-baseline emissions of a source modified after the baseline date remain as part of the baseline concentration, and only the post-baseline change in emissions from the modified source, whether upward or downward, is factored into the PSD increment consumption/expansion calculus. *NMU* at 2.

The Board further concluded, "Sierra Club's "plain language" reading on the other hand, produces results that confound the very sense and policy undergirding a workable increment consumption scheme. Were Sierra Club's views to prevail, no increment credit would be given for sources that shut down, and emissions already counted in the baseline concentration would be counted again against the PSD increment -- in effect, double counting." *NMU* at 23.

### Conclusions of Law

1. The Office of Environmental Adjudication ("OEA") has jurisdiction over the decisions of the Commissioner of the IDEM and the parties to the controversy pursuant to IC § 4-21.5-7-3.

2. Findings of Fact that may be construed as Conclusions of Law and Conclusions of Law that may be construed as Findings of Fact are so deemed.

3. It is obvious that there are issues as to material fact in this matter. The parties disagree on whether there were modifications to EGS that affect either the baseline concentration or consume increment. However, the question of the proper interpretation of the statutes and regulations can be answered.

4. Each of the parties has presented plausible arguments regarding the rule in question.[5] Therefore, the ELJ concludes that the rule is ambiguous and that it is appropriate to look to the rules of statutory interpretation to determine the legislative intent.

5. While the OEA conducts a *de novo* review of all IDEM appeals and does not defer to IDEM interpretations, a review of applicable policy statements, including the comments

---

[5] "A statute is ambiguous where it is reasonably susceptible to more than one interpretation." *Elmer Buchta Trucking, Inc. v. Stanley,* 744 N.E. 2d 939, 942 (Ind. 2001).

**ADDENDUM 35**

made by the agency during rulemaking can be used to determine legislative intent.[6] In this case, the Indiana rule is substantially the same as the federal rule. Therefore, Duke's citing to federal guidance and other secondary sources are appropriate and persuasive. In addition, to the language cited by Duke, the following language supports the conclusion that only in the increase or decrease in actual emissions affects the increment analysis. In the preamble for the proposed rules on Prevention of Significant Deterioration New Source Review/Refinement of Increment Modeling Procedures, the U.S. EPA says "Consequently, any increases in actual emissions occurring after that date [minor source baseline date] (with some possible exceptions that we will discuss later) would be considered to consume the applicable PSD increment." (72 Fed. Reg. 31375, 31375) and "(For major sources, emissions increases or decreases resulting from construction as defined at 40 CFR 51.166(b)(8) and 40 CFR 52.21(b)(8) that have occurred since the major source baseline date consume or expand increment)." 72 Fed. Reg. 31375, 31377. It appears very clear that the U.S. EPA and the IDEM interpret these rules in the same manner as Duke.

6.  Moreover, the order issued by the Environmental Appeals Board provides further support to Duke's position and is persuasive.

7.  The Court concludes:

    i.     Only increases in actual emissions of $PM_{10}$, $SO_2$ or $NO_2$ resulting from any major modifications at the Existing Units that are determined to have occurred after the respective major source baseline dates would consume available increments.

    ii.    Even if any major modifications at the Existing Units were determined to have occurred after the respective major source baseline dates, the actual emissions of $PM_{10}$, $SO_2$ or $NO_2$ from the Existing Units as of the time of the major source baseline dates would be included in the respective baseline concentrations; and

    iii.   The reductions in emissions to occur as a result of the shutdown of the Existing Units as required by the Permit will expand available increments and would offset the consumption of increments associated with prior increases in emissions if any major modifications at the Existing Units were determined to have occurred after the respective major source baseline dates.

8.  There are genuine issues of material fact as to whether there has been an increase or decrease in emissions, and if there has been an increase or decrease, the amount of increased or decreased emissions; therefore summary judgment is not appropriate and should be denied.

<u>Order</u>

---

[6] "A preamble may be considered in ascertaining legislative intent in construing an ambiguous statute, but it is not controlling." *Nextel W., Corp. v. Ind. Util. Regulatory Comm'n*, 831 N.E.2d 134, 142 (Ind. Ct. App. 2005); *Besozzi v. Ind. Employment Sec. Bd.*, 237 Ind. 341, 146 N.E.2d 100 (1957)

7

AND THE COURT, being duly advised, hereby **ORDERS, ADJUDGES AND DECREES** that Duke Energy Indiana Inc.'s Second Motion for Partial Summary Judgment is **DENIED.**

You are further notified that pursuant to provisions of IC §4-21.5-7-5, the Office of Environmental Adjudication serves as the ultimate authority in administrative review of decisions of the Commissioner of the Indiana Department of Environmental Management. This is an order subject to further review consistent with applicable provisions of IC §4-21.5 and other applicable rules and statutes.

IT IS SO ORDERED this _18th_ day of _August_ 2011 in Indianapolis, IN.

Hon. Catherine Gibbs
Adjunct Environmental Law Judge

Hon. Mary Davidsen
Chief Environmental Law Judge

**DISTRIBUTION**

Counsel for IDEM:

Valerie Tachtiris, Esq.
Office of the Indiana Attorney General for the
Indiana Department of Environmental Management
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204

Counsel for Permittee/Respondent:

Larry J. Kane, Esq.
Matthew A. Gernand, Esq.
Robin L. Babbit, Esq.
Gregory A. Neibarger, Esq.
Bingham McHale LLP
2700 Market Tower

8

**ADDENDUM 37**

10 W. Market St.
Indianapolis, IN 46204-4900

Julie Ezell, Esq.
Duke Energy Indiana
1000 E. Main St.
Plainfield, IN 46168

Counsel for Petitioners:

Jerome E. Polk, Esq.
Polk & Associates LLC
101 W. Ohio St., Suite 2000
Indianapolis IN 46204

David C. Bender, Esq.
Christa Westerberg, Esq.
McGillivray Westerberg & Bender LLC
211 S. Paterson St., Suite 320
Madison, WI 53703

9

**ADDENDUM 38**