Appeal No. 12-3388

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

CLEAN WATER ACTION COUNCIL
OF NORTHEASTERN WISCONSIN,
INC. et al.,

      Petitioners,

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY et al.,

      Respondents,

GEORGIA-PACIFIC CONSUMER
PRODUCTS LP,

      Intervening Respondent.

Petition for Review of a Final Order of the Administrator of the United States
Environmental Protection Agency, EPA Docket No. V-2011-1

**REPLY BRIEF OF PETITIONERS CLEAN WATER ACTION COUNCIL OF
NORTHEASTERN WISCONSIN INC., ET AL.**

Dated: June 25, 2013     **McGillivray Westerberg & Bender LLC**
            *Attorneys for Petitioners*

            David C. Bender (#1046102)
            Pamela R. McGillivray (#1034194)
            Christa O. Westerberg (#1040530)
            James N. Saul (#1067236)
            211 S. Paterson Street, Suite 320
            Madison, WI 53703
            (608) 310-3560

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

ARGUMENT...................................................................................................1

I.    This Court Has Jurisdiction To Review The EPA's Order In This Case ............1

    A.    Petitioners Are Not Barred By 42 U.S.C. § 7607(b)(1) From
        Challenging EPA's Unlawful Order In This Case....................................1

        1.    The Preamble Statements EPA Relies On Do Not Set Forth
            An Authoritative Interpretation And Petitioners Are Not
            Required To Challenge A Stray Preamble Statement That
            Contradicts The Regulation Text That EPA Actually
            Adopted...............................................................................................2

        2.    The Court's Precedent Does Not Require Challenges To
            EPA Rules Within 60 Days Where The Rule Does Not
            Immediately Impact The Petitioner..................................................6

    B.    Georgia-Pacific's Argument That State Law Preempts the Clean
        Air Act And Precludes Review In a Federal Forum Lacks Merit ...........7

II.    None of EPA or Georgia-Pacific's Arguments Overcomes The Plain
    Language of the Statute and the Regulation That Govern ................................13

    A.    EPA's Attempt To Manufacturer "Ambiguity" and "Conflict"
        In 42 U.S.C. § 7479(4) Relies On A Misreading of the Statute ...............14

    B.    Vague Legislative History And A Prior Erroneous Interpretation
        by EPA Cannot Justify Its Unreasonable Interpretation ........................17

    C.    EPA's Attempt to Insert Words Based On Broad Interpretations
        of General Policies In The Clean Air Act Also Fails ...............................19

III.    Georgia-Pacific's Dire Predictions If The Court Applies The Plain
    Language of the Statute and Regulations Is Overblown and Hollow ..............22

CONCLUSION.............................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Am. Rd. & Transp. Builders Ass'n v. EPA*,
705 F.3d 453 (D.C. Cir. 2013) ..................................................................6

*Association of American Railroads v. Costle*,
562 F.2d 1310 (D.C. Cir. 1977) ...............................................................5

*Association of Career Employees v. Klauser*,
195 Wis. 2d 602, 536 N.W.2d 478 (Ct. App. 1995) ..................................9

*Bethlehem Steel Corp. v. EPA*,
723 F.2d 1303 (7th Cir. 1983) ...............................................................6, 7

*Citizens to Save Spencer County v. EPA*,
600 F.2d 844 (D.C. Cir. 1979) ...............................................................15

*Costanzo v. Tillinghast*,
287 U.S. 341 (1932) ..................................................................................6

*County of Sauk v. Trager*,
118 Wis. 2d 204, 346 N.W.2 756 (1984) .................................................9

*Ill. Envtl. Protection Agency v. U.S. EPA*,
947 F.2d 283 (7th Cir. 1991) ...................................................................6

*Kennecott Utah Copper Corp. v. Dept. of Interior*,
88 F.3d 1191 (D.C. Cir. 1996) .................................................................7

*Leal-Rodriguez v. INS*,
990 F.2d 939 (7th Cir. 1993) ...................................................................6

*Medical Waste Inst. & Energy Recovery Council v. EPA*,
645 F.3d 420 (D.C. Cir. 2011) .................................................................6

*Nat'l Wildlife Federation v. EPA*,
286 F.3d 554 (D.C. Cir. 2002) .................................................................5

*Pfizer v. Heckler*,
735 F.2d 1502 (D.C. Cir. 1984) ...............................................................5

*Sierra Club v. Otter Tail Power,*
615 F.3d 1008 (8th Cir. 2010) ...................................................................11

*United States v. AM General Corp.,*
34 F.3d 472 (7th Cir. 1994) ......................................................................10

*Wis. Elec. Power Co. v. Reilly,*
893 F.2d 901 (7th Cir. 1990) ......................................................................5

**Federal Statutes**

42 U.S.C. § 7411(a)(4) ...............................................................................16

42 U.S.C. § 7413(a)(5) ...............................................................................10

42 U.S.C. § 7473(c)(1)(A)-(D) ...................................................................16

42 U.S.C. § 7479(2)(C) .........................................................................2, 5, 18

42 U.S.C. § 7479(4) .............................................................................. *passim*

42 U.S.C. § 7604 .................................................................................11, 12

42 U.S.C. § 7607 ..............................................................................8, 10, 11

42 U.S.C. § 7607(b) ........................................................................1, 2, 6, 11

42 U.S.C. §§ 7661a(b)(6) ...........................................................................22

42 U.S.C. § 7661c(a) ...................................................................................8

42 U.S.C. § 7661d ....................................................................................10, 11

42 U.S.C. § 7661d(b) ........................................................................... *passim*

**State Statutes**

Wis. Stat. § 227.52 .......................................................................................8

Wis. Stat. § 227.53 .......................................................................................8

Wis. Stat. § 285.62(9)(a) .................................................................................12

Wis. Stat. § 285.81(1),(2) ..................................................................................9

## Federal Regulations

40 C.F.R. § 51.166(a)(2) ..................................................................................16

40 C.F.R. § 51.166(a)(7)(iv)(a) ........................................................................16

40 C.F.R. § 51.166(b)(39) ................................................................................16

40 C.F.R. § 51.166(b)(40) ................................................................................16

40 C.R.F. § 51.166(b)(13)(ii)(a) ................................................................ *passim*

40 C.F.R. § 51.166(c)(13)(i)(a) ...................................................................13, 16

40 C.F.R. § 52.24(13)(ii)(a) ...............................................................................3

40 C.F.R. § 70.2.................................................................................................8

40 C.F.R. § 70.4(d)(3)(iv) ................................................................................22

40 C.F.R. § 70.7(h) ..........................................................................................22

40 C.F.R. § 70.8(c) ............................................................................................7

40 C.F.R. § 70.8(d) ......................................................................................7, 22

## State Regulations

Wis. Admin. Code § NR 405.02(3)(a)1 ........................................................13, 16

Wis. Admin. Code § NR 405.02(3)(b)1 ......................................................... *passim*

Wis. Admin. Code § NR 405.02(4)(b)1 ....................................................13, 16, 20

## Federal Register

43 Fed. Reg. 26,380 (June 19, 1978) ..................................................................4

45 Fed. Reg. 52,676 (August 7, 1980) ........................................................3

57 Fed. Reg. 32,250, 32,251 (July 21, 1992) ...............................................8

67 Fed. Reg. 80,186, 80,202 (Dec. 31, 2002) ...............................................3

72 Fed. Reg. 31,372, 31,377 (June 6, 2007) .............................................3. 4

75 Fed. Reg. 64,864, 64,869 (Oct. 20, 2010) ...............................................5

**ARGUMENT**

The controlling statute and regulations provide that the sulfur dioxide and particulate matter air pollution emissions of a plant modified after January 6, 1975, are excluded from the "baseline concentration" and affect the amount of "increment" (the cap on the ambient air quality impact pollution sources can have).  Unlike other statute sections in the Clean Air Act and other regulatory provisions, the controlling statue and regulations at issue in this case do not say "changes in" or "increases in" emissions; they just say "emissions."  Nothing raised in the Environmental Protection Agency's (EPA) or Georgia-Pacific's responses can avoid the fact that EPA's Order on appeal in this case relied on an interpretation that inserted words into the statute and regulation to change their meaning in conflict with the plain language.  EPA's interpretation is unlawful and should be vacated and remanded.

I.  This Court Has Jurisdiction To Review The EPA's Order In This Case.

EPA and Georgia-Pacific seek to avoid having this Court reach the merits of this case on the grounds that this Court does not have jurisdiction to consider the legal interpretations in EPA's Order.  Those arguments lack legal and factual support.

    A.  Petitioners Are Not Barred By 42 U.S.C. § 7607(b)(1) From Challenging EPA's Unlawful Order In This Case.

EPA argues that Petitioners are barred by EPA's previous announcement in a preamble to a rule that only the increases in air pollution from polluters constructed or

1

modified[1] after 1975 consume the available air pollution increment, and that if a polluter pre-dates 1975 none of its pollution as of 1975 can consume increment even if the plant is later modified after 1975.  (EPA Br. at 29.)  EPA contends that because it made these assertions years ago, Petitioners were required to challenge them pursuant to 42 U.S.C. § 7607(b)(1) long ago and are now precluded  from arguing that EPA's interpretation is wrong.  (EPA Br. at 32.)  This argument fails for at least two reasons.  First, the non-rule preamble statements that EPA relies on (if given the meaning EPA ascribes to them now) conflict with and do not override the text of the regulations EPA actually adopted. Second, in arguing that Petitioners are time-barred, EPA relies on precedent from outside this Circuit that conflicts with this Court's holdings.

   1.  The Preamble Statements EPA Relies On Do Not Set Forth An Authoritative Interpretation And Petitioners Are Not Required To Challenge A Stray Preamble Statement That Contradicts The Regulation Text That EPA Actually Adopted.

EPA purports that in statements made in the Federal Register in various years, it announced that "*increases in* emissions from a modification of a source built prior to January 6, 1975, but modified after that date, consumes increment, while the rest of that source's emissions remain in the baseline concentration."  (EPA Br. at 29 (emphasis EPA's); see also id. at 32-37.)  EPA is correct that it has said various things about how increment consumption is calculated, often without reliance on the actual statute and regulation text, often conflating major and minor sources and increases related and

---

[1] The terms "construction" and "modification" are interchangeable here because Congress defined "construction" to explicitly include modifications to existing sources.  42 U.S.C. § 7479(2)(C).

2

unrelated to "construction," and often using the term "construction" to only mean the initial construction of a new pollution source and other times meaning both construction of a new source and modification of an existing source.[2]  None of the statements EPA cites, however, purport to set forth a binding and authoritative EPA interpretation of 42 U.S.C. § 7479(4).  Indeed, the actual regulatory text that EPA adopted in 1980, and which has not been changed, contradicts the EPA's interpretation in this case because it specifically excludes the *actual emissions*, not the *increase* or *change in* actual emissions, consume the increment.  *See* 40 C.F.R. § 51.166(b)(13)(ii)(a) and Wis. Admin. Code § NR 405.02(3)(b)1. (providing that "actual emissions" from major sources constructed after the specified date consume increment); 45 Fed. Reg. at 52,731 (adopting 40 C.F.R. § 52.24(13)(ii)(a) (now codified in 40 C.F.R. § 51.166(b)(13)).[3]

---

[2] The preamble statements EPA leans on suffer other problems as well.  For example, the 1978 preamble's discussion of the baseline concentration and increment consumption, 43 Fed. Reg. at 26,400, is irrelevant since EPA revised those definitions two years later.  45 Fed. Reg. 52,676, 52,731, 52,737 (August 7, 1980).  The discussion in the 1980 preamble that EPA relies on, EPA Br. at 20, 37 (quoting 45 Fed. Reg. at 52,270), refers to a unique situation of sources that would change from natural gas as a fuel to dirtier fuels as a national natural gas shortage.  The 2002 statement was in the context of EPA's response to comments on a wholly different issue (the look-back period for determining if a modification occurs).  67 Fed. Reg. 80,186, 80,202 (Dec. 31, 2002).  The 2007 statement was in a notice of a draft rulemaking that was never finalized.  72 Fed. Reg. 31,372, 31,377 (June 6, 2007).  Besides, the fact that EPA felt compelled to provide a meandering explanation of the preamble statements based on a brief filed by Texas and an appellate decision that EPA admits apply to situations where there was no "construction," which is the critical word in the statute, belies any argument that these statements are plain on their face. (EPA Br. at 34-36.)

[3] It is hardly apparent in the 2002 preamble statement EPA cites that EPA was intending to announce an official interpretation of the amount of emissions that consume increment from major sources constructed after the baseline date, but rather, appears that EPA was mentioning increment issues tangentially while actually responding to public comments on a wholly different issue (the look-back period for determining if a modification occurs).  67 Fed. Reg. at 80,202 [JA 232].  The 2007 preamble was for a proposed rule change that was not adopted.  72 Fed. Reg. 31,372.  To the extent that a preamble to a draft and never-finalized rule is relevant to

Rather than identifying any regulatory text that actually sets forth the interpretation EPA urges in this case, EPA attempts to weave together pieces of Federal Register preamble, a 1978 brief by the State of Texas, and a portion of a D.C. Circuit case addressing a different regulatory provision related to the PSD increment.  (EPA Br. at 34-38.)  Georgia-Pacific also cites various internet documents and EPA's 1990 draft "NSR Manual."  (GP Br. at 28-30.)  But, even if these Federal Register preambles and potpourri of "guidance" references said exactly what EPA and Georgia-Pacific represent them to mean, they would be directly contradicted by the regulatory text EPA actually adopted, which provides that the "actual emissions," and not the "changes" or "increases" in emissions, consume the increment.  43 Fed. Reg. 26,380, 26,404 (June 19, 1978) (defining "baseline concentration" by excluding "any contribution from major stationary sources and major modifications on which construction commenced on or after January 6, 1975…") [JA 200]; 45 Fed. Reg. at 52,731, 52,737  (August 7, 1980) (defining "baseline concentration" to exclude "[a]ctual emission from any major stationary source on which construction commenced after January 6, 1975…") [JA 228].  This language remains in the actual regulations' text.  *See* 40 C.F.R. § 51.166(b)(13)(ii)(a); Wis. Admin. Code § NR 405.02(3)(b)1.

Moreover, EPA attempts to ignore other quotes that contradict EPA's selections. For example, the 2010 rulemaking that EPA cites first notes the general concept that emissions as of the baseline date are the baseline concentration, and changes since the

anything, the 2007 Federal Register actually undermines EPA's interpretation in this case because it confirms that "[f]or sources constructed since the relevant baseline date, all their current actual emissions consume increment…"  *Id*. at 31,377.

baseline date impact the increment. (EPA Br. at 21 (quoting 75 Fed. Reg. 64,864, 64,869

(Oct. 20, 2010)).) While EPA insists that this should be taken as saying only changes *in*

*emissions* since the baseline date affect the increment, that interpretation is belied by the

very next sentence, which points out that major sources constructed after the baseline

date are treated differently because "[f]or sources constructed since the relevant

baseline date, *all* their current actual emissions consume increment…." (*Id.* (emphasis

added by EPA).) EPA insists that this applies only to a new source, EPA Br. at 21, but

the statement uses the statute and regulation's reference to "construction," which

specifically includes modifications of existing sources as well as new sources. 42 U.S.C.

§ 7479(2)(C); *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990).

Because no actual regulatory text supports EPA's interpretation, and because EPA's

various preamble statements (as interpreted by EPA in its brief) contradict the actual

regulation text EPA adopted, there was no reason to challenge EPA's stray preamble

statements. A statement in a rulemaking preamble is not a rule and cannot change the

plain language meaning of the regulation. *Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310,

1316 (D.C. Cir. 1977) (the preamble "is not an operative part of the statute and it does

not enlarge or confer powers on administrative agencies or officers"); *see also Nat'l*

*Wildlife Fed'n v. EPA*, 286 F.3d 554, 569-70 (D.C. Cir. 2002) (rejecting argument that a

contradictory preamble statement changes the plain meaning of the regulation's text);

*Pfizer v. Heckler*, 735 F.2d 1502, 1509 (D.C. Cir. 1984) (same). Since Petitioners agree with

the plain language meaning of the text EPA actually promulgated in the regulation, and

the preamble cannot change the regulation says, Petitioners were not required to

challenge any preamble statements pursuant to 42 U.S.C. § 7607(b).[4]

> ### 2. The Court's Precedent Does Not Require Challenges To EPA Rules Within 60 Days Where The Rule Does Not Immediately Impact The Petitioner.

EPA cites various opinions by the District of Columbia Circuit for the proposition

that where EPA announces a legal interpretation, any challenges to that interpretation

must be made within 60 days pursuant to 42 U.S.C. § 7607(b)(1). (EPA Br. at 32, 38

(citing *Medical Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 427 (D.C. Cir.

2011); *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453 (D.C. Cir. 2013)).)  EPA cites

no supporting authority from this Circuit and does not address this Court's precedent

interpreting 42 U.S.C. § 7607(b) to be less rigid.  *Ill. Envtl. Prot. Agency v. U.S. EPA*, 947

F.2d 283, 288-89 (7th Cir. 1991) (holding that 42 U.S.C. § 7607(b) should not be

interpreted to require a petitioner to challenge a regulation within 60 days until it is

clear that the regulation would impact the petitioner); *Bethlehem Steel Corp. v. EPA*, 723

F.2d 1303, 1306 (7th Cir. 1983) (holding that a petitioner is "not required to challenge a

regulation just because the regulation might some date harm it… it makes no sense at a

time of heavy federal judicial caseloads to encourage people to challenge regulations

that may never harm them.").  Thus, even if EPA had clearly announced the

---

[4] Nor is a longstanding erroneous interpretation immune from challenge, as Georgia Pacific argues.  (GP Br. at 28-30 (*citing Costanzo v. Tillinghast*, 287 U.S. 341, 345 (1932).)  This Court has rejected such congressional acquiescence arguments.  *Leal-Rodriguez v. INS*, 990 F.2d 939, 951 n.16 (7th Cir. 1993) ("The doctrine of congressional acquiescence, although perhaps enjoying some favor in the Supreme Court at one time, has recently fallen victim to plain meaning jurisprudence.").

interpretation it offers in this case in a preamble, Petitioners were not required to

challenge it until that determination directly impacted them through EPA's Order at

issue in this case.  *Id.*[5]

### B. Georgia-Pacific's Argument That State Law Preempts the Clean Air Act And Precludes Review In A Federal Forum Lacks Merit.

Georgia-Pacific argues that this Court does not have jurisdiction in this case because

the exclusive opportunity for review of the application of the air quality increment

consumption provisions at issue was through state proceedings.  (G.P. Br. at 14-21.)

Georgia-Pacific's arguments lack merit since the Clean Air Act specifically provides for

a determination of applicability by EPA in every federal operating permit, and a

process for review by this Court.  As EPA correctly notes in its brief, the Clean Air Act

both authorizes and requires the EPA to review state-issued permits and to object to

any permit "not in compliance" with any "applicable requirement" of the Clean Air

Act.  (EPA Br. at 11 (citing 42 U.S.C. § 7661d(b)(1) and 40 C.F.R. § 70.8(c)).)  If EPA fails

to object, any person may petition the EPA to object and EPA must object to the permit

in response to such a petition if "the permit is not in compliance with the requirements

of the Act."  42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.8(d).  Both the Act and the

implementing regulations broadly define the requirements that a state permitting

---

[5] Even under D.C. Circuit precedent, Petitioners would not be required to challenge a statement in a preamble as opposed to an actual regulation.  *Kennecott Utah Copper Corp. v. Dept. of Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996) (declining to review a preamble statement that does not clearly bind a party because "[u]nless and until [an agency] invokes the preamble in an attempt to affect the outcome of a real dispute, there is little need for and no factual basis to inform our inquiry into its validity.").

agency, and then EPA on review, must find before an operating permit is issued.  42
U.S.C. § 7661c(a); 40 C.F.R. § 70.2 (defining "applicable requirements" that must be
determined in operating permit issuance to include requirements of implementation
plans and conditions of PSD permits); *see also* 57 Fed. Reg. 32,250, 32,251 (July 21, 1992)
(one important purpose of an operating permit is to "clarify, in a single document,
which requirements apply to a source").  Included among those items that a state must
determine the applicability of, and that EPA must then review and object to if the state's
determination is incorrect, are the state's PSD program implementation plan.  *Id.*  EPA
decisions denying a petition under 42 U.S.C. § 7661d(b)(2) are reviewable in this Court
pursuant to 42 U.S.C. § 7607.

Congress explicitly requires one precondition to this process: that a petitioner
provides comments to the state agency during the operating permit issuance process in
order to preserve the right to petition the EPA to object to a state permit.  42 U.S.C. §
7661d(b)(2).  There is no dispute that Petitioner met that precondition in this case.  Yet,
Georgia-Pacific argues that this Court still does not have jurisdiction in this case
because Petitioners were required to seek review solely through a separate state venue
and process.  (GP Br. at 7, 12, 15-16, 20.)  Georgia-Pacific's argument is baseless.
Congress included no requirement that a petitioner also use all state forums instead of
the process Congress provided in the statute.

Georgia-Pacific relies on state statutes that regulate proceedings for review that are
filed in state venues.  Wis. Stat. §§ 227.52 (providing that state agency decisions are
subject to review in Wisconsin state courts), 227.53 (providing a right for any person to

seek review in state courts and establishing a procedure for such reviews), 285.81(1), (2)

(providing an opportunity to seek review in a state administrative hearing forum).[6]

Nothing in those statutes purports to restrict federal rights to review before EPA and

this Court.  Nor could a state statute preclude the separate avenue for review before

EPA and this Court provided by Congress in 42 U.S.C. § 7661d(b)(2).  U.S. Const., Art.

IV cl. 2; *Felder v. Casey*, 487 U.S. 131, 137-38 (1988) (state rules governing litigation in

state courts cannot defeat federal rights).

Not surprisingly, Georgia-Pacific provides no authority for its remarkable argument

that a state can preempt federal law and a federal forum by providing a separate state

forum.  The state cases Georgia-Pacific cites, *County of Sauk v. Trager*, 118 Wis. 2d 204,

211, 346 N.W.2 756 (1984) and *Ass'n of Career Employees v. Klauser*, 195 Wis. 2d 602, 612,

536 N.W.2d 478 (Ct. App. 1995), are inapplicable.  Those state cases apply state common

law, prudential, doctrines of exhaustion of administrative remedies or "exclusivity" of

administrative procedures.  The cases do not apply to, much less control, the

jurisdiction of EPA or this Court pursuant to federal statute.  Moreover, even if state

caselaw did control here, the cases only require that an administrative process be

completed before resort to judicial review and that judicial review follow the process

specified by statute for judicial review.  *Trager*, 118 Wis. 2d at 211; *Klauser*, 195 Wis. 2d

---

[6] Georgia-Pacific also makes an undeveloped argument that "Petitioners are incorrect that Wis. Stat. § 285.63(1)(b) provides an independent or alternative basis for revisiting the 2004 PSD Permit…".  (GP Br. at 20-21.)  While it's unclear what Georgia-Pacific's intended point is, its argument is irrelevant since the Petitioners do not rely on that statute in their brief.  Nor is this case about revisiting a 2004 permit; this case involves review of an EPA decision not to object to a 2011 operating permit.

at 612.  Here, the administrative process required comments to the state agency and a petition to the EPA.  42 U.S.C. § 7661d(b)(2).  Following a decision by EPA, appeal is specified pursuant to 42 U.S.C. § 7607.  *Id*.  That process was followed.  Georgia-Pacific's argument has no merit.

The federal cases Georgia-Pacific cites also fail to support Georgia-Pacific's arguments.  In *United States v. AM General Corp.*, 34 F.3d 472 (7th Cir. 1994), this Court did not hold, as Georgia-Pacific contends, that if EPA or a petitioner could have sought review in a state or local venue that EPA and the public are precluded from the remedies in 42 U.S.C. § 7661d.  In fact, the holding explicitly provides that the operating permit review process by EPA at issue in this case is appropriate.  In *AM General,* this Court held that EPA could not enforce pursuant to 42 U.S.C. § 7413(a)(5) (1989)—which authorized suit for constructing after a finding by EPA that the a state's implementation plan violated the Clean Air Act—where EPA's finding came after construction had started.  *Id*. at 474.  The Court's reasoning was based on the after-the-fact nature of the finding by EPA and the specific text of that statute.  *Id*.  While the Court noted that EPA could have appealed a permit through the local process, the holding was not based on a finding that such an appeal is mandatory.  In fact, the Court also noted that EPA probably could have brought an enforcement action under a different subsection and that, because of the intervening creation of the operating permit program in 1990, EPA was able to avoid similar situations in the future by reviewing and vetoing the state's operating permit pursuant to 42 U.S.C. § 7661d.  *Id*. at 474-75.  Thus, far from precluding the use of the procedure in 42 U.S.C. § 7661d to review state permitting decision, as

10

Georgia-Pacific argues, the *AM General* case explicitly pointed to the operating permit review process followed in this case as appropriate.

Georgia-Pacific's reliance on *Sierra Club v. Otter Tail Power*, 615 F.3d 1008 (8th Cir. 2010), is also erroneous. *Otter Tail* involved an enforcement suit pursuant to 42 U.S.C. § 7604(a)(1) alleging a violation of a regulation that the state explicitly determined to be inapplicable when issuing the facility an operating permit. The *Otter Tail* court held that the plaintiff should have pursued an objection by EPA pursuant to 42 U.S.C. § 7661d and judicial review pursuant to 42 U.S.C. § 7607, instead of an enforcement action pursuant to 42 U.S.C. § 7604. *Id.* at 1020-22.[7] That is, the *Otter Tail* holding supports using the process that Petitioner followed in this case over a direct enforcement action against a facility. The holding in the case contradicts Georgia-Pacific's attempt to use it to preclude this case.

Even less availing is Georgia-Pacific's attempt to apply caselaw involving enforcement actions seeking civil penalties to this case. (GP Br. at 16-19.)  Georgia-Pacific's straw man--that it could be subject to high civil penalties and that such penalties would be unjust, GP Br. at 19-- lacks any legal foundation. This is not an enforcement action, it is a review of EPA's decision as provided by statute in 42 U.S.C. §§ 7661d and 7607. Moreover, penalties would only be available in an enforcement

---

[7] The *Otter Tail* court relied on 42 U.S.C. § 7607(b)(2), which prohibits an enforcement action regarding an issue that could have been resolved through an appeal to the appellate circuit pursuant to 42 U.S.C. § 7607. 615 F.3d at 1021. To the extent Georgia-Pacific contends that the state's permit in 2004 constitutes an action that could have been reviewed in the federal courts pursuant to 42 U.S.C. § 7607, Georgia-Pacific fails to identify how such an appeal could have been perfected. No such avenue exists.

action under 42 U.S.C. § 7604(a)(1) if Georgia-Pacific violates an "emission standard or limitation" and Georgia-Pacific fails to indicate how EPA's erroneous interpretation during permitting at issue in this case constitutes an "emission standard or limitation" violation by Georgia-Pacific.

That Georgia-Pacific is desperate to avoid this Court reaching the merits is understandable, but it is not entitled to rely on erroneous interpretations of law and untenable legal theories. At bottom, Georgia-Pacific's main gripe is that this case comes nine years after the 2004 project at its facility. (GP Br. at 19.) But that fact has no bearing on this Court's jurisdiction, which is not based on equitable considerations. There is no dispute that Petitioner submitted public comments, filed its petition with EPA, and filed its petition with this Court to review EPA's petition denial within the required timelines. The delay in this case is caused by the long periods when the permit was pending before the state agency and when the petition at issue was pending before the EPA. Georgia-Pacific identifies no legal authority for denying this Court jurisdiction over Petitioner's claims based on the EPA and state's delays. Furthermore, Georgia-Pacific itself could have quickened the process by filing a state court action to speed up the permitting process if it was truly concerned. Wis. Stat. § 285.62(9)(a). It never did. This Court has jurisdiction to hear this case and nothing in Wisconsin statutes or the inapposite caselaw Georgia-Pacific cites says otherwise.

II.    None of EPA or Georgia-Pacific's Arguments Overcomes The Plain Language of the Statute and the Regulation That Govern.

There is no dispute that the controlling statute says that the "emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975" are excluded from the baseline and consume increment.  42 U.S.C. § 7479(4). Nor is there any dispute that the controlling regulations say that the "actual emissions from any major stationary source on which construction commenced after the major source baseline date [of January 6, 1975 for sulfur oxides and particulate matter]" are not included in the baseline concentration and consume increment.  40 C.F.R. § 51.166(b)(13)(ii)(a); Wis. Admin. Code § NR 405.02(4)(b)1.  The regulations also say that the general rule that emissions from facilities existing on the baseline date in 1975 are in the baseline specifically excludes sources whose emissions are covered by the provision for major sources constructed after the baseline date.  40 C.F.R. § 51.166(c)(13)(i)(a) (providing that emissions from existing sources are included in the baseline "except as provided in paragraph (b)(13)(ii)"); Wis. Admin. Code § NR 405.02(3)(a)1. (same).

Nowhere in the text of the statute or regulation is there a reference to "increases" or "changes."  Yet, EPA insists "that *increases in* emissions from a modification of a source built prior to January 6, 1975, but modified after that date, consume increment, while the rest of that source's emissions remain in the baseline."  (EPA Br. at 29 (emphasis original).)  EPA's main premise in arguing that its interpretation of 42 U.S.C. § 7479(4) and Wis. Admin. Code § NR 405.02(3)(b)1. is reasonable is not that the language of the

13

statute or regulation support EPA's interpretation, but that EPA essentially created

controlling law through various agency statements, notwithstanding the statute and

regulation. This argument lacks legal merit, as do EPA's secondary arguments seeking

to contradict the statute and regulation's plain language by resorting to EPA's

characterizations of the broad policies behind Clean Air Act.

### A.   EPA's Attempt To Manufacturer "Ambiguity" and "Conflict" In 42 U.S.C. § 7479(4) Relies On A Misreading of the Statute.

In order to justify interpreting the statute to include limiting words that Congress

did not include, and which conflict with the broad words Congress did use, EPA

contends that it is "gap-filling" and resolving conflict between the second and third

sentences in 42 U.S.C. § 7479(4). (EPA Br. at 41-42.) In theory, EPA speculates, it could

be "possible for the same source to be covered by both the second and third sentences of

section 169(4)." (*Id*. at 42.) However, EPA overstates any theoretical internal conflict in

the statute. The second sentence does not say that the baseline concentration includes

emissions from *all* "existing major sources (or those that had at least commenced

construction by that date)." (EPA Br. at 41.) Rather, the second sentence actually says

that the baseline concentration "shall take into account all projected emissions… from

any major emitting facility on which construction commenced prior to January 6, 1975,

*but which has not begun operation by the date of the baseline air quality concentration

determination*." 42 U.S.C. § 7479(4) (emphasis added).[8] That is, EPA ignores this last

---

[8] The fact that the baseline concentration is not simply the level of air pollution on the
baseline date, but must be adjusted up for sources in active construction on the baseline date
(second sentence) and adjusted down to exclude emissions from sources constructed after the

clause of the sentence, limiting its reach to a very small category of sources that were in active construction by January 6, 1975, but which had not yet started operating on that date. It is unclear from the record in this case whether there are *any* facilities that actually fall into this category, but it is clear that the Georgia-Pacific plant at issue in this case does not because it was operating prior to January 6, 1975. There is no conflict for those sources like Georgia-Pacific that are not covered by the second sentence and are only covered by the third.[9] EPA cannot justify ignoring the plain language of the third sentence in 42 U.S.C. § 7479(4) for Georgia-Pacific based on a theoretical conflict with another inapplicable sentence. *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 870 (D.C. Cir. 1979) ("Statutory conflict gives no license to a court or agency to indulge in unrestrained and fanciful flights of constructional imagination to arrive at artful but artificially consistent interpretations.").

Moreover, even if there was ambiguity created between the second and third sentences in 42 U.S.C. § 7479(4) for sources that were polluting the air before 1975, EPA's actual regulations provides the resolution. EPA's interpretation in this case conflicts with those regulations, which do not support an interpretation that only the emission changes from construction (modification) of major sources since the baseline

---

baseline date (third sentence) scotches Georgia-Pacific's argument that the baseline is a "snapshot" or static reference point. (GP Br. at 22-24.)

[9] The second sentence of the statute also does not say-- even for the small number of sources covered by the second sentence (if any) that were constructed but not yet operating-- that the baseline concentration must include their emissions. It says that the baseline concentration must take those emissions into account. In contrast, the third sentence is explicit that emissions from sources covered by that sentence "shall not be included in the baseline and shall be counted against the maximum allowable increases in pollutant concentrations…." 42 U.S.C. § 7479(4).

date consume increment. Rather, they provide that the baseline concentration includes emissions from sources as of the baseline date "*except* as provided in" the subsequent section, which explicitly says that the "actual emissions"-- and not the *change* in emissions-- are excluded from the baseline and consume increment. 40 C.F.R. § 51.166(b)(13)(ii)(a) (emphasis added); Wis. Admin. Code § NR 405.02(4)(b)1. (same). Thus, the only emissions from sources existing and polluting before the baseline date that are included in the baseline concentration (and therefore not increment consuming) are those that are *not covered* by the later provision, which says that the actual emissions from any major sources that are constructed after the baseline date are excluded and consume increment. This means that a prior-existing air pollution source's emissions are in the baseline and not increment consuming, only if the source is not constructed (modified) after the baseline date, in which case its "actual emissions" consume increment.[10]

Nowhere in these regulations implementing 42 U.S.C. § 7479(4) is there authority to exclude only the emission "increase" from major sources constructed (due to modification) after the major source baseline date. (EPA Br. at 44.) Just as Congress uses the word "increase" explicitly when it means increase, so too do EPA's regulations. *See e.g.*, 42 U.S.C. § 7473(c)(1)(A)-(D), 7411(a)(4); 40 C.F.R. § 51.166(a)(2), (a)(7)(iv)(a),

---

[10] This explicit exclusion in 40 C.F.R. § 51.166(b)(13)(i)(a) and Wis. Admin. Code § NR 405.02(3)(a)1. belies Georgia-Pacific and EPA's argument that emissions from preexisting major sources that are later modified are double counted. (GP Br. at 22.) The phrase "except as provided in paragraph (b)(13)(ii)" in the regulation ensures that emissions from existing sources are only included in the baseline if they are not specifically excluded in 40 C.F.R. § 51.166(b)(13)(ii)(a) as actual emissions from a source that was later modified.

(b)(39), (b)(40).[11]  Congress and EPA know how to use the word "increase" where it is

intended, and omission from the provision specific to sources constructed after the

baseline date means it should not be implied.  (Pet. Br. at 30-32.)  Thus, even if EPA

needed to reconcile a conflict within 42 U.S.C. § 7479(4), EPA's regulations do so by

excluding from the baseline concentration all "actual emissions" from existing source

that are later modified after the baseline date.  This contradicts EPA's interpretation in

this case, which is unsupported by the text of EPA's implementing regulations.

B.  Vague Legislative History And A Prior Erroneous Interpretation by EPA Cannot Justify Its Unreasonable Interpretation.

Failing to find statutory text or the text of any actual regulation to support its

insertion of the words "increase since baseline emissions" for the phrase "[e]missions of

sulfur oxides and particulate matter from any major emitting facility" in 42 U.S.C. §

7479(4) or for the phrase "[a]ctual emissions from any major stationary source" in Wis.

Admin. Code § NR 405.02(3)(b)1., EPA resorts to its prior erroneous interpretation in

the *Northern Michigan University* case and the vague legislative history relied on in that

case.  (EPA Br. at 46-48.)[12]  Those sources do not support EPA's interpretation in this

case—as EPA's own "example," (EPA Br. at 47), illustrates.  EPA states that when

---

[11] EPA cites these sections and argues that "it follows" from Congress' use of the word "increases" elsewhere in the Act, "that only the *increase* in emissions consumes increment." (EPA Br. at 45 (emphasis original).)  EPA cites no authority for this theory that use of a word in one section implies its use in all sections; the actual rule of statutory construction is that where a word is used elsewhere but omitted from the statute at issue—42 U.S.C. § 7479(4)—its omissions was intentional and it should not be inserted by a Court.  (Pet. Br. at 32-33.)

[12] Georgia-Pacific also cites an Indiana state decision that relied on *Northern Michigan University*.  (GP Br. at 26.)  That decision suffers the same errors as *Northern Michigan*.  (*See* Pet. Br. at 27-30.)

imaginary Source A predates the baseline date and is retired and replaced by Source B after the baseline date, only the difference between A's emissions and B's emissions consume increment. *Id.* EPA argues that a 1977 Senate Report supports this conclusion. But EPA's "example" and the Senate Report relates to a different situation than is at issue in this case. Because the increment is measured from the baseline concentration that included Source A's emissions, when Source A is later retired the gap between the air quality and the increment cap can accommodate additional pollution. There is no dispute that this "example" is consistent with the statute and regulations.

But, in this case, the facts are different. Georgia-Pacific was both polluting before the 1975 baseline date and constructed after the baseline date due to Congress' decision to define "construction" to include modifications to existing major pollution sources. 42 U.S.C. § 7479(2)(C). Neither the Senate Report nor EPA's "example" supports EPA's interpretation related to Georgia-Pacific in this case.[13] Unlike a source that is retired and replaced by a *different* major stationary source, the statute dictates that: "[e]missions of sulfur oxides and particulate matter" from Georgia-Pacific, after it was "constructed" in 2004 through a modification, "shall not be included in the baseline and shall be

---

[13] The Senate Report is also unavailing since it discusses a Senate Bill that was rejected in favor of the House Bill for enactment as the 1977 Clean Air Act Amendments and because in both bills only new construction was included in 42 U.S.C. § 7479(4) when passed in August, 1977. 91 Stat. 685, 740 (originating as H.R. 6161 and omitting a definition of construction to include modification). Congress did not define "construction" to include modifications until later technical amendments in November. 91 Stat. 1393, 1399 (including definition of "construction" to include modifications). Furthermore, even if the Senate Report was directly on point and said exactly what EPA wishes it said, it would remain a Senate Report and not legislation and it would not trump the statute Congress enacted (or the regulation EPA adopted). (Pet. Br. at 25-30.)

counted against the maximum allowable increases in pollutant concentrations established under this part." 42 U.S.C. § 7479(4); *see also* 40 C.F.R. § 51.166(b)(13)(ii)(a); Wis. Admin. Code § NR 405.02(3)(b)1.

## C.  EPA's Attempt to Insert Words Based On Broad Interpretations of General Policies In The Clean Air Act Also Fails.

After acknowledging that the applicable regulation instructs that the "actual emissions" from a source on which construction commenced after the baseline date are to be excluded from the baseline concentration and consume increment, and that the phrase "actual emissions" is specifically defined, EPA asserts that it can nevertheless make the phrase "attributable to the construction" appear in the regulation.  (EPA Br. at 50.)  EPA makes various non-textual arguments based on the general structure of the Act and purported policies behind the Act.  None support EPA's attempt to avoid the plain language.

EPA first contends that because "construction" only occurs if there is an increase in emissions, "[t]he concept of emissions changes is… incorporated in[to]" the meaning of "actual emissions"  (EPA Br. at 51.)  But EPA fails to explain why the fact that Congress defined one word—"construction"—to include increases necessarily means that Congress intended a different term—"baseline concentration"—to  only exclude emission increases.  To the contrary, Congress' decision not to include the word "increases" when providing that "the emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975" consume increment was deliberate.  This is especially true when Congress

specifically included the word "increases" in other provisions of the Clean Air Act. (Pet. Br. at 30, 32 (Congress' inclusion of a term in one provision but excluding it from another should not be vitiated by reading it into the provisions from which it was excluded).)

Moreover, EPA's assumes a link between the term "emissions" and the term "construction" that does not exist. Specifically, EPA implies that the "emissions" are the subject and "construction" is the object of the preposition "from," such that the regulation effectively means that "emissions *from construction*" are increment consuming. (EPA Br. at 44, 48, 51.) But in both the statute and the regulation, it is the facility as a whole that is the object of the preposition "from." In the statute, "major emitting facility"-- not "construction"-- is the object of the preposition: "sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975." 42 U.S.C. § 7479(4). The term "construction" is the object of a different preposition, "on." Likewise in the regulation, "major source" is the object of the preposition: "actual emissions from any major stationary source which commenced construction." 40 C.F.R. § 51.166(b)(13)(ii)(a); Wis. Admin. Code § NR 405.02(4)(b)1. Thus, plain English grammar trumps EPA's attempt to rewrite the regulation to say that the emissions from the construction, rather than the emissions from the source, that is constructed after the baseline date consume the increment.

Here, there is no dispute that Georgia-Pacific is the "major emitting facility" within the meaning of the statute (and "major source" within the meaning of the regulation) and that construction commenced on the Georgia-Pacific after the major source baseline

date.  The statute and regulation are both clear that it is the actual emissions from

Georgia-Pacific plant that are excluded from the baseline and consume increment.  42

U.S.C. § 7479(4); 40 C.F.R. § 51.166(b)(13)(ii); Wis. Admin. Code § NR 405.02(3)(b)1.

EPA's attempt to rearrange the sentence structure to insert a meaning that is not found

in the text should be rejected.

EPA and Georgia-Pacific's argument that "Congressional design" of the Clean Air

Act supports their interpretation also fails.  (EPA Br. at 53-54.)  EPA contends that it

would be "penalizing" of existing sources to require that all of their emissions count

against the limited increment when the source is modified.  (*Id*.)  But, it is not a

"penalty" to impose on an existing facility the same obligation that their would-be

competitor faces.  Notwithstanding EPA's hypothetical scenarios, *id*., the facts here are

that Georgia-Pacific underwent a major modification to rebuild a paper machine to

increase production from 61,000 to 110,960 tons of paper annually.  (Pet. Br. at 15.)

Despite increasing emissions and therefore triggering the PSD program, EPA's

interpretation of 42 U.S.C. § 7479(4) and the regulations at issue in this case means the

facility would not have to achieve any pollution reductions in order to stay within the

increment cap.  However, if a competitor to Georgia-Pacific wanted to produce better or

cheaper paper products by building a 110,000-ton-per-year paper mill across the street,

all of that new facility's emissions would consume increment, and the plant would have

to make emission reductions, capacity restrictions, or other potentially costly steps to

stay within the increment cap.  There is nothing in Congress' design of the Clean Air

Act that supports the assumption that Congress intended to give permanent

preferential treatment to existing facilities by allowing them to rebuild without the restrictions of increment caps, while imposing on their would-be competitors an obligation to reduce emissions to sufficiently fit below the increment caps. (Pet. Br. at 34-36.) To the contrary, Congress' intent in imposing the PSD program on existing source modifications in addition to new source construction was to avoid distorting the choice between rebuilding an old plant and replacing it with a new one. (*Id*.)

III.    Georgia-Pacific's Dire Predictions If The Court Applies The Plain Language of the Statute and Regulations Is Overblown and Hollow.

Georgia-Pacific lastly argues that the Court should not interpret the statute and regulation according to their plain language—whereby the emissions, rather than the change in emissions of a major source modified after 1975 consume increment—because various consequences would result. (GP Br. at 30-33.) The first consequence, that the 2011 federal operating permit issued for Georgia-Pacific will be corrected, is exactly as Congress intended. 42 U.S.C. § 7661d(b)(3) (providing that after an EPA objection to a deficient state-issued permit, the state or the EPA must correct the permit). This provides no basis to ignore the statue and regulation's plain language.

The second consequence, that Petitioners will challenge other permits, is overblown. Petitioners, as with any member of the public, always have the right to comment on and pursue administrative appeals federal operating permits when they are renewed every five years. 42 U.S.C. §§ 7661a(b)(6), 7661d(b)(2); 40 C.F.R. §§ 70.4(d)(3)(iv), 70.7(h), 70.8(d). The fact that the state may fail to correctly determine application of a federal Clean Air Act requirement does not justify turning a blind eye to all state permitting

errors, however.  Furthermore, the fact that there have been 148 major source

construction permits issued in Wisconsin, GP Br. at 32, is also meaningless since there is

no indication that any of those involves the specific situation here where there is a pre-

1975 existing source obtaining a permit for a major modification and for which the

increment consumption analysis was improperly done.  Certainly there is no indication

that correctly applying the Clean Air Act and EPA regulations as written will "result in

a deluge," and "economic devastation" that Georgia-Pacific predicts.  While the fact

that Georgia-Pacific feels the need to resort to such empty, hyperbolic prophecy with no

factual basis is revealing, the Court should reject such arguments and apply the plain

language instead.

## Conclusion

EPA and Georgia-Pacific fail to justify EPA's interpretation of law in its order

below, which conflicts with the plain language of the statute and the implementing

regulations.  EPA's decision should be vacated and remanded, consistent with the law's

plain text.

June 25, 2013.

Respectfully submitted,

By: s/ David C. Bender

David C. Bender (Wis. Bar No. 1046102)
McGillivray Westerberg & Bender LLC
211  S. Paterson Street, Ste 320
Madison, WI 53703
(608) 310-3560
Counsel for Petitioners

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28.1(e)(3) and 32(a)(7)(C), I hereby certify that this brief conforms to the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B) and the type face requirements of Circuit Rule 32(b). This brief is produced with a proportionally spaced typeface using Microsoft Office Word 2007 in 12-point Book Antiqua font in the body and 11-point font in the footnotes. The length of this brief is 6,887 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: June 25, 2013.

s/ David C. Bender
David C. Bender
Counsel for Petitioners

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. App. P. 25(d), I hereby certify that on June 25, 2013, I

electronically filed the foregoing with the Clerk of the Court for the United States Court

of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all

participants in the case are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

Dated:  June 25, 2013.

s/ David C. Bender
David C. Bender
Counsel for Petitioners